E-FILED
Tuesday, 04 April, 2006 01:09:02 PM
Clerk, U.S. District Court, ILCD

BEFORE THE CIVIL SERVICE COMMISSION, STATE OF ILLINOIS

| | | |
|---|---|---|
| ILLINOIS DEPARTMENT OF CORRECTIONS, | ) ) ) | |
| Petitioner, | ) ) | CASE NO. DA-71-04 |
| v. | ) ) | |
| RICK LIND, | ) ) | |
| Respondent. | ) | |

## FINDINGS AND DECISION OF THE COMMISSION

THE UNDERSIGNED, HAVING READ THE DECISION OF THE ADMINISTRATIVE LAW JUDGE DATED JANUARY 7, 2005 HEREBY ADOPT SAID DECISION AND HEREBY CERTIFY IT TO THE DIRECTOR OF THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, STATE OF ILLINOIS, FOR ENFORCEMENT.

IT IS HEREBY DETERMINED THAT THE WRITTEN CHARGES FOR DISCHARGE APPROVED BY THE DIRECTOR OF THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, STATE OF ILLINOIS, HAVE NOT BEEN PROVEN AND DO NOT WARRANT THE DISCHARGE OF THE RESPONDENT, RICK LIND, FROM HIS POSITION OF CERTIFIED CORRECTIONAL OFFICER WITH THE DEPARTMENT OF CORRECTIONS, STATE OF ILLINOIS. THIS IS A FINAL ADMINISTRATIVE DECISION SUBJECT TO THE ADMINISTRATIVE REVIEW ACT.

_____        _____
Chris Kolker, Chairman                       George E. Richards, Commissioner

_____        _____
Raymond W. Ewell, Commissioner            Barbara J. Peterson, Commissioner

_____
Betty Bukraba, Commissioner

ENTERED THIS 20TH DAY
OF JANUARY 2005.


EXHIBIT
5

## BEFORE THE CIVIL SERVICE COMMISSION, STATE OF ILLINOIS

ILLINOIS DEPARTMENT OF
CORRECTIONS,                          }
                                      }
                                      }
                        Petitioner,   }
                                      }
            vs.                       }        No. DA-71-04
                                      }
RICK LIND,                            }
                                      }  Administrative Law Judge:
                        Respondent.   }  *Andrew C. Barris*

REPRESENTING PETITIONER:    Honorable Lisa Madigan, Illinois Attorney
                            General, 100 West Randolph Street, Suite
                            1300, Chicago, Illinois 60601; Mr. Kevin
                            Lovellette and Ms. Jill Cole, Assistant
                            Attorneys General

REPRESENTING RESPONDENT:    Mr. Stephen T. Fieweger, Attorney at Law,
                            200 Plaza Office Building, Rock Island,
                            Illinois 61204

## PROCEEDINGS

This is the Respondent Rick Lind's ("Lind") appeal of his discharge from the
position of Correctional Officer at the Department of Corrections ("DOC")
effective November 10, 2003. A copy of the Amended Charges is attached. A
written request for hearing was made by Lind within 15 days and a hearing was
scheduled within 30 days. A hearing on this matter was held February 27, 2004.
On July 2, 2004, the Administrative Law Judge entered a recommended decision
reinstating Lind to his position at the Department of Corrections. A copy of that
recommended decision is attached and incorporated to the extent not inconsistent
with this recommended decision. On July 15, 2004, the Civil Service Commission
rejected the Administrative Law Judge's decision to reinstate the Respondent and
remanded this matter to the Administrative Law Judge for the purpose of further

proceedings including the taking of additional evidence. Tim Stump testified at a hearing on September 16, 2004.

## FINDINGS OF FACT

1. Tim Stump ("Stump") testified that he was the Shift Commander for the second shift at the East Moline Correctional Center in 2003.

2. Stump testified that he supervised approximately 70 staff members and 1100 inmates.

3. Stump testified that one of his duties as Shift Commander involved working with time sheets for the Correctional Officers.

4. Stump testified that he prepared a document titled "Notification of Proof Status" on April 17, 2003.

5. Stump testified that he served the document on Lind on May 30, 2003 but that Lind refused to sign for the document.

6. Stump testified that proof status would have lasted for 90 days from April 17, 2003.

7. Stump testified that he did not have a meeting with Lind to discuss Lind's attendance prior to placing him on proof status.

8. Stump testified that a union representative was not present when Stump served the Notification of Proof Status on Lind.

## CONCLUSIONS OF LAW

1. Section 1.170 (a) of the Rules of the Civil Service Commission sets forth the standard of cause for discharge appeals and states:

2

Cause for discharge consists of some substantial shortcoming which renders the employee's continuance in his position in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for the employee no longer holding the position. In determining the appropriate penalty for an offense which the employee is found guilty, the Commission shall consider the employee's performance record and the employee's length of continuous service unless the offense would warrant immediate discharge.

2. Section 1.232 of the Rules of the Civil Service Commission states:

    a. The proponent of any matter asserted shall have the burden of proof to establish by a preponderance of evidence that the matter asserted is more probably true than not true.

    b. When a party has the burden of proof and establishes the matter by the required quantity of evidence, the party has made a prima facie case, and the burden of disproving the matter asserted goes to the opposing party by the same quantity of evidence.

3. Institutional Directive (I.D.) 03.01.301, II, F, 6 (c) provides in pertinent part, "Prior to placing an employee on proof status, the supervisor shall meet with the employee to discuss the attendance record."

4. Institutional Directive 03.01.301, II, F, 3 states:

Authorization to use other benefit time, or if none is available, authorized docks shall be granted under the following criteria when sick time has been exhausted:

    a. The employee has not been on proof status within the previous three (3) months, unless the Warden approves use of such time.

    b. Proper medical certification is provided.

    c. Use of authorized dock time under these circumstances is limited to (5) days within a (12) month period, unless approval for more time is granted by the Warden.

3

5. The Petitioner has not established by a preponderance of the evidence that Lind's conduct violated I.D. 03.01.301.

6. I.D. 03.01.301, II, F, 6 (c) requires a supervisor to meet with an employee prior to the employee being placed on proof status. In this matter, Stump testified that he did not meet with Lind to discuss Lind's attendance record prior to his placement on proof status. In fact, Stump did not meet with Lind to discuss his attendance record until more than a month and a half *after* he placed Lind on proof status. For this reason, it cannot be claimed that Lind was effectively placed on proof status according to I.D. 03.01.301.

7. According to I.D. 03.01.301, II, F, 3, an employee's request to use alternative benefit time or authorized docks shall be granted if the following criteria are met: 1. The employee has not been placed on proof status within the three previous months. 2. The employee provides proper medical certification. 3. The use of authorized dock time is limited to five days within a twelve-month period. Lind met these criteria to use alternative benefit time. As previously discussed, the testimony of Stump indicates that Lind was not effectively placed on proof status three months prior to his absence from work. The evidence indicates that, in addition to submitting two requests for disability leave, Lind timely submitted leave of absence slips and a doctor's note for the days in which Lind was absent from work. The evidence indicates that Lind had approximately 6 days of alternative benefit time that he could have used towards his absences from work. Having met these three criteria, the DOC should have authorized Lind's use of alternative benefit time for the days he was absent from work. Therefore, the DOC is not allowed to use those days in calculating whether Lind reached the termination level under the affirmative attendance policy. Without those days, Lind has not reached the termination threshold.

8. For these reasons, the Petitioner failed to establish by a preponderance of the evidence that Lind's absences were in violation of A.D. 03.01.301.

4

## RECOMMENDED DECISION

It is the recommended decision that the written charges approved by the Director of Central Management Services, State of Illinois have not been proven as they relate to the above charges and Lind should be reinstated to his position at the Department of Corrections.

Andrew C. Barris
Administrative Law Judge

Entered this 7th day of
January, 2005

# AMENDED CHARGES

**Rick Lind**

**Discharge for Cause on November 10, 2003**

Rick Lind, employed by the Illinois Department of Corrections at East Moline Correctional Center in the position of Correctional Officer, is discharged for cause because of the following circumstances:

> Mr. Lind called in sick to the facility on July 24, 25, 28, 29, 30, 31, 2003 and August 1, 4, 5, 6, 2003. Mr. Lind did not report to his assigned shifts on these dates. Mr. Lind did not have sufficient time on the books to cover his absence.

These absences are unauthorized and are in violation of A.D. 03.01.301 Affirmative Attendance.

A review of Mr. Lind's personnel file reveals the following attendance-related discipline:

| | | |
|---|---|---|
| Unauthorized Absence | 4/28/00 | 1-Day Suspension |
| Unauthorized Absence | 6/11/01 | 3-Day Suspension |

Mr. Lind was placed on Suspension Pending Discharge effective October 17, 2003.

Rick Lind's absences in the month of July and August, 2003 bring him up to and beyond his tenth offense against the Petitioner's Attendance Directive. Therefore, immediate discharge is warranted.

