02-2004 11:20 FROM:SHOKS HEBRECHT

E-FILED
Friday, 02 February, 2007 03:34:24 PM
Clerk, U.S. District Court, ILCD

# EAST MOLINE CORRECTIONAL CENTER
## Institutional Directive

| | | | |
|---|---|---|---|
| **REFERENCE:** | 20 ILCS 5/3-2-2<br>Personnel Rules of<br>Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 | | |
| **SECTION:** | 03 – Personnel and Labor Relations | **NUMBER:** | 03.01.301 |
| **SUBSECTION:** | 01 – General Provisions | **EFFECTIVE DATE:** | November 08, 2002 |
| **SUBJECT:** | 301 – Affirmative Attendance | **PAGES:** | Page 1 of 8 |

## POLICY

A. **Authority**

   20 ILCS 5/3-2-2

   Personnel Rules of the Department of Central Management Services

   Negotiated Labor Contracts (AFSCME, INA, ISEA, etc.)

   A.D. 03.01.301

B. **Policy Statement**

   1. All employees are expected to report to duty on a daily basis. Absences shall be approved in accordance with various labor contracts or personnel rules.

   2. Supervisors are to make affirmative decisions regarding all absences daily, and to review employee time records at least monthly for indications of possible abuse.

I. **PROCEDURE**

   A. **Purpose**

   The purpose of this directive is to establish a written procedure governing use of benefit and dock time by employees of the East Moline Correctional Center consistent with various labor agreements or personnel rules.

   B. **Applicability**

   This directive is applicable to all employees of East Moline Correctional Center.

   C. **Internal Audits**

   An internal audit of this directive shall be conducted at least quarterly.

   D. **Definitions**

Joint Ex. 1

| | | | |
|---|---|---|---|
| **EAST MOLINE CORRECTIONAL CENTER**<br>**Institutional Directive** | | **REFERENCE:** | 20 ILCS 5/3-2-2<br>Personnel Rules of<br>Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 |
| **SECTION:** | 03 – Personnel and Labor Relations | **NUMBER:** | 03.01.301 |
| **SUBSECTION:** | 01 – General Provisions | **EFFECTIVE DATE:** | November 08, 2002 |
| **SUBJECT:** | 301 – Affirmative Attendance | **PAGES:** | Page 2 of 8 |

Chief Administrator – the Chief Administrative Officer of East Moline Correctional Center

Unauthorized Absence – an absence for which time is not approved.

E. <u>General Provisions</u>

The Chief Administrative Officer shall ensure that all employees have access to and are advised of the contents of this directive.

1. Distribution and access of Administrative Directive 03.01.301-Affirmative Attendance.

   a. All individuals employed at the East Moline Correctional Center received a copy of Administrative Directive 03.01.301 during June 1999.

   b. The Human Resource Representative shall ensure that all new employees receive and sign for a copy of Administrative Directive 03.01.301 at the time they complete appropriate personnel paperwork. The Personnel Office shall forward the receipt signed by the employee to the Training Coordinator.

   c. Administrative Directive 03.01.301 shall be available in all A.D. Manuals.

2. This Institutional Directive shall be distributed through regular distribution procedures and made available for employee access in Institutional Directive Manuals.

F. <u>Requirements</u>

1. Employees are expected to report for work on time each day. Tardiness shall be addressed by counseling and progressive discipline. The establishment or change in tardiness policy shall be negotiated with the Union. During such negotiations, current tardiness practices and policies shall remain in effect.

2. Vacation, holiday, compensatory, and personal business time must be requested in advance except in emergency situations.

| | | |
|---|---|---|
| EAST MOLINE CORRECTIONAL CENTER<br>Institutional Directive | REFEREE: | 20 ILCS 5/3-2-2<br>Personnel Rules of Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 |
| SECTION: 03 - Personnel and Labor Relations | NUMBER: | 03.01.301 |
| SUBSECTION: 01 - General Provisions | EFFECTIVE DATE: | November 08, 2002 |
| SUBJECT: 301 - Affirmative Attendance | PAGES: | Page 3 of 8 |

    a.    In emergencies, if no personal time is available, vacation, holiday, or compensatory time may be approved subject to verification of an emergency situation.

    b.    In the absence of an emergency, only the Chief Administrative Officer or Assistant Wardens may approve the use of such time on a call-in basis.

3.    Authorization to use other benefit time or, if none is available, authorized docks shall be granted under the following criteria when sick time has been exhausted:

    a.    The employee has not been on proof status within the previous three (3) months, unless the Warden approves use of such time.

    b.    Proper medical certification is provided.

    c.    Use of authorized dock time under these circumstances is limited to five (5) days within a twelve (12) month period, unless approval for more time is granted by the Warden.

    **NOTE:** Employees who have used all allowable dock time shall be informed of their right to apply for a medical leave of absence.

4.    All employee requests for sick time usage must be supported by a Notification of Absence and Call-In Report, DC 314-F, signed by the employee. The DC 314-F shall be provided to the supervisor no later than 48 hours after the employee's return from the absence(s), unless extenuating circumstances exist which are approved by the supervisor. The Supervisor will ensure that the DC 314-F is readily available to the employee. Failure of an employee to provide such will result in the absence being considered unauthorized. The employee will be docked and a disciplinary referral will be initiated.

5.    Supervisors must process all signed DC 314-F forms generated from call-ins within three calendar days of receipt, either approving or disapproving the request. The original (white) copy of the DC 314-F shall be forwarded to the timekeeper, the pink copy shall be given to the employee, and the yellow copy shall be retained by the supervisor.

| EAST MOLINE CORRECTIONAL CENTER<br>Institutional Directive | REFERENCE: | 20 ILCS 5/3-2-2<br>Personnel Rules of<br>Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 |
|---|---|---|
| SECTION: 03 – Personnel and Labor Relations | NUMBER: | 03.01.301 |
| SUBSECTION: 01 – General Provisions | EFFECTIVE DATE: | November 08, 2002 |
| SUBJECT: 301 – Affirmative Attendance | PAGES: | Page 4 of 8 |

6. The Assistant Wardens, Department Heads, including Shift Commanders and designated Lieutenants, shall be designated to review the attendance record of each employee under their supervision within twenty days of the conclusion of each calendar month.

   a. Timekeepers shall provide a duplicated Employee Time Sheet, DC 333-F, for each employee to the designated supervisory staff within eight working days of the conclusion of each calendar month. The Personnel Office will ensure that all designated staff sign a verification of attendance record located in the Personnel Office documenting that they have completed the monthly review of the timesheet.

   b. Documentation of this review shall be noted on the Attendance Record Review Form, DC 9095, a copy of which shall be maintained for each employee in the supervisor's file. In the column designated for results of this review, the supervisor must note any action taken such as counseling, placement on proof status, referral to the Employee Assistant Program, oral reprimand, or referral for discipline. If the supervisor finds the employee's attendance to be acceptable, an "OK" must be noted. Although a formal review is only required once each month, supervisors must ensure on-going scrutiny of sick time usage and dockages, and shall take prompt action anytime the circumstances warrant such. Counseling is the first step in working with employees who may have an attendance problem.

   c. Prior to placing an employee on proof status, the supervisor shall meet with the employee to discuss the attendance record. Any employee whose attendance record creates reason to suspect abuse of sick time shall be immediately given written notice of his or her placement on proof status for a 90-day period.

