E-FILED
Friday, 02 February, 2007 03:35:10 PM
Clerk, U.S. District Court, ILCD

BEFORE THE CIVIL SERVICE COMMISSION

STATE OF ILLINOIS

| | |
|---|---|
| DEPARTMENT OF CORRECTIONS, | ) |
| STATE OF ILLINOIS, | ) |
|     Petitioner, | ) |
| | ) |
|   vs. | ) No. DA 7104 |
| | ) |
| RICK LIND, | ) |
|     Respondent. | ) |

TRANSCRIPT OF PROCEEDINGS had in the above-entitled matter on the 27th day of February, A.D. 2004, at 9:35 a.m.

BEFORE:  Leonard Sacks, Administrative Law Judge.





ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

```
 1   PRESENT:

 2

 3        OFFICE OF THE ATTORNEY GENERAL,

 4        STATE OF ILLINOIS

 5        (100 West Randolph Street, 13th Floor,

 6        Chicago, Illinois 60601,

 7        312-814-3000), by:

 8        MR. LOVELLETTE and

 9        MS. JILL COLE,

10             appeared on behalf of the Petitioner;

11

12

13        KATZ, HUNTOON & FIEWEGER, P.C.,

14        (200 Plaza Office Building,

15        Rock Island, Illinois 61204,

16        309-788-5661), by:

17        MR. STEPHEN T. FIEWEGER,

18             appeared on behalf of the Respondent.

19

20

21

22

23   REPORTED BY:  AMY K. ZUMBROCK,

24             CSR NO. 84-4356.
```

1    THE COURT:  Let the record show this is the

2    case of Illinois Department of Corrections versus

3    Rick Lind.  Case No. DA 7104.

4         Present for the petitioners are

5    assistant Attorneys General Jill Cole and Kevin

6    Lovellette.  Present with the respondent is

7    attorney Stephen Fieweger.

8         Yesterday when I got back to my office

9    at 6:00 o'clock I learned there was a motion to

10   amend the charges, which I have now read.  Is there

11   any objection to the motion?  Mr. Fieweger, first,

12   did you receive a copy of it?

13       MR. FIEWEGER:  I did receive a copy.  Judge, I

14   think this is late.  I believe that under the --

15       THE COURT:  Your objection?

16       MR. FIEWEGER:  My objection is the lateness of

17   it.

18       THE COURT:  Overruled.  It's not a surprise.

19   His personnel record would come into evidence

20   anyway, and I don't think it offends due process

21   for him to be notified in this proceeding that his

22   personnel record, which is a matter of course,

23   would be admitted is going to be considered if, in

24   fact, the allegations of the charges are proven --

1    the factual allegation of the charges are proven to

2    be correct.

3        The charges in this case arise out of a

4    discharge which were approved and served on

5    November 6th by Central Management Service

6    effective November 10th, 2003.

7        The Commission received the charges

8    November 8th, 2003, and it appears as though

9    Mr. Lind filed his appeal of the charges with the

10   Commission on November 17th, 2003, which is within

11   the 15-day rule.  And therefore, with regard to

12   that particular aspect of jurisdiction, there is no

13   issue of jurisdiction in my opinion.

14       The charges are specifically dated

15   November 10th, 2003.

16       "Rick Lind, employed by the Illinois

17   Department of Corrections at East Moline

18   Correctional Center in the position of correctional

19   officer, is discharged for cause because of the

20   following circumstances:"

21       And then it talks about unauthorized

22   absences from July 24th through August the 6th.  He

23   received a copy of the charges?

24       MR. FIEWEGER:  Yes.



1    THE COURT:  The petitioner claims that the
2    charges violate Administrative Directive.  Is that
3    right?  What the A.D. stands for is Administrative
4    Directive?
5    MR. LOVELLETTE:  That's correct.
6    THE COURT:  03.01.301, which is an affirmative
7    attendance policy.  I will take judicial notice of
8    the affirmative attendance policy, but I want to be
9    reminded of it with a copy put into the record
10   somewhere in your case.  Okay?  I don't care where
11   you put it in.  I can't remember it word for word,
12   but I've seen it, Mr. Fieweger, many times.  Okay?
13   MR. FIEWEGER:  No doubt.
14   THE COURT:  Are there any preliminary matters
15   other than the ones that I've taken care of?
16   MR. LOVELLETTE:  I don't think so.
17   THE COURT:  How about you, sir?
18   MR. FIEWEGER:  No.
19   THE COURT:  Are there any stipulations of fact
20   that the parties have discussed, any settlement
21   potential that anybody wants to pursue, or are we
22   ready to proceed?
23   MR. LOVELLETTE:  I think we're ready to
24   proceed.

