E-FILED
Friday, 02 February, 2007 03:35:50 PM
Clerk, U.S. District Court, ILCD

1  under your supervision or control?

2  BY THE WITNESS:

3      A.    I just get a file copy.

4      THE COURT:  Somebody else supervises the

5  manufacture and control of that document?

6  BY THE WITNESS:

7      A.    Yes.

8      THE COURT:  Who is that?

9  BY THE WITNESS:

10     A.    It would be the human personnel rep.

11     THE COURT:  Okay.  Any questions?

12     MR. LOVELLETTE:  I have nothing else.

13     THE COURT:  Your knowledge as to whether or

14 not he was on proof status is based on what that

15 document is telling you; is that right?

16 BY THE WITNESS:

17     A.    Yes, sir.

18     THE COURT:  Okay.  Do you have any questions?

19     MR. FIEWEGER:  Yeah.

20              RECROSS EXAMINATION

21 BY MR. FIEWEGER:

22     Q.    Based on that, the document is dated

23 4/17/03; is that correct?

24     THE COURT:  Is that the same document?

1      MR. FIEWEGER:  That's the same document.

2    BY THE WITNESS:

3      A.    The captain at the time signed it on May

4    30th.

5    BY MR. FIEWEGER:

6      Q.    And to place an employee under the union

7    contract on proof status, the employee is to have

8    union representation at the time he is having that

9    meeting for proof status, correct?

10      THE COURT:  If you know.

11    BY THE WITNESS:

12      A.    I'll only say no as a supervisor.  But

13    as a supervisor, I need to have union

14    representation when I counsel my people, my staff.

15    BY MR. FIEWEGER:

16      Q.    You don't know with respect to Mr. Lind

17    and Captain Stump's situation whether he was

18    required to have union representation present when

19    placing on proof status?

20      THE COURT:  Mr. Lind or Mr. Stump?

21      MR. FIEWEGER:  Mr. Lind entitled to union

22    representation.

23      THE COURT:  I understand.  But you're

24    saying -- you're talking about two people.

1    BY MR. FIEWEGER:

2        Q.    Captain Stump is the person who placed

3    him on proof status, correct, according to the

4    document?

5        A.    According to the document, yes.

6        Q.    And the document is signed May 30 of

7    2003, correct?

8        A.    Correct.

9        Q.    For a proof status that he's placing him

10   on on April 17, 2003, correct?

11       A.    Correct.

12       Q.    Doesn't the union contract require when

13   you're placing an employee on proof status to

14   provide them the notification on the date that

15   you're placing them on proof status, not 43 days

16   later?

17       THE COURT:  If you know.

18   BY THE WITNESS:

19       A.    I'll just say no again.

20   BY MR. FIEWEGER:

21       Q.    Okay.  Do you know?

22       A.    If it was me, I'd have union

23   representation.

24       THE COURT:  On which date?  The date it's

1   signed or the date that it's dated?  Or the date

2   that he's placed on proof status or the date that

3   it's dated?  Apparently, those are two different

4   dates here.

5       MR. FIEWEGER:  Correct.

6   BY THE WITNESS:

7       A.    I would try to get it as soon as I -- in

8   my own personal professional -- to do it sooner

9   than --

10                  EXAMINATION

11  BY THE COURT:

12      Q.    Okay.  Let me ask you this question:

13  Proof status is what?  What does that mean?

14      A.    You follow the rules of conduct in the

15  Department of Corrections, the standards in which

16  we live by as to coming to work.

17           You first have your counseling.  Then

18  you have your written, and then you can go ahead

19  and start doing the different things, progressive

20  discipline.

21      Q.    What does the term "proof status" mean?

22      A.    That means when you call in you need to

23  have a doctor's permission statement.

24      Q.    All right.  There's some rule or

1    regulation that changes your status from just being

2    a sick person who doesn't show up at work and calls

3    in to being a sick person who doesn't show up that

4    has to have some kind of evidence that they're

5    sick.   Is that what proof status is?

6        A.    That's correct.

7        Q.    And somebody has the authority to direct

8    or tell an employee that he or she is on proof

9    status; is that right?

10       A.    That's correct.

11       Q.    And does the proof status come about

12   because of some prior questions as to whether or

13   not the employee was actually sick or not sick?

14       A.    Yes.

15       Q.    And so who has the authority to

16   determine whether or not someone is on proof

17   status?

18       A.    The warden.

19       Q.    And is it just the warden or his

20   assistant or deputy?

21       A.    He has the responsibility to dock from

22   the facility.

23       Q.    I'm trying to find out:   How does a

24   person achieve the status of being on proof status?

