E-FILED
Friday, 02 February, 2007 07:36:31 PM
Clerk, U.S. District Court, ILCD

1  consistent.  If I consider something one way, I'm

2  going to consider it another way too.

3      MR. FIEWEGER:  I'm not objecting to you

4  considering it both ways.

5      MR. LOVELLETTE:  I'm going to object to the

6  relevance.

7      THE COURT:  All right.  Do you believe that

8  past practices in a Civil Service matter like this

9  are somehow relevant or should be considered?

10      MR. FIEWEGER:  In the event that under --

11  under Article 19, Section 21, management takes the

12  position that you must have these pre-approved for

13  medical leaves of absences.  I think it's relevant

14  and material because there's a pattern and practice

15  with this management of allowing the employee to be

16  sick, come back to work, submit the medical slip

17  leave and request the authorized leave of an

18  absence for medical reasons.

19      THE COURT:  I understand what you're saying.

20  I'm just saying in general.  Your position is

21  there's a past practice, and, therefore, I should

22  consider it in this case.  And I'm saying that I'm

23  aware that in grievance arbitrations past practices

24  are relevant, and in labor disputes they're

1    relevant.  I'm just wondering if they are in --
2    I don't know the answer -- in proceedings before
3    the Civil Service Commission.  Do the same rules
4    apply?  That's my question to you.  You want me to
5    consider some evidence as being relevant.  I'm not
6    telling you it's irrelevant.  I just don't know the
7    answer.
8         MR. FIEWEGER:  And my argument is it is.
9         THE COURT:  Huh?
10        MR. FIEWEGER:  My argument is it is.
11        THE COURT:  Okay.  And is there any authority
12   to support that?
13        MR. FIEWEGER:  I can't cite you to the
14   authority.
15        THE COURT:  Do you have any authority that
16   says it isn't?
17        MR. LOVELLETTE:  I don't have any authority.
18   But if I understand the reasoning correctly, I
19   don't think in the petitioner's case-in-chief it
20   was ever mentioned that these CMS 95s or medical
21   leaves of absence have to be approved prior to the
22   actual leave, and that's not what the policy says,
23   which is already in evidence.
24        THE COURT:  So you're not relying nor are you

1  going to hang your hat on the fact that he was late

2  if you strictly construe the rules.  Your position

3  is that his lateness or tardiness in submitting

4  documentation isn't the basis for the discharge.

5      MR. LOVELLETTE:  I would not go that far.  I

6  would say it doesn't have to be pre-approved before

7  the leave is taken.  However, the rules say it has

8  to be done in five days after you take the leave.

9      THE COURT:  That's what the rule says.  He

10  says there's a practice that's different than that.

11      MR. LOVELLETTE:  Is that what you're saying?

12      MR. FIEWEGER:  Yeah.

13      MR. LOVELLETTE:  Okay.

14      THE COURT:  And so my question is:  Is it your

15  position that we have to strictly construe the

16  rule, or can I consider the practice from this

17  witness particularly testifying that that's the way

18  it's been in the past, therefore, I rely on it?

19      MR. LOVELLETTE:  I think the rules have to be

20  strictly construed.  I think that's what the Civil

21  Service rules say.

22      THE COURT:  Well, I'll tell you.  The safe

23  route here is for me to admit this evidence, which

24  I'll do, and I'll, in deciding the case, decide how

1    much weight to give to it.  So go on.

2         MR. FIEWEGER:  Thank you.

3         THE COURT:  You're welcome.

4    BY MR. FIEWEGER:

5         Q.    Have there been occasions where union

6    employees have exhausted their sick time and then

7    more than five days after being on a medical leave

8    submitted to management their leave slips and a

9    doctor's slip authorizing the time back?

10        A.    Absolutely.

11        Q.    Do you have any specific examples?

12        A.    Yes.  David Tyler.

13   MR. LOVELLETTE:  I'm going to object.

14        THE COURT:  Sustained.

15   BY MR. FIEWEGER:

16        Q.    And were they approved by management for

17   the leave?

18        A.    Yes, they were.

19        Q.    Okay.  Were they on furnish proof

20   status?

21        A.    Yes, they were.

22        MR. FIEWEGER:  I have no further questions,

23   sir.

