E-FILED
Friday, 02 February, 2007 10:37:23 PM
Clerk, U.S. District Court, ILCD

1     A.    Yes, I did.

2     Q.    What did you do?

3     A.    I actually brought his slips down to the

4 warden on numerous occasions.  Basically, that's

5 what I did to get him the alternative time.  And

6 then I went back and re-checked, you know, to see

7 what the status was.

8     Q.    And was there a practice at the East

9 Moline Correctional Center concerning requests for

10 alternative time in 2003?

11    MR. LOVELLETTE:  I'm going to object to the

12 relevance.

13    THE COURT:  That will be consistent.

14 Overruled.  You can answer the question.

15 BY THE WITNESS:

16     A.    Yes, there's always been a practice to

17 approve alternate time.  Myself, I've been approved

18 alternate time many times.

19 BY MR. FIEWEGER:

20     Q.    Must you submit your request for

21 alternative time before you take the alternative

22 time?

23     A.    No.  You request alternate time after

24 you've taken the time off.

1    THE COURT:   What happens if somebody turns it

2    down?

3    BY THE WITNESS:

4    A.    If you turn down alternate time, then

5    you apply for a leave of absence, which is filling

6    out a physician's statement and applying for a

7    leave of absence.

8    THE COURT:   Don't you ask for the leave of

9    absence first?

10    BY THE WITNESS:

11    A.    No.  It's much easier to fill out a --

12    okay.  At any institution, you get a -- what's

13    called a time-off slip.  Okay?  And it comes back

14    you called in sick personal on that date.  You

15    might have called in sick personal five dates.  If

16    you're out of sick time, you just write on the

17    comments, out of sick time, requests alternate

18    time.

19    And usually a union steward will take

20    them down for you.  And nine out of ten times

21    they're approved.  And even if the guy is on proof

22    status, nine out of ten times they're approved.

23    BY MR. FIEWEGER:

24    Q.    If they're on proof status, then a

1    doctor's slip has to be accompanying that form; is

2    that correct?

3         A.    Yes, it is.

4         Q.    Did that happen with Mr. Lind?  Was his

5    request for alternative time accompanied by a

6    doctor's slip?

7         A.    Rick's slips have always been

8    accompanied with a doctor's slip.

9         Q.    Okay.  And at the September 8, 2003

10    pre-disciplinary hearing, what was management's

11    position concerning whether Mr. Lind was on furnish

12    proof status or not?

13         A.    When you say management, if you mean

14    upper management, meaning first shift, major and

15    wardens, they were contending that he was on proof

16    status.

17         THE COURT:  Was any management contending that

18    he wasn't on proof status?

19    BY THE WITNESS:

20         A.    Yes.  The second-shift commander, which

21    was Major Spriet, who was here earlier and left, I

22    was on an ongoing thing with him this whole time.

23    He stated that Rick Lind was not on proof status.

24         MR. LOVELLETTE:  I'm going to object to the

1   hearsay here.

2       THE COURT:  All right.  Go ahead.

3       THE WITNESS:  That's fine, but I can prove it.

4       THE COURT:  Well, don't argue with him.  Just

5   answer my question.

6       THE WITNESS:  Okay.  What was the question

7   then?

8       THE COURT:  I want to know the other

9   management people.  You said upper management --

10  BY THE WITNESS:

11      A.    Meaning the major and wardens.

12      THE COURT:  Well, upper management was

13  contending that he was --

14  BY THE WITNESS:

15      A.    On proof status, yes.

16      THE COURT:  Then you said there was other

17  management, lower management, that said he was not

18  on --

19  BY THE WITNESS:

20      A.    Shift commander and relief shift

21  commander on second shift were under the contention

22  he was not on proof status, meaning Major Spriet,

23  who at the time was a captain, and Captain Stump,

24  who's now a lieutenant, said he was not on proof



1    status.

2        THE COURT:   Captain Stump says he was not on

3    proof status?

4    BY THE WITNESS:

5        A.    Yes.  Because if you look at the

6    paperwork that supposedly when Rick was put on

7    proof status, the system is when an employee gets

8    put on proof status, then the letter recommending

9    proof status goes to the major, which is Major

10   Wright, and then he signs off on it and sends it

11   back putting him on proof status.

