E-FILED
Friday, 02 February, 2007  03:39:04 PM
Clerk, U.S. District Court, ILCD
E-FILED
Monday, 11 July, 2005  02:51:16 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

RICK LIND,                                )
                                          )
        Plaintiff,                        )
                                          )
    vs.                                   )
                                          )
STATE OF ILLINOIS, through its            )
Agency THE ILLINOIS                       )
DEPARTMENT OF CORRECTIONS,                )
                                          )
        Defendant.                        )

## **COMPLAINT**

Now comes the plaintiff, Rick Lind, by and through his attorneys, Katz, Huntoon & Fieweger, P.C., and for his Complaint at Law against the defendant, State of Illinois, through its Agency, the Illinois Department of Corrections (hereinafter referred to as "DOC") and in support thereof states as follows:

1.  That this court has subject matter jurisdiction pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, and 28 U.S.C. § 1331.

2.  That Rick Lind is a resident of Erie, Illinois.  At all times material to this cause of action was employed as a correctional officer by the defendant State of Illinois through its Agency, the Illinois Department of Corrections, at its correctional facility located in East Moline, Rock Island County, State of Illinois.



EXHIBIT
11

2

3. That beginning on July 23, 2004, plaintiff, Rick Lind, suffered from a serious health condition in that he was incapacitated due to degenerative disk disease of the lower back for which he was seeking medical treatment.

4. That defendant DOC is an employer and employs more than 50 persons at the East Moline Correctional Center for purposes of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

5. That Rick Lind is an employee protected by the FMLA in that at the time of his leave request on July 24, 2003, had worked more than 1,250 hours of service for the DOC during the previous 12-month period and had been employed by the DOC for more than 12 months since he had commenced his employment with the DOC on November 12, 1984 and had been continuously employed until that date.

6. That the plaintiff sought a medical leave of absence pursuant to his rights under the FMLA by submitting appropriate documentation to the Warden of the East Moline Correctional Center on July 30, 2003. Exhibit 1, a true and correct copy of the Request for Leave of Absence effective July 24, 2003, and Exhibit 2, a true and correct copy of the Physician's Statement submitted on July 30, 2003, are attached hereto and made a part of this Complaint.

7. That the defendant, DOC, by its Warden, Gene Jungwirth, and others within his employ or under his supervision, unlawfully interfered, restrained and denied the exercise or attempt to exercise plaintiff's rights to FMLA leave in one or more of the following manners in violation of 29 U.S.C. § 2615(a):

3

A. Instituted disciplinary action against plaintiff for failing to report to work despite being provided with written proof of his need for leave for his serious health condition;

B. Suspended the plaintiff for 30 days pending discharge from employment on October 9, 2003;

C. Discharged the plaintiff on November 6, 2003;

D. Failed to process plaintiff's request for a medical leave of absence;

E. Failed to advise plaintiff of his rights to seek leave of absence under the FMLA and provide documentation to him concerning his rights;

F. Failed to notify the plaintiff that the Department of Corrections was denying his request for medical leave absence before it took action to discipline him for failure to report to work on September 2003;

G. Failed to notify plaintiff within 14 days of the submission of his physician's statement on July 30, 2004 that it was denying the request for leave of absence or that the information provided was inadequate; and

H. Failed to maintain plaintiff's health insurance coverage under the defendant's group health plan.

8. That the State of Illinois, Department of Corrections, is subject to the provisions of the FMLA pursuant to the Fourteenth Amendment of the United States Constitution and pursuant to the State of Illinois' express waiver of any claimed sovereign immunity right under the Eleventh Amendment of the United States Constitution through its Union Agreement between AFSCME Council 31 in the State of Illinois dated July 1,

4

2000 through June 30, 2004 in which the State agreed to be subject to the provisions of the FMLA. Exhibit 3, a true and correct copy of the relevant portions of the agreement between AFSCME Council 31 AFL-CIO and the State of Illinois, is attached hereto and made a part of this Complaint. As further evidence of the State's waiver of any sovereign immunity claim, attached hereto as Exhibit 4 is a true and correct copy of the FMLA document that the State of Illinois, through its Agency, Department of Corrections, issues to its employees in which it acknowledges the employees' rights and protections under the FMLA.

9. That plaintiff has previously sought reinstatement to his employment through an appeal of his dismissal to the Illinois Civil Service Commission and the Illinois Civil Service Commission has ruled that the Department of Corrections failed to prove that Rick had violated its affirmative attendance directive when he called in sick on July 24, 25, 28, 29, 30, 31, 2003 and August 1, 4, 5, and 6, 2003, and that plaintiff be reinstated to his former position as a correctional officer. Exhibit 5, a true and correct copy of the decision from the Illinois Civil Service Commission reinstating the plaintiff to his employment with the Illinois Department of Corrections, is attached hereto and made a part of this Complaint.

10. Plaintiff is entitled to recover damages under 29 U.S.C. § 2617(a) equal to amount of back wages that he lost from July 24, 2003 through the present date, an additional amount equal to the lost employment benefits including contributions to pension and retirement plans an amount equal to the premium payments to maintain health insurance coverage under the defendant's group insurance plan through Health

5

Alliance HMO, and recovery of compensatory damages equal to medical expenses that were not paid by insurance during the time in which he was terminated. He is also entitled to recover interest in the above amounts at the prevailing rate and he is entitled to recover liquidated damages equal to the amount of loss of wages, salaries, employment benefits and other compensatory damages and interest on that amount, all in an amount in excess of $50,000.00.

11. That the court shall allow, in addition to any judgment amount awarded to the plaintiff, reasonable attorneys' fees, reasonable expert witness fees and other costs of the action to be paid by the DOC pursuant to 29 U.S.C. § 2617(a)(3).

WHEREFORE, plaintiff Rick Lind hereby requests this court enter judgment in his favor and against the defendant State of Illinois through its Agency, State of Illinois, Department of Corrections, in the amount in excess of $50,000.00 for compensatory and liquidated damages, plus the costs of this action, and an amount equal to reasonable attorneys' fees and expert witness fees and grant such other and further equitable relief as may be appropriate, including an order to reinstate the plaintiff to the same insurance

6

company that he had prior to his termination and such other equitable relief the court

deems necessary and appropriate.

RICK LIND, Plaintiff


By: /s/ Stephen T. Fieweger

For:
KATZ, HUNTOON & FIEWEGER, P.C.
Attorneys for Plaintiff
1000 - 36th Avenue
P.O. Box 950
Moline, IL 61266-0950
Telephone:  309-797-3000
Fax:  309-797-3330


s:\wp\worddoc\11260001.07C

**E-FILED**
Tuesday, 30 May, 2006  04:41:49 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

RICK LIND,                                      )
                                                )
            Plaintiff,                          )
                                                )
      - vs-                                      )          No. 05-4059
                                                )
STATE OF ILLINOIS, through its                  )
Agency THE ILLINOIS                             )
DEPARTMENT OF CORRECTIONS                       )
                                                )
            Defendant.                          )

### ANSWER AND AFFIRMATIVE DEFENSES

NOW COMES the Defendant, STATE OF ILLINOIS, through its Agency THE ILLINOIS DEPARTMENT OF CORRECTIONS, by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, and hereby file its Answer and Affirmative Defenses to Plaintiff's Complaint.  In support thereof, Defendant states as follows:

1.      Defendant denies the allegations contained within paragraph 1 of Plaintiff's Complaint.

2.      Defendant admits that Plaintiff is a resident of Erie, Illinois. Defendant denies the remaining allegation contained within paragraph 2 of Plaintiff's Complaint.

3.      Defendant denies the allegations contained within paragraph 3 of Plaintiff's Complaint.

4.      Defendant admits paragraph 4 of Plaintiff's Complaint.

5.      Defendant admits that as of July 24, 2003, Mr. Lind had worked more than 1,250 hours of service for DOC during the previous 12 month period and had worked for

1

DOC for more than 12 months since the commencement of his employment on November 12, 1984. Defendant denies the remaining allegations contained within paragraph 5 of Plaintiff's Complaint.

6.      Defendant denies the allegations contained within paragraph 6 of Plaintiff's Complaint.

7.      Defendant denies the allegations contained within paragraph 7, including all subparagraphs.

8.      Defendant denies the allegations contained within paragraph 8 of Plaintiff's Complaint.

9.      Defendant admits that Plaintiff sought reinstatement to his employment through an appeal of his dismissal to the Illinois Civil Service Commission. Defendant admits that Exhibit 5 is a true and accurate copy of the Civil Service Commission findings and conclusions of law and the document speaks for itself as to the Commission's ruling. Defendant denies all remaining allegations contained within paragraph 9 of Plaintiff's Complaint.

10.     Defendant denies the allegations contained within paragraph 10 of Plaintiff's Complaint. Answering further that Family Medical Leave is unpaid leave.

11.     Defendant admits that 29 U.S.C. § 2617(a)(3) is a provision under the Family Medical Leave Act and speaks for itself.

WHEREFORE, Defendant prays that judgment be entered in its favor and against Plaintiff together with its costs of suit.

2

## AFFIRMATIVE DEFENSES

NOW COMES the defendant, Illinois Department of Corrections, and for its Affirmative Defenses to Plaintiff's Complaint states as follows:

1.     Plaintiff's Complaint for money damages is barred by the Eleventh Amendment.

2.     Plaintiff failed to comply with the requirements under the FMLA to qualify or be entitled to FMLA leave; and

3.     Plaintiff failed to timely give notice or as soon as practicable to qualify or be entitled to FMLA leave; and

4.     Plaintiff failed to give the employer the requisite notice and/or medical documentation that he suffered from a "serious health condition" to be qualify or be entitled to FMLA leave.

5.     Plaintiff failed to mitigate damages.

3

WHEREFORE, Defendant prays that judgment be entered in its favor and against Plaintiff together with its costs of suit.

