E-FILED
Friday, 02 February, 2007  03:39:53 PM
Clerk, U.S. District Court, ILCD

1         UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2            ROCK ISLAND DIVISION

3

                              **ORIGINAL**
4

5  RICK LIND,                  )
                               )
6          Plaintiff,          )
                               )
7      vs.                     )    No. 4:05-CV-4959
                               )
8  STATE OF ILLINOIS,          )
   DEPARTMENT OF CORRECTIONS,  )
9                              )
           Defendant.          )
10 _____)

11

12

13         DEPOSITION OF WARDEN GENE JUNGWIRTH,
   taken before Heidi Krafka, Certified Shorthand Reporter
14 of the States of Iowa and Illinois, at Katz, Huntoon &
   Fieweger, 1000 36th Avenue, Moline, Illinois, on
15 Thursday, the 18th day of January, 2007, commencing at
   10:02 a.m., pursuant to the within stipulation.
16

17

18

19

20

21

22

23

24              Kelly Reporting
                (309) 788-3630
25

6

```
 1  Q.  And Mr. Oliver served as warden until when?
 2  A.  To be honest, I'm not sure when he left.  July or
 3      June, went to Springfield, of '03.
 4  Q.  And then you became acting warden when?
 5  A.  June or July.  We're not sure of the date.  I
 6      couldn't find the date in my personnel file showing
 7      when I became acting warden, so it was sometime in
 8      that time period.
 9  Q.  Were you acting warden as of July 23rd, 2003?
10  A.  Honestly don't recall if I was or not.  I don't
11      have any records showing that.
12  Q.  Prior to becoming assistant warden of programs at
13      East Moline Correctional Center, where were you
14      employed?
15  A.  I was employed with Rock Island County Sheriff's
16      Department from 1968 till 1998.
17  Q.  Started as a deputy?
18  A.  Correct.
19  Q.  And retired as what?
20  A.  Captain.
21  Q.  Did you work between 1998 and April of 2003?
22  A.  Just -- I'd worked security for probably twenty
23      years at the Lions Club in Rock Island, and during
24      that time I did some work for them during the bingo
25      games.  Made sure the old ladies behaved.
```

Kelly Reporting    (309) 788-3630

7

```
 1  Q.  Did they?
 2  A.  Most of the time.
 3          MS. KERLEY:  That's unusual as far as I
 4      know.
 5  Q.  Except when -- Except when there was a dispute over
 6      the big prize.
 7          So how did you become employed by the East
 8      Moline Correctional Center?
 9  A.  It was a political appointment.
10  Q.  So when Blagojevich came into power, he had control
11      over appointments of assistant wardens and wardens
12      in the State of Illinois?
13  A.  That's correct.
14  Q.  Okay.  And through Mr. Blagojevich's office you
15      applied and received the appointment; is that
16      correct?
17  A.  That's correct, yes, sir.
18  Q.  Have you reviewed any documents to prepare for your
19      deposition?
20  A.  Very few, yes.
21  Q.  What have you reviewed?
22  A.  I believe the leave of absence that Mr. Lind
23      submitted, and I think that's about the only thing
24      I've really looked at.
25  Q.  Have you spoken to anyone besides Miss Kerley
```

Kelly Reporting    (309) 788-3630

8

```
 1      regarding the facts of this case?
 2  A.  No, sir.
 3  Q.  Have you spoken to Pam Verstraete?
 4  A.  Briefly.  She said she was in --
 5          MS. KERLEY:  Objection.  Calls for
 6      attorney/client privilege.
 7  Q.  Was your conversation with Miss Verstraete in the
 8      presence of Miss Kerley?
 9  A.  I don't recall if she was present or not.  I don't
10      think so.
11  Q.  Okay.  Did Miss Verstraete tell you what her
12      questions and answers were in her deposition?
13  A.  Other than you kept asking her questions, no,
14      that's about the only thing she said.  Since then
15      her father has taken ill, and she hasn't been at
16      work for quite a period of time.
17  Q.  Other than on the fact that I took a long
18      deposition of her, did she say anything else about
19      her testimony?
20  A.  Other than the same question was asked over
21      different ways.  That's just about the extent of
22      the conversation.
23  Q.  Damn lawyers.
24  A.  That's right.
25  Q.  Had you had any discussions with Ian Oliver in the
```

Kelly Reporting    (309) 788-3630

9

```
 1      time period from your appointment until he left as
 2      a warden regarding Mr. Lind and Mr. Lind's ability
 3      to take medical leaves of absence?
 4  A.  To the best of my knowledge, no, I did not.
 5  Q.  Did Ian Oliver ever tell you that he had informed
 6      Mr. Lind in April and May of 2003 that any future
 7      requests for medical leave of absence by Mr. Lind
 8      would be turned down by the institution?
 9  A.  To the best of my knowledge, no, sir.
10  Q.  You were the person who made the decision to
11      suspend Mr. Lind for 30 days pending discharge for
12      failing to report to work on July 24th, 25th, 28th,
13      29th, 30, 31st, and August 1st, 4th, 5th, and 6th,
14      2003; correct?
15  A.  Yes, sir, I was the one that signed the paperwork.
16  Q.  Okay.  And that was on the basis of an employee
17      review hearing of September 8th, 2003; correct?
18  A.  September.  I'm not certain of the exact date, but
19      yes.
20  Q.  And you were the person who terminated Mr. Lind
21      effective November 6th, 2003, for missing work on
22      July 24th, 25th, 28th, 29th, 30th, 31st, and
23      August 1st, 4th, 5th, and 6th, 2003; correct?
24          MS. KERLEY:  What date did you use?  I'm
25      sorry?
```

Kelly Reporting    (309) 788-3630

10

1    MR. FIEWEGER:  November 6th.

2  A.  I thought it was October, but here again, I don't

3      know for sure.  It was in that time period.

4  Q.  Mr. Lind was given a suspension, 30 days --

5  A.  Pending.

6  Q.  -- pending discharge; correct?

7  A.  Yes, uh-huh.

8  Q.  And so if you give a suspension --

9  A.  I see what you're saying, okay.

10 Q.  The discharge has to happen after the 30 days;

11     correct?

12 A.  Correct.

13 Q.  So if the suspension went into effect on or about

14     October 9th --

15 A.  Yes, that's correct.

16 Q.  Your discharge according to the paperwork appeared

17     to be on November 6th?

18 A.  That makes sense, yes, sir.

19 Q.  All right.  And did you have any discussion with

20     anyone at Central Management Services regarding

21     your decision to suspend Mr. Lind and then

22     discharge him?

23 A.  To the best of my recollection, no, sir, I did not.

24 Q.  So you were the decision-maker?

25 A.  Oh, I didn't have any discussion.  They are the

Kelly Reporting   (309) 788-3630

11

1      ones that get the paperwork and in turn review it

2      and determine what happens.

3  Q.  You're the person who makes the decision --

4  A.  I'm the person who made --

5  Q.  -- to submit it to Central Management Services; is

6      that correct?

7  A.  Yes.

8  Q.  Now, in the event Central Management Services

9      disagrees with your decision, you would be notified

10     in writing by someone from Central Management

11     Services that they disagreed with your decision;

12     correct?

13 A.  That is correct, yes.

14 Q.  But in this case no one from Central Management

15     Services told you that they disagreed with your

16     decision to suspend Mr. Lind for 30 days and to

17     fire him; correct?

18 A.  That is correct, no one told me.

19 Q.  So would you agree with me that you were the

20     decision-maker?

21 A.  Yes.

22 Q.  Are you familiar with the Family Medical Leave Act?

23 A.  Somewhat, yes, sir.

24 Q.  What is your familiarity with the Family Medical

25     Leave Act?

Kelly Reporting   (309) 788-3630

12

1  A.  That you can apply for it; if there's just cause,

2      you can be put on the Family Leave Act.  You have

3      to meet certain criteria.

4  Q.  Have you had any training from the Department of

5      Corrections as to how to determine whether an

6      employee is eligible to apply and receive family

7      medical leave?

8  A.  I'm sure I've had some sort of a seminar on it, but

9      I can't recall when or where.

10 Q.  Would there be anything that would indicate in

11     writing whether you attended such a seminar?

12 A.  If I did attend, there should be something in our

13     training file that would indicate that, yes, sir.

14 Q.  Had you had any training from the Department of

15     Corrections on the Family Medical Leave Act as of

16     July or August of 2003?

17 A.  No, sir.  No.

18 Q.  Prior to the termination of Mr. Lind effective

19     November 6th, 2003, what, if any, training had you

20     had on Family Medical Leave Act?

21 A.  To the best of my knowledge, none.

22 Q.  Who was responsible at East Moline Correctional

23     Center for processing requests for family medical

24     leave as of July 24th, 2003, through November 6th,

25     2003?

Kelly Reporting   (309) 788-3630

13

1  A.  I believe at that time we had Pam Verstraete in

2      that position as acting human resource since we did

3      not have a human resource person.

4  Q.  If she was absent, who would take her job for that?

5  A.  I believe Andria Lashbrook would have been the

6      backup.