Director of Central Management Services

Feb. 26, 2004
Date

Pet
Ex. 1

BEFORE THE CIVIL SERVICE COMMISSION, STATE OF ILLINOIS

| | | |
|---|---|---|
| Illinois Department of Corrections, | | |
| | **Petitioner** | |
| vs. | | No. DA 71 04 |
| RICK LIND | | **Administrative Law Judge:** |
| | **Respondent** | *Leonard F. Sacks* |

| | |
|---|---|
| REPRESENTING PETITIONER: | Honorable Lisa Madigan, Illinois Attorney General, 100 West Randolph Street, 13th Floor, Chicago, Illinois 60601, Mr. Kevin Lovellette, Ms. Jill Cole, Assistant Attorneys General |
| REPRESENTING RESPONDENT: | Mr. Stephen T. Fieweger, Attorney at Law, 200 Plaza Office Building, Rock Island, IL 61204 |

## CHARGES

1.    Rick Lind, employed by the Illinois Department of Corrections at East Moline Correctional Center in the position of Correctional Officer, is discharged for cause because of the following circumstances:

      a.    Mr. Lind called in sick to the facility on July 24, 25, 28, 29, 30, 31, 2003, and August 1, 4, 5, 6, 2003. Mr. Lind did not report to his assigned shifts on these dates. Mr. Lind did not have sufficient time on the books to cover his absence.

2.    These absences are unauthorized and are in violation of Administrative Directive 03.01.301 Affirmative Attendance.

3.    A review of Mr. Lind's personnel file reveals the following attendance-related discipline:

| | | |
|---|---|---|
| Unauthorized Absence | 4/28/00 | 1-Day Suspension |
| Unauthorized Absence | 6/11/01 | 3-Day Suspension |

1

4.    Mr. Lind was placed on Suspension Pending Discharge effective October 17, 2003.

5.    Rick Lind's absences in the month of July and August 2003 bring him up to and beyond his tenth offense against the Petitioner's Attendance Directive.

## JURISDICTION

1.    Rick Lind is employed by the Illinois Department of Corrections as a certified Correctional Officer.    His employment began November 12, 1984.    His termination became effective November 10, 2003.

2.    The charges in this case are specifically dated November 10, 2003.

3.    Mr. Lind's appeal was filed timely on November 17, 2003.

4.    There is no issue of jurisdiction of the Civil Service Commission.

## FACTS

1.    The employer, during the period of time in question, had an affirmative attendance policy that is attached hereto and is incorporated by reference herein.    The policy consists of 8 pages and was admitted into evidence as Joint Exhibit 1.    It is a document that is judicially noticed by the Judge.

2.    The amended charges as set forth above were admitted into evidence as Petitioner's Exhibit 1.

3.    The first witness was Todd Franzen.    The witness introduced himself as a 13-year employee with the Department of Corrections, who is currently employed as the Business Administrator with the East Moline Correctional Center.    His duties include budget, timekeeping and payroll at that institution.    In that capacity he is familiar with the attendance record of Rick Lind.

2

4.      According to Mr. Lind's time sheets, he was docked for the 24th, 25th, 28th, 29th, 30 and 31st of July; August 1st, 4th, 5th and 6th. On all of those days he was scheduled to work and he did not.

5.      The witness stated that on those dates Mr. Lind did not have accumulated sick time on the books. According to the witness, a medical leave of absence starts with a form known as a CMS 95 that has gone through the Warden's Office or the Personnel Office. The employee must fill that form out. A physician makes a statement and then the form is returned to the facility. There were no such CMS forms submitted.

6.      The affirmative attendance policy in evidence as Joint Exhibit 1 was in effect at the dates in question. If that policy is violated, the witness stated, such a violation is detrimental to the facility and the Department because the security of the inmates, the public, and the other employees is in danger. The schedule of guards is arranged to provide safety at the most needed times, and when there is not a full complement of guards, that is potentially dangerous.

7.      Upon cross-examination by Mr. Fieweger, the witness identified Respondent's Exhibit 1 as a Request for a Leave of Absence Non-Service Connected. That form is obtained from the "Human Personnel" Office.

8.      The witness understands that Mr. Lind was seeking a non-service related leave. He did that on or about July 24, 2003. Pursuant to the Union Contract, under Article 19, Section 21, Employees who are out of sick time can apply for non-service leaves of absences. They apply to the Warden's Office.

9.      On further cross-examination the witness states that he was not part of the disciplinary hearing held on September 8, 2003.

3

10.    On re-direct examination, looking at Respondent's Exhibit 4, the date that Mr. Lind actually signed it is unknown to the witness. The witness further stated that Mr. Lind was placed on "proof status" April 17, 2003. The witness was able to ascertain that Mr. Lind was on proof status based on the contents of the document.

11.    On re-cross examination, it is pointed out that the document is dated April 17, 2003, but was signed by the Captain on May 30, 2003.

12.    On further cross-examination, the witness states that when placed on proof status, the employee is permitted to have Union representation. Captain Stump was the person who signed putting Mr. Lind on proof status on May 30, 2003. That document shows that Mr. Lind refused to sign (Respondent's Exhibit 4).

13.    Upon examination by the Judge, the employee states that "proof status" means that when you call in for sick time you need a doctor's permission statement. There is a rule that changes your status from just being a sick person to a person who is required to have evidence that they are sick. There are people in authority who are authorized to place a party on "proof status". Normally proof status comes about because of prior questions as to whether or not the employee was actually sick.

14.    Under the supervision of the Warden or his assistants, the immediate supervisor of the employee has the authority to place the employee on proof status. The Union is required to be present when the employee is placed on proof status to determine on their own if proof status is appropriate. If it is inappropriate then it is a subject of grievance.

15.    The employee cannot grieve on his own. The Union must initiate the grievance. If someone places an employee on proof status and a Union representative is

4

not present, then the timeliness of the grievance could be affected. If the Union is unaware of the grievance and the cause for it, then it is conceivable that the grievance could be denied because of timeliness.

16.    On further cross-examination, it is pointed out that Administrative Directive 03.01.301, subparagraph (f) contains proof status requirements. Under paragraph (c) of Section F, employees are required to be counseled by the supervisor concerning their attendance problem before a decision is made to place them on proof status. There is no documentation in the file to show that Mr. Lind was ever counseled by Captain Stump. There are no documents in Mr. Lind's file that he was notified in writing of his need to apply for a medical leave of absence or face discipline. Under Section F, paragraph 7, as described aforesaid, employees shall be advised in writing of the need to apply for a leave of absence or face discipline.

17.    Under Section F, paragraph 11, employees are required to be referred to the Employee Assistance Program after discipline has been imposed. There is no documentation showing Mr. Lind to have been referred to management to the Employee Assistance Program.

18.    On re-direct, it appears as though Mr. Lind refused to sign acknowledgement of being put on proof status. On further cross, if a Union representative would have been present, the Union representative would have initialed the document, even if the employee refuses to sign. That is so they can measure the time for grievances. Whereupon the Petitioner rested.

19.    The Respondent then called Rick Lind as a witness in his own case. He testified that he lives about 20 miles from the East Moline Correctional Center. He states

5

that he has been employed at the Center for 19 ½ years, having begun his employment on November 12, 1984. He states that he is a Correctional Officer.

20.    The witness states that he has a degenerating disk in his lower back due to an automobile accident in 1980. Before the pending discipline he used his allotted sick time. He was having health problems in July of 2003 related to the automobile accident. He testified that he tried to secure a leave of absence due to his medical condition. He called in sick and requested a leave of absence on Form CMS 95.

21.    The form was obtained from a Pam Verstreate at the Warden's Office. She filled in the date of July 24th. The witness states that at that time he was under his doctor's care and was referred to a chiropractor. His primary physician, the chiropractor, was Dr. Kevin Freebern. When he requested the leave of absence on July 24 he requested a form that the doctor fills out. He had that form filled out and brought back to Pam on July 30, 2003. That is the date that Dr. Freebern signed it. He delivered it in person to Pam. At the time he was applying for this leave of absence he had no prior discipline.

22.    In May of 2003 he was referred for discipline. No one from the Warden's Office informed him that his request for disability leave was denied, nor did anyone inform him that Dr Freebern's Physician's Statement was defective.

23.    On September 8, 2003, he had a pre-disciplinary hearing. Respondent's Exhibit 4 was presented at the pre-disciplinary hearing. It is also called a pre-termination hearing.

24.    The witness claims he was not informed in writing for his need to apply for leave of absence or face discipline, or informed before the pre-disciplinary hearing

6

that his documentation was defective. He was never given a notice referring him to the Employer Assistance Program.