      (1) Proof status shall take effect immediately for employees not covered by a labor contract.

      (2) For employees covered by a labor contract, the proof status shall take effect:

02-2004 11:22 FROM SACKS AI BRECHT    9335584    TO:P17 524 3706    P.006

| | | |
|---|---|---|
| **EAST MOLINE CORRECTIONAL CENTER** **Institutional Directive** | REFERS | 20 ILCS 5/3-2-2 Personnel Rules of Dept. of CMS AFSCME Contract A.D. 03.01.301 ACA 3-4069 |
| SECTION: 03 – Personnel and Labor Relations | NUMBER: | 03.01.301 |
| SUBSECTION: 01 – General Provisions | EFFECTIVE DATE: | November 08, 2002 |
| SUBJECT: 301 – Affirmative Attendance | PAGES: | Page 5 of 8 |

    (a)    Ten days after the employee received written notice of the proof status and no grievance is filed.

    (b)    On the effective date of the grievance withdrawal if the withdrawal is entered prior to the Step Three disposition; or

    (c)    On the date the facility is notified of the Step Three disposition if the grievance is withdrawn or denied. The Proof Status grievance shall be heard at the earliest possible Step Three meeting pursuant to master contract Article V, Section 2. If the grievance is denied, the employee shall be placed on Proof Status pending the final disposition at Step Four.

d.    The mere usage of sick leave supported by appropriate medical documentation will not support a continuation of proof status, unless additional fact(s) support suspected abuse. Use of sick leave shall be reviewed on a case-by-case basis. If the employer seeks to extend proof status based upon additional facts:

    (1)    Said proof status shall take effect immediately for employees not covered by a labor contract.

    (2)    For employees covered by a labor contract the continuation of proof status shall take effect:

        (a)    Ten days after the employee receives written notice of the proof status and no grievance is filed;

        (b)    On the effective date if the grievance withdrawal if the withdrawal is entered prior to the Step Three disposition; or

        (c)    On the date the facility is notified of the Step Three disposition if the grievance is withdrawn or denied. The proof status grievance shall be heard at the earliest possible Step Three meeting pursuant to master contract Article V, Section 2. If the grievance is denied,

| | |
|---|---|
| **EAST MOLINE CORRECTIONAL CENTER** <br> **Institutional Directive** | REFERENCE: 20 ILCS 5/3-2-2 <br> Personnel Rules of Dept. of CMS <br> AFSCME Contract <br> A.D. 03.01.301 <br> ACA 3-4069 |
| SECTION: 03 – Personnel and Labor Relations | NUMBER: 03.01.301 |
| SUBSECTION: 01 – General Provisions | EFFECTIVE DATE: November 08, 2002 |
| SUBJECT: 301 – Affirmative Attendance | PAGES: Page 6 of 8 |

the employee shall be continued on proof status pending final disposition at Step Four.

 e. Proof status shall be reviewed with the employee after the initial 90-day period or 60 days after the continuation on proof status. Employees shall be given either:

  (1) Written notice of their continuation on proof status for an additional 60 day period if their use of sick time continues to reflect reason to suspect abuse; or

  (2) Written notice that proof status is terminated.

 f. The Notification of Proof Status, DC 710-1265, shall be used to notify employees of initial placement, continuation, or removal from proof status. The form shall be dated and signed by both the employee and the supervisor. The original signed form shall be given to the employee and a copy shall be placed in the Personnel File and in the supervisor's file.

7. An employee on proof status who fails to provide proper medical certification of the use of earned sick time shall be given an unauthorized absence and be docked for the day(s) in question. Employees on proof status who are out of earned sick time and who continue to claim illness shall be advised in writing of the need to apply for a leave of absence or face discipline.

8. Proper medical certification for proof status must contain the following minimum elements:

 a. Signature, address, and phone number of the medical practitioner.

 b. The pertinent date(s) in question.

 c. An indication that the employee was unable to work on the date(s) in question for reasons of personal or family illness.

9. Employees on proof status who utilize sick time for bereavement shall provide appropriate documentation.

024-cv-04059-JBM-JAG #:21-4 Page 7 of 19

| EAST MOLINE CORRECTIONAL CENTER<br>Institutional Directive | REFERENCES: Personnel Rules of Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 | |
|---|---|---|
| SECTION: | 03 – Personnel and Labor Relations | NUMBER: 03.01.301 |
| SUBSECTION: | 01 – General Provisions | EFFECTIVE DATE: November 08, 2002 |
| SUBJECT: | 301 – Affirmative Attendance | PAGES: Page 7 of 8 |

10. It is the employee's responsibility to provide proper certification. Documents that do not contain the necessary elements shall not be accepted and the employee shall be so notified. The absences shall be considered unauthorized if acceptable certification is not subsequently provided within five work days.

11. The Department recognizes that personal problems may affect the attendance of employees. In addition to counseling, proof status, and discipline, supervisors are strongly encouraged to utilize employee referrals to the Employee Assistance counselors available at each facility and program site. Such referrals may be made anytime during the attendance or performance review process where the need is apparent, but in all cases a referral must be made once an employee has incurred discipline for any attendance-related issue.

NOTE: Proof may be required for a single absence only if reasonable grounds exist to suspect abuse for the day in question.