1        MR. FIEWEGER:  Right.

2        THE COURT:  Okay.  Any opening remarks,

3    Mr. Lovellette or Ms. Cole?

4        MR. LOVELLETTE:  I think the charges just

5    speak for themselves.  So for opening we'd like to

6    insert the charges, which you've already read into

7    the record.

8        THE COURT:  Mr. Fieweger?

9      OPENING STATEMENT ON BEHALF OF THE RESPONDENT

10        MR. FIEWEGER:  Judge, Mr. Lind was informed on

11   these charges on November or had the hearing for

12   the suspension pending discharge on September 8th,

13   2003.  One of the issues we're raising is that the

14   discipline, namely discharge, was not committed

15   within 45 days as required.

16           Secondly, Mr. Lind requested a leave of

17   absence under the union contract which was not

18   acted upon by management, and that management took

19   the position in the September 8th disciplinary

20   hearing that he was on furnish proof status.

21           Under the directive, management is

22   required under 03.01.301 if an employee is on

23   furnish proof status to provide to the employee in

24   written notification of his right to --

1      THE COURT:  Of his right you say?

2      MR. FIEWEGER:  Yes.

3      THE COURT:  Okay.

4      MR. FIEWEGER:  Let me get the right paragraph.

5  Section F, Paragraph 7 states --

6      THE COURT:  Of the 301, last three digits are

7  301?

8      MR. FIEWEGER:  Correct.  "Employees on proof

9  status who are out of earned sick time and who

10  continue to claim illness shall be advised in

11  writing of the need to apply for a leave of absence

12  or face discipline."

13      Mr. Lind has never been advised by

14  management of that fact, despite the fact that at

15  the September 8th, 2003 disciplinary hearing

16  management took the position that he was on proof

17  status.

18      In addition, under -- let me get the

19  right section.  Mr. Lind submitted the appropriate

20  form for a request for a non-work-related medical

21  leave of absence under the union rules on July

22  24th, 2003.  He also continued to submit forms

23  throughout August and September, which management

24  did not act upon, and that's a violation of Section

1    10 under this rule.

2                Under Section F(10), if his

3    certification request, which was submitted in the

4    early period of August, 2003, is defective,

5    documents that do not contain the necessary

6    elements shall not be accepted, and the employee

7    shall be so notified.

8                Mr. Lind has an application on July 30th

9    signed by his treating chiropractor, Dr. Freebern,

10   which was submitted, and nobody notified him in

11   writing of any of the defectiveness of that.  And

12   under --

13        THE COURT:  Let me ask you this:  Are you

14   telling me what your closing argument is now?

15        MR. FIEWEGER:  I'm telling you what to look

16   for in this case.

17        THE COURT:  It doesn't sound to me like the

18   facts here are too much in dispute so far as

19   whether or not the guy was off of work for that

20   period of time.

21        MR. FIEWEGER:  Agreed.  And we're saying that

22   he took the necessary steps under the union

23   contract to be qualified for a medical leave of

24   absence which was not properly processed.

1      THE COURT:  So isn't that kind of like a --

2  aren't you giving me a legal argument, under the

3  facts of this case they can't fire him because (a),

4  (b), (c) and (d)?

5      MR. FIEWEGER:  Correct.

6      THE COURT:  Which to me is kind of like a

7  closing argument.

8      MR. FIEWEGER:  That's fine.  Let's proceed.

9      THE COURT:  Huh?

10     MR. FIEWEGER:  I'm ready to proceed.

11     THE COURT:  Okay.  Well, I'm not trying to cut

12  you off.  If you think I need to hear more

13  preliminary facts.  I'm just trying to separate my

14  understanding of the function of an opening

15  statement versus a closing argument.