1   A.  The immediate supervisor.

2   Q.  So if I'm a correctional officer, I have

3 an immediate supervisor, and my supervisor says,

4 Sacks, you're on proof status because I don't think

5 you were really sick three weeks ago, or whatever.

6 Okay?

7   And at that point you're telling me that

8 the contract says that someone's supposed to notify

9 the union and say Sacks is going to get put on

10 proof status because he, perhaps, was prevaricating

11 here some time ago, and we want to question his

12 diligence so far as being a good CO, correct?

13   A.  Correct.

14   Q.  And so the union then comes -- do they

15 have any authority to argue with you about it or to

16 do anything about it, or are they just to be

17 notified about it?

18   A.  They need to be present.

19   Q.  And if they think the proof status is

20 inappropriate, that then becomes a subject that can

21 be grieved; is that correct?

22   A.  That's correct.

23   Q.  To your knowledge, is that the reason

24 for having a union representative notified or

1    present of the proof status?

2         A.     Yes.

3         Q.     And the employee can't grieve that on

4    their own, can they?  They can only grieve that

5    through the union; isn't that true?

6         A.     That's correct.

7         Q.     So if someone places Mr. Lind on proof

8    status and the union is not present, the time for

9    filing a grievance of that could be eliminated,

10   could be blown.  Isn't there some limitation on --

11        A.     It could, sure.

12        Q.     I mean, if you have a grievance, doesn't

13   it have to happen within a certain period of time

14   of the event; is that true?

15        A.     Yes.

16        Q.     And if the union is unaware because they

17   haven't been told of this event, this proof status,

18   the time for filing the grievance evaporates,

19   doesn't it, or can evaporate?

20        A.     Could evaporate.

21        THE COURT:  That's all the questions I have.

22   Do you have any questions?

23        MR. FIEWEGER:  I do.

24        THE COURT:  Go for it.


ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1              FURTHER CROSS EXAMINATION

2    BY MR. FIEWEGER:

3         Q.     Under Administrative Directive

4    03.01.301, Subparagraph F, it contains the

5    requirements for placement on proof status; is that

6    fair to say?

7         A.     Yes.

8         Q.     And under Section F, Paragraph 6(c),

9    prior to being placed on proof status, an employee

10   is to be counseled by the supervisor about your

11   affirmative attendance problems before a decision

12   is made later to place them on furnish proof

13   status, correct?

14        A.     Correct.

15        Q.     And you saw no indication in the record

16   that Captain Stump ever counseled Mr. Lind about

17   the fact that he was having unauthorized absences

18   and may be subject to furnish proof status in the

19   future, correct?

20        A.     I don't have any documentation.

21        Q.     Okay.

22        A.     I'm in charge of the timekeeping.

23        Q.     But the employer is required to keep

24   that kind of counseling record prior to placing on



1  furnish proof status, correct?

2      A.    Personnel would have that.

3      Q.    All right.  And if he was on furnish

4  proof status, under Paragraph F(10) -- excuse me,

5  wrong section.  I'm sorry.

6          Section F, Paragraph 7, employees on

7  furnish proof status who are out of earned sick

8  time and who continue to claim illness shall be

9  advised in writing of the need to apply for a leave

10  of absence or face discipline, correct?

11      A.    Uh-huh.

12      MR. LOVELLETTE:  Is that yes?

13  BY THE WITNESS:

14      A.    Yes.  I'm sorry.

15  BY MR. FIEWEGER:

16      Q.    And you've seen no documents in his

17  personnel file or otherwise which would indicate

18  that Mr. Lind was notified in writing of his need

19  to apply for a medical leave of absence or face

20  discipline, have you?

21      A.    I have not seen anything.

22      Q.    Okay.  And also, under Section F,

23  Paragraph 11, the employee is to be referred to the

24  Employee Assistance Program before discipline can



1    be imposed, correct?  I'm sorry, once discipline

2    has been imposed.  I'm sorry.

3            The first date you say you're going to

4    be subject to discipline for your unauthorized

5    absence while on furnish proof status, he must be

6    referred to EAP, correct?

7        A.    Yes.

8        Q.    Have you seen any documentation within

9    his personnel file which would indicate that

10   someone from management referred Mr. Lind to the

11   Employee Assistance Program?

12       A.    I have not seen anything.

13       MR. FIEWEGER:  All right.  I have no further

14   questions.

15       THE COURT:  Mr. Lovellette?

16       MR. LOVELLETTE:  One question.

17             FURTHER DIRECT EXAMINATION

18   BY MR. LOVELLETTE:

19       Q.    Did Mr. Lind sign the notification of

20   proof status?