24        MR. LOVELLETTE:  I have a few questions.

                    CROSS EXAMINATION

BY MR. LOVELLETTE:

    Q.    Your knowledge that these individuals
that you're talking about in prior practices was on
proof status, that's through the union, correct,
through your service with the union?

    A.    No, that's strictly through them.

    Q.    What they told you?

    A.    Yes.

    Q.    So you never looked at their actual
records to see if they were on proof status.
You're relying on what they told you?

    A.    Yes, I am.

    MR. LOVELLETTE:  All right.  I move that that
testimony be stricken.

    THE COURT:  Overruled.

    MR. LOVELLETTE:  I'm going to show you what's
been marked as --

    THE COURT:  It's a question of weight.

    MR. LOVELLETTE:  I'm going to show you what's
been marked as Petitioner's Exhibit 5.

        (WHEREUPON, the exhibit was

        tendered to the witness.)

    MR. LOVELLETTE:  Did you admit all these?

1    MR. FIEWEGER:  Yes.

2    THE COURT:  Now Petitioner's Exhibit 5.

3    MR. LOVELLETTE:  This is petitioner's.  This

4    is ours.

5         (WHEREUPON, discussion was had

6         off the record.)

7    BY MR. LOVELLETTE:

8    Q.    Is your address 401 Main Street, Erie,

9    Illinois 61250?

10   A.    That's correct.

11   Q.    And Page 3 of Exhibit 5 is the same

12   thing as Exhibit 15, Respondent's Exhibit 15?

13   A.    Right.  It appears to be.

14   MR. LOVELLETTE:  Okay.  Move that Exhibit 5 be

15   admitted into evidence.

16   THE COURT:  Any objection?

17   MR. FIEWEGER:  No objection.

18   THE COURT:  Without objection, Petitioner's

19   Exhibit 5 -- which is a document consisting of

20   three pages?

21   MR. LOVELLETTE:  Yes.

22   THE COURT:  -- is admitted into evidence.

23        (WHEREUPON, Petitioner's Exhibit

24        No. 5, was received in evidence.)



BY MR. LOVELLETTE:

Q.    You were aware of the requirements of the affirmative attendance policy in July of '03, right?

A.    July of '03.  I believe so.

Q.    And you only had -- regarding alternate time, which means alternate other than sick time; is that right?

A.    Yes.

Q.    As of August 7th, you only had six days of alternate time when you were off for the last ten days; is that right?

A.    I'm not sure.  It's been seven months since I've been off.  I know I had vacation, comp time and holiday time, two days sick time.  I'm not sure.

Q.    On September 8th of '03, you were present at the pre-disciplinary hearing on that day?

A.    Yes, I was.

MR. LOVELLETTE:  I'm going to show you Petitioner's Exhibit 4.

(WHEREUPON, the exhibit was

tendered to the witness.)



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY

*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

BY MR. LOVELLETTE:

Q.    Petitioner's 4 is a memorandum to you dated September 5th of 2003, right?

A.    Yes, it is.

Q.    And it's from the acting warden at the prison?

A.    Yeah.

Q.    Okay.  And in that it says your CMS 95 form was defective, right?

A.    Which CMS 95 are we talking about here, though?

Q.    The one closest to September 5th.  It was the only one that you had -- you only put in one form in July of 2003?

MR. FIEWEGER:  Objection, misstatement of the record.

THE COURT:  Well, wait a minute.  Let's ask one question at a time.  That's the easier way to do this.

So the objection is sustained.  Let's start with one question at a time on this subject.

BY MR. LOVELLETTE:

Q.    You only had one form CMS 95 that you submitted to the facility in July of 2003, right?

1      A.    No, I submitted two because one was

2  not -- I didn't hear anything on the first one, and

3  I submitted another one.

4      MR. LOVELLETTE:  I'm going to show you Exhibit

5  6, Respondent's Exhibit 6 and -- this is 6.

6  There's another one.

7      MR. FIEWEGER:  1?

8      MR. LOVELLETTE:  It might be 1.  Do you have

9  it, Judge?