12            And at Rick's hearing, Major Wright

13   said, Well, there was a change in shift commanders

14   and the letter was just never sent back out

15   notifying Captain Stump and Captain Spriet that

16   Rick was on proof status.

17            And the reason why it never came back is

18   because I think they were actually trying to figure

19   out what the heck because there was six weeks

20   difference in between the proof status was put out

21   and by the time it was attempted to be served on

22   Mr. Lind.

23            And I was -- I'm the lead steward on the

24   shift, and I never signed off on that, and that's

1    also a practice, that a union steward, even if the

2    employee refuses to sign the proof status, it's

3    always a practice that the union steward is called.

4        Any time anybody is put on proof status,

5    the union steward is the first one brought in the

6    office. I was never notified Rick was being placed

7    on proof status when this happened. And if any

8    other steward would have been there, they would

9    have notified me, but also they would have signed

10   the bottom of the proof status, and it was never

11   signed by any union steward.

12   BY MR. FIEWEGER:

13       Q.    Now, Mr. Papish, if Mr. Lind was on

14   furnish proof status by that disciplinary hearing,

15   was he required to be notified of his need to apply

16   for a leave of absence in writing?

17       A.    Yes.

18       Q.    In reviewing his personnel records and

19   his disciplinary records prior to this

20   pre-disciplinary hearing, did you see any written

21   letters notifying Mr. Lind of his rights to be or

22   need to apply for a leave of absence?

23       A.    No, management never sent Rick no

24   letter.

Q.    And Rick also submitted a request for a disability leave of absence with the physician statement of July 30th, 2003; is that correct?

A.    That's correct.

Q.    Did you check on the status of that?

A.    Myself and the union vice president, who's out in the hallway.  The first time we went down to check on it we went together, and they assured us that it was sent off.

Q.    Who assured you?

A.    Pam Verstreate and the other lady that works in the office down there.  They assured us many times that it was sent off.  They're waiting word.  They're waiting word.  And nothing ever came back.  Nothing ever came back.  And, you know, that's all we can go on is what they tell us.

Q.    Did you see any written documents which would indicate that Mr. Lind was notified that the July 30th, 2004 (sic) physician statement, which he submitted in support of a disability leave, was somehow rejected or determined to be not acceptable?

A.    The only thing I can say is I seen one that they said was unacceptable, but he got it back

1  and then brought it back right away.  And I'm not

2  sure of dates, but I believe that's the one you're

3  talking about.  There was one that they said needed

4  something else, and he immediately brought it to

5  Dr. Freebern and then brought it back to work, and

6  then they said they filed it again.  They sent it

7  off to Springfield again.

8      Q.    Was that the 8/4/2003 one?

9      A.    I believe so.

10     Q.    All right.  And when an employee is

11  placed on furnish proof status, are they required

12  to be notified in writing of a referral to the

13  Employee Assistance Program?

14     A.    Yes.

15     Q.    And in reviewing Mr. Lind's personnel

16  file and in reviewing his disciplinary record in

17  this case, did you see any referrals to EAP by

18  either April 17th, 2003 or May 30th, 2003 or

19  thereafter?

20     MR. LOVELLETTE:  Objection to the relevance of

21  those dates.

22     THE COURT:  Well, their theory of the case is

23  it's relevant.  That's their theory of the case.

24     MR. LOVELLETTE:  I don't see the relevance.  I

1  don't know how that's relevant from April and May.

2  We're talking June, July and August.

3      THE COURT:  Yeah, you're right.  I agree.

4  Let's start with the notion of the request for the

5  EAP form.  That seems to be relevant on the July 24

6  through the August 6th or 7th date.  What's the

7  relevance of the earlier?

8      MR. FIEWEGER:  Well, because the management

9  had taken the position at the September 8th, 2003

10 hearing that he was on furnish proof status, and,

11 therefore, to get --

12     THE COURT:  Well, that couldn't have been

13 until May 30th, though.

14     MR. FIEWEGER:  I understand.  But the form is

15 dated April 17th.  And under directive -- or

16 Administrative Directive 03.01.301, Section F,

17 Subparagraph 11, if an employee has incurred

18 discipline, he must be referred to EAP.