Respectfully submitted,

ILLINOIS DEPARTMENT OF CORRECTIONS,

Defendant,

LISA MADIGAN, Attorney General
State of Illinois,

Attorney for Defendant,

By:    /s Stephanie L. Shallenberger
Stephanie L. Shallenberger, #6279773
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
Telephone: (217) 782-9014
Facsimile:   (217) 524-5091
E-Mail: sshallenberger@atg.state.il.us

4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

RICK LIND,                                    )
                                              )
            Plaintiff,                        )
                                              )
    - vs-                                     )          No. 05-4059
                                              )
DEPARTMENT OF CORRECTIONS,                    )
                                              )
            Defendant.                        )

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2006, I electronically filed **Defendant's Answer and Affirmative Defenses** with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Stephen T. Fieweger
Katz, Huntoon & Fieweger
200 Plaza Office Building
1705 Second Avenue
Rock Island, Illinois 61204-3250
sfieweger@katzlawfirm.com

and I hereby certify that on May 30, 2006, I mailed by United States Postal Service, the document(s) to the following non-registered participant(s):

None

Respectfully Submitted,
s/ Stephanie L. Shallenberger
Stephanie L. Shallenberger, #6279773
Assistant Attorney General
Attorney for the Defendants
500 South Second Street
Springfield, Illinois  62706
Phone:  (217) 782-9014
Fax:     (217) 524-5091
E-Mail:  sshallenberger@atg.state.il.us

PAM VERSTRAETE
January 5, 2007

## PAGE 1

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

RICK LIND,

                Plaintiff,

vs.                                No. 4:05-CV-4959

STATE OF ILLINOIS DEPARTMENT
OF CORRECTIONS,

                Defendant.

**ORIGINAL**

DEPOSITION UPON ORAL EXAMINATION OF
PAM VERSTRAETE

Taken January 5, 2007
Commencing at 10:40 a.m.

REPORTED BY:  KATHY REUMANN, CSR, RPR, RMR
Registered Professional and Merit Reporter
Certified in Iowa and Illinois

CONNELL REPORTING
P.O. Box 3171
Rock Island, Illinois  61204-3171
(309) 788-3741

## PAGE 2

DEPOSITION

The following is the deposition of PAM VERSTRAETE taken pursuant to Notice of Deposition, at the offices of the East Moline Correctional Center, 100 Hillcrest Road, East Moline, Illinois, commencing at approximately 10:40 a.m., on January 5, 2007.

APPEARANCES

On Behalf of the Plaintiff:

          ATTORNEY STEPHEN T. FIEWEGER
          Katz, Huntoon & Fieweger, P.C.
          1000 - 36th Avenue
          P.O. Box 950
          Moline, Illinois  61266-0950

Behalf of the Defendant:

          ASSISTANT ILLINOIS ATTORNEY GENERAL
          SARAH R. KERLEY
          General Law Bureau
          Office of the Attorney General
          500 South Second Street
          Springfield, Illinois  62706

ALSO PRESENT:  Rick Lind.

SPECIAL INSTRUCTIONS:  Signature reserved.  Deponent may review Attorney Kerley's transcript copy.

## PAGE 3

I N D E X

WITNESSES

All Witnesses:                                    page

PAM VERSTRAETE

Examination by MR. FIEWEGER:              5:4
Examination by MS. KERLEY:                78:16
Examination by MR. FIEWEGER:            111:1
Examination by MS. KERLEY:              116:16
Examination by MR. FIEWEGER:            117:6

EXHIBITS

Verstraete Deposition Exhibit No. 1       11:11
Verstraete Deposition Exhibit No. 2       17:5
Verstraete Deposition Exhibit No. 3       24:7
Verstraete Deposition Exhibit No. 4       35:1
Verstraete Deposition Exhibit No. 5       54:1
Verstraete Deposition Exhibit No. 6       67:4
Verstraete Deposition Exhibit No. 7       69:2
Verstraete Deposition Exhibit No. 8       78:14
Verstraete Deposition Exhibit No. 9       82:23
Verstraete Deposition Exhibit No. 10      89:6
Verstraete Deposition Exhibit No. 11      91:6
Verstraete Deposition Exhibit No. 12     111:24

CERTIFICATE OF SHORTHAND REPORTER        120

## PAGE 4

S T I P U L A T I O N

It is stipulated by and between parties herein by their respective counsel that the discovery deposition of PAM VERSTRAETE may be taken pursuant to the applicable rules of the Federal Code of Civil Procedure and that notice of taking said deposition is hereby waived.

That the deposition shall be taken before Kathy Reumann, Certified Shorthand Reporter, in and for the States of Iowa and Illinois, at the hour of 10:40 a.m., on January 5, 2007, at East Moline Correctional Center, 100 Hillcrest Road, East Moline, Illinois, and that the testimony of the witness may be transcribed by Kathy Reumann, Certified Shorthand Reporter, or at her direction.

That in the event said transcript or any portion thereof shall be sought to be used at time of trial for any proper purpose under the Federal Code of Civil Procedure, it shall not be necessary to call the reporter to verify the accuracy of said transcript; provided, however, respective counsel shall have reasonable time from the date of delivery of the transcript to call to the attention of the reporter any errors or omissions.

**EXHIBIT**
12

PAM VERSTRAETE
January 5, 2007

PAGE 5

1          PAM VERSTRAETE,
2 being first duly sworn, was examined and testified as
3 follows:
4 EXAMINATION BY MR. FIEWEGER:
5      Q.   Would you please state your name.
6      A.   Pamela Verstraete.
7      Q.   Ms. Verstraete, I'm Steve Fieweger, and I
8 represent Rick Lind in this litigation against the Department
9 of Corrections.
10          Have you ever had your deposition taken
11 before?
12     A.   No.
13     Q.   If you do not understand my question, let me
14 know and I'll phrase it in a way that we can get an answer to
15 the question.
16          If you need to talk to Ms. Kerley, we'll let
17 you do that. If you answer a question, I believe -- I'm
18 taking it that you understood the question. If you do not
19 know the answer to a question, a fair response is I don't
20 know. If you don't -- if you can't recall a date or time, a
21 fair answer is I don't recall.
22          And in the event that there are objections to
23 the questions that I've made, let the other attorney make the
24 objections. I'll probably still instruct you to answer the
25 question, and we'll fight amongst ourselves and the judge as

PAGE 6

1 to whether that question should have been answered or not.
2          And if you need a break, you're entitled to a
3 break. I'm not going to -- this isn't a marathon session.
4 If you need a reasonable break, we'll take a break, okay?
5          Please state your title or position.
6      A.   Executive Secretary III.
7      Q.   And what is that -- what do your duties entail
8 in that position?
9      A.   Secretary to the warden.
10     Q.   And how long have you been in that position?
11     A.   Since 2003.
12     Q.   Okay. When in 2003 were you assigned to that
13 position?
14     A.   Now that I'm thinking about it, I'm not sure
15 if it was 2002 or 2003, but it was October of one of those
16 years.
17     Q.   Have you reviewed any documents to prepare for
18 your deposition today?
19     A.   Yes.
20     Q.   What have you reviewed?
21     A.   I've reviewed CMS-95s, memo, doctor slip, time
22 sheets. That's all I'm recalling right now.
23     Q.   Okay. What are your day-to-day duties and
24 functions as the executive secretary to the warden?
25     A.   I do mail, answer phones, set up meetings, do

PAGE 7

1 memos, special projects. Basic secretarial work.
2      Q.   Are you the person who also handles requests
3 from employees for time off?
4      A.   No.
5      Q.   Who does that?
6      A.   Can you be more -- for what employees?
7      Q.   Sure. For the wage and hour employees covered
8 by the collective bargaining unit, such as sergeants on down.
9 Or lieutenants on down. Excuse me.
10     A.   It would be their immediate supervisor.
11     Q.   Okay. What if an employee has a medical
12 problem that they need long-term leave?
13     A.   They would give that to the human resource
14 representative.
15     Q.   Who was the HR representative as of June --
16 excuse me. July 23rd, 2003?
17     A.   We didn't have one.
18     Q.   Were you serving as the HR representative at
19 that point?
20     A.   I was told to do what I could.
21     Q.   Who told you that?
22     A.   Warden Olever.
23     Q.   That's an E in Olever?
24     A.   Yes.
25     Q.   How long was Warden Olever the warden here at

PAGE 8

1 East Moline Correctional Center?
2      A.   I'm not sure of the time that he was warden.
3      Q.   How long have you been employed here?
4      A.   Since 1992.
5      Q.   And take me through the progression of your
6 employment.
7      A.   Can you repeat that for me?
8      Q.   Sure.
9          Tell me what positions you've held.
10     A.   Office Assistant, Office Coordinator,
11 Executive Secretary I, and Executive Secretary III. Not two.
12     Q.   On July 23rd, 2003, and during the months of
13 August, September, and October of 2003, who was the person
14 who would have contact with employees from the East Moline
15 Correctional Center regarding requests for leaves of absence
16 due to medical or disability reasons?
17     A.   They would have brought it to me.
18     Q.   Okay. Besides Ms. Kerley, have you had any
19 discussions regarding the facts of this case with anyone
20 else?
21     A.   No.
22     Q.   Have you discussed the facts of this case with
23 Warden Jungwirth?
24     A.   He knows -- I mean, like, the whole case or --
25     Q.   Any of the facts of the case.