7  Q.  In what position is Andria in?

8  A.  She's the administrative assistant.

9  Q.  And Pam's position?

10 A.  She's the Executive Secretary III, my secretary.

11 Q.  In terms of hierarchy, who's higher, if anybody?

12 A.  I'm not sure on the chain of command with the

13     secretaries.

14 Q.  If you don't know, that's fine.

15 A.  I'm sorry, I don't.

16 Q.  As of July of 2003 would you agree that the East

17     Moline Correctional Center was subject to the

18     provisions and rules of the Family Medical Leave

19     Act?

20 A.  Yes.

21     MS. KERLEY:  Objection.  Calls for a

22     legal conclusion.

23 BY MR. FIEWEGER:

24 Q.  And as of July, August, September, October 2003,

25     the East Moline Correctional Center was informed by

Kelly Reporting   (309) 788-3630

22

1    informed Pam Verstraete of a need for a medical
2    leave of absence on or about July 24th, 2003?
3  A. No, sir, I do not.
4  Q. Do you have any facts which would indicate that he
5    did not request a medical leave of absence on or
6    about July 30th, 2003?
7  A. To the best of my knowledge, no, sir, I do not.
8  Q. Now, what does it mean by on that form
9    decentralized actions?  What does that mean?
10  A. Which form are we looking at?
11  Q. Exhibit 3.
12  A. I -- Where do you see that at, first?
13  Q. Right underneath the second line.
14  A. Oh.  I don't know.  Sorry.
15  Q. Are you familiar with the handwriting on -- the
16    printed language, not the signature?
17  A. As far as who did it, no, sir, I'm not.
18  Q. Does it appear similar to the handwriting of Pam
19    Verstraete?
20        MS. KERLEY:  Objection.  Lack of
21    foundation.
22  A. I -- I can't testify to that.  I'm sorry.
23  Q. Would you agree with me that Exhibit 3 is the
24    document that would be produced pursuant to
25    subparagraph A of the disability leave of absence

Kelly Reporting   (309) 788-3630

23

1    policy?
2        MS. KERLEY:  Objection.  Lack of
3    foundation.
4  A. I can't answer that.
5  Q. So how do you implement this policy if you don't
6    know what forms are necessary to do it?
7  A. I rely on the person that does personnel and takes
8    care of this.
9  Q. Well, have you seen any other form that would bring
10    forth a request for a disability leave of absence?
11  A. I've seen the other forms, but I can't testify what
12    order they're filled out or, you know, which would
13    come first.
14  Q. Okay.  You would agree with me that Exhibit 3
15    existed prior to the time in which Mr. Lind was
16    disciplined?
17        MS. KERLEY:  Objection to the form of the
18    question.  It's not -- The question is vague.  Are
19    you referring to the form or actually --
20        MR. FIEWEGER:  The form, not with the
21    exhibit sticker.
22        MS. KERLEY:  No.  My question, are you
23    referring to the printed form or the form with the
24    handwriting?
25        MR. FIEWEGER:  The handwritten form.

Kelly Reporting   (309) 788-3630

24

1        MS. KERLEY:  Okay.  My objection is lack
2    of foundation.
3  A. All I do is go by the dates they say it would have
4    been, no.
5  Q. Do you instruct your employees to fill out dates
6    that are inaccurate?
7  A. No, I do not.
8  Q. And assuming that date was the date in which he
9    first requested the disability leave, that would
10    predate the time in which you imposed discipline on
11    him; correct?
12  A. That is correct, yes.
13  Q. Then under the policy, Subsection B, it says
14    personnel will furnish a Physician's Statement
15    Form, CMS-95, to the employee; correct?
16  A. That is correct, yes.
17  Q. And that did, in fact, occur with respect to
18    Mr. Lind, didn't it?
19  A. As far as I know, yes, sir, it did.
20  Q. Okay.  Show you Exhibit 4.  Showing you what's been
21    marked as Exhibit 4, this is a CMS-95 form; is that
22    correct?
23  A. Yes, it is.
24  Q. And this is the form that accompanies Exhibit 3
25    when the employee is attempting to obtain a

Kelly Reporting   (309) 788-3630

25

1    disability leave of absence; correct?
2        MS. KERLEY:  Objection.  Lack of
3    foundation.
4  A. Yes.
5  Q. And would you agree with me that on page 2 of
6    Exhibit 4 it is signed by Dr. Kevin Freebern with a
7    signature date of July 30th, 2003?
8  A. Yes.
9  Q. And leaving aside the question of when the
10    Department of Corrections claims they first
11    received this document, this does, in fact, appear
12    to be a CMS-95 form signed by a licensed
13    chiropractic physician personally and completed in
14    compliance with Subsection C of the disability
15    leave policy, doesn't it?
16  A. Yes, it does.
17  Q. Do you have any independent facts that would
18    indicate -- that you have personal knowledge that
19    would indicate that Mr. Lind did not turn in
20    Exhibit 4 to your office on July 30 of 2003?
21  A. Do I have any independent facts?
22  Q. That you have personal knowledge of.
23  A. The only thing that I can recall about this was
24    there was some parts that weren't filled out
25    properly, and in conversation with Miss Verstraete

Kelly Reporting   (309) 788-3630

26

1     at that time period to the best of my recollection
2     had to be sent back, I'm not sure if it was more
3     than once to get everything completed on it.
4 Q.  What was incomplete on Exhibit 4?
5 A.  I can't recall.  I'm sorry.
6 Q.  Everything else on Exhibit 4 appears to be
7     typewritten, is that correct, with the exception of
8     some initials down in the remarks section?
9 A.  It does, yes.  Whether or not this was the first
10     one we received, I can't recall.
11 Q.  You have no idea how that date stamp of
12     October 1st, 2003, got on this document, do you?
13 A.  No, sir, I do not.
14 Q.  And do you see any Facsimile transmissions on
15     Exhibit 4 which would indicate that it was FAXed on
16     a date to your office?
17 A.  No, sir, I do not.
18 Q.  Okay.  Do you have any knowledge of facts which
19     would show that Exhibit 4 was not in the East
20     Moline Correctional Center's office of the warden
21     by July 30th, 2003?
22         MS. KERLEY:  Objection.  Foundation in so
23     much as you're -- unless you're referring to on his
24     desk solely, he doesn't have control of the entire
25     administrative office.

27

1         MR. FIEWEGER:  I would think as the
2     warden he does have control of the administration
3     office.
4         MS. KERLEY:  Control meaning authority or
5     control meaning a working knowledge of every piece
6     of paper that may exist under someone else's work
7     space or someone else's desk?
8 Q.  You can answer the question.
9         MS. KERLEY:  If you can.
10 A.  Like I say, I have no idea when this arrived.
11 Q.  So you have no facts to indicate that it didn't
12     arrive on or before July 31st, 2003?
13 A.  Other than the date stamp that's on that, no.
14 Q.  You would agree with me that from Exhibit 4, based
15     on the date stamp, that that document was within
16     the control of your office by October 1st, 2003?
17 A.  Yes.
18 Q.  And you would agree with me that Exhibit 4 is a
19     fully completed physician's statement under the
20     requirements of CMS-95?
21 A.  Yes.
22 Q.  And you would agree with me that under Exhibit 2,
23     the Disability Leave of Absence Policy, you had the
24     duty to approve or disapprove the leave request?
25 A.  Yes, uh-huh.

28

1 Q.  And you would agree with me that you imposed
2     discipline on Mr. Lind for missing work for the
3     period that is covered under Exhibit 4?
4 A.  Yes.
5 Q.  And, in fact, Mr. Lind had paperwork to you
6     requesting a medical leave of absence for the
7     period of July 24th through August 6th, 2004,
8     signed by a physician, completed in full, and in
9     compliance with the requirements of the disability
10     leave of absence policy under Exhibit 2; correct?
11 A.  In October, yes, he did.
12 Q.  As of October 1st 2003?
13 A.  Yes.  Yes.
14 Q.  And you made no decision on whether to approve or
15     disapprove this fully completed disability leave
16     request prior to suspending him and prior to
17     terminating him?
18 A.  If I remember correctly on the dates, this wasn't
19     back prior to his suspension.
20 Q.  Well, you made a decision to suspend him on
21     September 8th, 2003?
22 A.  That's correct.
23 Q.  But the suspension didn't go into effect until
24     October 9th, 2003?
25 A.  That was when it was confirmed by Springfield, yes.

29

1 Q.  And between October 1st and October 9th you didn't
2     reconsider your decision?
3 A.  My interpretation is that there are two separate
4     incidents.  You have one for the use of time and
5     one for the application for the leave of absence.
6 Q.  Well, if he was approved by you for a
7     non-service-related disability leave of absence for
8     the period of July 24th, 2003, through August 6th,
9     2003, there would have been no grounds for
10     disciplining him for missing work for that period
11     of time, would there?
12 A.  The problem was that he hadn't brought proof in for
13     that time period that he was off, and so that's why
14     the employee review board, ERB, was set up.  He
15     would have been referred to that by his major and
16     captain, I believe, with the paperwork on him for
17     proof, put him on proof, and the hearing was set up
18     at that time period due to those facts which --
19 Q.  Well, I understand what happened.
20 A.  Right.
21 Q.  But you had in your control knowledge of facts
22     which would indicate that he had a physician
23     statement signed by a licensed chiropractic
24     physician excusing him from work for the period in
25     which you're disciplining him; correct?