25.     At the September 8th hearing he was not informed that his paperwork was rejected. The witness states he was not required to submit a completed Physician's Statement under the CMS Form in order to request alternative time off. The witness states that if you have time on the books, and you are sick and you run out of sick time, you are allowed to request alternative time off. His request for alternative time was Exhibit 7. Alternative time is vacation time, holiday time, comp time. You can use those days if you are not on proof status. The witness states that when he requested alternative time he had some personal comp or vacation time left.   The witness submitted several physician statements. Another one was Exhibit 6, which was a statement from Dr. Freebern. He did that because he wanted to make sure he wasn't in any trouble. He states that by August 14, 2003, he had not heard with regard to his requests of July 30, 2003.

26.     The witness states that he did not receive Exhibit 8, which is a notice of a hearing for violating the Affirmative Attendance Policies. The witness claims he has never been discharged and has never been discharged within 45 days of September 8th. The witness claims that he is a Union Representative and has assisted employees in dealing with management, and has requested leaves for medical reasons when people have exhausted their sick time. An issue arose in the testimony about the past practice of considering late filed requests for leave of absence or documentation.

27.     On cross-examination. Petitioner's Exhibit 4 was a memo from the acting Warden stating that the CMS form submitted by the witness was defective. He states he

7

submitted two CMS forms. The second was submitted because he didn't hear anything on the first. The witness further states that he didn't know anything about being put on proof status and that if it happened he was not aware of it.

28.     He signed a Notice of Appeal appealing his discharge dated November 8th. He prepared that paper himself. The witness claims he didn't know he was appealing his discharge, however, and believed that he was only suspended for 30 days.

29.     On re-direct examination the witness states that he did receive a November 10 Discharge for Cause document. The documents relevant to his discharge were admitted as Exhibits 16 and 17.

30.     The next witness was a Jeffrey Papish, who is a Union person at the East Moline Correctional Center. He has been in the Department of Corrections for 20 years. The witness states that as a Union Representative he attempted to assist Mr. Lind in obtaining alternative leave time when Mr. Lind's sick time had been exhausted in the year of 2003, and that it has been the practice of Eastern Correctional Center that the request for alternative time is taken after the time has already been taken off. The alternative time is applicable even to people on proof status and usually it is approved.

31.     Mr. Lind always submitted his alternative time requests with doctor's slips. At the pre-disciplinary hearing on September 8, there was a question as to whether or not Mr. Lind was on proof status. The Union was never notified that Mr. Lind was on proof status. If he was, he was never notified, nor was the Union with regard to his rights to apply for a leave of absence.

33.     The next witness called was a Randy Sanders, who is also employed at East Moline as a Correctional Officer. He began there in 1988. He is a Union Steward.

At the pre-disciplinary hearing it was contested that Mr. Lind was on proof status. There was nothing in Mr. Lind's file. No writing in his file as to when or how he was placed on proof status and that he needed to seek a leave of absence, nor was there any indication that his paperwork was improperly submitted. The witness states that he reviewed Mr. Lind's file and could find no notice within 45 days that Mr. Lind had been discharged.

## ANALYSIS

1.      The Petitioner claims that Mr. Lind violated the Affirmative Attendance Policy, which is before the Commission as Joint Exhibit No. 1. According to the Petitioner the evidence supports a conclusion that Mr. Lind was not at work for 10 days in a row and did not have accumulated time to cover his absences.

2.      Petitioner further claims that the paperwork Mr. Lind did submit was inadequate and was not timely.

3.      The Respondent claims that the Petitioner violated the Collective Bargaining Agreement and the Affirmative Attendance Policy prior to and in the course of the discharge proceedings and that there has been a past practice to permit the late filing of documents to support an absence.

4.      The Petitioner counters that the Commission does not have Jurisdiction to determine if there is a violation of the collective bargaining agreement and therefore, those potential defenses fail. The Petitioner cites the case of *O'Keefe vs. Illinois State Police*, 313 Ill. App. 3d 817. The case is attached for the Commission.

5.      I find that case to be persuasive on the question of whether or not the Commission has authority to interpret the claimed contract violations. Therefore, without deciding the merits of whether the employer has violated the agreement I find that the

9

Commission lacks authority or jurisdiction to determine whether the claimed contract violations provide the Respondent with a defense.

6. The Petitioner has proven that the Respondent was absent for more than ten days and if the Respondent was on "proof status' he did not supply timely or appropriate medical evidence to support his absences.

7. It appears that Mr. Lind's file shows that on April 17, 2003 he was placed on proof status. The troubling aspect of that is that Captain Stump, a person authorized to place the Respondent on proof status, did not sign that document until May 30, 2003 and it is very difficult from the evidence to determine when, if at all, Mr. Lind knew that he was on proof status. The document, Respondent's Exhibit 4, states where Respondent's signature is called for, "Refused to Sign." According to the Union Steward, Mr. Sanders, there was nothing in Mr. Lind's file to verify or confirm that Mr. Lind was indeed notified that he was on proof status, or when he refused to sign. Mr. Lind also testified that he was not notified of being placed on proof status.

8. In addition, the Union was not notified that Mr. Lind was placed on proof status. The Union must be notified of a person being placed on "proof status". The purpose of that requirement appears to be to protect certain grievance rights and in particular to insure that if there is to be a grievance, which only the Union can file, it is filed in a timely fashion. Jeffery Papish, a Union Representative, testified that the Union never received a notification that Mr. Lind was placed on proof status.

9. The burden of proof is on the Petitioner. On the one hand there is a document in the Respondent's file showing he was placed on proof status, which at some time he is alleged to have refused to sign. There appears to be no evidence, however,

10

showing when notice to Mr. Lind or to the Union occurred, or when, prior to or on July 24th, 2003 and the 9 succeeding days that Mr. Lind knew he was on proof status.

## CONCLUSION AND RECOMMENDATION

It is axiomatic that if Mr. Lind was not notified of his status prior to the days when he was absent then he cannot be disciplined as is proposed by the Petitioner. Petitioner has fallen short in their evidence. It might simply have been proven if Captain Stump had testified. He did not.

Therefore, I recommend that he be reinstated.

*Leonard F. Sacks*

Leonard F. Sacks
Administrative Law Judge

Entered this 2nd day
of July, 2004.

11

| | | **REFERENCE:** | 20 ILCS 5/3-2-2 Personnel Rules of Dept. of CMS AFSCME Contract A.D. 03.01.301 ACA 3-4069 |
|---|---|---|---|
| **EAST MOLINE CORRECTIONAL CENTER** **Institutional Directive** | | | |
| **SECTION:** | 03 – Personnel and Labor Relations | **NUMBER:** | 03.01.301 |
| **SUBSECTION:** | 01 – General Provisions | **EFFECTIVE DATE:** | November 08, 2002 |
| **SUBJECT:** | 301 – Affirmative Attendance | **PAGES:** | Page 1 of 8 |

## I. POLICY

### A. Authority

20 ILCS 5/3-2-2

Personnel Rules of the Department of Central Management Services

Negotiated Labor Contracts (AFSCME, INA, ISEA, etc.)

A.D. 03.01.301

### B. Policy Statement

1. All employees are expected to report to duty on a daily basis. Absences shall be approved in accordance with various labor contracts or personnel rules.

2. Supervisors are to make affirmative decisions regarding all absences daily, and to review employee time records at least monthly for indications of possible abuse.

## II. PROCEDURE

### A. Purpose

The purpose of this directive is to establish a written procedure governing use of benefit and dock time by employees of the East Moline Correctional Center consistent with various labor agreements or personnel rules.

### B. Applicability

This directive is applicable to all employees of East Moline Correctional Center.

### C. Internal Audits

An internal audit of this directive shall be conducted at least quarterly.

### D. Definitions


Joint Ex.
1

| | | | |
|---|---|---|---|
| **EAST MOLINE CORRECTIONAL CENTER**<br>**Institutional Directive** | | **REFERENCE:** | **20 ILCS 5/3-2-2**<br>Personnel Rules of<br>Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 |
| **SECTION:** | 03 – Personnel and Labor Relations | **NUMBER:** | 03.01.301 |
| **SUBSECTION:** | 01 – General Provisions | **EFFECTIVE DATE:** | November 06, 2002 |
| **SUBJECT:** | 301 – Affirmative Attendance | **PAGES:** | Page 2 of 8 |

Chief Administrator – the Chief Administrative Officer of East Moline Correctional Center

Unauthorized Absence – an absence for which time is not approved.

**E.  General Provisions**

The Chief Administrative Officer shall ensure that all employees have access to and are advised of the contents of this directive.

1. Distribution and access of Administrative Directive 03.01.301-Affirmative Attendance.

    a. All individuals employed at the East Moline Correctional Center received a copy of Administrative Directive 03.01.301 during June 1999.

    b. The Human Resource Representative shall ensure that all new employees receive and sign for a copy of Administrative Directive 03.01.301 at the time they complete appropriate personnel paperwork. The Personnel Office shall forward the receipt signed by the employee to the Training Coordinator.

    c. Administrative Directive 03.01.301 shall be available in all A.D. Manuals.