G. **Discipline**

1. All docks for unauthorized absences shall be referred for discipline in a timely manner in accordance with Administrative Directive 03.01.120. If just cause is established for the violations, the following guidelines shall be followed:

    | | |
    |---|---|
    | 1st offense | Oral Reprimand |
    | 2nd offense | Written Reprimand |
    | 3rd offense | 2nd Written Reprimand |
    | 4th offense | 1 day suspension |
    | 5th offense | 3 day suspension |
    | 6th offense | 5 day suspension |
    | 7th offense | 7 day suspension |
    | 8th offense | 10 day suspension |
    | 9th offense | 15 day suspension |
    | 10th offense | Discharge |

2. Each day of unauthorized absence shall be considered a separate offense for purposes of progressive discipline.

3. Each day of unauthorized absence without a call in shall be considered as

| EAST MOLINE CORRECTIONAL CENTER<br>Institutional Directive | | Personnel Rules of Dept. of CMS<br>AFSCME Contract<br>A.D. 03.01.301<br>ACA 3-4069 |
|---|---|---|
| SECTION: | 03 - Personnel and Labor Relations | **NUMBER:** 03.01.301 |
| SUBSECTION: | 01 - General Provisions | **EFFECTIVE DATE:** November 08, 2002 |
| SUBJECT: | 301 - Affirmative Attendance | **PAGES:** Page 8 of 8 |

two offenses and appropriate progressive discipline shall be administered pursuant to Paragraph II.G.1 above.

4. Except for the 8th and 9th offense prior to discharge, any suspension time shall be documented, but the employee shall report to work and lose no wages. For the 8th offense prior to discharge, the employee shall actually serve three days of the suspension prior to discharge; and for the 9th offense prior to discharge, the employee shall actually serve five days of the suspension. The employee shall report to work and lose no wages for the remaining suspension days.

5. The level of discipline imposed shall be based upon the above guidelines and shall be progressive in nature consistent with the master contract Article IX, Section 7: "...upon review of an employee's record, discipline for absenteeism shall be removed from such record if, from the date of the last discipline, two (2) years pass without the employee receiving additional discipline for absenteeism."

Note: Discipline which is two years old will not be removed unless the employee goes two (2) years without receiving any discipline for absenteeism.

Gary L. Wyant,
Warden

Reviewed: November 08, 2002
Supersedes: November 09, 2001

## Notification of Proof Status

Employee's Name: _Rick Lind_    Work Location: _Security_

Based on the following time usage documented in your attendance record, you are being placed/continued/removed from Proof Status as indicated below. (Circle call-in or no call as appropriate.)

Date: _3/4/03_ with call-in/ no-call
Date: _4/4/03_ with call-in/ no-call _extended_
Date: _4/30/03_ with call-in/ no-call _clock day_
Date: _5/15/03_ with call-in/ no-call _extended_
Date: _5/16/03_ with call-in/ no-call _extended_

Date: _/ /_ with call-in/ no call
Date: _/ /_ with call-in/ no call
Date: _/ /_ with call-in/ no call
Date: _/ /_ with call-in/ no call
Date: _/ /_ with call-in/ no call

_removed from Proof on 3/4/03_

**Placed on Proof Status on** _4/17/03_

Your time will be reviewed in 90 days to determine whether Proof Status will be continued or you will be removed from Proof Status. You will be notified when you are removed from Proof Status.

While you are on Proof Status, you are required to furnish proof of all unscheduled absences on the first day upon return to work. For proof of illness, proper medical documentation must be provided. The documentation must be the original (not a copy) and include the signature, address, and phone number of the doctor, dentist, or other professional medical practitioner, the dates in question, and the statement that the employee was "unable to work." Documents that do not contain these necessary elements shall not be accepted and you will be so notified. If acceptable documentation is not provided within 5 working days of such notification, the absence(s) will be considered unauthorized.

☐ **Continuation of Proof Status Recommended on** _/ /_

The period of review for Continued Proof Status will be 60 days. Proper medical documentation as explained in the Placement on Proof Status Section above continues to be required during this period.

If appropriate medical documentation of sick leave was provided during the previous period of Proof Status and Proof Status is continued based upon additional facts, said Proof Status will not take effect until either:

a. Ten (10) working days after written notice of the Proof Status is received, and no grievance is filed; or
b. Your Proof Status grievance is heard at the third level and the grievance is either withdrawn or denied.

If grievances are resolved at first or second level and the resolution sustains continuation of Proof Status, such Proof Status shall commence on the date of resolution.

☐ **Removed from Proof Status on** _/ /_

Employees who are out of earned sick time and continue to claim illness may apply for leave of absence or face discipline. The confidential services of the Employee Assistance Program are available to employees who feel that personal problems and/or other matters are impacting their ability to meet the contractual and departmental obligations.

I have read and I understand this notification.

_Refused to sign_    _Capt Stump_    _5/30/03_
Employee's Signature    Date    Supervisor's Signature    Date

Resp EXHIBIT 4

Distribution: Employee
Personnel File
Supervisor's File

DC 719-1265 (Eff. 7/1999)
IL 426-22932

Westlaw

730 N.E.2d 607                                                                                                    Page 1
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

C
Briefs and Other Related Documents

Appellate Court of Illinois,
First District, Sixth Division.

Daniel T. O'KEEFE,
Plaintiff-Appellant/Cross-Appellee,
v.
ILLINOIS STATE POLICE MERIT BOARD and
Terrance W. Gainer, Director, Illinois
State Police,
Defendants-Appellees/Cross-Appellants.

No. 1-98-3471.

May 26, 2000.

State trooper sought judicial review of a decision of the Merit Board upholding his discharge from state police for various instances of misconduct. The Circuit Court, Cook County, Thomas P. Durkin, J., affirmed in part, and reversed in part. On cross-appeals, the Appellate Court, Buckley, J., held that: (1) any error in failing to suppress officer's statements was harmless; (2) even if the State Police violated a collective bargaining agreement by failing to complete a file initiation report until after the officer's suspension, the Merit Board lacked jurisdiction to hear such a claim; (3) broken tape on the outer box of the officer's urine sample did not break the custodial chain; and (4) officer was entitled to pay pending a hearing before the Merit Board.

Affirmed.

West Headnotes

[1] Officers and Public Employees 72.62
283k72.62 Most Cited Cases

State trooper's claim that his statements should have been suppressed in proceeding before the Merit Board because State Police failed to advise him that he had a right to counsel and that his statements could be used against him, as required by statute, was waived where the officer filed a motion to suppress, but did not raise the matter again during the disciplinary proceedings against him.

[2] Evidence 154
157k154 Most Cited Cases

Rulings on motions to suppress are not final and may be changed or reversed at any time prior to final judgment.

[3] Administrative Law and Procedure 670
15Ak670 Most Cited Cases

[3] Appeal and Error 205
30k205 Most Cited Cases

Failure to ask the court or administrative body to reconsider a motion to suppress when the evidence is introduced at trial results in a waiver of that issue on appeal.

[4] Officers and Public Employees 72.57
283k72.57 Most Cited Cases

Any error in failing to suppress state trooper's statements on the ground that the State Police failed to advise him that he had a right to counsel and that his statements could be used against him was harmless in a disciplinary proceeding, as the statements were cumulative and merely duplicated other testimony.