16     MR. FIEWEGER:  Okay.

17     THE COURT:  And I'm going to give you a chance

18  to put all that in writing because then I can read

19  it and not have to try to remember it all.

20     MR. FIEWEGER:  Okay.

21     THE COURT:  And that will give him a chance to

22  rebut it, if he can legally, so we can focus on

23  what the real issues of this case are.

24     MR. FIEWEGER:  That's fine.

1    THE COURT:  Go ahead.  You probably would even

2    stipulate to part of his case, but that's all

3    right.  Go ahead.

4        MR. LOVELLETTE:  May we go off the record for

5    a second?

6        THE COURT:  Sure.

7            (WHEREUPON, discussion was had

8            off the record.)

9        MR. LOVELLETTE:  Before we call our first

10   witness, we'd ask that the amended charges be

11   admitted as Petitioner's Exhibit 1.

12       THE COURT:  Okay.  That will be allowed.

13           (WHEREUPON, Petitioner's Exhibit

14           No. 1, was received in evidence.)

15       MR. LOVELLETTE:  We'd also ask that the

16   affirmative attendance policy be admitted at this

17   time as Petitioner's Exhibit 2.

18       THE COURT:  I'll take notice of it.  It will

19   be admitted.  Any objection to me taking notice?

20       MR. FIEWEGER:  I just want to make sure which

21   one it was because they amended it.  I mean, this

22   is the one after the discipline.  You had a

23   November 7, 2002 directive.  I have it.

24       MR. LOVELLETTE:  Do you have a copy of that

1  one?

2       MR. FIEWEGER:  I have it right here.

3       THE COURT:  Do you want to make that a joint

4  exhibit?

5       MR. FIEWEGER:  Sure.

6       THE COURT:  That will be Joint Exhibit 1.  The

7  amended charges are Petitioner's Exhibit 1.  Just

8  handwrite it on there, Kevin, that that's what it

9  is.

10       MR. LOVELLETTE:  Is that all right?

11       MR. FIEWEGER:  No objection.

12       THE COURT:  Joint Exhibit No. 1 is admitted.

13  Petitioner's Exhibit No. 1 is admitted, and don't

14  worry about that.  Just take it back.

15            (WHEREUPON, Joint Exhibit

16            No. 1, was received in evidence.)

17       MR. LOVELLETTE:  And finally, we'd ask that

18  the Commission take judicial notice that the

19  previous discipline is mentioned in the charges.

20       THE COURT:  That's a section of his personnel

21  record?

22       MR. LOVELLETTE:  Yes, it is.

23       THE COURT:  Mr. Fieweger, I want you to be

24  aware that if you want the entire personnel record



E S Q U I R E™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1  admitted, because there could be laudatory things

2  in there that might affect the discipline if the

3  charges are true, you are certainly --

4      MR. FIEWEGER:  Entitled to do that.

5      THE COURT:  -- entitled to do that.  I'm not

6  sure that's true.  I don't know the answer to that.

7      MR. LIND:  It's over two years, your Honor.

8      THE COURT:  Yeah, I know.  I can't remember

9  the provision.

10     MR. LIND:  Well, let me look in affirmative

11 attendance all --

12     THE COURT:  Let your lawyer talk for you,

13 Mr. Lind.

14         Okay.  Petitioner's Exhibit No. 2, I

15 think it is is what you offered?

16     MR. LOVELLETTE:  That's correct.

17     THE COURT:  Any objection?

18     MR. FIEWEGER:  Yes, we object.

19     THE COURT:  And your objection is?

20     MR. FIEWEGER:  It's improper to reference this

21 based on article -- or Administrative Directive

22 3.01.301(g)(5), which states that if the employee

23 goes more than two years without discipline for

24 absenteeism, that that prior discipline for

1    absenteeism more than two years old shall not be

2    used in any further disciplinary hearings.

3            It also violates Article 9, Section 7 of

4    the union contract with management from July -- it

5    runs for the period of July, 2000 to June 30th,

6    2004.