21       A.    No.

22       Q.    Did he refuse to sign?

23       THE COURT:  It says he refused to sign.

24


ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

BY THE WITNESS:

A.    Refused to sign.

BY MR. LOVELLETTE:

Q.    Does it have a date there?

THE COURT:  Wait, wait.  It says he refused to sign.  We don't know if he refused to sign.  But he didn't sign it, and someone wrote on it that he refused to sign.  That's the extent of the evidence.

BY MR. LOVELLETTE:

Q.    Do you have any other way of knowing if an employee doesn't sign how to notify that or note that in the record other than writing something like that?

A.    Other than writing, no.

Q.    Is that the normal way to do things when employees refuse to sign?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes.

Q.    And is the refusal to sign, is that documented in that document with a date?

A.    Yes.

Q.    When was that?  When did he refuse to

1    sign?

2        A.    May 30th, '03.

3        MR. LOVELLETTE:  Okay.  No further questions.

4                FURTHER CROSS EXAMINATION

5    BY MR. FIEWEGER:

6        Q.    Mr. Franzen, when an employee refuses to

7    sign and a union representative is at that meeting,

8    the union representative does sign the form then,

9    correct?

10        A.    Yes, initials.

11        Q.    And that helps the union know when the

12    10-day period runs to submit a grievance on this

13    type of discipline, correct?

14        A.    Could you repeat the question?

15        Q.    Sure.

16        THE COURT:  It's a way for the union to keep a

17    record of when the grievance time starts, if the

18    union rep puts their initials on it.

19    BY THE WITNESS:

20        A.    I'll say yes.

21        THE COURT:  That's one benefit of initialling.

22    BY THE WITNESS:

23        A.    Uh-huh.

24        MR. FIEWEGER:  All right.  No further

1    questions.

2         THE COURT:  Anything else?

3         MR. LOVELLETTE:  Nothing further.

4         THE COURT:  Okay.  Very good.  Thank you,

5    Mr. Franzen.

6         (WHEREUPON, the witness was excused.)

7         MR. LOVELLETTE:  Can we take just a 30-second

8    break?

9         THE COURT:  You can take -- we're going to

10   take probably a longer break unless you've got a

11   real short witness of some kind.

12        MR. LOVELLETTE:  I don't think we have another

13   witness, to tell you the truth.  But I want to talk

14   to my partner first.

15        THE COURT:  Sure.

16          (WHEREUPON, a recess was had.)

17        MR. LOVELLETTE:  Petitioner rests.

18        THE COURT:  Well, in that case, we're going to

19   break until noon.  That is a sure time that I'll be

20   back, and you can start your case.

21        MR. LOVELLETTE:  Can I ask that it be 12:30?

22   Because at noon I'm going to pick up an order at

23   the Daley Center.

24

1 (WHEREUPON, discussion was had

2 off the record.)

3 (WHEREUPON, at 10:30 a.m., 2/27/04,

4 the proceedings were recessed until

5 12:30 p.m., 2/27/04.)

6 THE COURT:  Same parties present.  The

7 petitioner has rested.  This is just a courtesy

8 copy?

9 MR. LOVELLETTE:  Yes, it is.

10 THE COURT:  Okay.  Petitioner has rested.

11 Does the respondent have any evidence?

12 MR. FIEWEGER:  Yes.

13 THE COURT:  Okay.  Do you want to proceed?

14 MR. FIEWEGER:  I call Rick Lind.

15 THE COURT:  Okay.  Mr. Lind, I think the

16 easiest way would be for Mr. Lovellette and

17 Ms. Cole to scoot down a little bit.

18 MR. FIEWEGER:  To have me come over there too?

19 THE COURT:  No, you stay right where you are.

20 Because if you can hear him, I'm going to assume

21 that I can hear him.

22 MR. FIEWEGER:  Okay.

23 THE COURT:  And I'm the one that wants to hear

24 him.  You heard my admonition to Mr. Franzen with



ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    regard to the answering of questions, keeping your

2    voice up, answering with words and so forth?

3         MR. LIND:  Yes, sir.

4         THE COURT:  If you would follow that, it would

5    be very helpful to this reporter and to me.  She'll

6    swear you in if you raise your right hand.

7                        (WHEREUPON, the witness was duly

8                        sworn.)

9                        RICK LIND,

10   called as a witness herein, having been first duly

11   sworn, was examined and testified as follows:

12                   DIRECT EXAMINATION

13   BY MR. FIEWEGER:

14        Q.    Would you please state your name?

15        A.    My name is Rick Lind, L-i-n-d.

16        Q.    Where do you live, sir?

17        A.    I live at 401 Main Street, Erie,

18   Illinois.

19        THE COURT:  Erie, Illinois?

20   BY THE WITNESS:

21        A.    Yes, sir.

22   BY MR. FIEWEGER:

23        Q.    That's how far from the East Moline

24   Correctional Center?



1    A.    Approximately 20 miles.

2    Q.    And how long have you been employed by

3 the East Moline Correctional Center?