10     THE COURT:  Have what?

11     MR. LOVELLETTE:  Any respondent's exhibits.

12     THE COURT:  Let me look.  I do have some.  I

13 have Respondent's 4 and Respondent's Exhibit No. 1.

14     MR. LOVELLETTE:  Oh, 2 is actually what I need

15 right there.

16     THE COURT:  Here's Respondent's Exhibit No. 2.

17 Here's 4.  Keep your own exhibits.  Wait a minute.

18 Here's 9, and here's 5.  And I think that's all I

19 have.  And 10.

20 BY THE WITNESS:

21     A.    There's two different ones.  So I don't

22 know which one you're talking about.

23 BY MR. LOVELLETTE:

24     Q.    Respondent's Exhibit 2 was submitted

1    on -- I believe you said was submitted on July 30th

2    of '03, right?

3         A.    Yeah.

4         Q.    And then I believe you said Respondent's

5    6 was the other one you talked about in your

6    testimony was submitted on August 14th, right?

7         A.    Yes.

8         MR. LOVELLETTE:  Move that Petitioner's 4 be

9    admitted into evidence.

10        MR. FIEWEGER:  Objection, hearsay.

11        THE COURT:  Say that again.

12        MR. FIEWEGER:  Hearsay.

13        THE COURT:  Overruled on that grounds.

14        MR. FIEWEGER:  Irrelevant and immaterial.

15        THE COURT:  Overruled on that grounds.  You're

16    overruled.  The document is admitted.

17             (WHEREUPON, Petitioner's Exhibit

18              No. 4, was received in evidence.)

19        THE COURT:  Unless you can really come up with

20    something that you can nail it on.

21        MR. FIEWEGER:  Then I'll just make a record.

22    Vague.  It doesn't reference which document you're

23    referring to.

24        THE COURT:  Your hole is deeper and deeper.

1    Overruled.  Admitted.

2        MR. LOVELLETTE:  No further questions.

3        MR. FIEWEGER:  No redirect.

4                        EXAMINATION

5    BY THE COURT:

6        Q.    Let me ask you:  Why is this one exhibit

7    that went to the lady in the warden's office --

8    Patricia, is that her name?

9        A.    Pam.

10       Q.    Pam.  You said you turned that in when?

11       A.    One on the 24th.

12       Q.    Okay.  And another one later on?

13       A.    On the 30th.

14       Q.    Okay.

15       A.    I believe it was.  But the dates are --

16       Q.    But one of them -- can I see the

17   exhibits -- has a stamp date of like October 1st, I

18   think.  Do you know why that is or not?

19       A.    No, sir, I couldn't tell you that.

20       Q.    That would be Exhibit 8, and I'm

21   assuming -- this doesn't say it, but is this the

22   respondent's exhibit?  Yellow sticker.

23       MR. FIEWEGER:  I'll mark that.

24       THE COURT:  I'll write it.  Do you mind if I



1    write it on there?

2    　　　　MR. FIEWEGER:  Not at all.

3    　　　　THE COURT:  I'll just put R-e-s-p.

4    BY THE COURT:

5    　　　　Q.　　Respondent's Exhibit 8 has a received

6    stamp October, looks like, 23rd.  Do you agree with

7    that?

8    　　　　A.　　I believe that's what it looks like.  I

9    also -- I see on the top here where it says 45th

10   day, 10/22.

11   　　　　Q.　　Where is that?

12   　　　　A.　　Right there also.

13   　　　　Q.　　Oh, yeah.  Okay.  I see that.

14   　　　　A.　　So that would be the 45th day from the

15   date of 9/8.

16   　　　　Q.　　You don't know who put that entry on

17   there either, do you?

18   　　　　A.　　No, sir, I don't.

19   　　　　Q.　　Now, there's another exhibit where you

20   refused to sign it, apparently.  Is that true or

21   not?

22   　　　　A.　　I didn't see that document until

23   September 8.

24   　　　　Q.　　Okay.  This document, where it says

1    dated May the 3rd, Respondent's Exhibit No. 4.

2        A.    May 30th.

3        Q.    It says May 30th here.

4        A.    Yes.

5        Q.    And somebody by the name of Captain

6    Stump signed it, apparently, on that date?

7        A.    Yes.

8        Q.    And do you have any recollection of any

9    discussion with Captain Stump where you refused to

10   sign a piece of paper?