19     THE COURT:  Well, had he incurred discipline

20 by that time?

21     MR. FIEWEGER:  No, but they're using furnish

22 proof status against him at that stage.

23     THE COURT:  Yeah, but he hadn't had any

24 discipline.  Why does he have to --

1      THE WITNESS:  Because they were denying his --

2      THE COURT:  Just a minute, sir.

3      THE WITNESS:  Okay.

4      THE COURT:  You're not a partisan here.

5  You're a witness.  I realize you have a lot that

6  you want to say.

7      THE WITNESS:  Okay.

8      THE COURT:  He hadn't suffered any discipline

9  by that time, had he?

10      MR. FIEWEGER:  No.

11      THE COURT:  So the EAP doesn't become relevant

12  until he gets discipline, apparently, according to

13  what you just read.  Sustained.  Go on with the

14  next question.

15  BY MR. FIEWEGER:

16      Q.    At the September 8th, 2003 hearing,

17  between July 24th and that date, did you see any

18  written notification from management referring

19  Mr. Lind to the Employee Assistance Program?

20      A.    No.  As a matter of fact, I myself

21  pulled his employee file, and there should be a

22  copy of it over there somewhere signed off by the

23  relief commander, Lieutenant Jeff McChurch, and I

24  believe that -- I looked for EAP referrals.  I

1   looked for any type of proof status referrals,

2   anything at all.  And I believe the last thing was

3   proof status of '02.  I think that was the last

4   thing, was proof status in '02.  And I had him draw

5   a line down and sign his name.  I know it was

6   pulled on my birthday, 10/26, I believe, of '03.

7       THE COURT:  Mr. Papish, do me a favor.

8       THE WITNESS:  Sure.

9       THE COURT:  Listen to the question that the

10   lawyer asks you, and answer the question.

11       THE WITNESS:  Okay.

12       THE COURT:  If they want more information,

13   they'll ask you another question.

14       THE WITNESS:  I thought it was into the same

15   question.

16       THE COURT:  Listen to the question.

17       THE WITNESS:  Okay.

18       THE COURT:  It's not a criticism.  It's simply

19   an attempt to keep the record straight.

20       THE WITNESS:  Okay.  I actually thought that's

21   what he was asking, the notation part.

22       THE COURT:  Okay.  Do you have any more

23   questions?

24       MR. FIEWEGER:  I'm looking real quick.



BY MR. FIEWEGER:

Q.      If Mr. Lind's discharge was effective November 6th, 2003, was that within 45 days of the pre-disciplinary hearing?

A.      No.

Q.      And does that violate any of the terms of the union agreement based on your understanding of it?

A.      Yes, it violates the 45-day rule.

Q.      And is that found at Article 9, Section 1(a)?

A.      If that states about the 45 days from the day of the hearing, from it commences or whatever, if that's what you're talking about, yeah.  When you tell me a page, I'm not sure.

THE COURT:  The answer is he doesn't know, and when you argue your case, you can put in whatever evidence you think supports that notion, including the union agreement, a specific page.

MR. FIEWEGER:  Okay.

THE COURT:  Go ahead.

MR. FIEWEGER:  I have no further questions.

MR. LOVELLETTE:  Just a few questions.

ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

CROSS EXAMINATION

BY MR. LOVELLETTE:

Q.    MR. Lind was suspended pending discharge on October 17, 2003, right?

THE COURT:  If you know.

BY THE WITNESS:

A.    Yes.

BY MR. LOVELLETTE:

Q.    And whether Mr. Lind was notified of his need to apply for a leave of absence, he did, in fact, apply for a leave of absence on July 30th?

A.    Yes.

MR. LOVELLETTE:  And I'm going to show you what's been marked as Petitioner's Exhibit 6.  Take a moment to look at that.

(WHEREUPON, the exhibit was
tendered to the witness.)

BY MR. LOVELLETTE:

Q.    And that's an August 29th, 2003 memo to Mr. Lind referring him to the ERB, correct?

A.    That's correct.

MR. LOVELLETTE:  I have no further questions, other than to admit this into evidence.

MR. FIEWEGER:  Let me look at that.



ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1        MR. LOVELLETTE:  I'm sorry.  I apologize.

2        MR. FIEWEGER:  That's okay.  No objection.

3        THE COURT:  Petitioner's Exhibit No. 6, is it?

4        MR. LOVELLETTE:  That's correct.

5        THE COURT:  Will be without objection

6    admitted.

7                (WHEREUPON, Petitioner's Exhibit

8                No. 6, was received in evidence.)

9        THE COURT:  Any other questions of Mr. Papish?

10        MR. FIEWEGER:  No.

11        THE COURT:  Thank you, Mr. Papish.  Sorry to

12    keep you here so long.

13        MR. FIEWEGER:  Judge, he's here pursuant to

14    subpoena.  Can he be released from his subpoena

15    then?

16        THE COURT:  It's up to you.  I don't need him.

17        MR. FIEWEGER:  I don't need him either.

18        THE COURT:  You are free to leave, sir, if you

19    wish, or you can wait for Mr. Lind if he's driving

20    you.

21                (WHEREUPON, the witness was excused.)

22                (WHEREUPON, discussion was had

23                off the record.)

24        THE COURT:  My name is Leonard Sacks.  I'm the



1   administrative law judge in this case.

2       MR. SANDERS:  How are you doing, Leonard?

3       THE COURT:  Good.  How are you, sir?

4       MR. SANDERS:  Good.

5       THE COURT:  Good.  Apparently, you're here to

6   testify in support of Mr. Lind's case.  I don't

7   know if you know that or not.  But his lawyer is

8   going to ask you some questions.

9           Please answer the questions out loud

10  with words.  Wait until he finishes his question

11  before you answer it.  He is instructed to wait for

12  you to finish your answer before he asks you

13  another question.  And then the lawyer for the

14  state, Mr. Lovellette, may ask you some questions,

15  and I may ask you some questions.  The same rules

16  apply.  All right?

17      MR. SANDERS:  Yep.

18      THE COURT:  And this court reporter is going

19  to ask you to raise your right hand and be sworn

20  in.

21           (WHEREUPON, the witness was duly

22           sworn.)

23           RANDY SANDERS,

24  called as a witness herein, having been first duly



sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FIEWEGER:

Q.    Can you please state your name?

A.    My name is Randy Sanders.

Q.    Where do you live, sir?

A.    I live in Colona, Illinois.

Q.    And where are you employed?

A.    East Moline Correctional Center.

THE COURT:  How close is that to Erie, Illinois?

BY THE WITNESS:

A.    Erie?  Like about 15, 20 minutes.

THE COURT:  Is it a megalopolis there, or is it just a couple separate little cities?

MR. FIEWEGER:  Yeah, it's near the twin cities, your Honor.

THE COURT:  I'm just trying get a handle on the geography here.  All right.  Go ahead.  Sorry to interrupt.

MR. FIEWEGER:  That's okay.

BY MR. FIEWEGER:

Q.    And how are you employed, sir?

A.    I'm a correctional officer.  I started



1    employment in 1988, November 21st.

2         THE COURT:   '88 did you say?

3    BY THE WITNESS:

4         A.    Yes.

5    BY MR. FIEWEGER:

6         Q.    And are you employed at the East Moline

7    Correctional Center?

8         A.    Yes, sir.

9         Q.    Are you also a union representative?

10         A.    Yes, I am.   I've been a union steward

11    for, approximately, 13 years.

12         Q.    And are you also the vice president of

13    the local union?

14         A.    I was until a couple weeks ago.

15         Q.    Did you lose the election?

16         A.    No, I resigned.

17         Q.    Okay.   What local are you a member of?

18         A.    Local 46.

19         Q.    Did you have involvement with Mr. Lind's

20    disciplinary hearing?

21         A.    Yes.   I know I was in one of the

22    hearings the early part of August, I believe.   I

23    don't recall the dates.

24         Q.    If the record shows that the hearing was

1    held on September 8th, 2003, are you going to

2    dispute that?

3        A.    No.

4        Q.    All right.  At that hearing, what was

5    management's position on whether Mr. Lind was on

6    proof status or not?