PAM VERSTRAETE

January 5, 2007

PAGE 13

1    Q.    Mr. Lind had worked more than 1,250 hours by
2  July 23rd in the year prior to July 23rd, 2003, hadn't he?
3    A.    Yes.
4    Q.    Mr. Lind was a person covered under the Family
5  Medical Leave Act, correct?
6    A.    Yes.
7          MS. KERLEY:  Objection.  Asks for a legal
8  conclusion.
9    Q.    Mr. Lind -- from your understanding, Mr. Lind
10  was a person who was entitled to notification from the
11  Department of Corrections of his rights to seek a medical
12  leave under the Family Medical Leave Act, correct?
13    A.    Yes.
14    Q.    And you have no records showing that he was
15  notified of his rights?
16    A.    Correct.
17    Q.    And you have no independent recollection of
18  oral conversations with Mr. Lind between July 23rd, 2003, and
19  August 6, 2003, in which you told him of what his rights
20  were?
21    A.    I don't know if it would have been between
22  those dates.
23    Q.    Okay.  And you don't have any independent
24  recollection of dates after August 6, 2003, in which you
25  notified Mr. Lind in writing of his rights to seek Family

PAGE 14

1  Medical Leave.
2    A.    No.
3    Q.    So you saw no documents which would indicate
4  who, if anyone, notified Mr. Lind after August 6, 2003, and
5  up until his termination on or about November 10th, 2003, of
6  his rights to seek a medical leave under the Family Medical
7  Leave Act?
8    A.    No.
9    Q.    So that's correct, right?
10    A.    That -- yes.
11    Q.    All right.  Now, in answers to
12  interrogatories, Jo Shoemaker is listed as a person who has
13  knowledge of the facts to help respond to the
14  interrogatories, correct?
15          And I'll show it to you.
16          MS. KERLEY:  For the record,
17  Ms. Verstraete is not a defendant in this case.
18          MR. FIEWEGER:  I didn't ask that.
19          MS. KERLEY:  She may not have ever seen
20  the answers to interrogatories because she's not the
21  defendant is my only point.
22    A.    Ask me your question again.
23    Q.    Sure.
24          I'm just showing you answer to Interrogatory
25  No. 1, and it says please provide names of the people who

PAGE 15

1  have helped answer the interrogatories.
2    A.    Okay.
3    Q.    You are listed, Jo Shoemaker, and Wendy
4  Navarro; is that correct?
5    A.    They're listed, yes.
6    Q.    And Kathy Greer is the fourth person listed,
7  correct?
8    A.    Correct.
9    Q.    Have you had any conversations with Jo
10  Shoemaker regarding this case?
11    A.    No.
12    Q.    Have you had any conversations with Wendy
13  Navarro regarding this case?
14    A.    No.
15    Q.    Have you had any conversations with Kathy
16  Greer regarding this case?
17    A.    No.
18    Q.    Have you had any e-mails, correspondence, text
19  messaging with any of these three individuals?
20    A.    No.
21    Q.    Do you have any personal knowledge of facts
22  which would indicate that Rick Lind was not suffering from a
23  serious health condition as of July 24th through August 6,
24  2003?
25    A.    Can you ask me that one again?

PAGE 16

1    Q.    Sure.
2          Do you have any knowledge of -- personal
3  knowledge of facts which would indicate that Rick Lind was
4  not suffering from a serious health condition as of July
5  24th, 2003, through August 6, 2003?
6    A.    No.
7    Q.    Mr. Lind had provided a CMS-95 form for that
8  period signed by his treating chiropractor, is that correct,
9  a physician's statement?
10    A.    Yeah, there was one submitted.
11    Q.    Okay.  And in that, it referred to his
12  degenerative arthritis condition in his low back, correct?
13    A.    I don't remember if it said that.
14    Q.    All right.  I'll get it out and make sure what
15  it said.
16          Before I get that out, do you have any
17  explanation as to why Mr. Lind did not get an FMLA packet?
18    A.    On that one, I'm not sure that he didn't get
19  one.
20    Q.    But you have no independent recollection of
21  facts which would prove that you did it in the ordinary
22  course of your duties and obligations as the executive
23  secretary filling in as the human resource representative for
24  East Moline Correctional Center prior to his termination, do
25  you?

PAM VERSTRAETE
January 5, 2007

PAGE 17

1     A.     No.
2     Q.     And you did not have any communications with
3  Mr. Lind in which he indicated to you at a time later that he
4  had, in fact, received from you a -- the documents to submit
5  for FMLA leave, did you?
6     A.     Can you ask me that one again?
7     Q.     Sure.
8            You didn't have any communications with
9  Mr. Lind at a later date in which he told you, Well, I've got
10 the FMLA paperwork from you guys, I'm just not submitting it,
11 or words to that effect.
12    A.     Correct.
13           MR. FIEWEGER:  Off the record.
14           (Discussion held off the record.)
15           (Verstraete Deposition Exhibit No. 2
16 marked for identification.)
17    Q.     I'm showing you your deposition Exhibit 2 for
18 identification.
19           Have you seen this document before?
20    A.     Yes.
21    Q.     And did you see this document before Mr. Lind
22 was placed on suspension pending discharge?
23    A.     I don't know that for a fact.
24    Q.     Well, there is a date on it of October 1st,
25 2003, correct?

PAGE 18

1     A.     Yes.
2     Q.     And Mr. Lind's suspension pending discharge
3  went into effect on October 16th, 2003, correct?
4     A.     That I'm not sure of.
5     Q.     Okay.  If I represent to you that is the date,
6  or in that time frame, would you agree with me that your
7  office had this information more than -- approximately two
8  weeks before the suspension period went into place?
9     A.     If those dates were correct, yes.
10    Q.     And would you agree with me that before any
11 discipline had been imposed on Mr. Lind, he did have to your
12 office this completed physician's statement with a signature
13 from his doctor dated July 30th, 2003?
14    A.     Ask me that one again, please?
15           MR. FIEWEGER:  Just read it back.
16           (Requested information read.)
17    A.     I had the form with the doctor's date of July
18 30th, yes.
19    Q.     Do you have any independent facts to indicate
20 that Dr. Freebern did not sign that form on that date?
21    A.     No.
22    Q.     Do you have any independent facts which would
23 indicate that Dr. Freebern was not a licensed medical
24 practitioner by the state of Illinois qualified to render
25 opinions regarding disability and need for medical leave for

PAGE 19

1  FMLA purposes?
2     A.     No.
3     Q.     And have you had any independent discussions
4  or communications with medical practitioners, whether
5  chiropractic or medical physicians within the state of
6  Illinois -- or even outside the state of Illinois, for that
7  matter -- which would indicate that Dr. Freebern's opinions
8  and conclusions that Mr. Lind could not work for the period
9  of July 24th through July 30th, 2003, were inaccurate?
10    A.     No.
11    Q.     Or improper?
12    A.     No.
13    Q.     Or not supported by his examination, care, and
14 treatment of the patient?
15    A.     No.
16    Q.     Now, when an employee is seeking a
17 disability -- a nonservice-related disability leave of
18 absence and they are subject to the union contract, your
19 office is to provide the employee with a CMS-95 form; is that
20 correct?
21    A.     Correct.
22    Q.     The employee then fills that out and then
23 takes Exhibit 2, the physician's statement, to the physician
24 who is to prepare the report for review, correct?
25    A.     Okay.  The CMS-95 and the physician's

PAGE 20

1  statement is the same thing.
2     Q.     All right.
3     A.     And the employee takes that to his physician
4  to be filled out.
5     Q.     Okay.  And did you keep a log or diary or any
6  type of record as to the date you would release one of these
7  forms to an employee and the date the employee would return
8  it?
9     A.     No.
10    Q.     Did Mr. Lind receive from you on July 24th,
11 2003, a CMS-95 form?
12    A.     Not to my knowledge.
13    Q.     Can you explain to me how he had that document
14 then?
15    A.     I may have given it to him at some point in
16 time.
17    Q.     If Mr. Lind testifies under oath that he came
18 to your office on the 23rd or 24th of July, 2003, and
19 requested this form and you delivered it to him, do you have
20 any facts in your memory or to your knowledge which would
21 indicate that that's inaccurate?
22    A.     Yes.
23    Q.     What facts do you have that would show that
24 that's inaccurate?
25    A.     I was on vacation.

PAM VERSTRAETE
January 5, 2007

PAGE 21

1    Q.    Okay. From when to when?
2    A.    It was the whole week. I think the first day
3 was the 21st. I left two hours early and was gone the rest
4 of the week.
5    Q.    And who filled in for you in your stead?
6    A.    Andrea Lashbrook and Theresa Severtsgaard
7 would cover the phone calls.
8    Q.    Can you spell Lashbrook?
9    A.    L-a-s-h-b-r-o-o-k.
10    Q.    And who's the other one?
11    A.    Theresa Severtsgaard.
12    Q.    Can you spell Theresa's last name?
13    A.    S-e-v-e-r-t-s-g-a-a-r-d.
14    Q.    And what's Andrea's position?
15    A.    She's the Administrative Assistant II.
16    Q.    And what is Theresa's position?
17    A.    Executive Secretary I.
18    Q.    Now, in your absence, if an employee needed a
19 CMS-95 form, who would be the person responsible for
20 delivering that to the employee?
21    A.    I don't know if they would have given it to
22 him or told him that I would be back on a certain date. I
23 don't have specific knowledge on what they would have done.
24    Q.    Okay. So you didn't have a policy or practice
25 in place --

PAGE 22

1    A.    No.
2    Q.    -- in late July 2003 while you were on
3 vacation that would indicate who was to deliver that type of
4 form to an employee in your absence.
5    A.    No.
6    Q.    Now, Exhibit 2 shows that on July 30th, 2003,
7 that form was signed by the doctor, correct?
8    A.    Yes.
9    Q.    Do you have any facts which would indicate
10 that that exhibit, Exhibit 2, was not delivered to the East
11 Moline Correctional Center by Rick Lind or on behalf of Rick
12 Lind on or about July 30th or July 31st, 2003?
13    A.    Yes, because I date stamped it.
14    Q.    Well --
15    A.    That's when I received it.
16    Q.    And from whom did you receive it?
17    A.    I can't answer that.
18         I'm going to change my answer. I just noticed
19 here it has Freebern's marking from their fax machine, and
20 it's dated October 10th -- or, October 1st. So I got it from
21 Freebern.
22    Q.    You may have gotten this form that day --
23    A.    Uh-huh.
24    Q.    -- by fax, but is it your testimony that it
25 was never received in your office prior to October 1st, 2003?