**30**

1 A. After the discipline had been handed out, yes, I
2    did receive it.
3 Q. Well, the discipline doesn't get meted or handed
4    out until its effective date; correct?
5 A. Well, he would have been on a 30-day pending
6    suspension.
7 Q. Yeah, and 30 days pending suspension started
8    October 9th, 2003; correct?
9 A. No, I put him on it in September.
10 Q. That was when you made the decision?
11 A. Made the decision for Springfield.
12 Q. And Springfield says oh, okay, you can do that?
13 A. Correct.
14 Q. But before it went into effect, before Mr. Lind's
15    suspension time started, you had information
16    available to you indicating that he had properly
17    submitted paperwork for a non service-related
18    disability leave for the period of time of
19    July 24th, 2003, through August 6th, 2003?
20 A. Correct, but he still hadn't met the requirements
21    for the proof status that he was put on.
22 Q. And what requirements were those?
23 A. That he would bring a doctor's slip in covering
24    those dates with -- and I'd have to refresh my
25    memory of the time period involved of when he had

Kelly Reporting   (309) 788-3630

**31**

1    to have the status of proof in, but I can't tell
2    you that.
3 Q. Tell me how many days he had to bring in a doctor's
4    slip for a proof status.
5 A. Three days.
6 Q. Do you know --
7 A. It sticks in my mind that it is three days.
8 Q. Didn't the union representatives, Jeff Papish and
9    Randy Sanders, provide you with a document showing
10    that he had signed documents from Dr. Freebern and
11    Dr. Mullen excusing him from work for that time
12    period?
13 A. Within that three-daytime period?
14 Q. Yes.
15 A. No, sir, to my knowledge, he did not. Sanders and
16    Papish you say would have brought it to me?
17 Q. Yes.
18 A. To my knowledge, no, sir.
19 Q. Have you reviewed the findings and ruling of the
20    Illinois Civil Service Commission in this case?
21 A. I read part of it, yes, sir.
22 Q. And have you reviewed findings of the Commission
23    that determined that Mr. Lind had complied with the
24    requirements regarding the documentation regarding
25    his absence?

Kelly Reporting   (309) 788-3630

**32**

1 A. Yes.
2 Q. And you simply just disagree with that; correct?
3 A. At that time period, yes, I did.
4 Q. All right. And the only time that Mr. Lind would
5    have been required under the Department of
6    Corrections directives regarding absences to
7    provide documentation from a physician to approve
8    missing work was if he was on properly a furnished
9    proof status; correct?
10 A. Yes. Uh-huh.
11 Q. And it's been determined that he wasn't on
12    furnished proof status; correct?
13 A. That is correct, yes.
14 Q. And so Mr. Lind wasn't even required to provide a
15    physician's documentation approval his absence to
16    be able to take that time off; correct?
17 A. According to the Civil Service, yes.
18 Q. And you never made a decision on whether or not to
19    approve Mr. Lind's disability leave of absence, did
20    you?
21 A. No, sir.
22 Q. And you never made a decision prior to implementing
23    his suspension pending discharge as to whether to
24    approve a subsequent request for a disability leave
25    of absence based on an August 14th physician's

Kelly Reporting   (309) 788-3630

**33**

1    statement signed by Dr. Freebern?
2      MS. KERLEY: Objection. Relevance.
3 A. As far as I can recall, we did not get that signed
4    statement at that time.
5 Q. You're saying you did not get a second statement
6    before the final in which Mr. Lind's suspension
7    went into effect?
8 A. I'm not understanding the question. I'm sorry.
9 Q. Sure. We have Exhibit 4, which is a July 31st
10    one?
11 A. Right.
12 Q. Showing that it was fully completed by
13    October 31st, according to the stamp?
14 A. For leave of absence?
15 Q. For leave of absence, correct.
16 A. Yes, we do have that.
17 Q. And you made no decision on Exhibit 4 before
18    imposing discipline; correct?
19 A. The discipline was already sent in to Springfield
20    at that time.
21 Q. Well, you didn't rescind your decision to
22    discipline him based on Exhibit 4, did you?
23 A. No, sir, I didn't. No, sir.
24 Q. Can you tell me what was inadequate about the
25    information provided on Exhibit 4 as of

Kelly Reporting   (309) 788-3630

34

```
1         October 1st, 2003?
2   A.    I don't recall what the parts were that were
3         adequate.
4   Q.    Well, looking at it, do you see anything that was
5         inadequate --
6   A.    The October -- I'm sorry.  I don't mean to
7         interrupt.  The October 1st one, no, I don't see
8         anything on that.
9   Q.    That appears to be fully completed; correct?
10  A.    Yes, sir.
11  Q.    And that should have been able to be used by you as
12        the warden to implement your allegations under
13        Subparagraph E of the Disability Leave of Absence
14        policy, which is Exhibit 2; correct?
15  A.    As all of this has been completed and it appears
16        here, yes, sir.
17  Q.    And you didn't do it?
18  A.    At that point, no, I do not.
19  Q.    All right.  And you did not notify anyone through
20        the union or Mr. Lind personally that you were
21        denying his request for a disability leave of
22        absence?
23  A.    I don't recall if I did or not, sir.
24  Q.    You never notified Rick Lind within 14 days of
25        July 30th, 2003, that the information contained in
```

35

```
1         the Exhibit 4, the physician's statement, signed by
2         Mr. -- or Dr. Freebern was inadequate?
3              MS. KERLEY:  Objection.  Lack of
4         foundation.  The witness has already testified that
5         he doesn't know when he got that document, so
6         14 days from -- it could be July 30th, 2005, and he
7         would lack foundation.
8              MR. FIEWEGER:  You can object all you
9         want.  I can ask the question.
10  A.    I don't have -- I don't know if I did or not.
11  Q.    If Mr. Lind had submitted Exhibit 4 by July 30th,
12        2003, you would agree with me you have no knowledge
13        of facts that would indicate that you told him that
14        Exhibit 4 was inadequate by July -- or August 14th,
15        2003, do you?
16             MS. KERLEY:  Objection.  Calling for
17        speculation.
18  A.    Myself personally, no.
19  Q.    Have you seen anything in writing that would
20        indicate that by August 14th, 2003, the Department
21        of Corrections notified Mr. Lind that Exhibit 4 was
22        defective?
23             MS. KERLEY:  Objection.  Lack of
24        foundation.
25  A.    The only thing I know is Verstraete's conversation
```

36

```
1         about having to send it back.  Seeing anything, I
2         don't recall if I did or not.
3   Q.    Did you ever personally advise Mr. Lind of his
4         rights to seek absence under the Family Medical
5         Leave Act at any time after July 24th, 2003, and
6         prior to his termination on November 6th, 2003?
7   A.    I did have conversations with Mr. Lind, but I don't
8         recall.  Usually the human resources is the one
9         that --
10  Q.    So you cannot recall a date between July 24th,
11        2003, and November 6th, 2003, in which you advised
12        Mr. Lind of his rights to seek a Family Medical
13        Leave Act leave of absence?
14  A.    That I personally did, no, sir.
15  Q.    All right.  Do you have any personal knowledge of
16        facts that would indicate that anyone at the
17        Department of Corrections advised Mr. Lind of his
18        rights to seek a leave of absence under the Family
19        Medical Leave Act between July 24th, 2003, and
20        November 6th, 2003?
21  A.    Other than conversation with Pam Verstraete who was
22        the acting human resource person at that time that
23        she was working with him on getting the one
24        corrected that he submitted would be the only
25        knowledge that I have.
```

37

```
1   Q.    I'm going to show you Exhibit 6.  Have you seen
2         Exhibit 6 before?
3   A.    I believe I have, sir, yes.
4   Q.    And Exhibit 6 is a CMS-95 physician's statement
5         signed by Dr. Kevin L. Freebern; is that correct?
6   A.    Yes, uh-huh.
7   Q.    And Exhibit 6 has a date for the signature of
8         8-14-03; correct?
9   A.    That is correct, yes.
10  Q.    Do you have any facts which would indicate this
11        document was not turned in to your office as of
12        8-14-03?
13  A.    I wouldn't know if it was or not, sir.
14  Q.    Okay.  Assuming that Exhibit 6 was turned in by
15        Dr. Freebern by 8-14-03, would you agree with me
16        that by August 28th, 2003, you did not notify
17        Mr. Lind in writing of any deficiencies of this
18        physician's statement?
19             MS. KERLEY:  Objection.  Calls for
20        speculation.
21  A.    I did not personally, no, sir.
22  Q.    Are you aware of anybody under your supervision who
23        did so?
24  A.    I don't know if this is the one that was in
25        question or not, sir.  I don't know.
```