2. This Institutional Directive shall be distributed through regular distribution procedures and made available for employee access in Institutional Directive Manuals.

**F.  Requirements**

1. Employees are expected to report for work on time each day. Tardiness shall be addressed by counseling and progressive discipline. The establishment or change in tardiness policy shall be negotiated with the Union. During such negotiations, current tardiness practices and policies shall remain in effect.

2. Vacation, holiday, compensatory, and personal business time must be requested in advance except in emergency situations.

| | | REFEREN | 20 ILCS 5/3-2-2<br>Personnel Rules of<br>Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 |
|---|---|---|---|
| **EAST MOLINE CORRECTIONAL CENTER**<br>**Institutional Directive** | | | |
| **SECTION:** | 03 – Personnel and Labor Relations | **NUMBER:** | 03.01.301 |
| **SUBSECTION:** | 01 – General Provisions | **EFFECTIVE DATE:** | November 08, 2002 |
| **SUBJECT:** | 301 – Affirmative Attendance | **PAGES:** | Page 3 of 8 |

    a.    In emergencies, if no personal time is available, vacation, holiday, or compensatory time may be approved subject to verification of an emergency situation.

    b.    In the absence of an emergency, only the Chief Administrative Officer or Assistant Wardens may approve the use of such time on a call-in basis.

3.    Authorization to use other benefit time or, if none is available, authorized docks shall be granted under the following criteria when sick time has been exhausted:

    a.    The employee has not been on proof status within the previous three (3) months, unless the Warden approves use of such time.

    b.    Proper medical certification is provided.

    c.    Use of authorized dock time under these circumstances is limited to five (5) days within a twelve (12) month period, unless approval for more time is granted by the Warden.

        **NOTE:** Employees who have used all allowable dock time shall be informed of their right to apply for a medical leave of absence.

4.    All employee requests for sick time usage must be supported by a Notification of Absence and Call-In Report, DC 314-F, signed by the employee. The DC 314-F shall be provided to the supervisor no later than 48 hours after the employee's return from the absence(s), unless extenuating circumstances exist which are approved by the supervisor. The Supervisor will ensure that the DC 314-F is readily available to the employee. Failure of an employee to provide such will result in the absence being considered unauthorized. The employee will be docked and a disciplinary referral will be initiated.

5.    Supervisors must process all signed DC 314-F forms generated from call-ins within three calendar days of receipt, either approving or disapproving the request. The original (white) copy of the DC 314-F shall be forwarded to the timekeeper, the pink copy shall be given to the employee, and the yellow copy shall be retained by the supervisor.

| EAST MOLINE CORRECTIONAL CENTER<br>Institutional Directive | REFERENCE | 20 ILCS 5/3-2-2<br>Personnel Rules of<br>Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 |
|---|---|---|
| **SECTION:** 03 – Personnel and Labor Relations | **NUMBER:** | 03.01.301 |
| **SUBSECTION:** 01 – General Provisions | **EFFECTIVE DATE:** | November 08, 2002 |
| **SUBJECT:** 301 – Affirmative Attendance | **PAGES:** | Page 4 of 8 |

6. The Assistant Wardens, Department Heads, including Shift Commanders and designated Lieutenants, shall be designated to review the attendance record of each employee under their supervision within twenty days of the conclusion of each calendar month.

    a. Timekeepers shall provide a duplicated Employee Time Sheet, DC 333-F, for each employee to the designated supervisory staff within eight working days of the conclusion of each calendar month. The Personnel Office will ensure that all designated staff sign a verification of attendance record located in the Personnel Office documenting that they have completed the monthly review of the timesheet.

    b. Documentation of this review shall be noted on the Attendance Record Review Form, DC 9095, a copy of which shall be maintained for each employee in the supervisor's file. In the column designated for results of this review, the supervisor must note any action taken such as counseling, placement on proof status, referral to the Employee Assistant Program, oral reprimand, or referral for discipline. If the supervisor finds the employee's attendance to be acceptable, an "OK" must be noted. Although a formal review is only required once each month, supervisors must ensure on-going scrutiny of sick time usage and dockages, and shall take prompt action anytime the circumstances warrant such. Counseling is the first step in working with employees who may have an attendance problem.

    c. Prior to placing an employee on proof status, the supervisor shall meet with the employee to discuss the attendance record. Any employee whose attendance record creates reason to suspect abuse of sick time shall be immediately given written notice of his or her placement on proof status for a 90-day period.

        (1) Proof status shall take effect immediately for employees not covered by a labor contract.

        (2) For employees covered by a labor contract, the proof status shall take effect:

| | EAST MOLINE CORRECTIONAL CENTER  Institutional Directive | REFERB: | 20 ILCS 5/3-2-2  Personnel Rules of  Dept. of CMS  AFSCME Contract  A.D. 08.01.301  ACA 3-4069 |
|---|---|---|---|
| SECTION: | 03 – Personnel and Labor Relations | NUMBER: | 03.01.301 |
| SUBSECTION: | 01 – General Provisions | EFFECTIVE DATE: | November 08, 2002 |
| SUBJECT: | 301 – Affirmative Attendance | PAGES: | Page 5 of 8 |





    (a)   Ten days after the employee received written notice of the proof status and no grievance is filed.

    (b)   On the effective date of the grievance withdrawal if the withdrawal is entered prior to the Step Three disposition; or

    (c)   On the date the facility is notified of the Step Three disposition if the grievance is withdrawn or denied. The Proof Status grievance shall be heard at the earliest possible Step Three meeting pursuant to master contract Article V, Section 2. If the grievance is denied, the employee shall be placed on Proof Status pending the final disposition at Step Four.

  d.   The mere usage of sick leave supported by appropriate medical documentation will not support a continuation of proof status, unless additional fact(s) support suspected abuse. Use of sick leave shall be reviewed on a case-by-case basis. If the employer seeks to extend proof status based upon additional facts:

    (1)   Said proof status shall take effect immediately for employees not covered by a labor contract.

    (2)   For employees covered by a labor contract the continuation of proof status shall take effect:

        (a)   Ten days after the employee receives written notice of the proof status and no grievance is filed;

        (b)   On the effective date if the grievance withdrawal if the withdrawal is entered prior to the Step Three disposition; or

        (c)   On the date the facility is notified of the Step Three disposition if the grievance is withdrawn or denied. The proof status grievance shall be heard at the earliest possible Step Three meeting pursuant to master contract Article V, Section 2. If the grievance is denied,

| | | REFERENCE: | 20 ILCS 5/3-2-2 Personnel Rules of Dept. of CMS AFSCME Contract A.D. 03.01.301 ACA 3-4059 |
|---|---|---|---|
| **EAST MOLINE CORRECTIONAL CENTER** **Institutional Directive** | | | |
| **SECTION** | 03 – Personnel and Labor Relations | **NUMBER:** | 03.01.301 |
| **SUBSECTION:** | 01 – General Provisions | **EFFECTIVE DATE:** | November 08, 2002 |
| **SUBJECT:** | 301 – Affirmative Attendance | **PAGES:** | Page 6 of 6 |

the employee shall be continued on proof status pending final disposition at Step Four.

    e.    Proof status shall be reviewed with the employee after the initial 90-day period or 60 days after the continuation on proof status. Employees shall be given either:

        (1)    Written notice of their continuation on proof status for an additional 60 day period if their use of sick time continues to reflect reason to suspect abuse; or

        (2)    Written notice that proof status is terminated.

    f.    The Notification of Proof Status, DC 710-1265, shall be used to notify employees of initial placement, continuation, or removal from proof status. The form shall be dated and signed by both the employee and the supervisor. The original signed form shall be given to the employee and a copy shall be placed in the Personnel File and in the supervisor's file.

7.    An employee on proof status who fails to provide proper medical certification of the use of earned sick time shall be given an unauthorized absence and be docked for the day(s) in question. Employees on proof status who are out of earned sick time and who continue to claim illness shall be advised in writing of the need to apply for a leave of absence or face discipline.

8.    Proper medical certification for proof status must contain the following minimum elements:

    a.    Signature, address, and phone number of the medical practitioner.

    b.    The pertinent date(s) in question.

    c.    An indication that the employee was unable to work on the date(s) in question for reasons of personal or family illness.

9.    Employees on proof status who utilize sick time for bereavement shall provide appropriate documentation.

| **EAST MOLINE CORRECTIONAL CENTER** **Institutional Directive** | | Personnel Rules of Dept. of CMS AFSCME Contract A.D. 03.01.301 ACA 3-4069 |
|---|---|---|
| **SECTION:** 03 – Personnel and Labor Relations | **NUMBER:** | 03.01.301 |
| **SUBSECTION:** 01 – General Provisions | **EFFECTIVE DATE:** | November 08, 2002 |
| **SUBJECT:** 301 – Affirmative Attendance | **PAGES:** | Page 7 of 8 |

10.   It is the employee's responsibility to provide proper certification. Documents that do not contain the necessary elements shall not be accepted and the employee shall be so notified. The absences shall be considered unauthorized if acceptable certification is not subsequently provided within five work days.