[5] Officers and Public Employees 72.22
283k72.22 Most Cited Cases

Even if the State Police in fact violated a collective bargaining agreement by failing to complete a file initiation report until after a state trooper's suspension, the Merit Board lacked jurisdiction to hear such a claim in a disciplinary proceeding against the officer, or to provide a remedy for such a violation. S.H.A. 20 ILCS 2610/8.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607                                                                                                       Page 2
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

**[6] Officers and Public Employees ⇔69.3**
283k69.3 Most Cited Cases

Merit Board is a creature of statute, and thus, its powers are generally limited to those conferred upon it by statute; the Board's authority arises either from the State Police Act's express language or by fair implication and intendment of the Act's express provisions as an incident to achieving the objectives for which the Board was created. S.H.A. 20 ILCS 2610/14.

**[7] Officers and Public Employees ⇔72.62**
283k72.62 Most Cited Cases

Broken tape on the outer box of a state trooper's urine sample did not break the custodial chain, so as to preclude admission of the sample in a disciplinary proceeding before the Merit Board; physician testifying on the officer's behalf admitted that the box's seal did not necessarily affect the sample's integrity, the officer did not dispute that the seal on the bottles themselves remained intact, and several doctors testified that the tape on the outer boxes commonly broke.

**[8] Officers and Public Employees ⇔72.53**
283k72.53 Most Cited Cases

Reviewing courts will not disturb the Merit Board's ruling on the sufficiency of a custodial chain absent an abuse of discretion.

**[9] Officers and Public Employees ⇔72.62**
283k72.62 Most Cited Cases

Mere speculation that a sample could have been altered is insufficient to undermine a custodial chain's adequacy for purposes of a disciplinary proceeding before the Merit Board.

**[10] Officers and Public Employees ⇔72.62**
283k72.62 Most Cited Cases

State Police procedure did not require a medical review officer to investigate an alleged custodial chain error in a broken tape on the outer box of a state trooper's urine sample before examining the urine specimen and verifying a positive drug test result; the seals on the bottles themselves remained intact, and the review officer testified that, in verifying that proper procedures were utilized, his concern was not for the tape but, rather, the integrity of the specimen bottle.

**[11] Officers and Public Employees ⇔72.62**
283k72.62 Most Cited Cases

Testing facility's storage of state trooper's urine sample in an unlocked refrigerator did not break the custodial chain, so as to preclude admission of the sample in a disciplinary proceeding before the Merit Board; fact that the inner seals remained intact negated any conclusion that someone tampered with the sample.

**[12] Officers and Public Employees ⇔69.12**
283k69.12 Most Cited Cases

While the Director of the State Police was statutorily authorized to impose disciplinary measures, including suspension, on officers for a reasonable period not exceeding 30 days, a state trooper was entitled to pay pending a Merit Board hearing where he was suspended for approximately four months before the State Police filed written charges and provided him with the hearing; the statute made no distinction between disciplinary suspensions and administrative suspensions pending a discharge. S.H.A. 20 ILCS 2610/13, 2610/14.

**[13] Appeal and Error ⇔893(1)**
30k893(1) Most Cited Cases

Statutory construction is a matter of law and is considered de novo.

**[14] Statutes ⇔181(1)**
361k181(1) Most Cited Cases

Cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent.

**[15] Statutes ⇔188**
361k188 Most Cited Cases

To determine the legislature's intent, courts first look to a statute's language.

**[16] Statutes ⇔223.2(.5)**
361k223.2(.5) Most Cited Cases

Statutory provisions relating to the same subject matter should be construed harmoniously where

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

possible.

[17] Statutes ⚖188
361k188 Most Cited Cases

Courts must accord a statute's language with its plain and commonly understood meaning.

**609*819***584 Paul D. Geiger, Chicago, for Appellant.

Paul Racette, Assistant Attorney General, Chicago, for Appellees.

Justice BUCKLEY delivered the opinion of the court:

On February 17, 1995, defendant, the Illinois State Police (ISP), indefinitely suspended plaintiff, Trooper Daniel O'Keefe, without pay and pending a termination proceeding before the Merit Board (Board) pursuant to section 14 of the State Police Act (the Act) (20 ILCS 2610/14 (West 1998)). On June 16, 1995, ISP filed a 10-count complaint before the Board, alleging various instances of misconduct by O'Keefe. On September 24, 1996, a hearing officer found that ISP had proven 9 of the 10 counts. On October 31, 1996, the Board unanimously adopted the hearing officer's findings and discharged O'Keefe. On review, the circuit court affirmed the Board in part and reversed in part. O'Keefe now appeals to this court, arguing that: (1) the hearing officer erred in denying his motion to suppress his statements to investigators and his drug-test results; and (2) that ISP's investigation violated a collective bargaining agreement. ISP cross-appeals, arguing that the circuit court erred in finding that O'Keefe was entitled to pay while the Board hearing was pending. We affirm.

I. BACKGROUND

Paula Barrows testified at an evidence deposition that she is a special agent with the Federal Bureau of Investigation and that she formerly worked for ISP. Barrows further testified that, On February 17, 1995, she became involved in an investigation regarding O'Keefe. According to Barrows, an informant, John Hernandez, had been arrested on drug charges and told investigators that O'Keefe had been supplying him with confidential information in exchange for cocaine. Hernandez met with Barrows that same day and, according to Barrows, stated that he had been supplying O'Keefe with cocaine for over five years. In exchange for the cocaine, O'Keefe gave Hernandez confidential information relating to police code words, planned drug busts, and license **610 ***585 plate information. According to Barrows, O'Keefe also gave Hernandez an "EPIC book." Barrows explained that an "EPIC book" contains intelligence information involving narcotics trafficking throughout the United States and probably the world, including information regarding current narcotics investigations.

To corroborate Hernandez' story, Barrows instructed Hernandez to call O'Keefe and ask him to run a particular license-plate number. Barrows and other investigators watched Hernandez dial O'Keefe's telephone number, saw O'Keefe's number appear on the display of *820 Hernandez' cellular telephone, and shared the telephone with investigators so that they could hear the conversation and identify O'Keefe's voice. Later that day, O'Keefe called back and provided the information Hernandez requested. Barrows verified through an ISP telecommunicator that, while O'Keefe was off duty that day, he had in fact called in a request for information regarding the same license-plate number. Also that day, Barrows and three other officers searched O'Keefe's squad car. Inside, they found several Penthouse magazines, individual photographs of a naked woman, and a set of brass knuckles. ISP prohibits troopers from having any such items in their patrol cars.