7    MR. LOVELLETTE:  First of all, the two dates

8    of the disciplinary action.  The first date was

9    April 28th of 2000.  The second one was June 11th

10   of 2001.  Those in and of themselves are within two

11   years.

12       THE COURT:  Of each other?

13       MR. LOVELLETTE:  Of each other.  And it says

14   if you go two years without any other attendance

15   problems then it's expunged.  It's silent as to

16   what happens.  If you have two violations within a

17   year of each other, is it expunged two years after

18   the second one?  We argue no, it stays on the

19   record.

20       THE COURT:  All right.  Here's my

21   interpretation of that.  I understand what you're

22   saying.  You're saying, I believe, that had there

23   only been the April 28th violation you would

24   acknowledge that that's more than two years from

1   the date of this alleged offense, and you would

2   acknowledge that it would drop or be expunged if

3   that was the only violation.

4         But your claim is, I believe, that

5   because there was another occurrence within two

6   years of the April 28th violation, that -- I can't

7   think of a good word for it -- perpetuates the

8   April 28th violation so that it never drops off.

9      MR. LOVELLETTE:  I don't know if I'd say

10   never, but I think a year, you know, or actually

11   just a few months after the two years I think it's

12   still --

13      THE COURT:  My interpretation, which is, of

14   course, always subject to other interpretations by

15   other people more smart than me, is that the

16   two-year period would run from the last violation,

17   and I don't think that the June violation

18   regenerates the April violation so that the April

19   violation perpetuates into infinity.

20         My understanding is that the purpose of

21   the two-year period is to give an employee an

22   opportunity to make amends for their prior

23   tardiness or absenteeism, and if they show a good

24   record for that two-year period, then the prior

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1  unauthorized absences drop off.

2          I don't know how else I could have so

3  in-artfully stated my view, but that is my view,

4  and I think you understand it.

5          MR. LOVELLETTE:  I do.

6          THE COURT:  So the objection is sustained to

7  consideration of the prior discipline of April

8  28th, 2000 and the June 11th, 2000 --

9          MR. LOVELLETTE:  I have one further argument.

10         THE COURT:  -- on the substance of these

11  charges.  Okay.  Go ahead.

12         MR. LOVELLETTE:  The Civil Service Rule 40

13  admits past work record without a time limitation

14  for the purposes of mitigation, and that's why it's

15  being offered here.  The rules that respondent has

16  quoted are not binding upon the Commission.  Rule

17  40 is.

18         THE COURT:  Well, there is a conflict here

19  because we're required to consider the terms of the

20  union agreement, and I think we're subject to the

21  terms of the union agreement so far as applicable

22  rules of the Civil Service Commission.  I think

23  that's true.

24          So that would create an absolute



1   conflict between the union agreement and the Civil

2   Service Commission rule where we can consider prior

3   discipline.

4          So my ruling is going to stand.  That's

5   what I feel the law is.  If you're correct, by the

6   way, in your charges, it isn't going to make any

7   difference.  The Commission isn't going to, in all

8   likelihood, reduce the discharge to a suspension

9   because he's way over the six or seven minimum

10  number of absences, unexcused absences, if your

11  position is correct.  And apparently, the fact that

12  he was absent is not in dispute.  Is that true?

13      MR. FIEWEGER:  That's correct.

14      THE COURT:  So we just discussed a very

15  molehill type of issue here.  But that's all right.

16  I like to do those things.

17      MR. LOVELLETTE:  So ultimately, Petitioner's

18  Exhibit 2 is not admitted?

19      THE COURT:  Well, yeah.  It's admitted because

20  those are the only charges for the limited purpose

21  of charging the -- oh, you offered it for the

22  purpose of his prior personnel record.  Is that

23  what you're offering it for?

24      MR. LOVELLETTE:  Yes.



1   THE COURT: Okay. It's not admitted because

2   the charges are before me on another fashion.

3   MR. LOVELLETTE: Well, it's also offered to

4   aggravate.

5   THE COURT: Yeah. Well, it's not admitted for

6   that purpose.

7   MR. LOVELLETTE: In that case, the petitioner

8   calls Todd Franzen.