4    A.    19 and-a-half years.

5    Q.    What's your date of service, your

6 beginning date of service?

7    A.    11/12 of '84.

8    Q.    And what is your position until this

9 discipline occurred?

10    A.    Officer.

11    Q.    And do you have medical conditions?

12    A.    Yes, I do.

13    Q.    And what's your medical conditions?

14    A.    I have degenerating disk in my lower

15 back due to a car accident in 1980, 4/26 of '80.

16    Q.    And due to that condition, have you used

17 your allotted sick time prior to the imposition and

18 discipline in this case?

19    A.    Yes, I have.

20    Q.    All right.  Now, were you having health

21 problems in July of 2003?

22    A.    Yes, I was.

23    Q.    And what problems were you having?

24    A.    I was having low back and severe

1    headache.

2         Q.    And was that related to the conditions

3    that you've described from the automobile accident?

4         A.    Yes, it was.

5         Q.    Did you attempt to secure a leave of

6    absence from the Department of Corrections due to

7    your medical condition?

8         A.    Yes, I did.

9         Q.    And what did you do?

10        A.    I called in sick, and then I called the

11   personnel department and requested a leave of

12   absence, form CMS 95.

13        Q.    And did you go in that day to get that?

14        A.    Yes, I did.

15   MR. FIEWEGER:  All right.  I'm going to show

16   you Respondent's Exhibit 1 for identification.

17             (WHEREUPON, the exhibit was

18             tendered to the witness.)

19   THE COURT:  Does the state have a copy?

20   MR. FIEWEGER:  I don't have copies.  I'm

21   sorry.

22   MR. LOVELLETTE:  That's okay.  I've seen it.

23   THE COURT:  All right.

24   THE WITNESS:  Do you need to see this?



1      THE COURT:  No, I'll see it at the end of the

2  case.  You go ahead and take a look at it.

3  BY MR. FIEWEGER:

4      Q.    Can you tell me what that document is?

5      A.    This is a personnel action form from --

6  this is your disability, request a leave of

7  absence.

8      Q.    And did you go in on July 24, 2003 to

9  request that?

10     A.    Yes, I did.

11     Q.    And where did you go to get it?

12     A.    I went to the personnel slash warden's

13  office to get that.

14     Q.    Okay.

15     A.    That's the only place you can pick up

16  the CMS 95.

17     Q.    And from whom did you pick this up?

18     A.    Pam Verstreate, which at that time was

19  the personnel liaison.

20     Q.    Did you sign it that date?

21     A.    Yes, I did.

22     Q.    Did you see the person fill out the top

23  of that form?

24     A.    Yes I did.

1      Q.    Who was it?

2      A.    Pam Verstreate.

3      Q.    And did she fill in the date of July 24,

4  2003?

5      A.    Yes, she did.

6      MR. FIEWEGER:  Move for the admission of

7  Exhibit 1.

8      THE COURT:  Any objection?

9      MR. LOVELLETTE:  None.

10     THE COURT:  Without objection, Respondent's

11  Exhibit 1 will be admitted into evidence.

12          (WHEREUPON, Respondent's Exhibit

13          No. 1, was received in evidence.)

14     THE COURT:  May I see it, please, sir?

15          (WHEREUPON, the exhibit was

16          tendered to the Court.)

17  BY MR. FIEWEGER:

18      Q.    Were you under a doctor's care at this

19  point?

20      A.    Yes, I was.

21      Q.    Who was your treating medical provider?

22      A.    I was referred to my chiropractor from

23  my medical doctor, which is Randall Mullen.  And

24  from the chiropractor I was referred to the



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY

*Chicago:* 312.782.8087 • 800.708.8087/• Fax 312.704.4950

1    neurologist, Dr. Brian Anson (phonetic).

2         Q.    Okay.  And as of July 24th, though, who

3    were you actually primarily seeing?

4         A.    Dr. Kevin Freebern.

5         Q.    And he's a licensed chiropractic

6    physician and licensed to practice chiropractic

7    medicine in the state of Illinois; is that correct?

8         A.    Yes, he is.

9         Q.    All right.  When you received Exhibit 1,

10   did you also request the form for Exhibit 2?

11        A.    Yes, I did.

12        Q.    And what is that?

13        A.    This is your CMS 95, your physician

14   statement, which accompanies your request for a

15   leave of absence.

16        Q.    Okay.

17        THE COURT:  So when you go in to see this Pam

18   lady, you have that already filled out, do you?

19   BY THE WITNESS:

20        A.    No, sir.  When I request this, she sends

21   this in the mail to me.  Then when I bring it back

22   to her, it's filled out and signed by the doctor.