11       A.    None whatsoever.

12       Q.    So is it your testimony that you don't

13   know a thing about this piece of paper, this proof

14   of status?

15       A.    That's absolutely correct.

16       Q.    So if this paper says, which it says,

17   that you were placed on proof of status April 17th,

18   2003, are you saying if that happened you're not

19   aware of it?

20       A.    That's correct.

21       Q.    Now, had you been on a prior proof of

22   status?

23       A.    I haven't been on proof status since

24   12/3 of '02.



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1      Q.    Okay.  This same piece of paper says --
2  which is your exhibit.
3      A.    Yes.
4      Q.    That you were on proof of status, the
5  way I read it, and you can tell me if I'm wrong,
6  March 4th, '03 with call-in.  Do you know what that
7  means?
8      A.    No, sir.
9      Q.    Is it your testimony you weren't on any
10  such proof of status?
11      A.    No, sir.  As a matter of fact, I have
12  the shift come out of my personnel file -- not my
13  personnel file.  My shift file and the shift
14  commander with his signature that states that I
15  haven't been on proof status since 12 -- December
16  3rd of '02.
17      Q.    Who created this document, if you can
18  tell?  Is that Captain Stump?
19      A.    I would say that has been directed from
20  Major Steve Wright or Captain Stump to put in my
21  file.
22      MR. LOVELLETTE:  I'm going to object to the
23  speculation there.
24      THE COURT:  I'll strike that.  I just want to

1  know if you can tell me if you know who created the

2  document.  If you don't know, that's okay too.

3  BY THE WITNESS:

4       A.    No, I'm just speculating.  That would be

5  my guess.

6  BY THE COURT:

7       Q.    Do you know who created the document?

8       A.    I can't tell you for sure, no, sir.

9       Q.    So you kind of think they're out to get

10  you; is that the idea?

11       A.    There's no doubt in my mind.

12       Q.    And is that because of your prior work

13  history injury-wise or because of your union

14  activities, in your opinion?  I realize that's

15  speculation, but.

16       A.    It's probably both.  I believe that my

17  work history is only going by the rules.

18       Q.    Say that again, sir.

19       A.    I believe my work history is -- I only

20  go by the rules.  I do what they tell me I'm

21  supposed to do and what I can do contractually.

22       Q.    So when you filed this notice of appeal,

23  you signed that?

24       A.    Yes, sir.

ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1      Q.    You filled that out yourself, actually,

2  probably, didn't you?

3      A.    I believe so.

4      Q.    What did you think you were appealing?

5      A.    The accusation that I'm discharged.

6      Q.    Well, how did you learn that you were

7  discharged?  How did that come to your attention?

8      A.    I learned that I was discharged.

9      Q.    Here, look.  You filed a piece of paper

10  in which you're appealing your discharge.  You know

11  that, right?

12      A.    Yes.

13      Q.    Okay.  Now, in your mind, at the time

14  that you signed that piece of paper, you believed

15  you were discharged?

16      A.    I signed that piece of paper because on

17  October 17th they came to me with a 30-day

18  suspension.  Asked me to sign that, which I did.  I

19  never --

20      Q.    A 30-day suspension pending discharge or

21  just a 30-day suspension?

22      A.    30-day suspension.

23      Q.    So were you suspended 30 days?

24      A.    I was off work.  I wasn't allowed to

1   work.

2       Q.    Were you suspended, or was it because

3   you were sick?

4       A.    No, I was suspended.  I wasn't allowed

5   on grounds.

6       Q.    Did you complete that suspension?

7       A.    I haven't been back to work since August

8   19th.

9       Q.    When did that suspension take place?

10      A.    October 17th.

11      Q.    You were suspended for 30 days October

12  17th?

13      A.    Yes.

14      Q.    And then during the suspension you got

15  some kind of a notice of a pre-disciplinary

16  hearing, I presume?

17      A.    Yes.

18      Q.    Was that a suspension pending discharge,

19  or do you have any papers regarding that suspension

20  someplace?

21      A.    I don't have any discharge papers.

22      Q.    No, no, no.  Do you have the suspension

23  paper?