7        A.    Major Wright contested that Rick Lind

8    was on proof at that time.  But his supervisors on

9    second shift, which were Captain Spriet and

10   Lieutenant Stump, they both said he wasn't on

11   proof.

12       MR. LOVELLETTE:  I'm going to object to the

13   hearsay there.

14       THE COURT:  Overruled.  Unless you have an

15   actual transcript of whatever the proceeding was,

16   this is in the nature of a bystander, in my view,

17   somebody who was there and is reporting what he

18   heard at the proceeding.  Not so?  Is it different?

19       MR. LOVELLETTE:  I don't want to argue about

20   it.  I just want to make the record.

21       THE COURT:  Well, I'm trying to get an idea of

22   why I should sustain your objection.

23       MR. LOVELLETTE:  It's an out-of-court

24   statement offered for the truth --

1    THE COURT:  I agree that it's an out-of-court

2    statement, but it's in the nature of a bystander to

3    the proceeding.  We don't have a reported

4    proceeding.

5    MR. LOVELLETTE:  I would disagree it's not a

6    bystander.

7    THE COURT:  Okay.  I know you disagree.  How

8    else am I going to know what was there, what took

9    place?

10    MR. LOVELLETTE:  The report right there.

11    THE COURT:  Is that the only report?

12    MR. LOVELLETTE:  As far as I'm aware.

13    THE COURT:  Isn't that a summary of what took

14    place?

15    MR. LOVELLETTE:  Yes.  It is not a verbatim

16    transcript.

17    THE COURT:  Well, go ahead.  I'm going to

18    overrule your objection.  I don't think there's

19    much difference between someone's typed summary and

20    a bystander reporting what he heard at the

21    proceeding.  I think the hearsay is both things.

22    Go ahead.

23    MR. FIEWEGER:  Thank you.

24    THE COURT:  I could be wrong.



BY MR. FIEWEGER:

    Q.    Did you review Mr. Lind's personnel file and discipline file prior to going into the pre-disciplinary hearing?

    A.    Yes, I did.

    Q.    Did you see in there any indication that Mr. Lind had been provided written notification when he was placed on proof status that he was to request the need for use of leave of absence time?

    A.    No, sir, I didn't.

    Q.    Did you see any written memorandum or notification that prior to being placed on furnish proof status that he had been counseled about his use of unauthorized time off?

    A.    No, sir.

    Q.    Did you see any notification that would indicate that Mr. Lind was providing documents for leave of absence or disability leave that were not properly filled out or certified?

    A.    Could you restate that for me?

    Q.    Sure.  Did you see anything in writing that indicated that Mr. Lind had been informed that his request for leave or disability time had been improperly certified or improperly submitted?

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1          A.    No, I did not.

2          Q.    Did you see any written notifications

3     that Mr. Lind had been referred to EAP between the

4     period of July 24th, 2003 and September 8th, 2003?

5          A.    No, I didn't.

6          THE COURT:  Excuse me.  Who prepared that

7     exhibit that you were pointing to as being the

8     record of the pre-d hearing?

9          MR. LOVELLETTE:  This is Respondent's 5.  It

10    is signed by David Rayborn, Employee Review

11    Officer, and the warden.  I do not know who prepared

12    it.

13         MR. FIEWEGER:  I'll ask the witness.

14    BY MR. FIEWEGER:

15         Q.    Do you know who prepared Exhibit 5?

16         THE COURT:  I'm just trying to get a handle on

17    what we were talking about a minute ago.  That's

18    all.  These things sort of roll around inside

19    hitting the various buttons in there.  It's like a

20    pinball machine.

21    BY THE WITNESS:

22         A.    Are you're asking do I know who David

23    Rayborn is?

24    BY MR. FIEWEGER:

1    Q.    No.   Who prepared the report, to your

2  knowledge?

3    A.    I'm not sure, actually.

4    Q.    Generally speaking, though, when these

5  reports are prepared, they aren't prepared by the

6  union reps, they're prepared by management; is that

7  fair to say?

8    A.    Yes, that's correct.

9    THE COURT:   But you have a right to file a

10  rebuttal in writing to the report, don't you, as a

11  union representative?