PAGE 23

1    A.    No, no.
2    Q.    So you don't know whether it was received on
3 or about July 30th, 2003, but you did have a receipt of it on
4 October 1st, 2003, from the Freebern Clinic, correct?
5    A.    Yes.
6    Q.    All right. Now, if Rick Lind testifies that
7 on July 30th he personally had that CMS physician's statement
8 delivered to your office on that date, do you have any facts
9 which would indicate that that's inaccurate?
10    A.    Ask me that one again.
11    Q.    Sure.
12         Ignore the fax transmission on the bottom of
13 the exhibit.
14    A.    Okay.
15    Q.    Do you have any facts which would indicate
16 that if Rick Lind said, I delivered that same document signed
17 by Dr. Freebern on July 30th, 2003, to the East Moline
18 Correctional Center's administrative office of the warden,
19 that that testimony would be inaccurate?
20    A.    I don't have any facts.
21    Q.    Okay. Would you agree with me that Mr. Lind
22 did some subsequent CMS-95 forms in August 2003 also?
23         MS. KERLEY: Objection. The question
24 mischaracterizes the witness's testimony. Whenever he --
25 when you use the word subsequent CMS-95s, there's been no

PAGE 24

1 testimony that this was received anytime besides October 1st.
2    Q.    Would you agree with me that Mr. Lind had a
3 CMS physician's statement dated August 14th, 2003,
4 delivered to your office during the month of August 2003?
5    A.    I don't recall what one you're talking about.
6         MR. FIEWEGER: Okay. We'll mark it.
7         (Verstraete Deposition Exhibit No. 3
8 marked for identification.)
9    Q.    Showing you Exhibit 3 for identification --
10         MS. KERLEY: Let's pause. What's 1?
11         MR. FIEWEGER: The request for admission.
12         MS. KERLEY: So the 7-30-03 is 2 and the
13 Exhibit 3 is 8-14, right?
14         MR. FIEWEGER: Yeah.
15         MS. KERLEY: Okay. Thanks.
16    Q.    Now, there is on Exhibit 3 a physician's
17 statement for Mr. Lind signed by Dr. Kevin Freebern, and the
18 date of the signature is 8-14-03. Is that correct?
19    A.    Correct.
20    Q.    And there is no stamp on Exhibit 3 to state
21 when it was received in the East Moline Correctional Center
22 office, correct?
23    A.    Correct.
24    Q.    Is it your testimony that this was not
25 delivered to the East Moline Correctional Center in August of

PAM VERSTRAETE
January 5, 2007

PAGE 29

1  ERB hearing was September 8th.
2         THE WITNESS:  Okay.
3      Q.   Do you have any facts which would indicate
4  that Mr. Lind had been provided a copy of the September 5th,
5  2003, memo from Warden Jungwirth prior to the September 8,
6  2003, disciplinary hearing?
7      A.   On the memo, I remember writing when he gave
8  it back to us.  I don't remember if it says on there when it
9  was given to him.
10     Q.   So you have no facts to indicate that prior to
11 the September 8, 2003, disciplinary hearing, that you had
12 provided Mr. Lind with the September 5th memo
13 signed by Warden Jungwirth of the deficiencies of his request
14 for medical leave of absence.
15     A.   I have no documentation.
16     Q.   Okay.  And yet the Department of Corrections
17 fired Mr. Lind on September 8 -- or, recommended 30-day
18 suspension pending termination based on violation of the
19 affirmative attendance policy for the period of July 23rd
20 through August 6, 2003, correct?
21     A.   Yes.
22     Q.   And that happened on September 8th, correct?
23     A.   Yes.
24     Q.   Now, is the information on Exhibit 2 in any
25 way defective?

PAGE 30

1      A.   Not to my knowledge.
2      Q.   So that appears to be a properly completed
3  form from a licensed physician for purposes of submission for
4  a medical leave of absence, correct?
5      A.   Yes.
6      Q.   Do you know why that wasn't approved?
7      A.   I don't know whether it was approved or
8  denied.
9      Q.   Okay.  Do you know why nobody made a decision
10 on whether to approve a medical leave of absence for Mr. Lind
11 despite having proper documentation in to support that
12 request for leave, prior to the time he was discharged on
13 November 10, 2003?
14     A.   We received this after the disciplinary
15 hearing, after he had been suspended.
16     Q.   I understand that.
17         MS. KERLEY:  And for the record, when she
18 says "this," she's --
19         MR. FIEWEGER:  Exhibit 2.
20         MS. KERLEY:  Yes, she's identifying
21 Exhibit 2.
22     A.   And I can't say for a fact why the leave was
23 not put in place.
24     Q.   I mean, if you had looked at this and said,
25 Look, we just fired this guy for affirmative attendance for

PAGE 31

1  the period of July 23rd through August 6, 2003, based on the
2  employee review hearing because he didn't have sufficient
3  time on the books to cover his leave of absence, but now
4  we've got proof from his doctor that he had a medical excuse
5  for it and was medically excused for that time period, why
6  couldn't the decision to fire him have just been reversed at
7  that point?
8      A.   I can't answer that.  I don't know.
9      Q.   Okay.  But yet you made Warden Jungwirth aware
10 of the fact that this document, Exhibit 2, had come in before
11 the effective date of the suspension, correct?
12     A.   I would have, yes.
13     Q.   All right.
14         MS. KERLEY:  When you said "this
15 document," what were you referring to?
16         MR. FIEWEGER:  I identified it.  Exhibit
17 2.
18         MS. KERLEY:  Okay.
19     Q.   And Exhibit 2 was obtained more than two weeks
20 before the effective date of the suspension, correct?
21     A.   Yes.
22     Q.   All right.  Do you recall any communications
23 or conversations with Warden Jungwirth about this, Exhibit 2?
24     A.   Not specific to this one, I don't recall.
25     Q.   Is the only one that you recall having a

PAGE 32

1  conversation with him regarding the CMS forms completed on
2  Rick's behalf, was the one that generated the September 5th
3  memo that he signed?
4      A.   Yes.
5      Q.   Okay.  Did you send Warden Jungwirth's letter
6  to Rick Lind explaining the deficiencies of the physician's
7  statement completed by Dr. Freebern, by certified mail,
8  return receipt requested?
9      A.   That I'm not sure of.
10     Q.   Do you have anything to indicate that that
11 document was mailed in the ordinary course of business?
12     A.   I have no documentation.
13     Q.   Now, go back to Exhibit 1, please.
14     A.   Okay.
15     Q.   Would you look at page 3, please.
16         MS. KERLEY:  Is that the --
17         MR. FIEWEGER:  Request to admit, Sarah.
18         MS. KERLEY:  I'm going to get buried
19 really quickly, I think.
20         MR. FIEWEGER:  You should have seen me
21 yesterday.
22         MS. KERLEY:  I bet.  Sounds fun.
23         That can be off the record as well.
24         I'm ready.  What page?
25         MR. FIEWEGER:  Page 3.

PAM VERSTRAETE
January 5, 2007

PAGE 41

1    A.    I don't have facts that there was nothing sent
2 to him between those dates.
3    Q.    You don't have facts that would indicate that
4 something was sent to him --
5    A.    Correct.
6    Q.    -- notifying him of his FMLA rights between
7 those dates, do you?
8    A.    No.
9    Q.    And you haven't seen in a review of Mr. Lind's
10 personnel file any documents which would notify Mr. Lind
11 between July 23rd, 2003, and up until the time of his
12 termination on November 10, 2003, that the Department of
13 Corrections notified him of his rights under the FMLA, do
14 you?
15    A.    I have no documentation.
16    Q.    Request No. 13, then, it says, Admit that the
17 defendant has no document which shows that it advised Rick
18 Lind of his rights to seek a leave of absence under the
19 Family Medical Leave Act of a period of July 23rd, 2003,
20 through August 6, 2003.  And the response by the defendant is
21 denied, correct?
22    A.    Correct.
23    Q.    Please state the name and title or position of
24 each state of Illinois employee who has personal knowledge of
25 facts which would indicate that there were documents that

PAGE 42

1 showed that it advised Rick Lind of his rights to seek a
2 leave under the FMLA between the period of July 23rd and
3 August 6, 2003.
4    A.    I don't know of anyone that has verification
5 that there were documents sent.
6    Q.    So how can you support a denial of that
7 request?
8        MS. KERLEY:  Objection, inasmuch as this
9 witness is not the defendant.
10       MR. FIEWEGER:  Well, I want to know which
11 witnesses can support this denial.
12       MS. KERLEY:  If that's the question, then
13 objection.  Asked and answered.
14       MR. FIEWEGER:  Well, I don't think it's
15 fair, Sarah, because you're the -- Ms. Verstraete was the
16 person in the answers to interrogatories who was listed as
17 the one with personal knowledge of the facts to support the
18 denials.
19       MS. KERLEY:  The interrogatory responses
20 were some months prior to Exhibit A, I recall.
21       MR. FIEWEGER:  Let me look.  Maybe they
22 were.  Maybe that's the first set.
23       MS. KERLEY:  I have on my certificate of
24 service that I responded on October 17th, 2006.
25       MR. FIEWEGER:  I'll withdraw that

PAGE 43

1 question.
2        MS. KERLEY:  Okay.
3    Q.    On Request for Admission No. 16, it states,
4 Admit that Rick Lind told the defendant on or about July
5 23rd, 2003, that he needed a medical leave of absence due to
6 his low-back condition.  And that response is denied,
7 correct?
8    A.    Correct.
9    Q.    Please state -- tell me the name and title or
10 position of each Department of Corrections employee who has
11 personal knowledge of facts which would support this denial,
12 if you know.
13    A.    I don't know.
14    Q.    Okay.  It's not you, is it?
15    A.    No.
16    Q.    On Request No. 18, it says, Admit that on
17 August 14th, 2003, Rick Lind gave defendant a second written
18 request for disability leave of absence.  And that response
19 was denied, correct?
20    A.    Yes, that's what it says.
21    Q.    Please state the name and title or position
22 with the defendant of each person who has personal knowledge
23 of facts which would indicate that that's inaccurate.
24    A.    I don't know if on that date a second request
25 was given.