38

```
 1   Q.  Okay.  You would agree with me that it's fully
 2       completed by the physician; correct?
 3   A.  It appears to be.
 4   Q.  Are you aware of when the predisciplinary hearing
 5       was conducted for Mr. Lind?
 6   A.  September, but I'm not certain of the date.  The
 7       first part of September.
 8   Q.  Were you present?
 9   A.  No, sir.
10   Q.  Who was present?
11   A.  Dave Rayborn, and I'm not sure who the other people
12       present were.  Mr. Lind was present, I assume.
13   Q.  How do you know Mr. Lind was present?
14   A.  I'm assuming that he was.  I guess I can't say for
15       positive that he was.
16   Q.  Did you ever inform Mr. Lind prior to the
17       predisciplinary hearing on September 8th, 2003,
18       that any documentation that was submitted to the
19       warden's office regarding a request for leave of
20       absence or time off was defective?
21   A.  Personally I don't recall ever doing that
22       personally, sir.
23   Q.  Are you aware of anyone else from the warden's
24       office who informed him that -- of those facts
25       prior to the September 8, 2003, hearing?
```

39

```
 1   A.  The conversation I had with Pam Verstraete, she
 2       would be the one that -- stated that she was
 3       working with him on it.
 4   Q.  Are you aware of anyone from Springfield office of
 5       DOC who gave Mr. Lind any paperwork indicating that
 6       what he was submitting was defective?
 7   A.  To the best of my recollection, no, sir.
 8   Q.  In the pretrial disclosure it states Warden
 9       Jungwirth has information related to Plaintiff's
10       falsification of documents.  What information do
11       you have regarding Mr. Lind's falsification of
12       documents?
13   A.  What documents are we talking about?
14   Q.  I don't know.  That's how it was disclosed.
15   A.  I don't recall.
16   Q.  So you have no personal knowledge of facts which
17       would indicate Mr. Lind falsified documents?
18   A.  I don't recall any documents you're talking about.
19   Q.  So if we're at trial, I'm not going to hear about
20       Mr. Lind's falsification of documents because you
21       can't recall it at this time?
22           MS. KERLEY:  Objection.  Calls for a
23       legal conclusion, and it's improper with respect to
24       legal strategy.
25   A.  Like I say, I don't recall what documents we're
```

40

```
 1       talking about.
 2   Q.  Well, you're the person listed regarding my
 3       client's falsification of documents, and I don't
 4       want to be surprised at trial to hear you start
 5       talking about 20 pages of documents that my client
 6       allegedly falsified.  All right?
 7   A.  I can speculate on what they're talking about, but
 8       like I say, I don't know.
 9   Q.  So as we sit here today, you have no personal
10       knowledge of facts which would indicate that my
11       client, Rick Lind, falsified any documents?
12           MS. KERLEY:  Objection.  Misstates the
13       witness's testimony.
14   A.  Like I say, I don't know what documents they're
15       talking about.  I'm sorry.
16   Q.  So if you don't know, how can you have any personal
17       knowledge of those facts?
18   A.  If I were to review them and see what we were
19       talking about, then I would know if I had
20       knowledge, but without reviewing them just sitting
21       here being asked that question, I can't testify to
22       that.
23   Q.  You are not claiming that Mr. Lind falsified
24       documents to request a medical leave of absence for
25       the period of July 24th through August 6th, 2003,
```

41

```
 1       are you?
 2   A.  From what I've seen in these exhibits, no, sir, I
 3       can't testify to that.
 4   Q.  All right.
 5           MS. KERLEY:  Could we take a break?  Can
 6       I get some coffee?
 7           (A break was taken.)
 8   BY MR. FIEWEGER:
 9   Q.  Looking at Exhibit 6 again, would you agree with me
10       that before the imposition of the discipline
11       commencing on October 9th, 2003, that you made no
12       action on whether to approve or disapprove this
13       request for disability leave?
14           MS. KERLEY:  Objection.  Lack of
15       foundation.
16   A.  As far as I can recall, that is correct, yes.
17   Q.  And it was your duty under paragraph E of the
18       disability leave of absence policy to approve or
19       disapprove leave?
20   A.  It is my -- What page are we on?
21   Q.  25.
22   A.  All right.  We're going to which one now, sir?
23   Q.  Paragraph E.
24   A.  Will approve or disapprove, yes, sir.
25   Q.  And if Exhibit 6 was in your office on or before
```

46

1  facts.  Okay?  It says, admit that Exhibit 8 is a
2  release from work signed by Dr. Kevin Freebern
3  releasing Rick Lind from work for the period of
4  July 24th, 2003, to August 7th, 2003, and the
5  response was:  Defendant admits that Exhibit 8 is a
6  document dated August 4th, 2003, signed by
7  Dr. Freebern that indicates that plaintiff was
8  temporarily unable to work from July 24th, 2003,
9  until August 7th, 2003.  Defendant denies that the
10  document released plaintiff from work.  Defendant
11  further denies that Exhibit 8 was sufficient to
12  satisfy the medical certification requirement for a
13  non-service connected leave of absence or leave
14  under the Family Medical Leave Act, and my question
15  to you is:  What facts do you have that supports
16  the claim by the defendant that this does not
17  release Lind from work for that period of time?
18  A.  I don't have knowledge if this was handed in at
19     that time period or not.  I don't recall seeing it.
20  Q.  That's the next question.  If you look at No. 41,
21     admit plaintiff gave Exhibit 8, your Deposition
22     Exhibit 7, to defendant on August 6th, 2003, and
23     that was denied.  What personal knowledge of facts
24     do you have that would support that denial of
25     Request No. 41?

47

1  A.  I have to say I have no idea whether this was
2     handed in, no knowledge of it.
3  Q.  If Mr. Lind testified that he handed it in
4     August 6th, 2003, Exhibit 7, you have no facts to
5     the contrary; correct?
6  A.  Personally, no, sir.
7  Q.  All right.  What personal knowledge of facts do you
8     have that Rick Lind failed to mitigate his damages
9     in this case?
10  A.  I have none.
11        MS. KERLEY:  Objection.  Calls for a
12     legal conclusion.
13  Q.  What personal knowledge of facts do you have that
14     indicates that Mr. Lind failed to look for work
15     after you terminated him?
16  A.  I have no personal knowledge of that.
17  Q.  What personal knowledge of facts do you have that
18     would indicate that Mr. Lind had job offers that he
19     turned down during the time in which he was off of
20     work from the Department of Corrections?
21  A.  No personal knowledge.
22  Q.  Okay.
23        (A break was taken.)
24  BY MR. FIEWEGER:
25  Q.  I'm showing you your Deposition Exhibit 8, and

48

1  these are half slips for notification of absence
2  that were used by the Illinois Department of
3  Corrections during July and August 2003; is that
4  correct?
5  A.  Yes, sir.
6  Q.  And these are sufficient for approval of a leave or
7     an absence if the employee is not on furnished
8     proof status; correct?
9  A.  Yes.
10  Q.  Is that your signature on each of these that denied
11     the request for sick time?
12  A.  Yes, it is.
13  Q.  And you signed those on 8-19-03?
14  A.  Yes, uh-huh.
15  Q.  And you did that because you believed Mr. Lind was
16     on furnished proof status?
17  A.  That is correct.
18  Q.  And if Mr. Lind had submitted Exhibit 6 by 8-19-03,
19     would have you used that in determining whether or
20     not to approve these absences?
21        MS. KERLEY:  Objection.  Calls for
22     speculation, and I didn't hear the question, so can
23     I hear it again?  I'm sorry.
24        (The question was read back by the court
25        reporter.)

49

1        MS. KERLEY:  Objection to the form of the
2     question in so much as submitted to whom is vague.
3        MR. FIEWEGER:  To him, how's that?
4        MS. KERLEY:  Yes.
5  BY MR. FIEWEGER:
6  Q.  To clarify the question, if Mr. Lind had submitted
7     to you, through the warden, Exhibit 6 by 8-19,
8     would you have reviewed that in conjunction with
9     the request for absence reflected in Exhibit 8?
10        MS. KERLEY:  Objection.  Calls for
11     speculation.
12  A.  I'm looking to see if this covers any specific
13     dates in here, and I don't -- don't see that it
14     does.  Okay.  Month -- Okay.  First visit, last
15     date of visit.  Me looking at it doesn't
16     specifically say that he was covered for those
17     certain dates.  It says visited those two days, but
18     he wasn't covered for being absent from work for
19     those days, unless I'm missing something.
20  Q.  Exhibit 4, would that if it was in your office by
21     August 19th, 2003, have been used in conjunction
22     with reviewing the information on Exhibit 8?
23  A.  Here again, it shows the date that he was --
24     visited the doctor, but there's nothing showing
25     that he's covered under medical problems or

50

```
 1   whatever for the dates he was absent.
 2  Q.  Okay.  Exhibit 7 does though; correct?  It says
 3       that Mr. Lind --
 4  A.  Exhibit 7 does show that, yes.
 5  Q.  It says that Mr. Lind was temporarily unable to
 6       work from 7-24-03 to 8-7-03; correct?
 7  A.  Yes.
 8  Q.  And that's signed by Dr. Kevin L. Freebern;
 9       correct.
10  A.  Yes.
11  Q.  And Dr. Freebern is a licensed chiropractic
12       physician; correct?
13  A.  Yes.
14  Q.  Are you aware that Exhibit 7 was accompanying the
15       requests for notification of absence that are
16       contained in Exhibit 8?
17  A.  That's the problem.  No, sir, I don't recall this.
18       If it were there, I would think that that would
19       have been used to review this, so I have no idea
20       where it went or where it came from.
21  Q.  If it was there and was accompanying the
22       notification of absences, that would have been
23       sufficient proof under the furnished proof status
24       policy for Mr. Lind to have been approved for those
25       days off; correct?
```