11.   The Department recognizes that personal problems may affect the attendance of employees. In addition to counseling, proof status, and discipline, supervisors are strongly encouraged to utilize employee referrals to the Employee Assistance counselors available at each facility and program site. Such referrals may be made anytime during the attendance or performance review process where the need is apparent, but in all cases a referral must be made once an employee has incurred discipline for any attendance-related issue.

NOTE: Proof may be required for a single absence only if reasonable grounds exist to suspect abuse for the day in question.

G.   **Discipline**

1.   All docks for unauthorized absences shall be referred for discipline in a timely manner in accordance with Administrative Directive 03.01.120. If just cause is established for the violations, the following guidelines shall be followed:

| | |
|---|---|
| 1st offense | Oral Reprimand |
| 2nd offense | Written Reprimand |
| 3rd offense | 2nd Written Reprimand |
| 4th offense | 1 day suspension |
| 5th offense | 3 day suspension |
| 6th offense | 5 day suspension |
| 7th offense | 7 day suspension |
| 8th offense | 10 day suspension |
| 9th offense | 15 day suspension |
| 10th offense | Discharge |

2.   Each day of unauthorized absence shall be considered a separate offense for purposes of progressive discipline.

3.   Each day of unauthorized absence without a call in shall be considered as

| **EAST MOLINE CORRECTIONAL CENTER** **Institutional Directive** | | Personnel Rules of Dept. of CMS AFSCME Contract A.D. 03.01.801 ACA 3-4069 |
|---|---|---|
| **SECTION:** | 03 – Personnel and Labor Relations | **NUMBER:** 03.01.801 |
| **SUBSECTION:** | 01 – General Provisions | **EFFECTIVE DATE:** November 09, 2002 |
| **SUBJECT:** | 801 – Affirmative Attendance | **PAGES:** Page 8 of 8 |

two offenses and appropriate progressive discipline shall be administered pursuant to Paragraph II.G.1 above.

4.  Except for the 8th and 9th offense prior to discharge, any suspension time shall be documented, but the employee shall report to work and lose no wages. For the 8th offense prior to discharge, the employee shall actually serve three days of the suspension prior to discharge; and for the 9th offense prior to discharge, the employee shall actually serve five days of the suspension. The employee shall report to work and lose no wages for the remaining suspension days.

5.  The level of discipline imposed shall be based upon the above guidelines and shall be progressive in nature consistent with the master contract Article IX, Section 7: "...upon review of an employee's record, discipline for absenteeism shall be removed from such record if, from the date of the last discipline, two (2) years pass without the employee receiving additional discipline for absenteeism."

Note: Discipline which is two years old will not be removed unless the employee goes two (2) years without receiving any discipline for absenteeism.

Gary L. Wyant,
Warden

Reviewed:        November 08, 2002
Supersedes:      November 09, 2001

Illinois Department of Corrections

## Notification of Proof Status

**Employee's Name:** _Rick Lind_          **Work Location:** _Security_

Based on the following time usage documented in your attendance record, you are being placed/continued/removed from Proof Status as indicated below. (Circle call-in or no call as appropriate.)

| | |
|---|---|
| Date: 3 / 4 / 03 with call-in/ no-call | Date: / / with call-in/ no call |
| Date: 4 / 4 / 03 with call-in/ no-call _extended_ | Date: / / with call-in/ no call |
| Date: 4 / 30 / 03 with call-in/ no-call _check day_ | Date: / / with call-in/ no call |
| Date: 5 / 15 / 03 with call-in/ no-call _extended_ | Date: / / with call-in/ no call |
| Date: 5 / 16 / 03 with call-in/ no-call _extended_ | Date: / / with call-in/ no call |

_removed from proof on 3/4/03_

**☒ Placed on Proof Status on** _4 / 17 / 03_

Your time will be reviewed in 90 days to determine whether Proof Status will be continued or you will be removed from Proof Status. You will be notified when you are removed from Proof Status.

While you are on Proof Status, you are required to furnish proof of all unscheduled absences on the first day upon return to work. For proof of illness, proper medical documentation must be provided. The documentation must be the original (not a copy) and include the signature, address, and phone number of the doctor, dentist, or other professional medical practitioner, the dates in question, and the statement that the employee was "unable to work." Documents that do not contain these necessary elements shall not be accepted and you will be so notified. If acceptable documentation is not provided within 5 working days of such notification, the absence(s) will be considered unauthorized.

**☐ Continuation of Proof Status Recommended on** _ / / _

The period of review for Continued Proof Status will be 90 days. Proper medical documentation as explained in the Placement on Proof Status Section above continues to be required during this period.

If appropriate medical documentation of sick leave was provided during the previous period of Proof Status and Proof Status is continued based upon additional facts, said Proof Status will not take effect until either:

a.   Ten (10) working days after written notice of the Proof Status is received, and no grievance is filed; or

b.   Your Proof Status grievance is heard at the third level and the grievance is either withdrawn or denied.

If grievances are resolved at first or second level and the resolution sustains continuation of Proof Status, such Proof Status shall commence on the date of resolution.

**☐ Removed from Proof Status on** _ / / _

Employees who are out of earned sick time and continue to claim illness may apply for leave of absence or face discipline. The confidential services of the Employee Assistance Program are available to employees who feel that personal problems and/or other matters are impacting their ability to meet the contractual and departmental obligations.

I have read and I understand this notification.

_Refused to Sign_                                    _Capt. Stumpp_                5/30/03
Employee's Signature          Date            Supervisor's Signature          Date

DC 710-1265 (Eff. 7/1999)
IL 426-22932

**EXHIBIT**
**4**

Distribution: Employee
Personnel File
Supervisor's File

## Westlaw.

730 N.E.2d 607                                                     Page 1
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

c
Briefs and Other Related Documents

Appellate Court of Illinois,
First District, Sixth Division.

Daniel T. O'KEEFE,
Plaintiff-Appellant/Cross-Appellee,
v.
ILLINOIS STATE POLICE MERIT BOARD and
Terrance W. Gainer, Director, Illinois
State Police,
Defendants-Appellees/Cross-Appellants.

No. 1-98-3471.

May 26, 2000.

State trooper sought judicial review of a decision
of the Merit Board upholding his discharge from
state police for various instances of misconduct.
The Circuit Court, Cook County, Thomas P.
Durkin, J., affirmed in part, and reversed in part. On
cross-appeals, the Appellate Court, Buckley, J.,
held that: (1) any error in failing to suppress
officer's statements was harmless; (2) even if the
State Police violated a collective bargaining
agreement by failing to complete a file initiation
report until after the officer's suspension, the Merit
Board lacked jurisdiction to hear such a claim; (3)
broken tape on the outer box of the officer's urine
sample did not break the custodial chain; and (4)
officer was entitled to pay pending a hearing before
the Merit Board.

Affirmed.

West Headnotes

[1] Officers and Public Employees €=72.62
283k72.62 Most Cited Cases

State trooper's claim that his statements should have
been suppressed in proceeding before the Merit

Board because State Police failed to advise him that
he had a right to counsel and that his statements
could be used against him, as required by statute,
was waived where the officer filed a motion to
suppress, but did not raise the matter again during
the disciplinary proceedings against him.

[2] Evidence €=154
157k154 Most Cited Cases

Rulings on motions to suppress are not final and
may be changed or reversed at any time prior to
final judgment.

[3] Administrative Law and Procedure €=670
15Ak670 Most Cited Cases

[3] Appeal and Error €=205
30k205 Most Cited Cases

Failure to ask the court or administrative body to
reconsider a motion to suppress when the evidence
is introduced at trial results in a waiver of that issue
on appeal.

[4] Officers and Public Employees €=72.57
283k72.57 Most Cited Cases

Any error in failing to suppress state trooper's
statements on the ground that the State Police failed
to advise him that he had a right to counsel and that
his statements could be used against him was
harmless in a disciplinary proceeding, as the
statements were cumulative and merely duplicated
other testimony.

[5] Officers and Public Employees €=72.22
283k72.22 Most Cited Cases

Even if the State Police in fact violated a collective
bargaining agreement by failing to complete a file
initiation report until after a state trooper's
suspension, the Merit Board lacked jurisdiction to
hear such a claim in a disciplinary proceeding
against the officer, or to provide a remedy for such
a violation. S.H.A. 20 ILCS 2610/8.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

**[6] Officers and Public Employees ⬅69.3**
283k69.3 Most Cited Cases

Merit Board is a creature of statute, and thus, its powers are generally limited to those conferred upon it by statute; the Board's authority arises either from the State Police Act's express language or by fair implication and intendment of the Act's express provisions as an incident to achieving the objectives for which the Board was created. S.H.A. 20 ILCS 2610/14.