Arthur Sebek, a squad supervisor in the ISP internal investigations division, testified that he was also present when Hernandez called O'Keefe, that he could identify O'Keefe's voice, and that he heard O'Keefe provide the license-plate information. Later that evening, O'Keefe was instructed to report to police headquarters. Sebek testified that, when O'Keefe arrived, and before Sebek could say anything, O'Keefe stated that he had known Hernandez for several years and that Hernandez was involved in drugs. According to Sebek, O'Keefe admitted, without being asked, that he ran a license plate for Hernandez and that he knew it was a mistake. Sebek testified that he cut O'Keefe off

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

ttp://print.westlaw.com/delivery.html?dest=atp&dataid=B00558000000105500036533258BB737A356D5D16... 7/1/04

730 N.E.2d 607                                                                                                        Page 4
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

and instructed him to complete a urinalysis test. Sebek accompanied O'Keefe to the testing center and then returned to police headquarters with O'Keefe. When the pair returned, O'Keefe's commander informed O'Keefe that he was suspended without pay. O'Keefe's urinalysis results indicated that he had cocaine in his system.

On June 16, 1995, the ISP Director filed a 10-count complaint with the Board, alleging numerous instances of official misconduct and requesting that O'Keefe be discharged. On February 1, 1996, O'Keefe filed a motion to quash his suspension and be reinstated or, alternatively, to be suspended with retroactive pay. O'Keefe also filed a motion to suppress the urinalysis test's results. On May 16, 1996, a hearing officer denied O'Keefe's motions.

The hearing officer conducted a hearing on ISP's complaint, spread over several dates between May 21, 1996, and July 30, 1996. On May 23, 1996, O'Keefe filed a supplemental motion to repress the urinalysis test's results, arguing that new evidence appeared indicating that an external chain-of-custody error had occurred. On September 24, 1996, after hearing testimony from several witnesses, including O'Keefe, Hernandez, Sebek, several physicians, and several ISP officials, the hearing officer denied O'Keefe's supplementary motion to suppress and submitted her proposed findings of facts and conclusions of law. The hearing officer found that O'Keefe knowingly associated with *821 drug traffickers, had observed illegal drug use but failed to report it to ISP, divulged confidential information to drug traffickers (including license plate and drug enforcement information) in exchange for cocaine, used cocaine while on or off duty, and had sexually explicit materials and unauthorized weapons in his patrol car. Further, the hearing officer found that ISP met its burden in proving 9 of the 10 counts in its complaint. On October 31, 1996, the Board unanimously adopted the hearing officer's findings of fact and conclusions of law, and ordered that O'Keefe be removed and discharged from ISP.

**611 ***586 On November 27, 1996, O'Keefe filed a petition for administrative review before the circuit court. O'Keefe argued that the investigation and suspension violated section 14 of the Act and the collective bargaining agreement between ISP and the Fraternal Order of Police (FOP), and that the Board improperly relied on his urinalysis test results despite procedural and custodial errors. On August 1, 1997, the circuit court found that ISP violated section 14 of the Act by suspending O'Keefe without pay and pending the hearing, and the court entered an order remanding the matter to the Board for payment of back pay. According to the transcript, the court also found that ISP violated section 14 of the Act by questioning O'Keefe without sufficient notice, and that evidence obtained from such questioning should have been suppressed pursuant to section 14a of the Act (20 ILCS 2610/14a (West 1998)), but that sufficient evidence nevertheless existed to support the Board's finding. Further, the circuit court refused to disturb the Board's findings with respect to O'Keefe's chain-of-custody argument and whether ISP violated the collective bargaining agreement. On August 22, 1998, O'Keefe advised the circuit court that he received his back pay, and the court entered a final order disposing of all matters before it. On September 11, 1998, O'Keefe filed the instant appeal.

On appeal before this court, O'Keefe again argues that ISP's investigation and suspension violated section 14 of the Act and the collective bargaining agreement between ISP and the FOP, and that the Board improperly relied on his urinalysis test results despite procedural and custodial errors. O'Keefe does not dispute the Board's factual findings or other conclusions of law.

II. ANALYSIS
A. Motion to Suppress O'Keefe's Statements

O'Keefe first argues that ISP failed to advise him on February 17, 1995, that he had a right to counsel and that his statements could be used against him, as required under section 14 of the Act. Section 14 of the Act reads in pertinent part as follows:
*822 "Before any such officer may be interrogated or examined * * *, the results of which * * * may be the basis for filing charges seeking his or her suspension for more than 15 days or his or her removal or discharge, he or she shall be advised in writing as to what specific improper or illegal act he or she is alleged to have committed; he or she shall be advised in writing that his or her admissions made in the course of the hearing, interrogation or examination may be used as the basis for charges seeking his or her

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

suspension, removal or discharge; and he or she shall be advised in writing that he or she has a right to counsel of his or her choosing, who may be present to advise him or her at any hearing, interrogation or examination." 20 ILCS 2610/14 (West 1998).

Further, under section 14a of the Act (20 ILCS 2610/14a (West 1998)), "statements or admissions obtained during the course of any hearing or interrogation not conducted in accordance with this Act may not be utilized against the officer in any subsequent disciplinary proceeding." Therefore, O'Keefe argues, the hearing officer erred by denying his motion to suppress his statement with regard to running license plates for Hernandez.

ISP disagrees, arguing that O'Keefe was never interrogated or examined. Instead, ISP argues, O'Keefe volunteered the information about Hernandez without being asked. Sebek testified that, before he had a chance to say anything, O'Keefe voluntarily admitted that he ran license-plate information for Hernandez. O'Keefe further admitted to Sebek that he knew it was a mistake and that he should not have done it. ISP Investigator Anthony Rapacz **612 ***587 also testified that O'Keefe made this admission voluntarily. Rapacz further testified that he reminded O'Keefe that he was an FOP trustee, that they had a contract, and that he had rights. However, O'Keefe waved Rapacz off and continued to state that he should not have done it. According to Rapacz, O'Keefe said that he was sorry for putting the other officers in such an awkward position. O'Keefe himself even admitted that he immediately told Sebek and the officers that he "knew what this was about" and then proceeded to tell them what he thought it was about, namely, running the license plate for Hernandez. O'Keefe also admits in his brief that ISP never conducted an interrogation or examination.

[1][2][3] We need not determine whether ISP violated section 14 of the Act because O'Keefe has waived this issue. While the record indicates that O'Keefe indeed filed a motion to suppress, O'Keefe fails to cite where, nor does review of the record indicate that, he raised the matter again during the proceedings. Rulings on motions to suppress are not final and may be changed or reversed at any time prior to final judgment. See *People v. Brooks*, 187 Ill.2d 91, 127, 240 Ill.Dec. 607, 718 N.E.2d 88, 109 (1999). *823 Failure to ask the court or administrative body to reconsider the motion when that evidence is introduced at trial results in waiver of that issue on appeal. See *Brooks*, 187 Ill.2d at 128, 240 Ill.Dec. 607, 718 N.E.2d at 109.