9   THE COURT: Franzen?

10   MR. LOVELLETTE: Yes, F-r-a-n-z-e-n.

11   THE COURT: Hello, Mr. Franzen.

12   MR. FRANZEN: Hello, sir.

13   THE COURT: My name is Leonard Sacks. I'm the

14   administrative law judge in this case.

15   Mr. Lovellette or Ms. Cole, one of the two of them,

16   is going to ask you questions concerning the events

17   that you're brought here to testify to.

18   Let him finish his questions, or let her

19   finish her questions before you answer. Please

20   answer with words out loud as opposed to nods or

21   noises which tend to indicate yes or no. And then

22   possibly the other lawyer will ask you some

23   questions. I may ask you some questions. All of

24   us, hopefully, will let you finish your answer

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    before we ask another question.  Okay?

2         MR. FRANZEN:  Okay.

3         THE COURT:  She's going to either -- you can

4    either swear or affirm, whichever your preference

5    to taking the oath.  This lady will administer the

6    oath to you.

7                   (WHEREUPON, the witness was duly

8                   sworn.)

9               TODD E. FRANZEN,

10   called as a witness herein, having been first duly

11   sworn, was examined and testified as follows:

12               DIRECT EXAMINATION

13   BY MR. LOVELLETTE:

14        Q.    Will you state your name and spell your

15   last name for the record?

16        A.    Todd E. Franzen.  F, as in Frank,

17   r-a-n-z, as in zebra, e-n.

18        Q.    Are you currently employed?

19        A.    With the Department of Corrections.

20        Q.    Where at?

21        A.    East Moline Correctional Center.

22        Q.    How long have you been with DOC?

23        A.    With DOC 13 years.  As a business

24   administrator, two years.



Q.    Are you the business administrator at East Moline?

A.    Yes.

Q.    Briefly, what are your jobs duties as the business administrator?

A.    I handle -- oversee budget for the facility, timekeeping and payroll.

Q.    In your position, are you familiar with Mr. Lind's attendance record?

A.    Yes.

Q.    Do you know was Mr. Lind scheduled to work on July 24th of 2003?

A.    Yes.

Q.    How about July 25th of 2003?

A.    If I can see something.

Q.    Is there anything that would refresh your recollection?

A.    Yes.

Q.    What would that be?

A.    The employee's time sheet.

MR. LOVELLETTE:  Do we need to mark this?

THE COURT:  Not as far as I'm concerned.  If you want him to mark it.

MR. FIEWEGER:  No.

1          THE COURT:  This is not a fact that's in

2     dispute, I don't think.

3          MR. FIEWEGER:  No.

4     BY THE WITNESS:

5          A.    July 24th, 25th, 26th and 27th were days

6     off, and then --

7          THE COURT:  Wait, wait.  24th and 25th he was

8     scheduled to work?

9     BY THE WITNESS:

10          A.    Yes.

11          THE COURT:  26th and 27th were scheduled days

12     off?

13     BY THE WITNESS:

14          A.    Yes.

15          THE COURT:  All right.  Go ahead.

16     BY MR. LOVELLETTE:

17          Q.    How about the 28th through the 31st of

18     July?

19          A.    Scheduled to work.

20          Q.    Did he appear at work?

21          A.    I have him as dock.

22          THE COURT:  As what?

23     BY THE WITNESS:

24          A.    As a dock day.



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1        THE COURT:  Dock?

2   BY MR. LOVELLETTE:

3        Q.    What does that mean?

4        A.    It's either unauthorized absence or no

5   paperwork came to us.  So the timekeeping docks the

6   employee.

7        THE COURT:  You dock.  You're using that word

8   in the sense of reducing pay or benefits, not dock

9   in the sense of it being an abbreviation for

10  doctor.

11  BY THE WITNESS:

12       A.    I'm sorry.  Yes.

13       THE COURT:  That's okay.  I just want to

14  understand what you're saying.

15  BY THE WITNESS:

16       A.    As an authorization of absence.

17       MR. FIEWEGER:  With a "k" on the end of it,

18  correct?

19  BY THE WITNESS:

20       A.    Yes.

21  BY MR. LOVELLETTE:

22       Q.    Was Mr. Lind scheduled to work on August

23  1st, 2003?