23   The only place you can get these is in the --

24        THE COURT:  The warden's office.

BY THE WITNESS:

    A.    -- the warden's office slash personnel. At that time we had cut back on staff, and she was doing both jobs.

    THE COURT: All right. So do you have that in your possession on this day, on the 24th of July when she fills this out?

    MR. FIEWEGER: You mean completed?

    THE COURT: No, I want to know if he has it, number one.

    MR. FIEWEGER: Oh, the form. Okay.

BY THE WITNESS:

    A.    Yes, I went and picked it up.

    THE COURT: The same day that Pam fills this out?

BY THE WITNESS:

    A.    Yes.

    THE COURT: Okay. Go ahead.

BY MR. FIEWEGER:

    Q.    All right. And then did you take that to Dr. Freebern?

    A.    Yes.

    Q.    And did you then receive that back from him?



1    A.    Yes, I did.

2    Q.    What did you do with the form?

3    A.    Brought it to Pam Verstreate.

4    Q.    What date did you do that?

5    A.    7/30.

6    Q.    Of '03?

7    A.    Yes.

8    Q.    And is that the date that Dr. Freebern

9    signed it?

10    A.    Yes, it is.

11    Q.    Did you deliver that in person, or did

12    you put it in the mail?

13    A.    No, I delivered it in person.

14    Q.    Okay.  Did Ms. Verstreate in your

15    presence stamp it?

16    A.    No.

17    MR. FIEWEGER:  All right.  Move for the

18    admission of Exhibit 2.

19    MR. LOVELLETTE:  No objection.

20    THE COURT:  Without objection Exhibit 2 is

21    admitted into evidence.

22             (WHEREUPON, Respondent's Exhibit

23             No. 2, was received in evidence.)

24    THE COURT:  Let me look at it for just a



1    second.

2                    (WHEREUPON, the exhibit was

3                    tendered to the Court.)

4        MR. LOVELLETTE:  For the court reporter, how

5    do you spell Verstreate, do you know?

6    BY THE WITNESS:

7        A.    V-e-r-s-t-r-e-a-t-e, I believe.  She's

8    no longer in the personnel department.  When they

9    changed governors, they changed several things.

10       MR. FIEWEGER:  May I continue to inquire?

11       THE COURT:  Yeah, go ahead.

12   BY MR. FIEWEGER:

13       Q.    All right.  Now, at the time that you're

14   applying for this leave of absence disability, were

15   you subject to any prior progressive discipline for

16   absenteeism?

17       A.    No, I had no prior discipline.

18       MR. FIEWEGER:  I'm going to show you

19   Respondent's Exhibit 3 for identification.

20                   (WHEREUPON, the exhibit was

21                   tendered to the witness.)

22   BY MR. FIEWEGER:

23       Q.    Were you being referred for discipline

24   in May of 2003 for absence in mid-May, 2003?



1    MR. LOVELLETTE:  I'm going to object to the
2    relevance.
3        MR. FIEWEGER:  In the event that your ruling
4    on their Exhibit 2 is overruled, this is evidence
5    of the fact that there was no prior discipline for
6    absenteeism.
7        THE COURT:  Their Exhibit 2 has already
8    been -- isn't that the amended charges, their
9    Exhibit 2?
10       MR. FIEWEGER:  No.
11       THE COURT:  What's their Exhibit 2?
12       MR. FIEWEGER:  That was the April of 2000 and
13   June of 2001 progressive discipline.
14       THE COURT:  Didn't I already rule on that?
15       MR. FIEWEGER:  Correct, but I'm just
16   protecting my record in the event that you're
17   overruled on that issue.
18       THE COURT:  Well, I understand protecting your
19   record.  But so far your record is you're winning
20   on that issue.  So let's say that I'm wrong, and
21   the Commission decides to consider it.  Is that why
22   you're wanting this in?
23       MR. FIEWEGER:  Yes.
24       THE COURT:  Well, I can appreciate your



1    wanting it in, and I'm going to admit it for the

2    limited purpose of it being considered in the event

3    that my ruling is somehow overturned as to

4    Petitioner's Exhibit No. 2 relating to the April

5    28th discipline and the June 11th discipline.  Is

6    that what you're wanting?

7        MR. FIEWEGER:  That's exactly why I'm offering

8    it.

9        THE COURT:  Okay.  It's in for that purpose.

10            (WHEREUPON, Respondent's Exhibit

11            No. 3, was received in evidence.)

12        THE COURT:  I don't need to look at it.  I'm

13    not going to be overturned on that issue.

14    BY MR. FIEWEGER:

15        Q.    Mr. Lind, did anyone from the warden's

16    office inform you that the physician statement and

17    request for the disability leave of absence were

18    going to be denied?