24      A.    I believe it's over there somewhere,

1    isn't it?  No?

2         MR. FIEWEGER:  I don't see it.

3         THE COURT:  I want to go off the record for a

4    second.  I want to ask the lawyers something.

5              (WHEREUPON, discussion was had

6              off the record.)

7         THE COURT:  If you can't find it, you can't

8    find it.  Apparently, it's not critical here.

9    BY THE COURT:

10        Q.    Mr. Lind, I'm having trouble with the

11   notion that you would appeal something in --

12   where's the exhibit with the -- I have it right

13   here.  I take that back.

14             Your notice of appeal is dated November

15   8th?

16        A.    Okay.

17        Q.    The one I have.  That's the right date?

18        A.    Yeah.

19        Q.    Now, the charges were -- it says:

20             "I hereby request a hearing in my own

21   defense to the charges filed against me by the

22   Department of Corrections, officially approved by

23   the director of Central Management Services, the

24   State of Illinois, on the 8th day of November,

1    2003."

2              And that appears by my layman's eye that

3    you filled in the 8th day in November as well.

4    That's your handwriting as well?

5         A.    That's correct.  Yes.

6         Q.    So you dated it November 8th.  You

7    got -- according to this, the Central Management

8    files charges against you that were dated approved

9    November 8th, 2003.  What charges were you talking

10   about if it wasn't the ones we're dealing with

11   here?

12        MR. FIEWEGER:  Judge, we'll stipulate that

13   it's --

14        THE COURT:  I'm sorry?

15        MR. FIEWEGER:  We'll stipulate --

16        THE COURT:  But I want to know.  There's

17   issues of credibility as well as fact.  Okay?

18        MR. FIEWEGER:  Okay.

19        THE COURT:  We've got credibility questions

20   here.

21        MR. FIEWEGER:  That's fine.

22   BY THE COURT:

23        Q.    So what I'm trying to find out is:  What

24   are you talking about when you filed the notice of

1    appeal here when it says that you're appealing the

2    charges that was filed by CMS?   What are you

3    appealing?   What did you think you were appealing?

4          A.    Well, I was appealing the -- I guess I

5    didn't know which one I was really appealing

6    because I won one in a grievance, the first one in

7    a grievance.   That's why they re-stipulated, I

8    understand.

9          Q.    You won what in a grievance?

10         A.    A leave of absence.

11         Q.    What did you grieve?

12         A.    The denial of a leave of absence.

13         Q.    That was the 24th leave of absence?

14         A.    No, sir, that was, I believe, May 14th,

15   15th and 16th.   And so I didn't really -- I wasn't

16   really clear on what you were asking me, but I'm

17   appealing the 30 days pending discharge or the 30

18   days that I was charged pending discharge.

19         Q.    In this?

20         A.    In the September 8th hearing.

21         Q.    In the September 8th hearing?

22         A.    Yes.

23         Q.    But I'm talking about what you filed

24   with the Commission, the Civil Service Commission.



1   Do you want to look at it?  Let the record show

2   that I'm --

3        A.    That's the only one I know of.

4        THE COURT:  Well, but that's what I'm having a

5   little trouble with.

6            I'm showing you my file, which is your

7   file.

8            (WHEREUPON, the file was

9            tendered to the witness.)

10  BY THE COURT:

11       Q.    And the first thing in my file is notice

12  of the approval of written charges by the director

13  of Central Management.  Corrections versus Rick

14  Lind.  Commission receives that November 20th.

15  It's dated November 6th.  And the guy that's the

16  head of the Department of Central Management

17  Services signed that.

18            Then there's a form from CMS that's

19  attached to that, and that tells us some things

20  about what occurred.  Okay?  I don't know that you

21  got this or you didn't.  But the next piece of

22  paper is dated November 10th, 2003.  Okay?

23       A.    Uh-huh.

24       Q.    That post-dates what you dated November



1    8th.   Follow me?

2        A.    No, I don't follow you.

3        Q.    You're saying in your notice you're

4    appealing something that occurred on November 8th.

5    The charges that are before me, as far as I can

6    tell, are dated November 10th, two days after you

7    filed an appeal.   You're saying you never got this

8    sheet of paper?