12  BY THE WITNESS:

13    A.    This is a report stating that he's being

14  sent to the review board, and, actually, we don't

15  have anything to do with like a rebuttal or

16  nothing.  We just have to go to the hearing and

17  after the hearing wait for the decision to come

18  down, and then from there we can grieve it.

19    THE COURT:   Or come to the Commission if the

20  person gets fired.

21  BY THE WITNESS:

22    A.    Yes.

23  BY MR. FIEWEGER:

24    Q.    And did that hearing take place on



1    September 8, 2003, to your knowledge?

2          A.      Yes, it did.

3          Q.      Was Mr. Lind notified of his discharge

4    by November -- excuse me, October 22nd, 2003, to

5    your knowledge?

6          A.      No, he wasn't.

7          Q.      And did you review his file to determine

8    whether he had been notified within 45 days of the

9    employee review hearing?

10         A.      I didn't review it the 22nd of October,

11   but a couple months later we reviewed it.

12         THE COURT:  We who?

13   BY THE WITNESS:

14         A.      Myself, Officer Papish, Sergeant Papish

15   now.  He's been promoted.  The president of the

16   union, Myron Farver (phonetic).  And never did we

17   see a signed statement from Officer Lind that he

18   had received his discharge papers.

19         THE COURT:  So based on the fact that you

20   didn't see that paper, is that how you're

21   concluding he didn't get discharged within 45 days?

22   BY THE WITNESS:

23         A.      That's correct.

24         THE COURT:  Okay.  Go ahead.

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1

2   BY MR. FIEWEGER:

3       Q.    If he received a notice by November 6th,

4   2003 or a day or two thereafter, is that within 45

5   days of the September 8, 2003 hearing?

6       A.    No, sir, it isn't.  Can any time I can

7   add anything?

8       THE COURT:  No, actually, you're not supposed

9   to be a volunteer here.

10      THE WITNESS:  Okay.

11      THE COURT:  I know that a lot of people would

12  like to editorialize their own testimony, but the

13  rules are it's a question-and-answer session.

14      THE WITNESS:  Okay.

15      THE COURT:  But thank you for trying to be

16  more helpful.  I appreciate that.

17      THE WITNESS:  I could have cleared something

18  up, but that's okay.

19      THE COURT:  If you want to correct an answer,

20  is that what you want to do?

21  BY THE WITNESS:

22      A.    No.

23      THE COURT:  Just a minute.  Is there an answer

24  that you gave that's mistaken that you want to

1    correct?

2    BY THE WITNESS:

3        A.    I don't think so.

4        THE COURT:  Okay.  Go ahead.  The answer is

5    no, he doesn't want to correct anything.  He just

6    wanted to add to something.

7    BY MR. FIEWEGER:

8        Q.    Is there anything you want to clarify or

9    add to?

10       THE COURT:  Wrong kind of question.  He's not

11   going to get the opportunity to give you an

12   editorial.  If you have a question, ask it.

13       MR. FIEWEGER:  Okay.

14       THE COURT:  Sorry, sir.  That's just one of

15   our little rules here that we don't let witnesses

16   just go on and on.

17       THE WITNESS:  That's fine.

18       THE COURT:  It's not directed at you

19   specifically.

20   BY MR. FIEWEGER:

21       Q.    Do you have to have prior approval to

22   exercise the right to alternative medical leave

23   time if you're out of sick time?

24       A.    Do you have to have prior -- you mean



1  before you take it?

2      Q.    Right.

3      A.    No.

4      Q.    What has happened in your experience at

5  East Moline Correctional Center?

6      MR. LOVELLETTE:  Object to the relevance.

7      THE COURT:  His experience isn't particularly

8  relevant.  I'll sustain that.

9  BY MR. FIEWEGER:

10     Q.    In representing employees who have

11 exhausted sick time and requested medical leave on

12 alternative time, have you had any involvement in

13 that?

14     MR. LOVELLETTE:  Object to the relevance.

15     THE COURT:  Did you say yes?

16 BY THE WITNESS:

17     A.    No, I said, Ah.  I was starting to say

18 something.

19     THE COURT:  The question is yes or no.

20 BY THE WITNESS:

21     A.    Yes.

22     THE COURT:  Overruled.  Go ahead.

23 BY MR. FIEWEGER:

24     Q.    And what practice has been in place at



1   East Moline regarding that situation?

2       A.    I know personally I've had rotator cuff

3   surgery.  I ran out of sick time.