PAGE 44

1    Q.    We have Exhibit 3, I believe.
2    A.    Yes.
3    Q.    Which is the 8-14-03 physician's statement
4 signed by Dr. Freebern, correct?
5    A.    Correct.
6    Q.    And that's Bates stamped 494 and 495; is that
7 correct?
8    A.    Correct.
9    Q.    And is it your testimony that Rick Lind did
10 not deliver Exhibit 2, the physician's statement, on or about
11 August 14, 2003?
12    A.    On or about?
13    Q.    That day.
14    A.    That day?  I don't know.
15    Q.    Wouldn't you agree with me that Mr. Lind was
16 under the gun in terms of his job regarding lack of days off
17 because of exhaustion of sick leave and annual leave?
18    A.    Yes.
19    Q.    And wouldn't you agree with me that he had
20 made known by August 14, 2003, that his low-back condition
21 was what was preventing him from being able to work as a DOC
22 employee?
23       MS. KERLEY:  I'm sorry.  I didn't hear
24 that.
25    Q.    Wouldn't you agree with me that by mid-August,

PAM VERSTRAETE
January 5, 2007

PAGE 45

1 he was telling this office -- meaning the office of the
2 warden -- that because of his low-back condition, he couldn't
3 report to work?
4     A.    I don't know.
5     Q.    He never told you this?
6     A.    Ask me again.
7     Q.    Sure.
8     A.    I'm missing something.
9     Q.    You knew by mid-August 2003 that Rick was
10 missing this work because he was claiming that he had a
11 low-back problem.
12    A.    Rick came in one day, and I asked him how he
13 was doing. He said his back still hurt. I don't know what
14 date that was.
15    Q.    It was prior to his firing, right?
16    A.    Yes.
17    Q.    Did you ever know Rick Lind not to get
18 documents to the warden's office in a timely manner when
19 requested?
20    A.    Yes.
21    Q.    When?
22    A.    Exhibit 2.
23    Q.    You're assuming that wasn't delivered on or
24 about July 30th, 2003, correct?
25    A.    Correct.

PAGE 46

1     Q.    And if Mr. Lind says I delivered it and you
2 say he didn't, that's a disputed fact, right?
3     A.    True.
4     Q.    But it was delivered, regardless, two weeks
5 prior to the time in which he began his suspension pending
6 discharge?
7     A.    True.
8     Q.    And it was delivered in time for consideration
9 of the fact at the time you were firing him -- meaning the
10 state of Illinois -- was covered by this physician's
11 statement?
12          MS. KERLEY: Objection, inasmuch as
13 there's no testimony that this witness had any role in the
14 discipline process. So she lacks foundation to answer about
15 the disciplinary process.
16          MR. FIEWEGER: You can answer the
17 question, though.
18    A.    Ask me the question again.
19    Q.    Sure.
20          Exhibit 2 was delivered two weeks before the
21 start of the suspension, correct?
22    A.    Correct.
23    Q.    The discipline leading to the 30-day
24 suspension pending discharge was for the period covered by
25 the physician's statement, correct?

PAGE 47

1     A.    Correct.
2     Q.    Meaning before the implementation of the
3 suspension, your office had knowledge of facts indicating
4 that a doctor had excused him from work for a serious medical
5 condition, correct?
6          MS. KERLEY: Objection. Contains a legal
7 conclusion. This witness is not capable of testifying to
8 what is or is not a serious medical condition.
9          MR. FIEWEGER: You can answer the
10 question.
11          MS. KERLEY: I'm going to direct her not
12 to answer a legal conclusion. Insomuch as you want to
13 rephrase your question as to not include a term of legal art,
14 I would withdraw my direction.
15    Q.    By October 1st, 2004, Dr. Kevin Freebern, a
16 licensed chiropractic physician from the state of Illinois,
17 certified to the state of Illinois Department of Corrections
18 that Mr. Lind had a medical condition relating to his low
19 back that excused him from work for the period of July 24,
20 2003, through August 4, 2003; is that correct?
21    A.    Correct.
22    Q.    And I think you testified earlier you had no
23 information in the warden's office that would indicate that
24 any other licensed physician or chiropractor or medical
25 provider had contrary facts to indicate otherwise, that

PAGE 48

1 Mr. Lind did not have that condition.
2     A.    True.
3     Q.    And yet Mr. Lind was fired effective --
4 beginning -- or, suspended beginning October 16th, 2003, and
5 then discharged beginning November 10th, 2003, despite the
6 fact that there was a physician's statement excusing the time
7 period for which he was fired.
8     A.    Okay.
9     Q.    Would you agree with me?
10    A.    Yes.
11    Q.    All right. Mr. Lind had available to him
12 personal days for or I would call dock time of six days still
13 on the books as of July 24, 2003, correct?
14    A.    I don't know.
15    Q.    Why not?
16    A.    That's timekeeping.
17    Q.    Oh, okay. Who would know that?
18    A.    Right now our timekeeper is Fonda Ishmael, but
19 I don't know who it was at that time.
20    Q.    Mr. Lind, if he signed leave of absence
21 request documents and submitted them through his union
22 representatives requesting the use of alternative time or
23 dock time for the period of July 24th through August 6,
24 2006 -- 2003, excuse me, should have been able to utilize
25 that if he had that time on the books, correct?

PAM VERSTRAETE
January 5, 2007

PAGE 49

1       MS. KERLEY: Objection to the
2 characterization of leave of absence forms. I believe you're
3 talking notification of absence.
4       MR. FIEWEGER: Yes.
5       MS. KERLEY: The half sheets?
6       MR. FIEWEGER: The half sheets.
7       MS. KERLEY: Okay. So that we're clear.
8   A.  So it's the notification of absence?
9   Q.  Notification of absence forms.
10  A.  Okay. Can you ask me again?
11  Q.  Sure.
12      If Mr. Lind still had time on the books to be
13 able to utilize for leave of absence after he had exhausted
14 his sick time and submitted the proper half sheets in a
15 timely manner, either personally or through union
16 representatives, he should have been able to utilize those,
17 correct?
18      MS. KERLEY: Objection, inasmuch as
19 you're calling it a leave of absence, which is a specific
20 thing. I understand --
21      MR. FIEWEGER: What words do you want me
22 to use so we get this clarified?
23      MS. KERLEY: A notification of absence
24 for use of benefit time in lieu of dock.
25      MR. FIEWEGER: With that -- I'll adopt

PAGE 50

1 that language as part of the question, and can you answer the
2 question, please?
3   A.  Okay. Aside from the terminology of the
4 forms, what is the question?
5   Q.  The question is: If he had six days of
6 alternative time available on the books, and he submitted the
7 proper half sheet, should he have been able to utilize those?
8   A.  Approval of alternative time is up to the
9 warden.
10  Q.  Okay. Did you have any discussions with the
11 warden as to why Mr. Lind was being disciplined?
12  A.  I don't recall talking to him about it.
13  Q.  Okay. Was Warden Jungwirth the person who
14 approved the termination of Mr. Lind, if you know?
15  A.  Yes.
16  Q.  Was he the decision maker?
17  A.  As far as I know.
18  Q.  Okay. Do you know of anybody else other than
19 the people who referred him for discipline that participated
20 in the discipline decision?
21  A.  Ask me that one again.
22  Q.  Sure.
23      Other than the people who referred him to the
24 employee review board for discipline, are you aware of any
25 other Department of Corrections employee who was part of the

PAGE 51

1 decision making process to terminate Mr. Lind's employment
2 for violation of the affirmative attendance policy for the
3 period of July 24th through August 6, 2003?
4   A.  I wouldn't know if the warden had talked to
5 someone else about it, or not.
6       MR. FIEWEGER: Let's take a five-minute
7 break.
8       MS. KERLEY: That's fine.
9       (Break taken.)
10  Q.  We also sent the prior request for admission
11 of facts in this case and received answers to those requests
12 for admission of facts from the state of Illinois in June of
13 last year. All right?
14  A.  Okay.
15  Q.  And it states in Request No. 4 -- and I don't
16 have a copy of it.
17      MR. FIEWEGER: Do you have a copy for
18 her, or not?
19      MS. KERLEY: I can. I'll share it with
20 her.
21      MR. FIEWEGER: That's good.
22  Q.  In Request No. 4 it says, Admit that on July
23 24th, 2003, Rick informed the defendant through the East
24 Moline Correctional Center that he was suffering from a
25 serious health condition, in that he was having severe

PAGE 52

1 low-back problems for which he needed a leave of absence for
2 medical reasons. And that answer is denied.
3       Do you see that?
4   A.  Correct.
5   Q.  And then I asked in the interrogatories, the
6 written questions, the name, address, and telephone number
7 and position with the defendant of each person who has
8 personal knowledge of facts which would support a denial of
9 any of the requests for admission of facts, and for each
10 denial, please identify the person who has knowledge of facts
11 which support the denial to the particular request for
12 admission of facts.
13      Do you see that?
14  A.  Yes.
15  Q.  Now, on Request No. 4, it says you are the
16 person who has knowledge of facts which would support the
17 denial that Rick did not notify the East Moline Correctional
18 Center on July 24th of his need for medical leave due to his
19 low-back condition, correct?
20  A.  Yes.
21  Q.  Well, you testified earlier that you were on
22 vacation that day.
23  A.  Right.
24  Q.  So how could you know what happened with Rick
25 Lind on that day?