Kelly Reporting  (309) 788-3630

51

```
 1  A.  I would say at that time period I would have
 2       thought it would have been, yes, sir.
 3  Q.  And you never notified Mr. Lind that his medical
 4       documentation submitted by August 19th, 2003, was
 5       deficient, did you?
 6  A.  I'm sorry.  I don't understand the question.
 7  Q.  Sure.  You made your decision to turn down this
 8       request for leave of absence or use of alternative
 9       time; correct?
10  A.  Correct.  Correct.
11  Q.  On August 19th, 2003?
12  A.  Correct.
13  Q.  And at no time by the time you made that decision
14       on August 19th, 2003, did you tell Mr. Lind that
15       his medical documentation was deficient in any
16       manner?
17           MS. KERLEY:  Objection on lack of
18       foundation.  This witness has testified that he
19       doesn't know when he got any medical documentation.
20  A.  My personal knowledge, I can't recall if I did or
21       didn't.
22  Q.  Okay.  So what facts do you have available to you
23       to indicate that as of August 19th, 2003, Mr. Lind
24       had not satisfied the Department of Corrections
25       requirements regarding proof of -- through a
```

Kelly Reporting  (309) 788-3630

52

```
 1       physician of the need for an absence?
 2  A.  At the time of this, to the best of my
 3       recollection, and from guidance I was receiving
 4       from the assistant warden since I just took over
 5       the position, I was under the impression he was put
 6       on proof of status, that he had not provided any
 7       proof of his illness, and that's what we were going
 8       by.
 9  Q.  And who was the guiding forces there?
10  A.  Cox would have been the -- the one that was leading
11       me or helping me.
12  Q.  Did you have any discussions with any union
13       representatives before you made your decision to
14       discipline Mr. Lind?
15  A.  I don't recall if I did or didn't.  I believe Myron
16       Farber was the union president at that time,
17       F-A-R-B-E-R.
18  Q.  Did you have any discussions with Randy Sanders?
19  A.  I don't recall.
20  Q.  Did you have any discussions with Jeff Papish?
21  A.  I don't recall if I did with him.
22  Q.  If both Mr. Sanders and Mr. Papish were to testify
23       at trial in this case that they were informing you
24       of the fact that Mr. Lind was ill still and was
25       providing documentation to you directly regarding
```

Kelly Reporting  (309) 788-3630

53

```
 1       this request for a leave of absence due to medical
 2       reasons, would you say that they are being
 3       untruthful?
 4  A.  I couldn't say that.  I don't recall if they did or
 5       didn't.
 6  Q.  Have you had any involvement or discussions with
 7       anyone from the Department of Corrections regarding
 8       payment to Mr. Lind pursuant to the Illinois Civil
 9       Service Commission ruling?
10           MS. KERLEY:  Are you referring to the
11       ruling?
12           MR. FIEWEGER:  Right.
13  A.  I don't recall anyone from the DOC talking to me
14       about that.
15  Q.  Okay.  Has anyone from the DOC discussed with you
16       why they haven't paid Mr. Lind to date for the
17       period of March 1st, 2004, through June 30th, 2004?
18  A.  No, sir.
19  Q.  Okay.
20           (Exhibit 9 marked for identification.)
21  Q.  I'm going to show you Exhibit 9 for identification,
22       and this is in sequence a September 5th, 2003,
23       letter bearing your signature to Mr. Lind, an
24       8-20-03 document signed by Dr. Kevin Freebern, and
25       a CMS-95 form dated 8-14-03 signed by Dr. Freebern,
```

Kelly Reporting  (309) 788-3630

54

1    and would you agree with me that the physician's
2    statement in Exhibit 9 is the same as Exhibit 6?
3 A. Yes, uh-huh.  Appears to be, yes.
4 Q. Would you agree with me that the documents
5    attached, Bate stamps 493 through 495 accompanied
6    your letter dated September 5th, 2003?
7 A. I -- I don't know if they did or didn't.  I'm
8    sorry.  They're in numerical order, I'll say that,
9    but I don't know.
10          MS. KERLEY:  For the record, I'll
11    indicate that the numbering on these documents was
12    provided by the Attorney General's Office after the
13    commencement of this litigation.
14 Q. Okay.  Why don't you take some time just to read
15    the letter just to refresh your recollection.
16 A. Okay.
17 Q. Would you agree with me that the bullet points that
18    are contained at this bottom of the letter appear
19    to be referencing the CMS-95 form pages 494 and
20    495?
21          MS. KERLEY:  Which bullet points did you
22    say, Steve?
23          MR. FIEWEGER:  Just all of them, meaning
24    the document you're referring to is the CMS-95 --
25 A. It appears to be, yes.

Kelly Reporting   (309) 788-3630

55

1 Q. Okay.  Did you prepare this letter?
2 A. No, this probably would have been prepared by Pam
3    Verstraete and I would have signed it.
4 Q. Would you have signed it on September 5th, 2003?
5 A. I would assume, yes, that date.
6 Q. Do you know how it was delivered to Mr. Lind?
7 A. I do not know.
8 Q. Do you even know if it was delivered to Mr. Lind?
9 A. Personal knowledge that it was, no, sir, I don't.
10 Q. Would you agree with me that if the employee review
11    board hearing was September 8th, 2003, that would
12    have been within three days of the September 5th
13    letter that you sent?
14 A. Yes, uh-huh.
15 Q. And would you also agree with me that you did not
16    give Mr. Lind 14 days to correct any deficiencies
17    in the August 14th, 2003, CMS-95 physician's
18    statement before conducting a disciplinary hearing
19    for Mr. Lind over his absence?
20 A. The August 14th?
21 Q. Right.
22 A. And I didn't give him 14 days, wouldn't that have
23    put him at August --
24 Q. No, what I'm getting at --
25 A. I misunderstood, I'm sorry.

Kelly Reporting   (309) 788-3630

56

1 Q. Let's assume this fact for sake of argument.  The
2    first time you told Mr. Lind vis-a-vis a letter of
3    any deficiencies in any of the paperwork he
4    submitted for a leave of absence for medical
5    reasons was September 5th, 2003.
6 A. By letter as far as I know, yes, that is correct.
7 Q. And you don't have any independent knowledge of
8    facts which would indicate orally that you told
9    Mr. Lind prior to September 5th, 2003, that any of
10    the documents that he was submitting for a medical
11    leave of absence were defective?
12 A. That I told him?  No, sir, I do not.
13 Q. So assuming that September 5th, based on Exhibit 9,
14    was the first time you told Mr. Lind that there was
15    something wrong with the paperwork he was
16    submitting for a medical leave of absence that he
17    was requesting beginning July 24th, 2003, that you
18    conducted an employee review hearing or had an
19    employee review board hearing conducted in which
20    you imposed discipline of 30 days pending discharge
21    on Mr. Lind less than 14 days from the time in
22    which he had to look at this information and
23    determine that it was defective or not?  Do you see
24    what I'm saying?
25 A. I'm getting confused on the 14 days, I'm sorry.

Kelly Reporting   (309) 788-3630

57

1 Q. Don't worry about it.
2          MS. KERLEY:  Let's go off the record.
3          (A discussion was held off the record.)
4          MS. KERLEY:  A discussion was held off
5    the record whereby in that discussion the witness
6    affirmed that there is, in fact, not 14 days
7    between September 5th and September 8th of the year
8    2003.
9          THE WITNESS:  That is correct, yes.
10 BY MR. FIEWEGER:
11 Q. Are you aware under the Family Medical Leave Act
12    when an employer questions the adequacy of the
13    documentation submitted by the employee for an
14    approval of FMLA leave, that an employee has the
15    right to submit additional paperwork when the
16    employer questions it within 14 days?
17 A. Yes, uh-huh.
18 Q. And if Mr. Lind was told for the first time what
19    you're giving us from your physician is defective
20    September 5th, you didn't allow him a 14-day period
21    in which to submit new paperwork before you had a
22    review hearing to impose discipline on him;
23    correct?
24 A. From what the signed paper says, that would be
25    correct.