**[7] Officers and Public Employees ⬅72.62**
283k72.62 Most Cited Cases

Broken tape on the outer box of a state trooper's urine sample did not break the custodial chain, so as to preclude admission of the sample in a disciplinary proceeding before the Merit Board; physician testifying on the officer's behalf admitted that the box's seal did not necessarily affect the sample's integrity, the officer did not dispute that the seal on the bottles themselves remained intact, and several doctors testified that the tape on the outer boxes commonly broke.

**[8] Officers and Public Employees ⬅72.53**
283k72.53 Most Cited Cases

Reviewing courts will not disturb the Merit Board's ruling on the sufficiency of a custodial chain absent an abuse of discretion.

**[9] Officers and Public Employees ⬅72.62**
283k72.62 Most Cited Cases

Mere speculation that a sample could have been altered is insufficient to undermine a custodial chain's adequacy for purposes of a disciplinary proceeding before the Merit Board.

**[10] Officers and Public Employees ⬅72.62**
283k72.62 Most Cited Cases

State Police procedure did not require a medical review officer to investigate an alleged custodial chain error in a broken tape on the outer box of a state trooper's urine sample before examining the urine specimen and verifying a positive drug test result; the seals on the bottles themselves remained intact, and the review officer testified that, in verifying that proper procedures were utilized, his

concern was not for the tape but, rather, the integrity of the specimen bottle.

**[11] Officers and Public Employees ⬅72.62**
283k72.62 Most Cited Cases

Testing facility's storage of state trooper's urine sample in an unlocked refrigerator did not break the custodial chain, so as to preclude admission of the sample in a disciplinary proceeding before the Merit Board; fact that the inner seals remained intact negated any conclusion that someone tampered with the sample.

**[12] Officers and Public Employees ⬅69.12**
283k69.12 Most Cited Cases

While the Director of the State Police was statutorily authorized to impose disciplinary measures, including suspension, on officers for a reasonable period not exceeding 30 days, a state trooper was entitled to pay pending a Merit Board hearing where he was suspended for approximately four months before the State Police filed written charges and provided him with the hearing; the statute made no distinction between disciplinary suspensions and administrative suspensions pending a discharge. S.H.A. 20 ILCS 2610/13, 2610/14.

**[13] Appeal and Error ⬅893(1)**
30k893(1) Most Cited Cases

Statutory construction is a matter of law and is considered de novo.

**[14] Statutes ⬅181(1)**
361k181(1) Most Cited Cases

Cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent.

**[15] Statutes ⬅188**
361k188 Most Cited Cases

To determine the legislature's intent, courts first look to a statute's language.

**[16] Statutes ⬅223.2(.5)**
361k223.2(.5) Most Cited Cases

Statutory provisions relating to the same subject matter should be construed harmoniously where

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

Page 3

possible.

[17] Statutes ⚖188
361k188 Most Cited Cases

Courts must accord a statute's language with its plain and commonly understood meaning.

**609*819***584 Paul D. Geiger, Chicago, for Appellant.

Paul Racette, Assistant Attorney General, Chicago, for Appellees.

Justice BUCKLEY delivered the opinion of the court:

On February 17, 1995, defendant, the Illinois State Police (ISP), indefinitely suspended plaintiff, Trooper Daniel O'Keefe, without pay and pending a termination proceeding before the Merit Board (Board) pursuant to section 14 of the State Police Act (the Act) (20 ILCS 2610/14 (West 1998)). On June 16, 1995, ISP filed a 10-count complaint before the Board, alleging various instances of misconduct by O'Keefe. On September 24, 1996, a hearing officer found that ISP had proven 9 of the 10 counts. On October 31, 1996, the Board unanimously adopted the hearing officer's findings and discharged O'Keefe. On review, the circuit court affirmed the Board in part and reversed in part. O'Keefe now appeals to this court, arguing that: (1) the hearing officer erred in denying his motion to suppress his statements to investigators and his drug-test results; and (2) that ISP's investigation violated a collective bargaining agreement. ISP cross-appeals, arguing that the circuit court erred in finding that O'Keefe was entitled to pay while the Board hearing was pending. We affirm.

## I. BACKGROUND

Paula Barrows testified at an evidence deposition that she is a special agent with the Federal Bureau of Investigation and that she formerly worked for ISP. Barrows further testified that, On February 17, 1995, she became involved in an investigation regarding O'Keefe. According to Barrows, an informant, John Hernandez, had been arrested on drug charges and told investigators that O'Keefe had

been supplying him with confidential information in exchange for cocaine. Hernandez met with Barrows that same day and, according to Barrows, stated that he had been supplying O'Keefe with cocaine for over five years. In exchange for the cocaine, O'Keefe gave Hernandez confidential information relating to police code words, planned drug busts, and license **610 ***585 plate information. According to Barrows, O'Keefe also gave Hernandez an "EPIC book." Barrows explained that an "EPIC book" contains intelligence information involving narcotics trafficking throughout the United States and probably the world, including information regarding current narcotics investigations.

To corroborate Hernandez' story, Barrows instructed Hernandez to call O'Keefe and ask him to run a particular license-plate number. Barrows and other investigators watched Hernandez dial O'Keefe's telephone number, saw O'Keefe's number appear on the display of *820 Hernandez' cellular telephone, and shared the telephone with investigators so that they could hear the conversation and identify O'Keefe's voice. Later that day, O'Keefe called back and provided the information Hernandez requested. Barrows verified through an ISP telecommunicator that, while O'Keefe was off duty that day, he had in fact called in a request for information regarding the same license-plate number. Also that day, Barrows and three other officers searched O'Keefe's squad car. Inside, they found several Penthouse magazines, individual photographs of a naked woman, and a set of brass knuckles. ISP prohibits troopers from having any such items in their patrol cars.

Arthur Sebek, a squad supervisor in the ISP internal investigations division, testified that he was also present when Hernandez called O'Keefe, that he could identify O'Keefe's voice, and that he heard O'Keefe provide the license-plate information. Later that evening, O'Keefe was instructed to report to police headquarters. Sebek testified that, when O'Keefe arrived, and before Sebek could say anything, O'Keefe stated that he had known Hernandez for several years and that Hernandez was involved in drugs. According to Sebek, O'Keefe admitted, without being asked, that he ran a license plate for Hernandez and that he knew it was a mistake. Sebek testified that he cut O'Keefe off

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 5RZ)

and instructed him to complete a urinalysis test. Sebek accompanied O'Keefe to the testing center and then returned to police headquarters with O'Keefe. When the pair returned, O'Keefe's commander informed O'Keefe that he was suspended without pay. O'Keefe's urinalysis results indicated that he had cocaine in his system.

. . . . . . . . . . . . . . . . . . . . . . . .

On June 16, 1995, the ISP Director filed a 10-count complaint with the Board, alleging numerous instances of official misconduct and requesting that O'Keefe be discharged. On February 1, 1996, O'Keefe filed a motion to quash his suspension and be reinstated or, alternatively, to be suspended with retroactive pay. O'Keefe also filed a motion to suppress the urinalysis test's results. On May 16, 1996, a hearing officer denied O'Keefe's motions.

The hearing officer conducted a hearing on ISP's complaint, spread over several dates between May 21, 1996, and July 30, 1996. On May 23, 1996, O'Keefe filed a supplemental motion to repress the urinalysis test's results, arguing that new evidence appeared indicating that an external chain-of-custody error had occurred. On September 24, 1996, after hearing testimony from several witnesses, including O'Keefe, Hernandez, Sebek, several physicians, and several ISP officials, the hearing officer denied O'Keefe's supplementary motion to suppress and submitted her proposed findings of facts and conclusions of law. The hearing officer found that, O'Keefe knowingly associated with *821 drug traffickers, had observed illegal drug use but failed to report it to ISP, divulged confidential information to drug traffickers (including license plate and drug enforcement information) in exchange for cocaine, used cocaine while on or off duty, and had sexually explicit materials and unauthorized weapons in his patrol car. Further, the hearing officer found that ISP met its burden in proving 9 of the 10 counts in its complaint. On October 31, 1996, the Board unanimously adopted the hearing officer's findings of fact and conclusions of law, and ordered that O'Keefe be removed and discharged from ISP.

**611 ***586 On November 27, 1996, O'Keefe filed a petition for administrative review before the circuit court. O'Keefe argued that the investigation and suspension violated section 14 of the Act and the collective bargaining agreement between ISP and the Fraternal Order of Police (FOP), and that

the Board improperly relied on his urinalysis test results despite procedural and custodial errors. On August 1, 1997, the circuit court found that ISP violated section 14 of the Act by suspending O'Keefe without pay and pending the hearing, and the court entered an order remanding the matter to the Board for payment of back pay. According to the transcript, the court also found that ISP violated section 14 of the Act by questioning O'Keefe without sufficient notice, and that evidence obtained from such questioning should have been suppressed pursuant to section 14a of the Act (20 ILCS 2610/14a (West 1998)), but that sufficient evidence nevertheless existed to support the Board's finding. Further, the circuit court refused to disturb the Board's findings with respect to O'Keefe's chain-of-custody argument and whether ISP violated the collective bargaining agreement. On August 22, 1998, O'Keefe advised the circuit court that he received his back pay, and the court entered a final order disposing of all matters before it. On September 11, 1998, O'Keefe filed the instant appeal.