[4] Even if we were to reach the merits of O'Keefe's claim and conclude that O'Keefe's statements should have been excluded, such error would be harmless. The gist of O'Keefe's statement was that he knew Hernandez, he knew Hernandez was involved with drugs, and that he ran a license plate for Hernandez earlier that day. O'Keefe's February 17, 1995, statements were cumulative and merely duplicated other testimony. Sebek, Barrows, and others testified that they heard Hernandez ask O'Keefe to run a particular license plate, and that they heard O'Keefe supply the information that Hernandez requested. Hernandez testified that O'Keefe often ran license plates for him. Carroll Gibbs, a telecommunicator with ISP, testified that O'Keefe called her on February 17, 1995, and asked her to run the same license-plate number that Hernandez requested. O'Keefe himself testified during the hearing that he ran the license plate for Hernandez. Under these facts, even if the asserted error occurred, it would be harmless. See *People v. Wilkerson*, 87 Ill.2d 151, 157, 57 Ill.Dec. 628, 429 N.E.2d 526, 528 (1981) (finding that error is harmless when "the evidence is cumulative or merely duplicates properly admitted evidence").

B. Violation of the Collective Bargaining Agreement

[5] O'Keefe next argues that his suspension violated the collective bargaining agreement between ISP and the FOP. Article 7 of the collective bargaining agreement provides in pertinent part:
   "b. No internal investigation will be conducted and no discipline may be issued unless a file initiation report has been completed."
O'Keefe contends that ISP violated the collective bargaining agreement by failing to complete the file initiation report until after O'Keefe's suspension and that such failure requires that this court reverse the Board's finding.

This argument lacks merit. Assuming, arguendo, that ISP in fact violated article 7 of the collective bargaining agreement, we find that the Board lacked

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

jurisdiction to hear such a claim or provide a remedy for such a violation.

[6] Section 8 of the Act (20 ILCS 2610/8 (West 1998)) provides in pertinent part that the "Board shall exercise jurisdiction over the certification for appointment and promotion, and over the discipline, removal, demotion and suspension of Department of State Police officers." O'Keefe fails to cite any authority indicating \*\*\*588 \*\*613 that the Board has authority to provide a remedy for a violated labor agreement. Further, the plain language of section 8 indicates that the Board has no such \*824 power. Because the Board is a creature of statute, its powers are generally limited to those conferred upon it by statute. See *Schalz v. McHenry County Sheriff's Department Merit Comm'n*, 113 Ill.2d 198, 202, 100 Ill.Dec. 553, 497 N.E.2d 731, 732-33 (1986). The Board's authority arises either from the Act's express language or by fair implication and intendment of the Act's express provisions as an incident to achieving the objectives for which the Board was created. See *Schalz*, 113 Ill.2d at 202-03, 100 Ill.Dec. 553, 497 N.E.2d at 733. Section 8 of the Act clearly limits the Board's jurisdiction to disciplinary actions regarding an officer's conduct. O'Keefe's arguments relate not to his conduct but, rather, to ISP's alleged failure to adhere to a labor contract. We further note that, assuming the collective bargaining agreement is relevant here, article 8 of the agreement sets forth a separate procedure under which employees may file union grievances for agreement violations.

Further, assuming that the agreement is relevant here, O'Keefe has failed to cite any persuasive evidence in the record to indicate that the agreement was even broken. Barrows testified that she completed the report but that she could not recall whether she completed it on February 17, 1995, or February 20, 1995. Even if we were to make such a factual determination (see *Folbert v. Department of Human Rights*, 303 Ill.App.3d 13, 26, 236 Ill.Dec. 463, 707 N.E.2d 590, 599 (1999) (stating that "it is not the function of the reviewing court to resolve factual disputes")), O'Keefe has failed to explain how a delay of one business day prejudiced him.

C. Motion to Suppress Drug Test

Dr. Robert DuPont testified that O'Keefe's sample indicated that he had used cocaine within two or three days of the test. Dr. DuPont further testified that O'Keefe's sample contained an unusually high level of cocaine. ISP also presented evidence that a second facility also tested O'Keefe's sample and that it reached similar conclusions.

[7] However, O'Keefe contends that the Board erred by considering his urinalysis results. Specifically, O'Keefe argues that such evidence should have been excluded due to an external custodial chain error that was identified when the urine sample reached the toxicology center. According to an affidavit filed by Carmen Mitelescu, a lab worker, the sample was sent to the laboratory in a taped box, but that the tape "broke in transit." This discrepancy, according to O'Keefe, was so significant that the Board should have granted his motion to suppress. We disagree.

[8][9] The hearing officer found O'Keefe's argument unconvincing and determined that ISP established a sufficient custodial chain. Reviewing courts will not disturb the Board's ruling on the sufficiency of a \*825 custodial chain absent an abuse of discretion. *Williamson v. Police Board*, 182 Ill.App.3d 304, 310, 130 Ill.Dec. 729, 537 N.E.2d 1058, 1061 (1989). To support the Board's determination, the record must indicate that ISP took reasonable protective measures to ensure that the sample taken from O'Keefe was indeed the same sample tested in the laboratory. *Williamson*, 182 Ill.App.3d at 310, 130 Ill.Dec. 729, 537 N.E.2d at 1061. To prevail, O'Keefe must present tangible suggestion of tampering, alteration or substitution. See *Williamson*, 182 Ill.App.3d at 310, 130 Ill.Dec. 729, 537 N.E.2d at 1061. Mere speculation that the sample could have been altered is insufficient to undermine a custodial chain's adequacy. *Williamson*, 182 Ill.App.3d at 310, 130 Ill.Dec. 729, 537 N.E.2d at 1061.

We find that sufficient evidence exists to support the Board's determination. Dr. Mohamad Rahmanian testified that, when a urine sample is collected, the sample is divided between two bottles. The bottles \*\*614 \*\*\*589 are then wrapped lengthwise with tamper-resistant tape and identified with a control number. The sample provider's initials and the date are also written on the tape. The bottles are then placed in a sealed bag, and the bag is placed inside a box. The box is

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

Page 7

then sealed with security tape bearing the same control number. Dr. Rahmanian stated that the outer tape is designed to be fragile to prevent tampering. However, the tape is so fragile that it may be damaged during shipping. According to Dr. Rahmanian, such damage would not undermine the test's integrity so long as the bottles remain sealed. Dr. Donald Frederick testified on O'Keefe's behalf. Dr. Frederick similarly admitted that the box's seal does not necessarily affect the sample's integrity. O'Keefe does not dispute that, while the tape on the outer box was damaged, the seal on the bottles themselves remained intact. We further note that several doctors, including Frederick, testified that the tape on the outer boxes commonly breaks. Under these facts, we find that the broken tape on the outer box did not break the custodial chain.