24       A.    Yes.



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1      Q.    Did he appear at work?

2      A.    No.

3      Q.    Was he scheduled for the 2nd and the 3rd

4  of August?

5      A.    Those were days off.

6      Q.    How about the 4th, 5th and 6th of

7  August?

8      A.    He was scheduled to work.

9      Q.    Did he appear at work?

10     A.    No.

11     Q.    As of July 24th, 2003, which I believe

12  was the first date you testified that Mr. Lind did

13  not come to work of this group of dates, did he

14  have any accumulated sick time on the books?

15     A.    Did you say July 24th?

16     Q.    July 24th.

17     A.    No.

18     Q.    Did you ever receive any paperwork

19  regarding a medical leave of absence for this time

20  from Mr. Lind in your office?

21     A.    No.

22     Q.    Will you explain what a medical leave of

23  absence is?

24     A.    A medical leave of absence starts with,

1    I believe, a CMS 95 that has gone through the human

2    personnel office or the warden's office, and then

3    the employee needs to come in and fill that work

4    out.

5        Q.    Okay.

6        A.    And then have a physician make the

7    statement, and then it's returned back to the

8    facility.

9        Q.    Okay.  And to your knowledge there was

10    no such CMS 95 form?

11        A.    I have not seen one.

12        Q.    Okay.  Are you aware of the affirmative

13    attendance policy for DOC?

14        A.    Yes.

15    MR. LOVELLETTE:  I'm going to show you what's

16    been marked Joint Exhibit 1.

17            (WHEREUPON, the exhibit was

18            tendered to the witness.)

19    BY MR. LOVELLETTE:

20        Q.    Is that the attendance policy?

21        A.    Yes.

22        Q.    Was that policy in effect in July and

23    August of 2003?

24        A.    Yes.

1      Q.     Did this policy cover Mr. Lind at that

2  time?

3      A.     Yes.

4      Q.     If the policy is violated, is that

5  detrimental to the department?

6      A.     Department and the facility, which we're

7  at, yes.

8      Q.     In what way is it detrimental to the

9  facility?

10     A.     There are scheduling for all securities

11  as well as non-security, and those positions are

12  arranged at the most-needed times during the days.

13     Q.     If you don't have a full complement of

14  guards, is that a safety concern?

15     A.     Yes.

16     Q.     To whom?

17     A.     Both the welfare to non-security,

18  security, as well as inmates.

19     Q.     And how about the public?

20     A.     And public.

21     MR. LOVELLETTE:  That's all the questions we

22  have.

23     THE COURT:  Mr. Fieweger?

24     MR. FIEWEGER:  Mr. Franzen, I'm going to show

1    you what is Respondent's Exhibit 1 for

2    identification.

3                (WHEREUPON, the exhibit was

4                tendered to the witness.)

5                CROSS EXAMINATION

6    BY MR. FIEWEGER:

7        Q.    Is that a CMS 95 form?

8        A.    No.

9        Q.    Isn't that a request for a leave of

10   absence, non-service related leave of absence?

11       A.    This is, yes.

12       Q.    And that is obtained from your office,

13   correct?

14       A.    From human personnel.

15       Q.    Okay.  That's not your office, correct?

16       A.    No, sir.

17       Q.    But if Mr. Lind is requesting a

18   non-service related leave of absence for medical

19   reasons, he comes in and gets that form, correct?

20       A.    I believe so.

21       Q.    And that form is dated July 24th, 2003,

22   correct?

23       A.    Yes.

24       Q.    And are you familiar with Mr. Lind's



1    signature?

2        A.    I would say it's his.

3        Q.    Okay.  And you would agree that Mr. Lind

4    is not authorized to place a different date on it

5    from the date that he requested it from the human

6    resources office, does he?

7        A.    That's correct.

8        Q.    In fact, they fill out that date when

9    it's requested, correct?

10       A.    Correct.

11       Q.    So if the date reflected therein is not

12   7/24/03, Mr. Lind got it that day from that office,

13   correct?