19        A.    No.

20        Q.    Did anyone inform you that the physician

21    statement submitted by Dr. Freebern on July 30 of

22    2003 was defective in any manner?

23        A.    No.

24        Q.    All right.  Now, you were subjected to



1    the hearing for discipline on these charges on

2    September 8th, 2003, correct?

3         A.    That's correct.

4         Q.    And at that hearing, did management take

5    the position that you were on furnish proof status?

6         A.    Yes, they did.

7         MR. FIEWEGER:  All right.  I'm going to show

8    you Respondent's Exhibit 4 for identification.

9              (WHEREUPON, the exhibit was

10              tendered to the witness.)

11        THE COURT:  Does anybody have the record of

12   those proceedings, or is there any record of those

13   proceedings?

14        MR. FIEWEGER:  I've got them right here.

15   Coming.

16        THE COURT:  I mean, I'd rather see the record

17   of the proceeding than your client say what

18   happened there because I'm not sure he's qualified

19   to know except he either got fired or he didn't.

20   But go ahead.

21        MR. FIEWEGER:  Thank you.

22   BY MR. FIEWEGER:

23        Q.    Is Exhibit 4 the document that was

24   presented at the September 8, 2003 hearing to

1    support management's position that you were on

2    furnish proof status?

3         A.    Yes, it was.

4         Q.    Were you represented by Jeff Papish and

5    Randy Sanders, who are union representatives?

6         A.    Yes, I was.

7         THE COURT:    At the pre-d hearing you're

8    talking about?

9         MR. FIEWEGER:  Yes.

10   BY THE WITNESS:

11        A.    Yes.

12   BY MR. FIEWEGER:

13        Q.    Prior to your disciplinary hearing, your

14   pre-hearing --

15        THE COURT:    It's a pre-termination hearing.

16        MR. FIEWEGER:   Pre-termination hearing.  I'm

17   sorry.

18        THE COURT:    That's okay.

19   BY MR. FIEWEGER:

20        Q.    Were you informed in writing of your

21   right or need to apply for a leave of absence or

22   face discipline?

23        A.    No, I was not.

24        Q.    Were you ever informed prior to the



1    pre-disciplinary hearing that the documents that

2    you had submitted for your leave of absence were in

3    any form defective, meaning by writing?  Did

4    anybody ever notify you of that?

5         A.    No, I was not.

6         Q.    Prior to your September 8, 2003 hearing,

7    were you ever given a written notification

8    referring you to the Employee Assistance Program?

9         A.    No, I was not.

10         Q.    And at the September 8, 2003 hearing,

11    did anyone from management inform you that your

12    request for a leave of absence was being rejected

13    with respect to this July 30th, 2003 physician

14    statement and your CMS 95 form that was submitted

15    on July 24th, 2003?

16         A.    No, they did not.

17         MR. FIEWEGER:  All right.  I'll show you

18    Exhibit 5.

19              (WHEREUPON, the exhibit was

20              tendered to counsel.)

21         MR. LOVELLETTE:  This is a copy of the same

22    page.  I believe there's a second page to this.

23         MR. FIEWEGER:  Oh, I've got the wrong page.

24    Okay.

1        MR. LOVELLETTE:  I probably have that

2   somewhere too.

3        MR. FIEWEGER:  Let me see if I can find it

4   real quick.

5        MR. LOVELLETTE:  Here it is.

6        THE COURT:  Why don't you just make a copy of

7   that second page, or a couple.

8        MR. LOVELLETTE:  I can't make it work.

9            (WHEREUPON, discussion was had

10           off the record.)

11       MR. FIEWEGER:  I'm going to show you

12  Respondent's Exhibit 5.

13           (WHEREUPON, the exhibit was

14           tendered to the witness.)

15  BY MR. FIEWEGER:

16       Q.    Is this a true and correct copy of the

17  pre-disciplinary hearing meeting minutes that

18  resulted from that date?

19       A.    Yes.

20       Q.    Okay.  And did you prior to that date

21  also submit a notification of absence forms along

22  with a doctor's slip?

23       A.    Yes, I did.

24       Q.    And are you required under your



1    knowledge of the union contract to submit a

2    completed physician's statement under the CMS form

3    in order to request alternative time?

4         A.    To request alternative time, no, you're

5    not.

6         MR. FIEWEGER:  I'm going to show you Exhibit 9

7    and 10 for identification.

8              (WHEREUPON, the exhibits were

9              tendered to the witness.)

10   BY MR. FIEWEGER:

11        Q.    What is Exhibit 9?

12        A.    9 is my physician statement from my

13   physician.