9        A.    No, sir.

10        Q.    Never ever?

11        A.    No, sir.

12        Q.    But you did get some piece of paper that

13    you were suspended?

14        A.    Yes, they were contemplating.

15        Q.    Discharge?

16        A.    Discharge, yes.   Yes, sir.

17        Q.    And the suspension pending discharge

18    effective October 17th is what came out of the

19    September 8th meeting; is that what you're saying?

20        A.    Yes, sir.

21        THE COURT:   Okay.   I don't have any other

22    questions of you, sir.   I may have some for the

23    lawyers later.

24        MR. LOVELLETTE:   Do you have any?

1        MR. FIEWEGER:  No.

2        MR. LOVELLETTE:  I just have one more.

3                RECROSS EXAMINATION

4  BY MR. LOVELLETTE:

5        Q.    At some point you did receive

6  notification of how to file what he was talking

7  about on November 8th and what address to send it

8  to the Commission, right?

9        A.    That's my signature and stuff.  I sent

10  it.

11        Q.    You sent it.  So at some point you had

12  to have received something that gave you the

13  address?

14        A.    Oh, absolutely.  It's right there.  My

15  signature is on it.

16        MR. LOVELLETTE:  Okay.

17        MR. FIEWEGER:  Judge, can I just see your file

18  so I can see if I have any questions about that?

19            (WHEREUPON, the file was

20            tendered to counsel.)

21        THE COURT:  Also, you may want to look at the

22  amended charges also dated November 10th.  It's

23  some exhibit number, 1.

24        Okay.  That concludes Mr. Lind's



1    testimony.  You have other witnesses, correct?

2        MR. FIEWEGER:  Yes.

3        THE COURT:  We're going to take a recess

4    until -- well, how long will your other witnesses

5    take?

6        MR. FIEWEGER:  Not long.  10 minutes.

7        THE COURT:  10 minutes.  15 each?

8        MR. FIEWEGER:  Yeah.

9        THE COURT:  So if we take a break until five

10   minutes until 2:00, that will give us another two

11   and-a-half hours to do those 15-minute witnesses.

12   Okay.  We're in recess until five to 2:00.

13            (WHEREUPON, a recess was had.)

14       MR. FIEWEGER:  I have more questions for

15   Mr. Lind about your questions on this issue,

16   briefly.

17       THE COURT:  Okay.  You want to move to reopen

18   your direct examination or redirect examination?

19       MR. FIEWEGER:  I would.

20       THE COURT:  Any objection?

21       MR. LOVELLETTE:  For the record, I'm going to

22   object because the witness was able to speak to

23   counsel.

24       THE COURT:  No such thing as just for the

1    record.  Either you're objecting or you're not.

2        MR. LOVELLETTE:  I am going to object that the

3    witness was able to speak with his counsel during

4    the break.

5        THE COURT:  He was.  However, there was no

6    admonition for him not to.  I'll weigh the

7    testimony in light of the fact that he's had an

8    opportunity to be refreshed in some fashion.  Go

9    ahead.

10        MR. FIEWEGER:  I'm going to show you

11    Respondent's Exhibit 16 and 17.

12                (WHEREUPON, the exhibits were

13                tendered to the witness.)

14                RICK LIND,

15    called as a witness herein, having been previously

16    duly sworn and having testified, was examined and

17    testified further as follows:

18                REDIRECT EXAMINATION

19    BY MR. FIEWEGER:

20        Q.    Have you seen Exhibit 16 and 17 before?

21        A.    Yes, I have.

22        Q.    And on the break after the judge was

23    asking you about what was in your file, did we find

24    those within your paperwork?

1      A.    Yes, we did.

2      Q.    Okay.  And did you also receive the

3 November 10th discharge for cause document?

4      A.    Yes, I did.

5      Q.    Okay.  And did that all come in one

6 packet?

7      A.    Yes, it did.

8      Q.    All right.  And then did you file the

9 notice of appeal that's on the file?

10      A.    Yes, I did.

11      MR. FIEWEGER:  Move for the admission of 16

12 and 17.