4       THE COURT:  Time out.  He asked you what

5   practice has been in place at East Moline, not what

6   happened to you or not what happened to

7   Mr. Lind.  Is there a practice that you can

8   identify?

9   BY THE WITNESS:

10      A.    There is a practice.  If a person is off

11  on sick leave, they exhaust their sick leave.  Then

12  they can fill out for a leave of absence.

13  BY MR. FIEWEGER:

14      Q.    And must they do that before they're on

15  the sick leave or the leave?

16      A.    No.

17      Q.    And do they have to provide any doctor's

18  slips?

19      A.    They need to get a form to fill out for

20  the leave of absence, which is a form that you take

21  to your doctor.  And he fills out the form, which

22  basically states the injury or illness and how long

23  they think they're going to be off.  And if it's

24  going to be more than 30 days, then they have to



1    update it every 30 days.

2        Q.    And if that is submitted and Mr. Lind

3    has not heard anything back on that form, what is

4    the practice at the East Moline Correctional Center

5    about granting that type of leave?

6        A.    That's a hard question because they

7    generally -- they should get back to him.  If they

8    don't get back to him, then I guess they would

9    assume that they never received the paperwork or

10   they lost it or something happened.

11       MR. LOVELLETTE:  I'm going to object to the

12   speculation.

13       THE COURT:  Sustained.

14   BY MR. FIEWEGER:

15       Q.    Now, was Mr. Lind ever referred to a

16   different or a separate physician for evaluation?

17       MR. LOVELLETTE:  Objection, relevance.

18       THE COURT:  What's the relevance?

19       MR. FIEWEGER:  Under Article 19, Section 21,

20   if the employer is disputing the claim for

21   disability based on the request and the submission

22   of the physician statement, the employer has the

23   right to refer the employee for a separate medical

24   examination.




1    THE COURT:  And so if they don't, is that an
2  irrebuttable presumption that he's got a legitimate
3  injury or illness?
4    MR. FIEWEGER:  That's what I'm arguing, under
5  the union contract.
6    THE COURT:  What's your position on that?
7    MR. LOVELLETTE:  I take the exact opposite
8  position.
9    THE COURT:  What?
10    MR. LOVELLETTE:  That it does not create any
11  sort of presumption at all.  I'm also going to
12  object to the question on the basis of foundation.
13  I don't know how this gentleman would know that.
14    THE COURT:  I'll sustain it on that basis.
15    MR. FIEWEGER:  Nothing further.
16    MR. LOVELLETTE:  I have no questions.
17    THE COURT:  Thank you, sir.  I appreciate you
18  waiting all day and morning.
19    MR. FIEWEGER:  He's also here pursuant to
20  subpoena.
21    THE COURT:  You're released from your
22  subpoena.
23    (WHEREUPON, the witness was excused.)
24    THE COURT:  Okay.  Respondent rests.  Any

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1  rebuttal?

2      MR. LOVELLETTE:  No rebuttal.

3      THE COURT:  No rebuttal.  Evidence is closed.

4  I want your position in writing, and I don't think

5  simultaneous briefs will be appropriate.  I think

6  there should be a schedule of petitioner and

7  respondent and then rebuttal simply because I think

8  it's fair for you to see the documents that he's

9  relying on, the legal things that he's claiming for

10 your rebuttal argument.  That's my view, unless you

11 have a different view.

12     MR. LOVELLETTE:  I'll agree with that.

13     MR. FIEWEGER:  I don't object to that either.

14     THE COURT:  All right.  So how long, Kevin, do

15 you need to give your initial argument?  Do you

16 want the record first?  Is that it?

17     MR. LOVELLETTE:  Yes, I do.

18     THE COURT:  Okay.  Ms. Reporter, what's your

19 estimate on delivery?

20     THE COURT REPORTER:  10 days.

21     THE COURT:  How many?

22     THE COURT REPORTER:  10.

23     THE COURT:  Okay.  So let's assume 14 just to

24 be polite, which takes us to March 12th; is that



1    right?  Yeah, it would be March 12th.  That's a

2    Monday.

3         MR. FIEWEGER:  Friday.

4         THE COURT:  A Friday.  That's what I said,

5    it's a Friday.  How long do you want once you

6    receive it, 30 days, three weeks?  Ms. Cole, how

7    long do you need?