CONNELL REPORTING
P.O. Box 3171, Rock Island, Illinois  61204-3171

PAM VERSTRAETE

January 5, 2007

PAGE 57

1 Dr. Freebern authorized plaintiff to be off work. Upon
2 reasonable inquiry, defendant lacks sufficient knowledge to
3 admit or deny whether plaintiff suffered from a serious
4 medical condition from July 24th, 2003, to August 7th, 2003.
5        And then in response to the interrogatories, I
6 asked who had knowledge of facts to support denial of Request
7 No. 7, and you were the person listed.
8        Are you aware of that?
9    A.    Okay. I see that.
10   Q.    What facts did you investigate to determine
11 that Mr. Lind wasn't suffering from a low-back problem?
12   A.    I didn't investigate what his problem was.
13   Q.    Well, what reasonable inquiry did you make
14 before you state the defendant found that they couldn't admit
15 or deny that request for admission of facts?
16        Did you look at any medical records? Did you
17 ask for a medical authorization form from Dr. Freebern's
18 office? Did you call a meeting with Mr. Lind and anybody to
19 try to clarify whether he was not suffering from his low-back
20 condition?
21   A.    No.
22        MS. KERLEY: Objection to this entire
23 line of questioning insomuch as serious medical condition is
24 a legal term of art of which this witness is not qualified to
25 testify about the ramifications of that terminology.

PAGE 58

1        MR. FIEWEGER: There was no objection to
2 that under the request for admission of facts either. So I
3 think that's waived.
4    Q.    What independent facts did you investigate to
5 determine when Dr. Freebern signed Exhibit 2, the physician's
6 statement that bears his signature of July 30th, 2003?
7    A.    Ask me that one again, please.
8    Q.    Sure.
9        What independent investigation did you do to
10 determine that Dr. Freebern did not sign Verstraete Exhibit 2
11 on July 30th, 2003?
12   A.    I didn't.
13   Q.    So it says, Defendant lacks sufficient
14 information to admit or deny when Dr. Freebern prepared a
15 physician's statement, correct?
16   A.    Correct.
17   Q.    Is it your understanding that physicians
18 prepare documents and sign them on different dates than what
19 are indicated on the signature?
20   A.    I have no knowledge of what he would do, if he
21 would date it the same day or another day.
22   Q.    But you didn't do anything to investigate
23 whether his signature dated July 30 of 2003 did not occur on
24 July 30th, 2003, did you?
25   A.    No.

PAGE 59

1    Q.    Now, in that denial, also it says, Further,
2 defendant denies that Dr. Freebern authorized plaintiff to be
3 off work, correct?
4    A.    Correct.
5    Q.    And page 2 of that form has Dr. Freebern's
6 signature on it, correct?
7    A.    Uh-huh.
8        MS. KERLEY: Which is exhibit?
9        MR. FIEWEGER: Exhibit 2.
10   Q.    Verstraete Exhibit 2. It states in his
11 opinion, the patient is now temporarily totally disabled from
12 any occupation, and he checked yes.
13   A.    Uh-huh.
14   Q.    And he checked from patient's regular
15 occupation, correct?
16   A.    Yes.
17   Q.    And then it said, If yes, when do you think
18 the patient will be able to resume any work? And it said,
19 August 7, 2003, correct?
20   A.    Correct.
21   Q.    And in the denial it says, Defendant denies
22 that Dr. Freebern authorized plaintiff to be off work,
23 correct?
24   A.    Are you still talking about No. 7?
25   Q.    No. 7 still.

PAGE 60

1    A.    Okay. But in No. 7, it says from July 24th to
2 August 7th.
3    Q.    Okay. So with the exception of August 7th, if
4 I had said August 6th, you wouldn't have denied that,
5 correct?
6    A.    No. On the front here --
7        MS. KERLEY: Objection. This witness is
8 not the defendant and is not the responder. She is listed as
9 a person who has facts that support the denial. She is not
10 the responder to the request for admission of facts.
11   Q.    But if Dr. Freebern said that he was
12 authorized to be off work from the 24th to August 6, 2003,
13 you would have no independent facts available to you to say
14 that Rick Lind was able to work during that time period.
15       MS. KERLEY: Objection. Calls for
16 speculation, facts not in evidence. Lack of foundation as to
17 what she may have done.
18       MR. FIEWEGER: You can answer the
19 question.
20   A.    Can you ask me the question again?
21       MR. FIEWEGER: Sure. Just read it back.
22       (Requested information read.)
23   A.    No.
24       MS. KERLEY: I withdraw my objection.
25   Q.    Now, on Request No. 9, Admit that Exhibit 2,

PAM VERSTRAETE
January 5, 2007

PAGE 61

1 meaning the physician's statement, was provided to the
2 Department of Corrections at the East Moline Correctional
3 Center on July 30th, 2003, by the plaintiff. And that's
4 denied, correct?
5    A.   Correct.
6        Q.   And on Request to Admit No. 9 on the answers
7 to interrogatories says that you have personal knowledge of
8 the facts which would support denial of Request No. 9.
9    A.   Correct.
10       Q.   What facts do you have personal knowledge of?
11   A.   Because it was date stamped the 1st.
12       Q.   But you can't state under oath that Rick Lind
13 was not here on July 30th delivering that document to the
14 warden's office, can you?
15   A.   With Freebern's date down here, I would say
16 yes.
17       Q.   So you're saying that Rick Lind wasn't here on
18 July 30th, 2003, solely based on the fact of the fax
19 transmission document on October 1st, 2003, on Exhibit 2,
20 correct?
21       MS. KERLEY:  Objection. Mischaracterizes
22 the witness's testimony.
23       Answer if you can.
24   A.   As a fact, I don't know if he was here July
25 30th.

PAGE 62

1        Q.   Okay. And as a fact, you don't know if he did
2 not deliver Exhibit 2 that date to this office.
3        MS. KERLEY:  Objection as to the form of
4 the question.
5        MR. FIEWEGER:  I'll rephrase it.
6        MS. KERLEY:  Thank you.
7        MR. FIEWEGER:  That was too many double
8 negatives.
9        MS. KERLEY:  Yeah, I didn't know what you
10 were saying.
11       Q.   You have no personal knowledge of facts which
12 would show that Rick Lind failed to deliver the physician's
13 statement that is Verstraete Exhibit 2 to the East Moline
14 Correctional Center on July 30th, 2006 -- 2003, excuse me.
15   A.   With my date stamp on it and the fax, I would
16 say he did not deliver it on July 30th.
17       Q.   But if he says that he did, you don't -- you
18 can't contradict his testimony regarding that, can you?
19   A.   I would say yeah. Yes.
20       Q.   We already know that you didn't send him any
21 FMLA paperwork, correct?
22   A.   I didn't send any that was return receipt
23 requested that I can find documentation for.
24       Q.   And you didn't copy any of the paperwork
25 showing that you sent it to him, correct?

PAGE 63

1    A.   Correct.
2        Q.   And you didn't have any return receipt
3 requested showing that you sent the September 5th letter of
4 Warden Jungwirth to him.
5    A.   Correct.
6        Q.   And now you don't have any true filing system
7 to show when these documents are turned in, do you? You
8 don't keep a log or diary or anything?
9    A.   No.
10       Q.   So for all we know, that document was sitting
11 on your desk for two months and then you stamped it on
12 October 1st?
13   A.   Why would Freebern have October 1st on their
14 fax machine?
15   Q.   I don't know.
16   A.   I don't either.
17   Q.   But --
18       MS. KERLEY:  Why don't you ask her a
19 question, Steve. Why don't you ask her if it sat on her desk
20 for two months.
21       MR. FIEWEGER:  I did.
22       MS. KERLEY:  That's not at all what you
23 asked.
24       MR. FIEWEGER:  Well, I'll ask it.
25   Q.   Do you know if that document was sitting in

PAGE 64

1 your office for two months?
2    A.   It was not.
3        Q.   Do you know if you worked on July 30th, 2003?
4    A.   Yes. My time sheet says I was here.
5        MS. KERLEY:  Off the record.
6        (Discussion held off the record.)
7        Q.   Would you look at Request No. 12. It says,
8 Admit that the defendant failed to process the plaintiff's
9 request for a medical leave of absence submitted to it by
10 July 30th, 2003.
11       And you said, Admit that it did not process
12 any request by plaintiff for a medical leave of absence by
13 July 30th because no complete request had been submitted by
14 the plaintiff, correct?
15   A.   Correct.
16       Q.   And that is based on your Bates stamp of
17 October 1st, 2003, correct?
18   A.   This is a Bates stamp? Is that what you're
19 saying?
20   Q.   A calendar date.
21       MS. KERLEY:  Date stamp.
22   Q.   Date stamp.
23       MS. KERLEY:  I call them Bates stamps all
24 the time too.
25   A.   Yes.

PAM VERSTRAETE

January 5, 2007

PAGE 65

1  Q.   Now, you would admit, though, that this
2  request was not processed prior to the time Mr. Lind was
3  terminated --
4  A.   Correct.
5  Q.   -- meaning Exhibit 2.
6       So if that had been submitted by October 1st,
7  his request for a medical leave of absence was not processed
8  before taking the disciplinary action against him.
9  A.   It was not processed before that.
10 Q.   Okay.
11      MS. KERLEY:  And are we still using
12 November 10th, 2003, as the discharge date?
13      MR. FIEWEGER:  And October 16th as 30
14 days pending discharge.
15      MS. KERLEY:  Okay.
16 Q.   And you did not prepare a letter for Warden
17 Jungwirth's signature indicating that Exhibit 2 was defective
18 in any manner.
19 A.   There was a letter prepared, but I don't know
20 for what physician's statement it was prepared on.  I don't
21 know if it was this one or another one.
22 Q.   Okay.  But you said earlier, I believe, in
23 your testimony that you didn't see anything deficient in the
24 way that this Exhibit 2 had been prepared and signed by the
25 physician, correct?

PAGE 66

1  A.   Not this one.
2  Q.   Meaning the July 30 of 2003 was a complete
3  CMS-95 form signed by a licensed Illinois chiropractic
4  physician, correct?
5  A.   The one that is date stamped October 1st, the
6  Exhibit 2, yes.
7  Q.   And if you had reviewed this on or about
8  October 1st, 2003, you wouldn't have generated a letter
9  pointing out deficiencies when you find that this exhibit is
10 true, correct, and accurate and complete.
11 A.   Correct.
12 Q.   All right.  So would it be more likely than
13 not that a later CMS form was the subject of the September
14 5th, 2004, letter -- or, 2003, letter that you prepared for
15 Warden Jungwirth?
16      MS. KERLEY:  Later from what date?
17      MR. FIEWEGER:  The August 14th, 2004 --
18 2003 CMS form rather than this one.
19 A.   Without actually comparing the memo to the
20 CMS-95, I couldn't answer that as a fact right now.
21 Q.   Okay.
22      MS. KERLEY:  What are you looking for?
23      MR. FIEWEGER:  The letter.
24      MS. KERLEY:  The memo?
25      MR. FIEWEGER:  Uh-huh.