Kelly Reporting   (309) 788-3630

58

1  Q.  So that would be a violation of the requirements
2      under the Family Medical Leave Act according to
3      your understanding?
4          MS. KERLEY:  Objection.  Calls for a
5      legal conclusion, calls for speculation, and I'm
6      going to instruct the witness not to answer.
7          MR. FIEWEGER:  I think it'll be clear
8      enough.
9  A.  Well --
10         MS. KERLEY:  No, don't answer.  You can
11     talk again, but after another question.
12 BY MR. FIEWEGER:
13 Q.  Based on instructions from counsel, are you
14     refusing to answer the question?
15 A.  Yes.
16         MR. FIEWEGER:  All right.  Certify the
17     question.
18 Q.  Now, would you agree with me that the disciplinary
19     hearing occurred less than 14 days from your
20     September 5th, 2003, letter?
21 A.  Yes.
22 Q.  And would you agree with me that under the
23     provisions of the Family Medical Leave Act that --
24     to your understanding that Mr. Lind had 14 days
25     from September 5th, 2003, in which to provide the

Kelly Reporting   (309) 788-3630

59

1      supplemental documentation from his physician?
2  A.  Yes.
3  Q.  And, yet, you made the decision on September 8th,
4      2003, to suspend him 30 days pending discharge;
5      correct?
6  A.  Yes, it was my understanding those were two
7      separate issues.
8  Q.  And the CMS-95 form submitted by Mr. Lind before
9      September 5th, 2003, was an attempt by Mr. Lind to
10     get a medical leave of absence covering the period
11     of July 24th, 2003, onward; correct?
12         MS. KERLEY:  Objection.  Calls for
13     speculation as to what Mr. Lind intended.  You can
14     go ahead and answer.
15 A.  Would that have been the one on August 4th that
16     we're talking about?
17 Q.  Correct.
18         MS. KERLEY:  For clarification of the
19     record, the witness is looking at Exhibit 6, which
20     is dated August 14th, 2003.
21 A.  Okay.  I'm sorry.  It says the examination was on
22     the 4th.  It is dated the 14th, correct.  Now, the
23     question again was?
24         MR. FIEWEGER:  She needs to read it back.
25     I can't remember now.

Kelly Reporting   (309) 788-3630

60

1          (The question was read back by the court
2      reporter.)
3  A.  Correct.
4  Q.  So by your September 5th, 2003, letter to him, you
5      were asking for more information or corrected
6      information, and then three days later you fired
7      him or recommended that he be fired?
8  A.  That is correct.
9          MR. FIEWEGER:  I have no further
10     questions.
11                 EXAMINATION
12 BY MS. KERLEY:
13 Q.  Do you know what day you signed the recommendation
14     for suspension pending discharge?
15 A.  It was in September.  I don't want to guess,
16     because I'm not positive of the date.  September.
17 Q.  Would it be normal practice for you to sign off on
18     findings and recommendations on the same day that
19     the employer review board hearing was conducted?
20 A.  Usually, yes.
21 Q.  On the same day that it was conducted or the same
22     day you received the written findings?
23 A.  Well, when I receive the written findings, so
24     usually it's the same day.  Occasionally it's not,
25     but --

Kelly Reporting   (309) 788-3630

61

1  Q.  Do you recall when you received written findings
2      with respect to Mr. Lind's ERB?
3  A.  No, I don't.
4  Q.  I'm going to go ahead and direct your attention
5      back to Exhibit 9.  Prior to Pam Verstraete
6      preparing this document for your signature, did you
7      have any information regarding Mr. Lind's absences
8      and/or any requests for a leave of absence?
9  A.  I would have had probably knowledge of Exhibit 6 or
10     one of the two notices.
11 Q.  You testified that Exhibit 6 appears to be the
12     CMS-95 that you're referring to in your -- in the
13     memorandum in Exhibit 9; correct?
14 A.  Correct.
15 Q.  I'm going to direct your attention to the second
16     page of Exhibit 9, and I'll ask you to review that.
17     Okay?  And then look back to the first page of
18     Exhibit 9, please, and directing your attention to
19     the very last bullet point of that memorandum, does
20     it appear that the last bullet point in your
21     memorandum dated September 5th, 2003, was referring
22     to Bate's stamp page 493?
23 A.  It appears that way, yes, ma'am -- no, it does not,
24     because it's August -- Yes, it does.  The dates are
25     the same, August 20th to September 29th.

Kelly Reporting   (309) 788-3630

70

1    the Department of Corrections; is that fair to say?
2 A.  Yes.  I do have to review them.  There are so many
3    of them, it's hard to keep everything straight, but
4    yes, I do have a working knowledge.
5 Q.  Do you also have a working knowledge of the
6    institutional directives that apply to the East
7    Moline Correctional Center?
8 A.  Yes, same thing, I do review those occasionally
9    when there's questions.
10 Q.  Do you have a working knowledge of the employee
11    handbook --
12 A.  Yes.
13 Q.  -- for employees of East Moline Correctional
14    Center?
15 A.  Yes.
16 Q.  Does affirmative -- The department's affirmative
17    attendance policy, is that housed in an
18    administrative directive?
19 A.  Yes.
20 Q.  Does the affirmative attendance policy of the
21    department include the provisions regarding proof
22    status?
23 A.  Yes.
24 Q.  With respect to proof status, the department's
25    proof status adds additional responsibilities on an

Kelly Reporting    (309) 788-3630

71

1    employee; is that an accurate statement?
2 A.  Yes, it is.
3 Q.  And violation of the added obligations under proof
4    status is a violation of an administrative
5    directive; correct?
6 A.  Yes.
7 Q.  The violation of administrative directives can lead
8    to discipline; is that correct?
9 A.  That's correct, yes.
10 Q.  What bearing does a leave of absence either pending
11    or requested -- what bearing does an employee being
12    on a leave of absence have with respect to
13    discipline concerning violations of administrative
14    directives?
15    MR. FIEWEGER:  Objection.  Vague.
16 A.  None that I'm aware of.
17 Q.  From July 2003 to November 2003 what was your
18    understanding as to what effect Rick Lind's request
19    for a leave of absence would -- what effect that
20    request had on his discipline for violating the
21    administrative directives regarding proof status
22    and affirmative attendance?
23    MR. FIEWEGER:  Objection.  Vague and
24    assumes facts not in evidence.
25 Q.  Go ahead and answer.

Kelly Reporting    (309) 788-3630

72

1 A.  My understanding at that time is they were two
2    separate incidents, situations, or items that
3    didn't relate to each other.
4 Q.  Just so I'm clear, you were not present at the ERB
5    hearing with respect to Mr. Lind's discharge?
6 A.  No, ma'am, I was not.
7 Q.  You identified Rick Rogers as an individual that
8    was present?
9 A.  No, Dave Rayborn.
10 Q.  Dave Rayborn, thank you.  What did Mr. Rayborn --
11    did he complete any paperwork after the ERB?
12 A.  Yes, he did.
13 Q.  And what was that?
14 A.  It would have been the final write-up of the
15    decision on the recommendation.
16 Q.  And who did that recommendation go to?
17 A.  To me.
18 Q.  And you approved that recommendation?
19 A.  Yes.
20 Q.  What happened to that recommendation after you
21    approved it?
22 A.  Then forwarded it to Springfield.
23 Q.  What is your role in that discipline after it leave
24    the facility?
25 A.  None.

Kelly Reporting    (309) 788-3630

73

1 Q.  Have you ever -- Following an approval of a
2    recommendation and sending the paperwork forward to
3    Springfield, have you ever called back discipline
4    or ever sought to change discipline after it's left
5    the facility?
6 A.  To the best of my recollection, no, I never have.
7 Q.  Is that something you would have remembered?
8 A.  Oh, I would think so, yes.
9 Q.  Would that have been an unusual incident?
10 A.  Yes.
11    MS. KERLEY:  I have no further questions.
12    EXAMINATION
13 BY MR. FIEWEGER:
14 Q.  Mr. Jungwirth, you don't have any idea whether
15    Mr. Lind was properly on furnished proof status or
16    not, do you?
17 A.  All I can go by is what I was told.
18 Q.  And what the Civil Service Commission said was that
19    he wasn't on furnished proof status; correct?
20 A.  I understand that.
21 Q.  So if Mr. Lind was not on furnished proof status
22    and had six days of alternative time available to
23    him, he should have been able to use that
24    alternative time, shouldn't he?
25 A.  If that were the case, yes, sir.

Kelly Reporting    (309) 788-3630

78

1      not in evidence.
2   A.  My understanding, yes, he would have been.
3   Q.  And why is that?
4   A.  Because of the time period involved.
5          MS. KERLEY:  No further questions.
6                EXAMINATION
7   BY MR. FIEWEGER:
8   Q.  Your answer to that question assumes that Mr. Lind
9      was properly on furnished proof status; correct?
10  A.  That is correct, yes.
11  Q.  And Mr. Lind would not be required to provide
12     medical documentation to cover his absences if he
13     wasn't on furnished proof status, would he?
14  A.  No, he wouldn't.
15  Q.  But Mr. Lind did provide CMS-95 forms to your
16     department or to your organization prior to the
17     September 8th, 2003, disciplinary hearing signed by
18     a licensed chiropractic physician, Dr. Freebern,
19     which covered the period that was -- the issues
20     subjecting him to discipline; correct?
21         MS. KERLEY:  Objection.  Asked and
22     answered.
23  A.  He did submit the forms for that time period, but I
24     understand it's two separate situations, and it
25     didn't cover the proof.