On appeal before this court, O'Keefe again argues that ISP's investigation and suspension violated section 14 of the Act and the collective bargaining agreement between ISP and the FOP, and that the Board improperly relied on his urinalysis test results despite procedural and custodial errors. O'Keefe does not dispute the Board's factual findings or other conclusions of law.

## II. ANALYSIS
### A. Motion to Suppress O'Keefe's Statements

O'Keefe first argues that ISP failed to advise him on February 17, 1995, that he had a right to counsel and that his statements could be used against him, as required under section 14 of the Act. Section 14 of the Act reads in pertinent part as follows:

*822 "Before any such officer may be interrogated or examined * * *, the results of which * * * may be the basis for filing charges seeking his or her suspension for more than 15 days or his or her removal or discharge, he or she shall be advised in writing as to what specific improper or illegal act he or she is alleged to have committed; he or she shall be advised in writing that his or her admissions made in the course of the hearing, interrogation or examination may be used as the basis for charges seeking his or her

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

Page 5

suspension, removal or discharge; and he or she shall be advised in writing that he or she has a right to counsel of his or her choosing, who may be present to advise him or her at any hearing, interrogation or examination." 20 ILCS 2610/14 (West 1998).

Further, under section 14a of the Act (20 ILCS 2610/14a (West 1998)), "statements or admissions obtained during the course of any hearing or interrogation not conducted in accordance with this Act may not be utilized against the officer in any subsequent disciplinary proceeding." Therefore, O'Keefe argues, the hearing officer erred by denying his motion to suppress his statement with regard to running license plates for Hernandez.

ISP disagrees, arguing that O'Keefe was never interrogated or examined. Instead, ISP argues, O'Keefe volunteered the information about Hernandez without being asked. Sebek testified that, before he had a chance to say anything, O'Keefe voluntarily admitted that he ran license-plate information for Hernandez. O'Keefe further admitted to Sebek that he knew it was a mistake and that he should not have done it. ISP Investigator Anthony Rapacz **612 ***587 also testified that O'Keefe made this admission voluntarily. Rapacz further testified that he reminded O'Keefe that he was an FOP trustee, that they had a contract, and that he had rights. However, O'Keefe waved Rapacz off and continued to state that he should not have done it. According to Rapacz, O'Keefe said that he was sorry for putting the other officers in such an awkward position. O'Keefe himself even admitted that he immediately told Sebek and the officers that he "knew what this was about" and then proceeded to tell them what he thought it was about, namely, running the license plate for Hernandez. O'Keefe also admits in his brief that ISP never conducted an interrogation or examination.

[1][2][3] We need not determine whether ISP violated section 14 of the Act because O'Keefe has waived this issue. While the record indicates that O'Keefe indeed filed a motion to suppress, O'Keefe fails to cite where, nor does review of the record indicate that, he raised the matter again during the proceedings. Rulings on motions to suppress are not final and may be changed or reversed at any time prior to final judgment. See *People v. Brooks*,

187 Ill.2d 91, 127, 240 Ill.Dec. 607, 718 N.E.2d 88, 109 (1999). *823 Failure to ask the court or administrative body to reconsider the motion when that evidence is introduced at trial results in waiver of that issue on appeal. See *Brooks*, 187 Ill.2d at 128, 240 Ill.Dec. 607, 718 N.E.2d at 109.

[4] Even if we were to reach the merits of O'Keefe's claim and conclude that O'Keefe's statements should have been excluded, such error would be harmless. The gist of O'Keefe's statement was that he knew Hernandez, he knew Hernandez was involved with drugs, and that he ran a license plate for Hernandez earlier that day. O'Keefe's February 17, 1995, statements were cumulative and merely duplicated other testimony. Sebek, Barrows, and others testified that they heard Hernandez ask O'Keefe to run a particular license plate, and that they heard O'Keefe supply the information that Hernandez requested. Hernandez testified that O'Keefe often ran license plates for him. Carroll Gibbs, a telecommunicator with ISP, testified that O'Keefe called her on February 17, 1995, and asked her to run the same license-plate number that Hernandez requested. O'Keefe himself testified during the hearing that he ran the license plate for Hernandez. Under these facts, even if the asserted error occurred, it would be harmless. See *People v. Wilkerson*, 87 Ill.2d 151, 157, 57 Ill.Dec. 628, 429 N.E.2d 526, 528 (1981) (finding that error is harmless when "the evidence is cumulative or merely duplicates properly admitted evidence").

B. Violation of the Collective Bargaining Agreement

[5] O'Keefe next argues that his suspension violated the collective bargaining agreement between ISP and the FOP. Article 7 of the collective bargaining agreement provides in pertinent part:

"b. No internal investigation will be conducted and no discipline may be issued unless a file initiation report has been completed."

O'Keefe contends that ISP violated the collective bargaining agreement by failing to complete the file initiation report until after O'Keefe's suspension and that such failure requires that this court reverse the Board's finding.

This argument lacks merit. Assuming, arguendo, that ISP in fact violated article 7 of the collective bargaining agreement, we find that the Board lacked

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607

Page 6

(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

jurisdiction to hear such a claim or provide a remedy for such a violation.

[6] Section 8 of the Act (20 ILCS 2610/8 (West 1998)) provides in pertinent part that the "Board shall exercise jurisdiction over the certification for appointment and promotion, and over the discipline, removal, demotion and suspension of Department of State Police officers." O'Keefe fails to cite any authority indicating ***588 **613 that the Board has authority to provide a remedy for a violated labor agreement. Further, the plain language of section 8 indicates that the Board has no such *824 power. Because the Board is a creature of statute, its powers are generally limited to those conferred upon it by statute. See Schalz v. McHenry County Sheriff's Department Merit Comm'n, 113 Ill.2d 198, 202, 100 Ill.Dec. 553, 497 N.E.2d 731, 732-33 (1986). The Board's authority arises either from the Act's express language or by fair implication and intendment of the Act's express provisions as an incident to achieving the objectives for which the Board was created. See Schalz, 113 Ill.2d at 202-03, 100 Ill.Dec. 553, 497 N.E.2d at 733. Section 8 of the Act clearly limits the Board's jurisdiction to disciplinary actions regarding an officer's conduct. O'Keefe's arguments relate not to his conduct but, rather, to ISP's alleged failure to adhere to a labor contract. We further note that, assuming the collective bargaining agreement is relevant here, article 8 of the agreement sets forth a separate procedure under which employees may file union grievances for agreement violations.

Further, assuming that the agreement is relevant here, O'Keefe has failed to cite any persuasive evidence in the record to indicate that the agreement was even broken. Barrows testified that she completed the report but that she could not recall whether she completed it on February 17, 1995, or February 20, 1995. Even if we were to make such a factual determination (see Folbert v. Department of Human Rights, 303 Ill.App.3d 13, 26, 236 Ill.Dec. 463, 707 N.E.2d 590, 599 (1999) (stating that "it is not the function of the reviewing court to resolve factual disputes")), O'Keefe has failed to explain how a delay of one business day prejudiced him.

### C. Motion to Suppress Drug Test

Dr. Robert DuPont testified that O'Keefe's sample

indicated that he had used cocaine within two or three days of the test. Dr. DuPont further testified that O'Keefe's sample contained an unusually high level of cocaine. ISP also presented evidence that a second facility also tested O'Keefe's sample and that it reached similar conclusions.

[7] However, O'Keefe contends that the Board erred by considering his urinalysis results. Specifically, O'Keefe argues that such evidence should have been excluded due to an external custodial chain error that was identified when the urine sample reached the toxicology center. According to an affidavit filed by Carmen Mitelescu, a lab worker, the sample was sent to the laboratory in a taped box, but that the tape "broke in transit." This discrepancy, according to O'Keefe, was so significant that the Board should have granted his motion to suppress. We disagree.

[8][9] The hearing officer found O'Keefe's argument unconvincing and determined that ISP established a sufficient custodial chain. Reviewing courts will not disturb the Board's ruling on the sufficiency of a *825 custodial chain absent an abuse of discretion. Williamson v. Police Board, 182 Ill.App.3d 304, 310, 130 Ill.Dec. 729, 537 N.E.2d 1058, 1061 (1989). To support the Board's determination, the record must indicate that ISP took reasonable protective measures to ensure that the sample taken from O'Keefe was indeed the same sample tested in the laboratory. Williamson, 182 Ill.App.3d at 310, 130 Ill.Dec. 729, 537 N.E.2d at 1061. To prevail, O'Keefe must present tangible suggestion of tampering, alteration or substitution. See Williamson, 182 Ill.App.3d at 310, 130 Ill.Dec. 729, 537 N.E.2d at 1061. Mere speculation that the sample could have been altered is insufficient to undermine a custodial chain's adequacy. Williamson, 182 Ill.App.3d at 310, 130 Ill.Dec. 729, 537 N.E.2d at 1061.