[10] O'Keefe further argues that Dr. DuPont improperly examined O'Keefe's specimen and verified the positive result before investigating the alleged custodial-chain error. ISP procedure requires that Dr. DuPont, as the ISP medical review officer, "receive all pertinent information" prior to making such a determination, and O'Keefe contends that this omission required that the Board suppress his drug-test results. While Dr. DuPont admitted that he indeed examined O'Keefe's sample before investigating the broken tape, this argument nevertheless lacks merit. As previously stated, the seals on the bottles themselves remained intact. Dr. DuPont testified that, in verifying that proper procedures were utilized, his concern is not for the tape on the box but, rather, the integrity of the specimen bottle. We further *826 note that Dr. DuPont regularly contacts the provider of a positive sample to ask a series of questions that might establish an alternative reason for the positive result. Dr. DuPont left such a message for O'Keefe, but O'Keefe did not return his call.

[11] Citing *People v. Slaughter*, 149 Ill.App.3d 183, 102 Ill.Dec. 769, 500 N.E.2d 662 (1986), O'Keefe next argues that the testing facility improperly stored his sample in an unlocked refrigerator. Failure to store the sample securely, O'Keefe contends, violated ISP procedures and constituted a break in the custodial chain. We find that *Slaughter*'s facts are inapposite to the instant case. In *Slaughter*, the State acknowledged that the evidence at issue, an envelope containing two hand-rolled marijuana cigarettes, was handled in a lackadaisical manner. *Slaughter*, 149 Ill.App.3d at 186, 102 Ill.Dec. 769, 500 N.E.2d at 665. Further, the court noted:

"[T]he testimony is wholly inadequate to 'match' the description of the envelope * * *. [The corrections officer] did not testify to the color, or the size, of the envelope into which he put the cigarettes he found * * *. He also did not state that he ever sealed the envelope, marked, labelled, or identified the envelope, or that he inventoried the envelope.
Furthermore, the evidence * * * is insufficient to trace the individuals who did have access to the envelope, or the number of persons who could have had access to it. * * *
In addition, the record does not establish the degree to which access was restricted to the correctional facility's safe. [The officer] stated that he himself 'dropped' the envelope into the safe. He also stated that the safe was accessible to two persons, the lieutenant and the facility's accountant. Because [the officer's] access to the safe enabled him to drop the envelope into the safe, we cannot determine the degree to which access to the safe was permitted, beyond the two persons * * * specified at the hearing. Also, although [the officer] testified that the safe was of the type **615 ***590 which is locked by a key, he did not state that it was locked * * *.
* * *
The record is also inconclusive with respect to whether access was restricted to the correctional facility's safe in which the guard placed the envelope containing the cannabis. We therefore determine that the State failed to establish a proper chain of custody of the cannabis evidence it presented at the revocation hearing." *Slaughter*, 149 Ill.App.3d at 186-87, 102 Ill.Dec. 769, 500 N.E.2d 662.

The veritable litany of errors identified by the court in *Slaughter* simply does not exist in this case. In *Slaughter*, the court relied on numerous factors, including the fact that the record failed to adequately show whether others had access to the safe and whether the envelope had been sealed. Here, access is not a dispositive issue because the fact remains that the container's inner seals remained *827 intact and, therefore, the sample was in fact not disturbed. Carmen Mitelescu testified that she collected O'Keefe's sample and placed in a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

730 N.E.2d 607                                                                                              Page 8
(Cite as: 313 Ill.App.3d 817, 730 N.E.2d 607, 246 Ill.Dec. 582)

triple-sealed container, Mitelescu wrote the date, O'Keefe's initials, and a control number on the seals. That the inner seals remained intact negates the conclusion that someone tampered with the sample.

### D. Cross-Appeal

[12][13][14][15][16] On cross-appeal, ISP argues that the circuit court misinterpreted section 14 of the Act and erred in finding that the Board should have granted O'Keefe's motion to quash his unpaid suspension. We disagree. Statutory construction is a matter of law and is considered *de novo. Branson v. Department of Revenue*, 168 Ill.2d 247, 254, 213 Ill.Dec. 615, 659 N.E.2d 961, 965 (1995). The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill.2d 76, 81, 196 Ill.Dec. 655, 630 N.E.2d 820, 822 (1994). To determine the legislature's intent, courts first look to the statute's language. *Zekman v. Direct American Marketers, Inc.*, 182 Ill.2d 359, 368-69, 231 Ill.Dec. 80, 695 N.E.2d 853, 858 (1998). Statutory provisions relating to the same subject matter should be construed harmoniously where possible. *Rawles v. Hartman*, 172 Ill.App.3d 931, 936, 123 Ill.Dec. 217, 527 N.E.2d 680, 682 (1988). The relevant portion of section 14 of the Act states as follows:

"Except as is otherwise provided in this Act, no Department of State Police officer shall be *removed*, demoted or *suspended* except for *cause, upon written charges filed* with the Board by the Director and a *hearing* before the Board thereon upon *not less than 10 days' notice* at a place to be designated by the chairman thereof. At such hearing, the accused shall be afforded full opportunity to be heard in his or her own defense and to produce proof in his or her defense." (Emphasis added.) 20 ILCS 2610/14 (West 1998).

Section 13 of the Act also provides for suspensions and states in pertinent part as follows:

"Disciplinary measures prescribed by the Board for Department of State Police officers may be taken by the Director for the punishment of infractions of the rules and regulations of the respective divisions as promulgated by the Department. Such disciplinary measures may include *suspension* of any such officer for a reasonable period, *not exceeding 30 days*." (Emphasis added.) 20 ILCS 2610/13 (West 1998).

Construing sections 13 and 14 together, we find that the Director may impose disciplinary measures, including suspension, on officers for a reasonable period not exceeding 30 days. Illinois courts have upheld such suspensions even if they were unpaid. See, e.g., *828Scott v. Illinois State Police Merit Board*, 222 Ill.App.3d 496, 165 Ill.Dec. 20, 584 N.E.2d 199 (1991); *Clark v. Morris*, 99 Ill.App.2d 24, 31, 240 N.E.2d 515, 518 (1968). However, before ISP may suspend an officer beyond 30 **616 ***591 days, it must have cause, must file written charges with the Board, and must hold a hearing, to which officers must receive not less than 10 days' notice. The record indicates that ISP suspended O'Keefe without pay for approximately four months before filing written charges and providing him with the hearing required under section 14 of the Act.