14       A.    I believe so.

15       Q.    And under the union contract that is in

16   this -- that the Department of Corrections is

17   subject to, under Article 19, Section 21, employees

18   who are out of sick time can apply for an illness

19   or injury leave, which is the non-service related

20   leave of absence, correct?

21       A.    They can apply to the warden's office.

22       Q.    And you don't know from this document

23   whether he did or didn't, do you?

24       A.    No, sir.



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1        Q.    And you've never checked with the

2   warden's office to determine whether, in fact, he

3   did submit this to the warden's office on or about

4   that date, correct?

5        A.    That's not my job.

6        Q.    All right.  So you don't know.  If he

7   did, he would be following Article 19, Section 21,

8   correct?

9        MR. LOVELLETTE:  Objection, calls for a

10  conclusion.

11       THE COURT:  Sustained.  That's what I'm

12  supposed to be deciding, isn't it?

13  BY MR. FIEWEGER:

14       Q.    Were you part of the disciplinary

15  hearing on September 8?

16       A.    No, sir.

17       Q.    Okay.  So you don't know what position

18  management was taking at that time regarding

19  whether he was on proof status or not, do you?

20       A.    No, sir.

21       MR. FIEWEGER:  All right.  No further

22  questions.

23       THE COURT:  Mr. Franzen, was there a

24  pre-termination hearing on September 8th, do you

1  know?

2  BY THE WITNESS:

3      A.    I don't know, sir.

4      THE COURT:  Go ahead.  Any other questions?

5      MR. LOVELLETTE:  Yes.

6                    REDIRECT EXAMINATION

7  BY MR. LOVELLETTE:

8      Q.    Do you know does the department

9  routinely date stamp documents when they get it in?

10     MR. FIEWEGER:  Objection, that calls for

11 speculation.

12     THE COURT:  If he knows.  That's not

13 speculation.  He either knows or he doesn't know.

14     MR. FIEWEGER:  Well, he can't testify with

15 respect to the department that this form comes

16 from.  He doesn't know the business practices of

17 that.

18     THE COURT:  I don't know that.  He asked him

19 do you know.  If he says he knows, he knows.  Now,

20 if you want to voir dire him on his foundation of

21 knowledge, that's another issue.  However, as you

22 know, in an administrative agency, hearsay evidence

23 is admissible in certain ways, many ways.  I mean,

24 I'm not going to direct him to say I don't know.

1    If he says he knows, he knows.

2        MR. FIEWEGER:  Okay.

3        THE COURT:  Do you know?

4    BY THE WITNESS:

5        A.    Our timekeeping office does not date

6    stamp.

7        THE COURT:  Okay.  The answer is you don't

8    know?

9    BY THE WITNESS:

10        A.    That's correct.

11    BY MR. LOVELLETTE:

12        Q.    Do you know if the warden's office does?

13        A.    I can't answer that.

14        Q.    On Respondent's Exhibit 1, is there a

15    date by Mr. Lind's signature?

16        A.    No, sir.

17        Q.    So can you tell by this document what

18    date he actually signed that?

19        A.    No.

20        Q.    Okay.  Regarding proof status, to your

21    knowledge, was Mr. Lind placed on proof status

22    April 17th of 2003?

23        MR. FIEWEGER:  Objection, no foundation.

24        THE COURT:  Well, there's no foundation, but



1    I'll let him do it backwards.  If he has -- if he

2    knows, he's going to say I know; and if he doesn't

3    know, he's going to say I don't know.  And again,

4    if you want to voir dire him on his foundation,

5    that will be okay.

6        MR. FIEWEGER:  That's fine.

7        THE COURT:  Go ahead and answer the question.

8    If you know, was he placed on proof status on

9    whatever date he just asked you about?

10    BY THE WITNESS:

11        A.    I have a proof status in his file for

12    4/17/03.

13        THE COURT:  4/17/03 there is in the file a

14    designation of proof status; is that right?

15    BY THE WITNESS:

16        A.    Yes, sir.

17        THE COURT:  And is the file kept in the

18    ordinary course of business of the Department of

19    Corrections?  Is that file that you're holding in

20    your hot little hands there kept in the ordinary

21    course of business?

22    BY THE WITNESS:

23        A.    Yes.

24        THE COURT:  Is that something that is kept