14        Q.    Okay.  And what is 10?

15        A.    10 is my request for alternative time.

16        Q.    And you filled those all out on the day

17   you returned to work on August 7th, 2003, correct?

18        A.    That's correct.

19        Q.    What was the practice for submitting

20   requests for time off if you were allowed under the

21   union contract to request alternative time?

22        A.    That if you have time on the books and

23   you're sick and you run out of time, you're allowed

24   to request alternative time.

1       THE COURT:   What's alternative time?

2  BY THE WITNESS:

3      A.    Vacation, holiday, comp time.

4       THE COURT:   Oh, burning your vacation days,

5  burning your holiday days and so forth?

6  BY THE WITNESS:

7      A.    Yes, provided you're not on proof

8  status.  That is one criteria, I believe it is.

9       THE COURT:   So if you're on proof status you

10  can't burn personal days?

11  BY THE WITNESS:

12      A.    Not necessarily.  They can approve that,

13  but they don't have to, evidently.

14       THE COURT:   If you're not on proof status, you

15  can simply choose to do that; is that what your

16  understanding is?

17  BY THE WITNESS:

18      A.    You have the right to request it, yes.

19       THE COURT:  All right.  Go ahead.  I'm sorry.

20  BY MR. FIEWEGER:

21      Q.    And did you have accrued vacation and

22  holiday time at that time?

23      A.    Yes, I did.

24      Q.    Had you exhausted it all?

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1          A.     No, I hadn't.

2          MR. FIEWEGER:  Move for the admission of

3    Exhibits 9 and 10.

4          THE COURT:  What about 5?

5          MR. FIEWEGER:  And 5.

6          MR. LOVELLETTE:  No objection.

7          THE COURT:  What was the one before 5?  There

8    were several other ones.  What about 4?

9          MR. FIEWEGER:  Move for 4.

10         THE COURT:  And 3 I've already said I'll

11   consider it if we get overruled, but I didn't want

12   to look at it.  Let me see 4, 5, 9 and 10, please,

13   sir.

14         THE WITNESS:  4, 5, 9 and 10.

15               (WHEREUPON, the exhibits were

16               tendered to the Court.)

17   BY MR. FIEWEGER:

18         Q.     Did you have a concern about the way

19   that your request for alternative time or

20   disability time were being processed?

21         MR. LOVELLETTE:  Objection, relevance.

22         THE COURT:  I don't know what his state of

23   mind has to do with it, but I'll overrule your

24   objection.

```
 1    BY THE WITNESS:
 2         A.    Yes, I did.
 3    BY MR. FIEWEGER:
 4         Q.    Did you request from Dr. Freebern
 5    another CMS physician statement when you were
 6    returning to work and presenting Exhibits 9 and 10
 7    also?
 8         A.    Yes, I did.
 9         MR. FIEWEGER:  I'm going to show you
10    Respondent's Exhibit 6 for identification.
11              (WHEREUPON, the exhibit was
12              tendered to the witness.)
13    BY MR. FIEWEGER:
14         Q.    What is Exhibit 6?
15         A.    It's an another physician statement from
16    Dr. Freebern.
17         Q.    And who was that given to?
18         A.    That again was given to Pam Verstreate.
19         Q.    Why did you do that?
20         A.    I hadn't heard anything from the first
21    one, and I wanted to make sure that it wasn't lost
22    or anything like that.  I wanted to make sure I
23    wasn't in trouble.
24         Q.    When did you give that to
```

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    Ms. Verstreate?

2        A.    I gave it to her right after -- on 8/14.

3        Q.    Okay.  By 8/14/03, had you heard

4    anything back from the warden concerning your

5    request submitted on 7/30/03?

6        A.    No, I hadn't.

7        MR. FIEWEGER:  I'm going to show you Exhibit 8

8    for identification.

9            (WHEREUPON, the exhibit was

10           tendered to the witness.)

11   BY MR. FIEWEGER:

12       Q.    Do you know what Exhibit 8 is?

13       A.    This is a copy of a request for a leave

14   of absence.

15       Q.    Let me see that again.  I'm sorry.

16       A.    No, this is -- I'm not sure what that

17   is.

18       Q.    Is that your notification, your 30

19   days --

20       A.    Notification of 30, yes.

21       Q.    Okay.  And that commenced --

22       A.    Suspension pending discharge, yes.

23       Q.    Your hearing was September 8th, 2003?

24       A.    It states on this that the hearing date



1    was 9/8 of '03.

2         Q.    And that was issued, apparently, when?

3         THE COURT:   What is that exhibit number?

4         MR. FIEWEGER:   Number 8.

5    BY THE WITNESS:

6         A.    8.   I had never seen this before.

7    BY MR. FIEWEGER:

8         Q.    Okay.   And what date did you receive

9    your discharge notice?