13      MR. LOVELLETTE:  No objection.

14      THE COURT:  16 and 17 will be admitted.

15           (WHEREUPON, Respondent's Exhibit

16           Nos. 16 and 17, were received

17           in evidence.)

18      MR. FIEWEGER:  All right.  No further

19 questions.

20      THE COURT:  I have just a couple more

21 questions.

22             FURTHER EXAMINATION

23 BY THE COURT:

24      Q.    16 and 17 appear to be copies of what

1    you looked at in my file earlier?

2        A.    Yes, sir.

3        Q.    When you said that you received the

4    discharge for cause document, was that the page

5    that is in my file marked "Discharge for cause"?

6        A.    It appears to be the same, sir, but I

7    thought that there was supposed to be places for

8    signatures down here.  I didn't recall seeing this

9    one.  But evidently I did, and I was confused on

10   the dates.  That's all.

11       Q.    So when you testified earlier that you

12   had never received the discharge document, are you

13   now saying that that's mistaken testimony?

14       A.    That's obviously mistaken because that

15   is my signature, and I did file the appeal.

16       Q.    So what you're saying is is that your

17   earlier testimony today was mistaken?

18       A.    Yes, sir.

19       THE COURT:    That's all the other questions I

20   have.

21       MR. LOVELLETTE:    I have nothing.

22       MR. FIEWEGER:    Nothing further.

23          (WHEREUPON, the witness was excused.)

24       MR. FIEWEGER:    I call Jeff Papish.

1    THE COURT:  Papish?

2    MR. FIEWEGER:  Papish, yes.

3    THE COURT:  Mr. Papish, do you want to come

4 over here, sir, and have a seat.

5    MR. PAPISH:  Sure.

6    THE COURT:  My name is Leonard Sacks.  I'm the

7 administrative law judge in this case.

8        Counsel is going to ask you some

9 questions.  Then the other counsel is going to ask

10 you some questions.

11    MR. PAPISH:  Okay.

12    THE COURT:  I may ask you some questions.

13 Wait until the question is finished before you

14 answer it.  They'll wait for you to finish your

15 answer before they put another question to you.

16 Okay?

17    MR. PAPISH:  Yes, sir.

18    THE COURT:  Please answer the questions out

19 loud with words, and try to keep your voice up.

20 I'm a little hard of hearing.  Okay?

21    MR. PAPISH:  I have no problem with that.

22    THE COURT:  I'm glad I'm the only one with a

23 problem.  And this young lady will swear you in.

24 Okay?



1    MR. PAPISH:  Okay.

2     (WHEREUPON, the witness was duly

3     sworn.)

4     JEFF PAPISH,

5 called as a witness herein, having been first duly

6 sworn, was examined and testified as follows:

7     DIRECT EXAMINATION

8 BY MR. FIEWEGER:

9   Q. Could you please state your name?

10  A. My name is Jeffrey Alan Papish.

11  Q. Mr. Papish, where do you live?

12  A. I live in Moline, Illinois.

13  Q. And are you employed?

14  A. Yes, I am.

15  Q. Where are you employed?

16  A. At the East Moline Correctional Center.

17  Q. And in what capacity are you employed?

18  A. I'm a correctional sergeant on the

19 second shift at the East Moline Correctional

20 Center.

21  Q. In 2003, what capacity were you

22 employed?

23  A. I was a correctional officer at the East

24 Moline Correctional Center.



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1          Q.    So you've just recently been promoted;

2     is that correct?

3          A.    Yes.

4          Q.    Are you also a union representative?

5          A.    Yes, I'm the lead steward on the 3:00 to

6     11:00 shift representing Local 46.

7          Q.    And how long have you been in that

8     position?

9          A.    20 years.

10          Q.    And how long have you been employed by

11     the Department of Corrections?

12          A.    20 years, 6 months.

13               (WHEREUPON, discussion was had

14               off the record.)

15     BY MR. FIEWEGER:

16          Q.    Were you the lead union steward for

17     Mr. Lind?

18          A.    Yes, I was.

19          Q.    And was Mr. Lind in 2003 in a position

20     where he had exhausted his sick-time leave?

21          A.    Yes, he was.

22          Q.    And did you on behalf of the union

23     assist him in trying to gain alternative time after

24     exhausting his sick time?