8              (WHEREUPON, discussion was had

9              off the record.)

10       THE COURT:  Back on the record.  Petitioner's

11    original brief will be due to Springfield with a

12    copy to me March 31st, provided that they receive

13    the transcript by the 12th of March.  And the time

14    for filing the brief will be extended day for day

15    in the event that there's a late filing of the

16    transcript or record.

17       THE COURT:  How long do you need thereafter?

18       MR. FIEWEGER:  21 days.

19       THE COURT:  Three weeks, which would make it

20    the 21st day of April.  What day --

21       MR. LOVELLETTE:  That's a Wednesday.  That's

22    Secretary's Day.

23       THE COURT:  How about the 23rd day of April,

24    the close of business on Friday the 23rd?  And then

1    I'm going to give you three weeks to respond, if

2    you want three weeks.

3         MR. LOVELLETTE:   Yeah, we'll take three weeks.

4         THE COURT:   That would be the 14th of May.

5    What day is that?

6         MR. LOVELLETTE:   That is a Friday.

7         THE COURT:   Friday the 14th.   Okay.   So you

8    can have the reply brief or rebuttal brief by

9    Friday the 14th of May, and all of those briefing

10   dates will be extended day to day depending on when

11   the record comes in.

12        MR. LOVELLETTE:   When should the petitioner

13   file the record?   Should they wait until their

14   reply?

15        THE COURT:   Well, I prefer for you to wait

16   until your reply goes in, unless you have a

17   reason -- well, let me give you a hypothetical

18   problem.

19             If the record comes to the Attorney

20   General and he files it immediately, I have 60 days

21   from the date that he files it.   If he retains it

22   and makes it available to you, unless you buy a

23   separate record, I have 60 days from the time the

24   record gets filed.

E S Q U I R E ™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1          Frankly, if the record is filed when it

2    comes to him, I'm going to ignore the arguments and

3    just decide it without him.  Although, I consider

4    the arguments part of the case, part of the

5    hearing.  I have one guy who filed a paper saying

6    that wasn't the case.  He thought the record began

7    the 60 days.

8          So I would like you to put in the record

9    whatever your position is.  If your position is

10   that you feel the arguments are not part of the

11   hearing, I would like you to state that.

12   Otherwise, you're going to waive that issue, as far

13   as I'm concerned.  And I happen to believe that the

14   arguments are part of the hearing.

15        MR. FIEWEGER:  I think the arguments are part

16   of the hearing.

17        THE COURT:  You do?

18        MR. FIEWEGER:  I do.

19        THE COURT:  Okay.  And that's the way we'll

20   treat them.  So when I get the arguments and the

21   record goes to Springfield, we'll start the meter

22   running.  Okay?

23        MR. LOVELLETTE:  Okay.

24        THE COURT:  Anything else that we can do

1    today?

2         MR. LOVELLETTE:  I don't think so.

3         THE COURT:  Okay.  Very good.  Thank you.

4    That will close the hearing.

5         MR. FIEWEGER:  Thank you.

6              (WHICH WERE ALL THE PROCEEDINGS HAD

7              IN THE ABOVE-ENTITLED CAUSE ON

8              THIS DATE.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24


ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1  STATE OF ILLINOIS    )

2                       ) SS:

3  COUNTY OF C O O K    )

4

5      I, AMY K. ZUMBROCK, a Certified Shorthand

6  Reporter of the State of Illinois, CSR No. 84-4356,

7  do hereby certify that I reported in shorthand the

8  proceedings had in the aforesaid matter, and that

9  the foregoing is a true, complete and correct

10  transcript of the proceedings had as appears from

11  my stenographic notes so taken and transcribed

12  under my personal direction.

13      IN WITNESS WHEREOF, I do hereunto set my hand

14  this 10th day of March, 2004.

15

16

17      AMY K. ZUMBROCK, CSR

18      CSR No. 84-4356.

19

20

21

22

23

24



ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950