PAGE 67

1      MS. KERLEY:  Okay.  I'm going to use it
2  as a joint exhibit, so if you want to, why don't we just mark
3  it.
4      (Verstraete Deposition Exhibit No. 6
5  marked for identification.)
6  Q.   I'm showing you Deposition Exhibit 6, and this
7  is a document that's Bates stamped 492 through 495; is that
8  correct?
9  A.   Correct.
10 Q.   And would you agree with me that that's the
11 letter you prepared in reviewing pages 494 and 495?
12 A.   Yes.
13 Q.   And would you agree with me that pages 494 and
14 495 of Exhibit 6 are the same pages as the previous Exhibit
15 3?
16 A.   Yes.
17 Q.   All right.  And you would agree with me that
18 Exhibit 6 shows that the 8-14-03 physician's statement by
19 Dr. Freebern had been received by the East Moline
20 Correctional Center on or before September 5th, 2003?
21 A.   Correct.
22 Q.   And you would agree with me that you have no
23 proof that Mr. Lind received the warden's letter prior to his
24 September 8th ERB hearing, do you?
25 A.   No.

PAGE 68

1  Q.   And there's a sticky note on this in
2  handwriting that says, Returned by R. Lind on 9-9-03.
3  A.   Uh-huh.
4  Q.   Whose sticky note is that?
5  A.   Mine.
6  Q.   And what was returned?
7  A.   As a fact, only this piece of paper.  I don't
8  know.
9      MS. KERLEY:  And for the record, the
10 witness is pointing to Bates stamped document 492, the first
11 page of Exhibit 6.
12 Q.   Do you know why page 493 is made part of this
13 sequence of documents?
14 A.   In my opinion, it would be because I had these
15 two pieces of paper and the dates didn't match on them.
16 Q.   Well, Mr. Lind had submitted not just the
17 CMS-95 forms, but also similar Freebern Chiropractic forms
18 similar to 493 to your office during this time period in
19 which he was having his back problems, wasn't he?
20 A.   Yes.
21 Q.   In fact, he had Dr. Freebern sign one prior to
22 August 20th, 2003, correct?
23 A.   There were doctor slips.
24      MS. KERLEY:  I assume you're asking what
25 it's dated, since this witness would lack foundation as to

PAM VERSTRAETE
January 5, 2007

PAGE 69

1  when any document was signed.
2           (Verstraete Deposition Exhibit No. 7
3  marked for identification.)
4      Q.   Showing you Exhibit 7, would you agree with me
5  that that was a Freebern Chiropractic form signed by
6  Dr. Freebern that was submitted to East Moline Correctional
7  Center at or around its time of 8-4-03?
8      A.   I would agree that it's from Freebern
9  Chiropractic. I wouldn't -- I don't recall on what date it
10 was submitted.
11     Q.   Would you agree that this was contained within
12 Mr. Lind's personnel file?
13     A.   I don't know if it was in his personnel file.
14     Q.   Did you send Mr. Lind a letter asking for more
15 information signed by Warden Jungwirth off of Exhibit 7?
16     A.   Not that I recall.
17     Q.   Now, are you aware that when an employer has a
18 request for an employee for leave for medical purposes under
19 the FMLA, that they have the -- the employer can request
20 clarification from the physician or medical provider, more
21 information to support the request for the FMLA?
22     A.   I don't know.
23     Q.   Okay. And are you also aware that once the
24 employer requests the additional information, that the
25 employee has a period of 14 days in which to provide that

PAGE 70

1  requested information to the employer?
2      A.   No, I'm not aware.
3      Q.   Are you aware that the first -- would you
4  agree with me that the first time that the East Moline
5  Correctional Center requested additional information relative
6  to Rick's request for a medical leave of absence was the
7  September 5th, 2003, letter of Warden Jungwirth where you
8  sought clarification and a completion of the form filled out
9  by Dr. Freebern?
10     A.   Are we talking about the CMS-95 that's dated
11 8-14?
12     Q.   Absolutely.
13     A.   Yes.
14     Q.   And would you agree with me that less than 14
15 days lapsed before the ERB hearing resulted?
16     A.   Yes.
17     Q.   So if Mr. Lind got that on September 6 -- for
18 example, if you mailed it the 5th and the mail delivered it
19 to him the next day, on September 6th -- two days after
20 receipt of that, the Department of Corrections took a
21 disciplinary action against Mr. Lind, correct?
22     A.   They had the review board.
23     Q.   Right.
24     A.   Yes.
25     Q.   And from that review board, Mr. Lind was

PAGE 71

1  recommended by the review board for 30 days pending
2  discharge, and Warden Jungwirth approved it, correct?
3      A.   Yes.
4      Q.   And that was less than 14 days from the date
5  of Warden Jungwirth's September 5th, 2003, letter to him
6  asking for clarification of the CMS-95 form prepared by
7  Dr. Freebern on or about August 14th, 2003, correct?
8      A.   Yes.
9      Q.   On Request No. 13 in the first request for
10 admission of facts, it says, Admit that the defendant failed
11 to advise Rick Lind of his rights to seek a leave of absence
12 under the Family Medical Leave Act, and it was denied. And
13 you were the person listed with personal knowledge of facts
14 which would indicate that -- in support of that denial,
15 correct?
16     A.   Correct.
17     Q.   When did you advise Rick Lind from July 24th,
18 2003, onward until his termination date of November 10th,
19 2003, of his rights to seek a Family Medical Leave Act for
20 this low-back condition?
21     A.   I don't have any documentation that states
22 that I did that. But I have a pile of the packets on top of
23 my file cabinet, and I would say that when he turned in
24 paperwork, he would have gotten a copy of that. But there
25 would have been no documentation showing that.

PAGE 72

1      Q.   What date did that occur?
2      A.   I don't know.
3      Q.   And who was present when that occurred?
4      A.   I don't recall.
5      Q.   And did you do anything to diary or otherwise
6  memorialize the fact that that had occurred?
7      A.   No.
8      Q.   And where did it take place?
9      A.   Would have been in my office.
10     Q.   On Request No. 14, it says, Admit that the
11 defendant failed to provide documentation to plaintiff
12 concerning his rights under the Family Medical Leave Act, and
13 the answer is denied. And you're the person listed as the
14 person with knowledge of facts which would support that
15 denial.
16     A.   Correct.
17     Q.   What personal knowledge of facts do you have
18 that would support the denial of Request No. 14?
19     A.   Because, as I remember it, with those packets
20 on top of my file cabinet, I would have given him one.
21     Q.   Ms. Verstraete, is it your practice not to
22 copy these and put these in the employees' personnel files?
23     A.   Copy the packet that was given to an employee?
24     Q.   Yeah.
25     A.   Yes.

CONNELL REPORTING
P.O. Box 3171, Rock Island, Illinois 61204-3171

PAM VERSTRAETE
January 5, 2007

PAGE 77

1 And I'm trying to exhaust her knowledge
2 as to all facts that she knows to support this denial,
3 because I think it's an improper denial to not know it and
4 then deny it.
5 MS. KERLEY: Do you believe that by
6 asking this witness more questions, you're going to have her
7 agree that it's an improper denial when she has absolutely no
8 idea what a proper denial for a request for admission of fact
9 is?
10 MR. FIEWEGER: No. I'm asking her what
11 facts she has available to her to in any way make this denial
12 a proper denial.
13 Q. Do you know any other facts that you have that
14 can show that Rick Lind didn't deliver this on August 6,
15 2003, to this facility?
16 A. No. I don't know if he did it on the 6th, or
17 not.
18 Q. Did you discuss with anyone from the
19 Department of Corrections whether or not that was true or
20 not, other than attorneys?
21 A. And true being that he delivered it on August
22 6th?
23 Q. Yeah.
24 A. No.
25 Q. So you know of no facts which would indicate

PAGE 78

1 that he did not do that.
2 A. No.
3 Q. And you have no facts to indicate that after
4 the Freebern Chiropractic release from work for the period of
5 7-24-03 to 7 -- 8-7-03 was received, that anyone from the
6 Department of Corrections requested clarification from
7 Mr. Lind or his physician as to why Mr. Lind needed that
8 leave of absence.
9 A. Not to my knowledge.
10 MR. FIEWEGER: I have no further
11 questions.
12 MS. KERLEY: I have a few, Pam.
13 Can I have this marked as 8?
14 (Verstraete Deposition Exhibit No. 8
15 marked for identification.)
16 EXAMINATION BY MS. KERLEY:
17 Q. Ms. Verstraete, do you recognize Exhibit 8?
18 A. Yes.
19 Q. What is that?
20 A. It's an excuse from work from Freebern
21 Chiropractic for the dates of 7-24 through 8-7-03.
22 Q. When -- can you tell from the face of that
23 document when it was received by the warden's office?
24 A. September 24th, 2003.
25 Q. Did you ever see that document before

PAGE 79

1 September 24th, 2003?
2 A. I couldn't say that I did.
3 Q. Do you recall ever seeing that document
4 before --
5 A. No.
6 Q. -- September 24th?
7 A. No.
8 Q. Is -- in your understanding, you mentioned --
9 well, first of all, you mentioned excuse from work.
10 A. Uh-huh.
11 Q. Can anyone besides the Department of
12 Corrections excuse a Department of Corrections employee from
13 their scheduled shift?
14 MR. FIEWEGER: Objection. Argumentative.
15 No foundation. Speculative.
16 MS. KERLEY: You've asked her five
17 questions about excuses.
18 MR. FIEWEGER: I can make my objections.
19 MS. KERLEY: You may answer.
20 A. Can you ask me again?
21 Q. Yeah.
22 Who is -- let me ask it a different way.
23 Who is the employer of a correctional officer?
24 A. The Illinois Department of Corrections.
25 Q. Is there any -- in your time with the state of

PAGE 80

1 Illinois, in your time with the Department of Corrections, is
2 there anyone besides the Illinois Department of Corrections
3 that can authorize an employee to not come in on their
4 scheduled -- for a scheduled shift, including correctional
5 officers?
6 MR. FIEWEGER: Same objections.
7 THE WITNESS: Answer?
8 MS. KERLEY: Yep.
9 A. Their supervisor can give them time off. I
10 mean, benefit time off.
11 Q. And that supervisor would be acting on behalf
12 of the Department of Corrections management?
13 A. Yes.
14 Q. Can an employee's neighbor write them an
15 excuse --
16 A. No.
17 MR. FIEWEGER: Objection. Argumentative.
18 Q. -- and they'd be allowed to --
19 MS. KERLEY: You don't know until I
20 finish my question if you're going to like it or not.
21 MR. FIEWEGER: I already know.
22 Q. Can anyone who is not an employee of the
23 Department of Corrections authorize and make it okey-dokey
24 for an employee not to come to work for a scheduled shift?
25 MR. FIEWEGER: Argumentative.