Kelly Reporting   (309) 788-3630

79

1   Q.  Well, if a doctor says on a CMS-95 form that he
2      can't work for the period that you're disciplining
3      him, why doesn't that cover it?
4   A.  The time period involved and the discipline.  He
5      was put on proof.  He had a certain amount of time
6      to provide the doctor's slip which wasn't done, and
7      that's why -- they're considered two separate
8      situations.
9   Q.  That's assuming he didn't get it in timely;
10     correct?
11  A.  That he didn't get the doctor's slip in timely?
12  Q.  That's what you're assuming; right?
13  A.  Right.
14  Q.  Now, you were asked some questions regarding that
15     the director determines whether to fire somebody or
16     suspend somebody 30 days; correct?
17  A.  That's who signs off on it, yes.
18  Q.  That's who signs off on it, but you're the one who
19     recommended that discipline?
20  A.  I recommended it, yes.
21  Q.  So you were part of the decision-making process in
22     implementing a 30-day suspension pending discharge;
23     correct?
24  A.  Yes, I did recommend it.
25  Q.  And but for your influence, the director wouldn't

Kelly Reporting   (309) 788-3630

80

1      have made that decision; correct?
2          MS. KERLEY:  Objection.  Calls for
3      speculation.  No foundation.
4   A.  I can't answer that.
5   Q.  If you recommended five days, that's what the
6      director, Don Snyder, would have reviewed, correct,
7      your recommendation for five-day suspension?
8   A.  Would have reviewed it, yes.
9   Q.  But in this case your recommendation was that you
10     fire him, you suspend him for 30 days and you fire
11     him; correct?
12  A.  Correct.
13  Q.  And that was your recommendation for discipline was
14     what was reviewed by Director Donald Snyder;
15     correct?
16  A.  Correct.  I think he was still the director.  It
17     was a back and forth thing there.  He was there,
18     and then they took him out and put him back.  But
19     that is correct.
20         MR. FIEWEGER:  I have no further
21     questions.
22               EXAMINATION
23  BY MS. KERLEY:
24  Q.  At the time you approved the recommendation from
25     the ERB hearing, was the information that you had

Kelly Reporting   (309) 788-3630

81

1      and the understanding that you had that Mr. Lind
2      had not timely provided doctor's information
3      necessary under the obligations required under
4      proof status?
5   A.  That is the information I had, yes.
6          MS. KERLEY:  That's all the questions I
7      have.
8                EXAMINATION
9   BY MR. FIEWEGER:
10  Q.  Let's talk about that.
11         (Exhibit 10 marked for identification.)
12  Q.  Show you Exhibit 10 for identification.  Are these
13     the minutes from the employee review hearing?
14         MS. KERLEY:  Objection to the
15     characterization of minutes.  Lack of foundation.
16     This witness testified he was not present at the
17     ERB hearing.
18  A.  Okay.
19  Q.  Is this what's prepared in the ordinary course of
20     business as a result of an employee review hearing?
21  A.  Yes.
22  Q.  And is this what you review when you're determining
23     whether to accept what results from the employee
24     review hearing?
25  A.  Yes.

Kelly Reporting   (309) 788-3630

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

RICK LIND,                                    )
                                              )
    Plaintiff,                            )
                                              )
    vs.                                   )  No. 05-4059
                                              )
STATE OF ILLINOIS, through its                )
Agency THE ILLINOIS                           )
DEPARTMENT OF CORRECTIONS,                    )
                                              )
    Defendant.                            )

### AFFIDAVIT OF KEVIN FREEBERN, D.C.

STATE OF ILLINOIS            )
                             ) ss.
COUNTY OF ROCK ISLAND        )

I, Kevin Freebern, D.C., being first duly sworn upon oath, states as follows:

1.  I am of legal age, am competent and have personal knowledge of the facts set forth in this Affidavit.

2.  That I am a chiropractic physician licensed by the State of Illinois to practice chiropractic medicine in all of its fields and have a professional practice located at 918 16th Avenue, East Moline, Illinois 61244, as of July 24, 2003.

3.  That I am familiar with Rick Lind. Mr. Lind has been a longtime patient of mine and I have provided him with chiropractic adjustments and treatment for his back.

4.  That commencing on July 24, 2003, Rick Lind presented to me for treatment of his low back pain. At that time, I diagnosed Mr. Lind with cervical subluxation, headaches, thoracic subluxation, muscle spasms, lumbar subluxation and pelvic subluxation. I found in my


EXHIBIT
14

2

examination, care and treatment of Mr. Lind that his cervical pain, headaches, stiffness and pain in his mid and low back were the result of those above conditions. I prescribed a course of treatment of chiropractic adjustments, home care, ice therapy and rest. I referred him back to his physician, Randall Mullin, M.D., for prescription medication to alleviate pain.

5.   That on July 30, 2003, I completed a Physician's Statement at the request of Mr. Lind setting forth my findings and diagnosis and course of treatment and signed the document and provided it to Mr. Lind on July 30, 2003. Exhibit A, a true and correct copy of the Physician's Statement that I provided to Mr. Lind on July 30, 2003, is attached hereto and made a part of this Affidavit.

6.   That in addition, I completed a second Physician's Statement based on my examination of Mr. Lind on August 6, 2003 setting forth my findings, diagnosis and prescribed course of treatment. Attached hereto as Exhibit B is a true and correct copy of the August 14, 2003 Physician's Statement that I completed at the request of and on behalf of Mr. Lind. I found that Mr. Lind was unable to work at that point and would not be able to resume work until August 7, 2003. I signed the document on August 14, 2003 and provided the same to Mr. Lind on that same day.

7.   In addition, I completed a temporary release from work document on my own office form on August 4, 2003 in which I released Mr. Lind from work for the period of July 24, 2003 to August 7, 2003. Exhibit C, a true and correct copy of my August 4, 2003 release from work statement, is attached hereto and made a part of this Affidavit. I provided Exhibit C to Mr. Lind on August 4, 2003.

3

8. It is my opinion, within a reasonable degree of chiropractic medicine certainty, that Mr. Lind did suffer, beginning on July 24, 2003 and continuing through August 6, 2003, from cervical subluxation, headaches, thoracic subluxation, muscle spasms, lumbar subluxation and pelvic subluxations. It is my opinion, within a reasonable degree of chiropractic medicine certainty, that those conditions of ill-being produced headaches, poor cervical range of motion with inflammation, tense and tender cervical and thoracic muscles, stiffness and soreness of the mid and low back, prevented my patient, Mr. Lind, from being able to sleep, and interfered with his concentration, all to the effect that Mr. Lind was unable to work at his position as a correctional officer at the East Moline Correctional Center for the period of July 24, 2003 through August 6, 2003.

Further affiant sayeth naught.

Kevin Freebern, D.C.

Subscribed and sworn to before me, a Notary Public, this _1ST_ day of _February_, 2007.

Notary Public

OFFICIAL SEAL
STEPHEN T. FIEWEGER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-24-2008

s:\wp\worddoc\11260001.26A

# PHYSICIAN'S STATEMENT

## AUTHORIZATION FOR DISABILITY LEAVE AND RETURN TO WORK AUTHORIZATION

Name of Patient (full): __Rick Lind__     Date of Birth: __9-19-53__    Soc. Sec. Number __360488440__

Present Address—Street or Rural Route: __401 Main Street__

City: __Erie__     State: __Illinois__     Zip Code: __61252__

Employed by State of Illinois: _____
(Agency, Board, Commission, Department)

Facility: _____     Address: _____

**COMPREHENSIVE MEDICAL INFORMATION IS REQUIRED IN ORDER TO EVALUATE THE EMPLOYEE CLAIM FOR A DISABILITY LEAVE OF ABSENCE OR SUBSEQUENT RETURN TO WORK**

### DIAGNOSIS (including any complications):

(a) Date of last examination:    Month: __7__    Day: __30__    Yr. __2003__

(b) Diagnosis including any complications: __Cervical subluxation, headaches, thoracic subluxation, muscle spasms, lumbar subluxation and pelvic sub. His headache complaint is aggravated by stress, cold weather. These problems date back to a major auto accident in 1980.__

(c) Subjective symptoms: __Patient complains of severe cervical pain with movement, severe headaches, stiff and sore in mid and low back. Not able to sleep, poor concentration and just feels terrible.__

(d) Objective findings (including information derived from x-rays, EKG's, laboratory data and any clinical findings): __Poor cervical range of motion with inflamation and very tense and tender. Cervical and thoracic muscles. Patient appears very fatigued and down. Decreased lumbo-pelvic range of motion with mild inflamation.__

### DATES OF TREATMENT:

1) Date of first visit:    Month: __7__    Day: __30__    19 __2003__

2) Date of last visit:    Month: _____    Day: _____    19 _____ __still treating.__

3) Frequency:    Weekly [X]    Monthly [ ]    Other [ ] — (Please specify): _____

### TREATMENT:

Please describe treatment including any surgery and/or medication prescribed: __Chiropractic adjustments, home care, ice theraphy, rest, active care, MD treatment.__

Will treatment substantially improve function and employability?    Yes [X]    No [ ]    If yes, specify:

__His spinal function has improved some and his headaches have improved some.__

**IMPORTANT NOTICE**

This state agency is requesting disclosure of information that is necessary to accomplish the statutory purpose as outlined under Chp. 127, 63b, 108c(2). Disclosure of this information is VOLUNTARY. This form has been approved by the State Forms Management Center.