We find that sufficient evidence exists to support the Board's determination. Dr. Mohmad Rahmanian testified that, when a urine sample is collected, the sample is divided between two bottles. The bottles **614 ***589 are then wrapped lengthwise with tamper-resistant tape and identified with a control number. The sample provider's initials and the date are also written on the tape. The bottles are then placed in a sealed bag, and the bag is placed inside a box. The box is

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607

(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

Page 7

then sealed with security tape baring the same control number. Dr. Rahmanian stated that the outer tape is designed to be fragile to prevent tampering. However, the tape is so fragile that it may be damaged during shipping. According to Dr. Rahmanian, such damage would not undermine the test's integrity so long as the bottles remain sealed. Dr. Donald Frederick testified on O'Keefe's behalf. Dr. Frederick similarly admitted that the box's seal does not necessarily affect the sample's integrity. O'Keefe does not dispute that, while the tape on the outer box was damaged, the seal on the bottles themselves remained intact. We further note that several doctors, including Frederick, testified that the tape on the outer boxes commonly breaks. Under these facts, we find that the broken tape on the outer box did not break the custodial chain.

[10] O'Keefe further argues that Dr. DuPont improperly examined O'Keefe's specimen and verified the positive result before investigating the alleged custodial-chain error. ISP procedure requires that Dr. DuPont, as the ISP medical review officer, "receive all pertinent information" prior to making such a determination, and O'Keefe contends that this omission required that the Board suppress his drug-test results. While Dr. DuPont admitted that he indeed examined O'Keefe's sample before investigating the broken tape, this argument nevertheless lacks merit. As previously stated, the seals on the bottles themselves remained intact. Dr. DuPont testified that, in verifying that proper procedures were utilized, his concern is not for the tape on the box but, rather, the integrity of the specimen bottle. We further *826 note that Dr. DuPont regularly contacts the provider of a positive sample to ask a series of questions that might establish an alternative reason for the positive result. Dr. DuPont left such a message for O'Keefe, but O'Keefe did not return his call.

[11] Citing People v. Slaughter, 149 Ill.App.3d 183, 102 Ill.Dec. 769, 500 N.E.2d 662 (1986), O'Keefe next argues that the testing facility improperly stored his sample in an unlocked refrigerator. Failure to store the sample securely, O'Keefe contends, violated ISP procedures and constituted a break in the custodial chain. We find that Slaughter's facts are inapposite to the instant case. In Slaughter, the State acknowledged that the evidence at issue, an envelope containing two

hand-rolled marijuana cigarettes, was handled in a lackadaisical manner. Slaughter, 149 Ill.App.3d at 186, 102 Ill.Dec. 769, 500 N.E.2d at 665. Further, the court noted:

"[T]he testimony is wholly inadequate to 'match' the description of the envelope * * *. [The corrections officer] did not testify to the color, or the size, of the envelope into which he put the cigarettes he found * * *. He also did not state that he ever sealed the envelope, marked, labelled, or identified the envelope, or that he inventoried the envelope.

Furthermore, the evidence * * * is insufficient to trace the individuals who did have access to the envelope, or the number of persons who could have had access to it. * * *

In addition, the record does not establish the degree to which access was restricted to the correctional facility's safe. [The officer] stated that he himself 'dropped' the envelope into the safe. He also stated that the safe was accessible to two persons, the lieutenant and the facility's accountant. Because [the officer's] access to the safe enabled him to drop the envelope into the safe, we cannot determine the degree to which access to the safe was permitted, beyond the two persons * * * specified at the hearing. Also, although [the officer] testified that the safe was of the type **615 ***590 which is locked by a key, he did not state that it was locked * * *.
* * *

The record is also inconclusive with respect to whether access was restricted to the correctional facility's safe in which the guard placed the envelope containing the cannabis. We therefore determine that the State failed to establish a proper chain of custody of the cannabis evidence it presented at the revocation hearing." Slaughter, 149 Ill.App.3d at 186-87, 102 Ill.Dec. 769, 500 N.E.2d 662.

The veritable litany of errors identified by the court in Slaughter simply does not exist in this case. In Slaughter, the court relied on numerous factors, including the fact that the record failed to adequately show whether others had access to the safe and whether the envelope had been sealed. Here, access is not a dispositive issue because the fact remains that the container's inner seals remained *827 intact and, therefore, the sample was in fact not disturbed. Carmen Mitelescu testified that she collected O'Keefe's sample and placed in a

730 N.E.2d 607

(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

triple-sealed container, Mitelcsu wrote the date, O'Keefe's initials, and a control number on the seals. That the inner seals remained intact negates the conclusion that someone tampered with the sample.

### D. Cross-Appeal

[12][13][14][15][16] On cross-appeal, ISP argues that the circuit court misinterpreted section 14 of the Act and erred in finding that the Board should have granted O'Keefe's motion to quash his unpaid suspension. We disagree. Statutory construction is a matter of law and is considered de novo. *Branson v. Department of Revenue,* 168 Ill.2d 247, 254, 213 Ill.Dec. 615, 659 N.E.2d 961, 965 (1995). The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.,* 158 Ill.2d 76, 81, 196 Ill.Dec. 655, 630 N.E.2d 820, 822 (1994). To determine the legislature's intent, courts first look to the statute's language. *Zekman v. Direct American Marketers, Inc.,* 182 Ill.2d 359, 368-69, 231 Ill.Dec. 80, 695 N.E.2d 853, 858 (1998). Statutory provisions relating to the same subject matter should be construed harmoniously where possible. *Rawles v. Hartman,* 172 Ill.App.3d 931, 936, 123 Ill.Dec. 217, 527 N.E.2d 680, 682 (1988). The relevant portion of section 14 of the Act states as follows:

"Except as is otherwise provided in this Act, no Department of State Police officer shall be *removed,* demoted or *suspended* except for *cause, upon written charges filed* with the Board by the Director and a *hearing* before the Board thereon upon *not less than 10 days' notice* at a place to be designated by the chairman thereof. At such hearing, the accused shall be afforded full opportunity to be heard in his or her own defense and to produce proof in his or her defense." (Emphasis added.) 20 ILCS 2610/14 (West 1998).

Section 13 of the Act also provides for suspensions and states in pertinent part as follows:

"Disciplinary measures prescribed by the Board for Department of State Police officers may be taken by the Director for the punishment of infractions of the rules and regulations of the respective divisions as promulgated by the Department. Such disciplinary measures may

include *suspension of any such officer for a reasonable period, not exceeding 30 days.*" (Emphasis added.) 20 ILCS 2610/13 (West 1998).

Construing sections 13 and 14 together, we find that the Director may impose disciplinary measures, including suspension, on officers for a reasonable period not exceeding 30 days. Illinois courts have upheld such suspensions even if they were unpaid. See, e.g., *828Scott v. Illinois State Police Merit Board,* 222 Ill.App.3d 496, 165 Ill.Dec. 20, 584 N.E.2d 199 (1991); *Clark v. Morris,* 99 Ill.App.2d 24, 31, 240 N.E.2d 515, 518 (1968). However, before ISP may suspend an officer beyond 30 **616 ***591 days, it must have cause, must file written charges with the Board, and must hold a hearing, to which officers must receive not less than 10 days' notice. The record indicates that ISP suspended O'Keefe without pay for approximately four months before filing written charges and providing him with the hearing required under section 14 of the Act.

ISP contends that section 14 does not apply here, arguing that "it did not file a complaint with the Merit Board seeking the *suspension* of O'Keefe in this case, but rather his *discharge.*" ISP asserts that two types of suspensions exist. According to ISP, "O'Keefe's suspension pending discharge was not a *disciplinary suspension* but rather an *administrative suspension* " intended to remove a corrupt officer from the street pending a hearing. O'Keefe disagrees, arguing that the Act's plain language makes no such distinction. While the hearing officer agreed with ISP, the circuit court rejected ISP's argument, finding:

"[Section] 14 of the Police Act could hardly be clearer in its requirement that written charges be filed with the board before any disciplinary action takes place. Here, it is undisputed that no such charges were filed until June 16, 1995, four months after O'Keefe was indefinitely suspended. * * * The hearing officer found that the requirements [of section 14] were followed. * * * The court finds that the hearing officer's construction of [section 14] was erroneous and, consequently, rejects the result reached by the hearing officer [with respect to O'Keefe's motion to quash]."

[17] We find the circuit court's interpretation of section 14 persuasive. Courts must accord a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works