ISP contends that section 14 does not apply here, arguing that "it did not file a complaint with the Merit Board seeking the *suspension* of O'Keefe in this case, but rather his *discharge.*" ISP asserts that two types of suspensions exist. According to ISP, "O'Keefe's suspension pending discharge was not a *disciplinary suspension* but rather an *administrative suspension*" intended to remove a corrupt officer from the street pending a hearing. O'Keefe disagrees, arguing that the Act's plain language makes no such distinction. While the hearing officer agreed with ISP, the circuit court rejected ISP's argument, finding:

"[Section] 14 of the Police Act could hardly be clearer in its requirement that written charges be filed with the board before any disciplinary action takes place. Here, it is undisputed that no such charges were filed until June 16, 1995, four months after O'Keefe was indefinitely suspended. * * * The hearing officer found that the requirements [of section 14] were followed. * * * The court finds that the hearing officer's construction of [section 14] were erroneous and, consequently, rejects the result reached by the hearing officer [with respect to O'Keefe's motion to quash]."

[17] We find the circuit court's interpretation of section 14 persuasive. Courts must accord a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# AGREEMENT

For RC-06-OCB
RC-09-OCB
RC-10-OCB
RC-14-OCB
RC-28-OCB
RC-42-OCB
RC-62-OCB
RC-63-OCB

## BETWEEN



## STATE OF ILLINOIS

Department of Central
Management Services

AND

## AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES COUNCIL 31 (AFSCME), AFL-CIO




July 1, 2000 to June 30, 2004

## Section 9. Family Responsibility Leave

a) An employee who wishes to be absent from work in order to meet or fulfill responsibilities, as defined in subsection (f) below, arising from the employee's role in his or her family or as head of the household may, upon request and in the absence of another more appropriate form of leave, be granted a Family Responsibility Leave for a period not to exceed one year. Such request shall not be unreasonably denied.

b) Any request for such leave shall be in writing by the employee reasonably in advance of the leave unless precluded by emergency conditions, stating the expected duration of absence, and any additional information required by agency operations.

c) Such leave shall be granted to any permanent full-time, or part-time employee pursuant to the Family Medical Leave Act, except that an intermittent employee shall be non-scheduled for the duration of the required leave.

d) "Family Responsibility" for purposes of this Section is defined as the duty or obligation perceived by the employee to provide care, full-time supervision, custody or non-professional treatment for a member of the employee's immediate family or household under circumstances temporarily inconsistent with uninterrupted employment in State service.

Subject to the time limits of this Section and to the standards of Section 9(f) below, an employee, upon request, shall be permitted to work a part-time schedule unless to do so would interfere with the operating needs of the Agency. For purposes of the Memorandum of Agreement entitled Part-Time Employees, the employee shall be considered a full-time employee.

e) "Family" has the customary and usual definition for this term for purposes of this Section, that is:

1) group of two or more individuals living under one roof, having one head of the household and usually, but not always, having a common ancestry, and including the employee's spouse;
2) such natural relation of the employee, even though not living in the same household, as parent, sibling or child; or
3) adoptive, custodial and "in-law" individuals when residing in the employee's household but excluding persons not otherwise related of the same or opposite sex sharing the same living quarters but not meeting any other criteria for "family".

f) Standards for granting a Family Responsibility Leave are:

1) to provide nursing and/or custodial care for the employee's newborn infant, whether natural born or adopted for a period not to exceed one (1) year;
2) to care for a temporarily disabled, incapacitated or bedridden resident of the employee's household or member of the employee's family;
3) to furnish special guidance, care or supervision of a resident of the employee's household or a member of the employee's family in extraordinary need thereof;
4) to respond to the temporary dislocation of the family due to a natural disaster, crime, insurrection, war or other disruptive event;
5) to settle the estate of a deceased member of the employee's family or to act as conservator if so appointed and providing the exercise of such functions precludes the employee from working; or
6) to perform family responsibilities consistent with the intention of this Section but not otherwise specified.

g) If an agency requires substantiation or verification of the need by the employee for such leave, the substantiation or verification shall be consistent with and appropriate to the reason cited in requesting the leave, such as:

1) a written statement by a physician or medical practitioner licensed under the "Medical Practices Act" (225 ILCS 60 et seq.) or under similar laws of Illinois or of another state or country or by an individual authorized by a recognized religious denomination to treat by prayer or spiritual means, or by a person who holds a current national certification as a nurse practitioner. Such verification shall show the diagnosis, prognosis and expected duration of the disability requiring the employee's presence.
2) written report by a social worker, psychologist, or other appropriate practitioner concerning the need for close supervision or care of a child or other family member;
3) written direction by an appropriate officer of the courts, a probation officer or similar official directing close supervision of a member of the employee's household or family; or
4) any reasonable independent verification substantiating that the need for such leave exists.

h) Such leave may not be renewed, however a new leave may be granted at any time for any appropriate reason other than that for which the original leave was granted.

1) If an agency has reason to believe that the condition giving rise to the given need for such leave no longer exists during the course of the leave, it should require further substantiation or verification and, if appropriate, direct the employee to return to work on a date certain.

j) Failure of an employee, upon reasonable request by the employing agency, to provide such verification or substantiation timely may be cause, on due notice, for termination of the leave.

k) Such leave shall not be used for the purpose of securing alternative employment. An employee during such leave may not be gainfully employed full time, otherwise the leave shall terminate.

l) Upon expiration of a Family Responsibility Leave, or prior to such expiration by mutual agreement between the employee and the employing agency, the agency shall return the employee to the same or similar position classification that the employee held immediately prior to the commencement of the leave. If there is no such position available, the employee will be subject to layoff in accordance with the Section on Voluntary Reduction and Layoff.

m) Nothing in this Section shall preclude the abolition of the position classification of the employee during such leave nor shall the employee be exempt from the Section on Voluntary Reduction and Layoff by virtue of such leave.

n) The Employer shall pay its portion of the employee's health and dental insurance (individual or family) for up to six (6) months while an employee is on Family Responsibility Leave and also would qualify for a leave pursuant to the criteria set forth in the Family and Medical Leave Act of 1993.

## Section 10. Leave for Union Office

The Employer shall grant requests for leaves of absence for not more than thirty (30) bargaining unit employees at any one time for the purpose of service as AFSCME representatives or officers with the International, State, or Local organization of the Union for up to a maximum of two (2) years each, provided the requests for such leave shall normally be made a minimum of five (5) working days prior to the effective date

[74]                                                                                                                     [75]