10        A.    I never received a discharge notice.

11        Q.    Okay.   You did receive this discharge

12   for cause form or document unsigned, correct?

13        A.    Correct.

14        Q.    And it was dated November 10, 2003; is

15   that correct?

16        A.    That's correct.

17        Q.    And when did you receive that?

18        A.    1/15.

19        MR. FIEWEGER:   I'm going to show you Exhibit

20   9.

21             (WHEREUPON, the exhibit was

22             tendered to the witness.)

23   BY MR. FIEWEGER:

24        Q.    Is this the --

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    MR. LOVELLETTE:  I'm sorry, just to make sure

2  the record is clear, I think 9 is already in

3  evidence.

4    MR. FIEWEGER:  Did I say 9?  I'm sorry.  Let's

5  change that to 10.

6    MR. LOVELLETTE:  Actually, I think 10 is in

7  evidence.

8    MR. FIEWEGER:  10 is in evidence.  Okay.

9  Thanks for keeping track.  We'll make it 15.  How's

10  that?  Let me show you Exhibit 15.

11          (WHEREUPON, the exhibit was

12          tendered to the witness.)

13  BY MR. FIEWEGER:

14    Q.    And when did you get this?

15    A.    I've never seen this.

16    Q.    Okay.  Were you discharged within 45

17  days of the date of your pre-disciplinary hearing,

18  to your knowledge?

19    A.    I've never been discharged.

20    THE COURT:  Well, what are we doing here?

21  BY THE WITNESS:

22    A.    Sir, I'd like to know.

23    THE COURT:  Well, you filed a notice of appeal

24  that says you were discharged.  If you haven't been

1  discharged and if that's the position we're going

2  to take, why are we here?

3  BY THE WITNESS:

4      A.    Sir, I've never been notified of any

5  discharge at all.

6      THE COURT:  I don't want to debate it.  I'm

7  just wondering why we're here if you've never been

8  discharged.  Your lawyer will have to tell me that

9  later.

10     MR. FIEWEGER:  That's fine.

11     THE COURT:  What exhibit are you on?  I'm

12 sorry.

13     MR. FIEWEGER:  15.  Move for its admission.

14     THE COURT:  15 you said?

15     MR. FIEWEGER:  Yes.

16     MR. LOVELLETTE:  We have no objection.

17     MR. FIEWEGER:  Did I move for the admission

18 also of Exhibit 8?

19     THE COURT:  You got 8, 6.  He's holding one in

20 his hand.

21     THE WITNESS:  5, 6, 3.

22     THE COURT:  3 we've already dealt with.  You

23 can give that to the reporter.

24     THE WITNESS:  6, 15 and 8.

1    MR. FIEWEGER:  Move for the admission of 6, 15

2    and 8.

3    THE COURT:  And 5.

4    MR. FIEWEGER:  And 5.

5    MR. LOVELLETTE:  5 is --

6    THE COURT:  5 is already in?  I don't know.

7    I'm not keeping track.

8    MR. FIEWEGER:  Yeah.

9    THE COURT:  Any objection?

10    MR. LOVELLETTE:  These are all in the

11    personnel file.  No objection.

12    THE COURT:  Without objection, the numbered

13    exhibits named by counsel will be admitted, which

14    are 15, 8 and 6.

15         (WHEREUPON, Respondent's Exhibit

16         Nos. 6, 8 and 15, were received

17         in evidence.)

18    THE WITNESS:  Yes.

19    BY MR. FIEWEGER:

20    Q.    Are you a union representative too?

21    A.    Yes, I've been there for 18 years.

22    Q.    And do you assist employees in dealing

23    with management on leaves issues?

24    A.    Yes, I do.


ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1      Q.    And have other employees in the past

2   submitted requests for leaves for medical reasons

3   when they've exhausted their sick time?

4      A.    Yes, they have.

5      Q.    And are they required to have a

6   completed physician statement such as Exhibit 8?

7      THE COURT:  What's the relevance to this?

8      MR. FIEWEGER:  Because as a practice this is

9   allowing them to just submit slips for work off,

10  and after --

11     THE COURT:  Yeah, but this isn't a grievance

12  arbitration where past practice is -- I don't know

13  that they -- those rules apply at a labor

14  arbitration.  I'm not sure they apply to

15  proceedings before the Civil Service Commission.

16          You know, if I'm going to consider past

17  practices, I may wind up considering the past

18  practices of an unsigned proof of status request,

19  if there have been any past practices where there

20  have been unsigned proof of statuses.  You know, I

21  don't know.  Or proof of status requests without

22  union representation being present.

23          So there's no objection from the state,

24  and that's okay with me.  But I'm going to be