PAM VERSTRAETE
January 5, 2007

PAGE 109

1    A.   We would get the paperwork ready and send it

2 on, and then they would do the transactions on the computers.

3    Q.   Are you referring specifically to leaves of

4 absence?

5    A.   Leaves of absence would be one, yes.

6    Q.   Oh, okay.  So would personnel do the final

7 personnel transactions on anything that required a personnel

8 transaction?

9    A.   Yes.

10    Q.   Would that include salary adjustments?

11    A.   Uh-huh.

12    Q.   Discipline, anything that needed what's called

13 CMS-2; is that right?

14    A.   Yes.

15    Q.   Did Rick ever indicate to you that he was no

16 longer going to go through the East Moline Correctional

17 Center to get leaves of absence?

18    A.   He had told me that he was going to contact

19 Springfield for his leave.

20    Q.   And was that before -- was that comment made

21 to you before or after Warden Olever had denied a leave of

22 absence in May of 2003?

23        MR. FIEWEGER:  Objection.  Assumes facts

24 not in evidence.

25    A.   I'm not positive of the date.

PAGE 110

1    Q.   Did Warden Olever deny a leave of -- requested

2 leave of absence in May of 2003?

3    A.   Yes.

4    Q.   Do you recall Mr. Lind contacting Springfield

5 about that leave of absence?

6        MR. FIEWEGER:  Objection.  No foundation.

7 Speculative.

8    A.   I don't remember if he did, or not.

9    Q.   Did he ever tell you that he did?

10    A.   He said that he was going to contact

11 Springfield for his leave.

12    Q.   But you're not sure if that's referring to the

13 May 2003 leave or the July 2003 leave.

14    A.   No.

15    Q.   Okay.  Did -- was there anything that occurred

16 with respect to the -- to Mr. Lind being off work from July

17 24th, '03, to August 6th, '03, that made you think that he

18 contacted Springfield --

19        MR. FIEWEGER:  Objection.

20    Q.   -- to request a leave of absence?

21        MR. FIEWEGER:  Calls for speculation.  No

22 foundation.

23    A.   Ask me again, please.

24    Q.   Did anything occur that led you to believe

25 that Mr. -- did anything occur with respect to him being off

PAGE 111

1 the July to early August that led you to believe that

2 Mr. Lind was attempting to get a leave of absence from

3 Springfield?

4    A.   I'm not -- I don't know.

5    Q.   At some point did you form the opinion that

6 Mr. Lind had attempted to get a leave from Springfield?

7    A.   Yes.

8    Q.   Okay.  And on what did you form that belief?

9    A.   I believe it was just solely on Rick saying

10 that he would call Springfield.

11    Q.   In July -- or, from late July 2003 until

12 November 2003, did you make any effort to try to keep Rick

13 Lind from getting a leave of absence?

14    A.   No.

15    Q.   Did you ever find any documents that had been

16 lost or misplaced with respect to Mr. Lind's time off from

17 July 24th through August 7th, 2003?

18    A.   No.

19    Q.   Did you ever find documents that you should

20 have processed but you forgot?

21    A.   No.

22        MS. KERLEY:  I have no further

23 questions.

24        (Verstraete Deposition Exhibit No. 12

25 marked for identification.)

PAGE 112

1 FURTHER EXAMINATION BY MR. FIEWEGER:

2    Q.   Showing you Verstraete Exhibit 12 for

3 identification, is this a true and correct copy of the

4 employee handbook that was in effect pursuant to the Sergio

5 Molina, Warden, signature as of January 6, 1997?

6    A.   Yes.

7    Q.   Is that the current employee handbook?

8    A.   There's a new face sheet on it, but it's the

9 same information inside.

10    Q.   Okay.  So whoever the warden is now signs it

11 with his face sheet?

12    A.   Yes.

13    Q.   And the essence hasn't been changed, correct?

14    A.   No.  I believe the only changes in it is a

15 memo from the new warden.

16    Q.   Now, in the miscellaneous section, which on my

17 copy is page 21, it states what is to be done with respect to

18 disability leave of absence, correct?

19    A.   Correct.

20    Q.   And under paragraph E of the disability leave

21 of absence, it says, The warden will approve or disapprove

22 the leave, correct?

23    A.   Correct.

24    Q.   Now, you had in possession by October 1st a

25 completed physician's statement requesting a disability leave

PAM VERSTRAETE

January 5, 2007

PAGE 113

1 of absence for the period of July 24 through August 6, 2003,
2 that you testified under oath was a full and complete request
3 and CMS-95 form, properly prepared by a physician, correct?
4    A.    Correct.
5    Q.    And are you aware, before Mr. Lind was fired,
6 whether Warden Jungwirth completed this role; namely,
7 approving or disapproving the physician's statement of --
8 that you claim was received on October 1st, 2003?
9    A.    And did Warden Jungwirth --
10    Q.    Approve or disapprove it?
11    A.    I don't think he did either.
12    Q.    Okay.  And that would be a violation of the
13 policy under the employee handbook, wouldn't it?
14    A.    Yes.
15    Q.    And with respect to Exhibit 9, which you
16 testified you clarified with --
17        MS. KERLEY:  Ronda.
18    Q.    -- Ronda from the Freebern Clinic to get a
19 completed form that was satisfactory in your mind to what DOC
20 needed for this form, correct?
21    A.    Uh-huh.
22    Q.    That was, by September 26th, a completed
23 CMS-95 form for a disability, nonservice-related disability
24 leave of absence for the period of -- can't read upside
25 down -- that would approve leave of absence to 8-6-03,

PAGE 114

1 correct?
2    A.    Correct.
3    Q.    And are you aware whether Warden Jungwirth
4 approved or disapproved Verstraete Exhibit 9?  Namely, the
5 8-14, 2003, CMS-95 request for disability leave of absence
6 and fully completed physician's statement?
7    A.    I don't believe he approved or denied it.
8    Q.    And that, again, would be a violation of the
9 disability leave of absence policy under paragraph E,
10 correct?
11    A.    Yes.
12    Q.    And yet Mr. Lind was disciplined for failing
13 to report to work for that period of nine -- excuse me.
14 7-24-04 -- '03 -- let me start that all over.
15        Mr. Lind was fired for missing work between
16 7-23-03 and 8-6-03, correct?
17    A.    Correct.
18    Q.    And the warden was the decision maker for
19 that, correct?
20        MS. KERLEY:  Objection.  Lack of
21 foundation.
22    A.    I don't know if it was just the warden or if
23 he talked to someone else.  I don't know.
24    Q.    And he -- well, he was one of the decision
25 makers, correct?

PAGE 115

1    A.    I would think so.
2    Q.    And the warden failed to do his job under the
3 employee handbook in processing either disability leaves of
4 absence that were fully completed as of October 1st, 2006,
5 didn't he?
6    A.    What was the -- say it again, please.
7    Q.    He failed to do his job in processing either
8 of these requests; namely Verstraete 2 or Verstraete 9.
9    A.    He did not process them, no.
10    Q.    And took discipline against Mr. Lind after
11 failing to process the requests for the leave of absence,
12 correct?
13    A.    Yes.
14    Q.    And didn't reverse his decision from September
15 8, based on the fact that he knew that both Exhibit 9 and
16 Exhibit 2 had been properly presented for request for that
17 leave of absence for the period of 7-24 through August 6,
18 2003, correct?
19    A.    Yes.
20    Q.    So regardless of when all of this got
21 completed, before the discipline took place, available to the
22 Department of Corrections was sufficient documentation to
23 show that Mr. Lind had a medical condition for which he was
24 seeking a medical leave of absence for the period of 7-24-03
25 through 8-6-03, correct?

PAGE 116

1        MS. KERLEY:  Objection.  Lack of
2 foundation.  This witness has testified she doesn't make that
3 determination and has never been trained on it.
4        MR. FIEWEGER:  You may answer the
5 question.
6    A.    Can you repeat the question?
7        MR. FIEWEGER:  Just read it back.
8        (Requested information read.)
9    A.    Yes.
10        MR. FIEWEGER:  No further questions.
11 FURTHER EXAMINATION BY MS. KERLEY:
12    Q.    Do CMS-95s -- is that what gets approved or is
13 it Exhibit 5 that gets approved with documentation of the
14 CMS-95?
15    A.    Exhibit 2 correctly --
16    Q.    Let me back up.  I don't think I asked that
17 very well.
18        The warden approves or disapproves a request
19 for leave on a form like Exhibit 5, correct?
20    A.    Correct.
21    Q.    And Exhibit 2 and/or Exhibit 9 and/or Exhibit
22 3 or some other CMS-95 is what would be attached to
23 justification for the leave, correct?
24    A.    Correct.
25    Q.    Was Exhibit 5 with the justification of