EXHIBIT

A

PROGRESS:  (Please check appropriate box provided below):

a) The patient has:  Recovered ☐   Improved ☐   Remained unchanged ☐   Retrogressed ☐
b) The patient is:   Ambulatory ☒   House confined ☐   Bed confined ☐   Hospital confined ☐
c) Has the patient been hospital confined because of current condition?   Yes ☐   No ☒
   If yes, give name and address of hospital: _____

Confined from:   Month _____   Day ___ 19 ___   through   Month _____

LIMITATION:  (If there is a limitation, check appropriate box and describe below):

Lending ☐   Climbing ☐   Bending ☐   Use of hands ☐   Sitting ☐   Walking ☐   Stooping ☐
ting ☐   Psychological ☐   Other ☒   (Please specify): Looking down, stress, cold weather

PHYSICAL IMPAIRMENT:  (*As defined in Federal Dictionary of Occupational Titles):

CLASS 1 –  No limitation of functional capacity; capable of heavy work* No restrictions (0-10%)
CLASS 2 –  Medium manual activity* (15-30%)
CLASS 3 –  Slight limitation of functional capacity; capable of light work* (35-55%)
CLASS 4 –  Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)
CLASS 5 –  Severe limitation of functional capacity; incapable of minimal (sedentary*) activity (75-100%)
REMARKS— Severe headaches – impaired judgement and reaction to situations.

EXTENT OF DISABILITY:

| | From Any Occupation | | | From Patient's Regular Occupation | | |
|---|---|---|---|---|---|---|
| In your opinion is patient now temporarily totally disabled? | Yes ☒ | | No ☐ | Yes ☐ | | No ☐ |
| | MONTH | DAY | YEAR | MONTH | DAY | YEAR |
| If no, when was patient able to go to work? | | | 19 | | | 19 |
| | MONTH | DAY | YEAR | MONTH | DAY | YEAR |
| If yes, when do you think patient will be able to resume any work? | 8 | 7 | 19 2003 | | | 19 |
| | | [Approximate Date] | | Indefinite ☐ | | Never ☐ |
| In your opinion is patient permanently and totally disabled for employment? | Yes ☐ | | No ☒ | Yes ☐ | | No ☒ |
| If answer to (d) is "yes", please explain. | | | | | | |

_____
_____
_____
_____

REMARKS:

This episode is a severe irritation of tissue damaged in a major auto accident in 1980. He sustained a severe concussion and a T12 compression fracture, scar tissue is susceptible to episodes of flare up from activities of daily living and stress, and exposure to the cold.

Physician's Signature: _Dr. Kevin L. Freebern_   Degree: D.C.   Date: 7/30/03

TYPE OR PRINT THE FOLLOWING INFORMATION:

Physician's Name:   Kevin L. Freebern, D.C.

Office Street Address:   918 – 16th Avenue

East Moline   State: Illinois   Zip Code: 61244   Phone Number: 309–752–0750

NOTES:  You are responsible for having this form completed and returned to the appropriate person within your agency within the limits established by your agency.  Your failure to comply may result in termination of your disability leave.

# CENTRAL MANAGEMENT - SERVICES    PHYSICIAN'S STATEMENT

## AUTHORIZATION FOR DISABILITY LEAVE AND RETURN TO WORK AUTHORIZATION

Name of Patient (full): __Rick S Lind__   Date of Birth: __9/19/64__   Soc. Sec. Number: __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__

Present Address—Street or Rural Route: __401 Main Street__

City: __Erie__   State: __Illinois__   Zip Code: __61250__

Employed by State of Illinois: _____
(Agency, Board, Commission, Department)

Facility: _____   Address: _____

---

**COMPREHENSIVE MEDICAL INFORMATION IS REQUIRED IN ORDER TO EVALUATE THE EMPLOYEE'S CLAIM FOR A DISABILITY LEAVE OF ABSENCE OR SUBSEQUENT RETURN TO WORK.**

---

## DIAGNOSIS (including any complications):

(a) Date of last examination:   Month: __8__   Day: __4__   19 __2003__

(b) Diagnosis including any complications: __Cervical Subluxation, Headaches, Thoracic Subluxation, Muscle Spasms, Lumbar Subluxation, Pelvic Subluxation.__

__His headache complaint is aggrivated by stress, A/C.__

__These problems date back to a major auto accident in 1980.__

(c) Subjective symptoms: __Patient complains of severe cervical pain with movement, severe headaches, stiff and sore in mid and low back. Not able to sleep, poor concentration, just feels terrible.__

(d) Objective findings (including information derived from x-rays, EKG's, laboratory data and any clinical findings): __Poor cervical range of motion with inflamation and very tense and tender. Cervical and thoracic muscles. Decreased lumbo plevic range of motion with mild inflamation. Patient appears very fatiqued and down.__

---

## DATES OF TREATMENT:

(a) Date of first visit:   Month: __7__   Day: __24__   19 __2003__

(b) Date of last visit:   Month: __8__   Day: __6__   19 __2003__

(c) Frequency:   Weekly ☐   Monthly ☐   Other ☐ — (Please specify): _____

---

## TREATMENT:

(a) Please describe treatment including any surgery and/or medication prescribed: __Chiropractic adju- home care, Ice theraphy, rest, active care, md, treatment.__

(b) Will treatment substantially improve function and employability?   Yes ☒   No ☐   If yes, specify: __His spinal function has improved drastically, and his headaches have really resolved.__

---

**IMPORTANT NOTICE**
This state agency is requesting disclosure of information that is necessary to accomplish the statutory purpose as outlined under Chp. 127, 63b, 108c(2). Disclosure of this information is VOLUNTARY. This form has been approved by the State Forms Management Center.

EXHIBIT

B

5-95 (9/82)   IL401-0784

**PROGRESS:  (Please check appropriate box provided below):**

(a)  The patient has:   Recovered ☐   Improved ☒   Remained unchanged ☐   Retrogressed ☐

(b)  The patient is:   Ambulatory ☒   House confined ☐   Bed confined ☐   Hospital confined ☐

(c)  Has the patient been hospital confined because of current condition?   Yes ☐   No ☒
If yes, give name and address of hospital: _____

Confined from:   Month_____ Day_____ 19____   through   Month_____ Day_____ 19____

---

**LIMITATION:  (If there is a limitation, check appropriate box and describe below):**

Standing ☐   Climbing ☐   Bending ☐   Use of hands ☐   Sitting ☐   Walking ☐   Stooping ☐

Lifting ☐   Psychological ☐   Other ☐   (Please specify): _____

---

**PHYSICAL IMPAIRMENT:  (*As defined in Federal Dictionary of Occupational Titles):**

☒  CLASS 1 —   No limitation of functional capacity; capable of heavy work*  No restrictions (0-10%)

☐  CLASS 2 —   Medium manual activity* (15-30%)

☐  CLASS 3 —   Slight limitation of functional capacity; capable of light work* (35-55%)

☐  CLASS 4 —   Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)

☐  CLASS 5 —   Severe limitation of functional capacity; incapable of minimal (sedentary*) activity (75-100%)

☐  REMARKS — _____

---

**EXTENT OF DISABILITY:**

|  | From Any Occupation | | From Patient's Regular Occupation | |
|---|---|---|---|---|

(a)  In your opinion is patient now temporarily totally disabled? Yes

| | Yes ☐   No ☐ | | Yes ☐   No ☐ | |
|---|---|---|---|---|
| | MONTH | DAY | YEAR 19 | MONTH DAY YEAR 19 |

(b)  If no, when was patient able to go to work?

| | MONTH | DAY | YEAR 19 | MONTH DAY YEAR 19 |
|---|---|---|---|---|

(c)  If yes, when do you think patient will be able to resume any work?   8 / 6 / 19 2003

(Approximate Date)   Indefinite ☐   Never ☐

(d)  In your opinion is patient permanently and totally disabled for employment?  NO

Yes ☐   No ☒     Yes ☐   No ☐

(e)  If answer to (d) is "yes", please explain.

_____

_____

_____

---

**REMARKS:**

This episode is a severe irritation of tissue damaged in a

major auto accident in 1980. He sustained a severe concussion

and a T12 compression fracture, scar tissue is susceptible to

episodes of flare up from activities of daily living and stress,

and exposre to the cold.

---

Attending Physician's Signature: *Kevin L. Freeborn D.C.*   Degree: _____   Date: 8/14/03

PLEASE TYPE OR PRINT THE FOLLOWING INFORMATION:

Attending Physician's Name:  Kevin L. Freeborn , D.C

Physician's Office Street Address:  918 16th Ave

City:  East Moline   State:  Illinois   Zip Code: 61244   Phone Number  309-752-0750

---

**EMPLOYEES:**  You are responsible for having this form completed and returned to the appropriate person within your agency within
time limits established by your agency. Your failure to comply may result in termination of your disability leave.

**Freebern Chiropractic**
Kevin Freebern, DC
918 16th Avenue
East Moline, IL  61244
(309) 752-0750 – office
(309) 752-0755 – fax

: _8/4/03_

ne of Employee _Rick Lind_

above employee is temporarily unable to work from _7/24/03_ to _8/7/03_

ere are questions regarding this patient please contact the above telephone number.

Kevin L. Freebern, DC


EXHIBIT
C