E-FILED
Friday, 02 February, 2007  03:40:41 PM
Clerk, U.S. District Court, ILCD

```
 1                UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                    ROCK ISLAND DIVISION

 3
                                        COPY
 4

 5   RICK LIND,                  )
                                 )
 6          Plaintiff,           )
                                 )
 7      vs.                      )   No. 4:05-CV-4959
                                 )
 8   STATE OF ILLINOIS,          )
     DEPARTMENT OF CORRECTIONS,  )
 9                               )
            Defendant.           )
10   _____)

11

12

13              DEPOSITION OF RICK S. LIND,
     taken before Heidi Krafka, Certified Shorthand Reporter
14   of the States of Iowa and Illinois, at Katz, Huntoon &
     Fieweger, 1000 36th Avenue, Moline, Illinois, on
15   Thursday, the 18th day of January, 2007, commencing at
     12:48 p.m., pursuant to the within stipulation.
16

17

18

19

20

21

22

23

24                   Kelly Reporting
                     (309) 788-3630
25
```



EXHIBIT
15

## 18

1  leave of absence?

2  A. Yes, it's the employee's responsibility to know how
3  much sick time he has, and I knew I was out of sick
4  time, and I knew the procedure.

5  Q. To the best of your recollection what did you say
6  to her, and what did she say to you in that
7  conversation?

8  A. I told her just what I've already told you, and she
9  said, okay, and I went to the warden's office and
10  requested the CMS-95.

11 Q. And when did you have this conversation with
12  Ms. Richardson and followed by going to the
13  warden's office?

14 A. At some time during this period, during this time
15  off.

16 Q. When you say this time, are you referring --

17 A. It was by phone.

18      MS. KERLEY: I'm sorry. Could you
19  please -- could you read back his response.

20      (The question was read back by the court
21          reporter.)

22 BY MS. KERLEY:

23 Q. Mr. Lind, you indicated that you spoke to
24  Ms. Richardson, the timekeeper, by telephone?

25 A. Yes.

Kelly Reporting  (309) 788-3630

## 19

1  Q. And where were you when you made that phone call?

2  A. Home.

3  Q. And following -- And have you related to me
4  everything that you recall telling Ms. Richardson
5  in that telephone call?

6  A. Yes.

7  Q. Following the telephone call did you speak with
8  Ms. Richardson again about orally requesting a
9  leave of absence?

10 A. No.

11 Q. Did you orally request a leave of absence from
12  anyone besides Ms. Richardson?

13 A. Pam Verstraete.

14 Q. And where did you -- And did you have that
15  conversation in person or on the phone?

16 A. In person.

17 Q. And where was that conversation?

18 A. In the warden's office.

19 Q. And when you say the warden's office -- it's really
20  two offices; is that correct?

21 A. Yes.

22 Q. It's the warden's inner office and then
23  Ms. Verstraete and the administrative assistant is
24  outside of his office; would that be correct?

25 A. That would be correct.

Kelly Reporting  (309) 788-3630

## 20

1  Q. Were you in Warden Jungwirth's office or out in
2  Ms. Verstraete's work area?

3  A. Let me clarify. There's a double door, that states
4  warden's office on it. I walked in the first --
5  walked in the double door. That's where I
6  requested the form.

7  Q. All right. As you recall, what did you say to
8  Ms. Verstraete during that conversation?

9  A. I told her that I was -- I needed a CMS-95 and I
10  would be applying for an LOA.

11 Q. What did she say to you?

12 A. Okay.

13 Q. Is that the extent of the conversation, as best you
14  can recall?

15 A. Yes.

16 Q. Did she give you a CMS-95?

17 A. Yes.

18 Q. I'm going to direct your attention to Exhibit 3.
19  You do recognize that document?

20 A. Yes.

21 Q. Do you know when you signed that document?

22 A. Yes, when I submitted my CMS-95.

23 Q. And do you know when that was, what day that was?

24 A. On 7-30-03.

25 Q. When did your back first start bothering you?

Kelly Reporting  (309) 788-3630

## 21

1      MR. FIEWEGER: Relative to this time
2  period or historically?

3      MS. KERLEY: Historically.

4  A. June 26th, 1979.

5  Q. And was it -- Did you have an injury to your back?

6  A. Car accident. I almost killed myself.

7  Q. Were you diagnosed -- Or did you have a medical
8  diagnosis which referred to the injury to your
9  back?

10 A. Yes.

11 Q. And what was that diagnosis?

12 A. Fractured -- a compound fractured -- a compression
13  fracture, excuse me, of L4, 5 and 6.

14 Q. Were you employed by the Department of Corrections
15  in 1979?

16 A. No.

17 Q. Did that injury cause ongoing problems with your
18  back?

19 A. Can we go off the record?

20 Q. I bet your lawyer doesn't let you.

21 A. Okay. Well, then will you explain to me what
22  ongoing means?

23 Q. Sure. The compression fracture to the L4, 5, and
24  6, was that an injury that healed within two years
25  of your motor vehicle accident?

Kelly Reporting  (309) 788-3630

22

1  A.  Not completely healed.  Yes, I did heal from it.
2  Q.  And when you say not completely healed, what do you
3      mean?
4  A.  There was different steps, traction, rehab, things
5      like that, but I was much younger then, and I went
6      through it, and I survived it.
7  Q.  Did at some point you consider your back injury
8      healed?
9  A.  It will never completely heal.
10 Q.  Did you receive a subsequent diagnosis of problems
11     with your back, something -- a diagnosis separate
12     and apart from a compression fracture that you
13     suffered in 1979?
14 A.  Not in 1979, no.
15 Q.  I'm sorry.  Let me rephrase.  Sometime after 1979
16     did you receive from a medical professional an
17     additional diagnosis with respect to your back?
18 A.  Yes.
19 Q.  And what was that?
20 A.  That I had deteriorating disks, stenosis, and
21     arthritis.
22 Q.  When were you diagnosed with deteriorating disks?
23 A.  My early 40's.
24 Q.  And what years would those be?
25 A.  Boy -- Well, I'm 53 now, so that's --

23

1          MR. FIEWEGER:  '95, '96?
2          THE WITNESS:  Somewhere in there.
3  BY MS. KERLEY:
4  Q.  Somewhere in the mid '90s, is that as best you can
5      recall?
6  A.  Yes.
7  Q.  When were you diagnosed with stenosis?
8  A.  Same time.
9  Q.  And arthritis?
10 A.  Yes.
11 Q.  What was your prognosis, as you understood it, from
12     these diagnoses?
13 A.  The prognosis is that it will steadily get worse as
14     time and age goes on.
15 Q.  Since the mid '90s has your back -- your back
16     condition steadily gotten worse?
17 A.  Yes, it has.
18 Q.  When you say steadily gotten worse, is it your
19     testimony that each passing day is worse than the
20     day before or that in looking at a year at a time
21     each following year you had more problems with your
22     back than the year before?
23 A.  I would say it's on a day-to-day or week-to-week
24     basis.  You have good days and bad days.  It's like
25     anything else.

24

1  Q.  Would flare-ups -- would that be an appropriate --
2  A.  That would be appropriate, yes, or if you throw
3      your back out.
4  Q.  Okay.  So your -- That would be an appropriate
5      characterization?
6  A.  Yes.
7  Q.  In the mid '90s when you received this diagnosis,
8      did the diagnosis of your deteriorating disk,
9      stenosis, and arthritis cause you to quit work or
10     change occupations?
11 A.  No.
12 Q.  Do your flare-ups from time to time from the mid
13     '90s to 2002 cause you to miss work?
14 A.  Yes.
15 Q.  Would your flare-ups or throwing your back out --
16     would you call those -- or would episode be an
17     accurate characterization, an episode of symptoms?
18 A.  Yes, I suppose.  You could characterize it however
19     you want.  Something like that.
20 Q.  Is that an accurate --
21 A.  Yes, it could be.
22 Q.  And do those flare-ups then have an end of those
23     symptoms?  Do they get resolved, these flare-ups or
24     throwing your back out?
25 A.  As I stated before, they never totally are resolved

25

1      or totally healed.  It lessens in pain and
2      intensity.
3  Q.  And at some point you would consider the episode of
4      that flare-up -- that episode to have been past?
5  A.  Correct.
6  Q.  Directing your attention to July of 2003, is it
7      fair to say that you had a flare-up of your back
8      injury -- or your back diagnosis in July of 2003?
9  A.  Yes.
10 Q.  When did your back first start bothering you, or
11     when did this episode begin?
12 A.  I can't say exactly.  I started missing work on the
13     24th, so it was a few days before that, I'm sure.
14 Q.  Do you recall whether a specific instance caused
15     the onset of this episode or this flare-up?
16 A.  No.  No, I had no recollection of any action or
17     anything like that to cause it.
18 Q.  How was your back feeling during -- or how were you
19     feeling during the -- during July of 2003 with
20     relation to your back?
21 A.  How was I feeling?
22 Q.  Yes.
23 A.  It hurt like hell.
24 Q.  And what kind of pain, what kind of symptoms were
25     you experiencing in July of 2003 caused by your

26

```
1       flare-up?
2   A.  Pain, headaches, not being able to sleep, trouble
3       walking, trouble sitting, standing.
4   Q.  Is that an inclusive list as far as you can recall?
5   A.  That pretty much covers it.
6   Q.  Is your -- Pardon my ignorance.  Is this a lower
7       back injury, a mid back, or an upper back injury?
8   A.  Low back.
9   Q.  You indicated that July 24th was your first day off
10      work; correct?
11  A.  Yes.
12  Q.  And did you call in prior to your shift?
13  A.  Yes, I called in every day.
14  Q.  And why did you call in on July 24th, 2003?
15  A.  Because I wasn't feeling well.
16  Q.  Would you agree that July 24th was the first day of
17      a flare-up or an episode of symptoms that extended
18      through until August of 2003?
19  A.  Yes, I would.
20  Q.  What did you do that day?  Do you recall what you
21      did?
22  A.  I can't recall.
23  Q.  Did you seek treatment by a physician -- by a
24      medical doctor that day?
25  A.  Yes, I was called and referred to my chiropractor.
```

28

```
1       days that you were off work?
2   A.  Trying to relieve my pain.  I know I was on pain
3       medication which my physician also prescribed.
4   Q.  Dr. Mullen?
5   A.  Yes.
6   Q.  Did Dr. Mullen prescribe pain medication before or
7       after you were seen by Dr. Freebern?
8   A.  Before.
9   Q.  Was that in the same call that you made where he
10      gave you a referral to Dr. Freebern?
11  A.  Yes.
12  Q.  Do you remember what pain killer you were on?
13  A.  Yes.
14  Q.  What was it?
15  A.  Vicodin.
16  Q.  Had you received Vicodin before?
17  A.  Yes.
18  Q.  In addition to taking Vicodin, what other things
19      did you do in an attempt to relieve your pain
20      during the time that you were off work?
21  A.  Ice, heat.
22  Q.  Did at some point your symptoms begin to be
23      alleviated?
24  A.  Yes, after I started seeing a chiropractor.
25  Q.  And you don't recall when you first saw him?
```

27

```
1   Q.  I'm sorry.  You were called or you called?  I'm
2       sorry.  I didn't understand.
3   A.  I called and got a referral to see my chiropractor.
4   Q.  So you called your medical doctor's office?
5   A.  Yes.
6   Q.  And who was your medical doctor?
7   A.  Randall Mullen.
8   Q.  Did you see Dr. Mullen that day?
9   A.  No.
10  Q.  And he referred you to Dr. Freebern?
11  A.  Yes.
12  Q.  When was the first time that you saw Dr. Freebern?
13  A.  I've seen him for several years.  I don't recall
14      the first time.
15  Q.  You don't recall the first time as it relates to
16      that episode?
17  A.  As it relates to this episode, no.
18  Q.  You were off -- You were absent from work for --
19      From Exhibit 8 can you tell how many days you were
20      off work?  I counted ten.  Can you confirm with
21      Exhibit 8 that you were off ten days of work in the
22      time period of July 24th, 2003, until August 7th,
23      2003?
24  A.  Yes.
25  Q.  And how did you spend your time during those ten
```

29

```
1   A.  Not offhand, no.
2   Q.  Do you recall whether it was close in time to your
3       first absence or whether it was in the midst of
4       your ten days off from work?
5   A.  It was as soon as I could get in, I know that.
6   Q.  When was the first time that you called for an
7       appointment?
8   A.  I would imagine it's right on 7-24.
9   Q.  Do you specifically recall making that phone call?
10  A.  No.
11  Q.  You testified that you provided a total of three
12      CMS-95 documents?
13  A.  Yes.
14  Q.  Who did you provide the first CMS-95 to?
15  A.  Pam Verstraete.
16  Q.  And when did you provide her that document?
17  A.  On 7-30.
18  Q.  And how do you know that it was July 30th?  How do
19      you recall that?
20  A.  Because that's when I turned it in.
21  Q.  And is there any -- I mean, was it your spouse's
22      birthday, or is there something that makes that
23      date stand out in your mind?
24  A.  That's when the doctor signed my paperwork, and I
25      brought it immediately to the warden's office.
```

42

1   A.   No.
2   Q.   Would you have used -- Would you have gone to the
3        warden's office to provide paperwork after roll
4        call?
5   A.   No.
6   Q.   Do you ever recall doing that?
7   A.   Do I ever recall doing that?  Yes.  Yes, I have.
8   Q.   Do you recall that with -- Strike that.
9             What did you do in response to receiving the
10       memorandum dated September 5th, 2003?
11  A.   I called the warden's office, and I've already been
12       to -- and I said I didn't have enough time to get
13       any -- get my paperwork correct.  I requested more
14       time, and the hearing was already held.
15  Q.   All right.  There was lots in there.  When did you
16       receive this memo?
17  A.   9-5 -- no, I believe it was -- it was dated
18       September 5th, so I had to receive it on 9-8.
19  Q.   Do you recall whether or not you received it prior
20       to the day that your ERB was scheduled?
21  A.   No, I couldn't have.
22  Q.   And why do you say that you could not have?
23  A.   It came in the U.S. mail, regular mail.  It wasn't
24       sent certified, and if it is dated September 5th,
25       it would be impossible to get it before my ERB.

43

1   Q.   And why is it impossible?  I'm sorry.  I don't
2        understand.
3   A.   The length of time that it would take the mailman
4        to deliver it.
5   Q.   And you live in Erie, Illinois?
6   A.   That's correct.
7   Q.   And approximately how long of a distance or how
8        many -- how long does it take you to travel from
9        Erie to East Moline?
10  A.   30 minutes.
11  Q.   And it's your testimony that for this Exhibit 9 to
12       get from East Moline to your house 30 minutes away
13       would have to have taken a minimum of three days?
14  A.   By U.S. mail, yes.
15  Q.   Okay.  You don't recall when you got it?
16  A.   Not exactly, no.
17  Q.   After you received it, you indicated that you
18       called the warden's office?
19  A.   Yes.
20  Q.   Who did you talk to?
21  A.   Pam Verstraete, and I asked for the warden.
22  Q.   And what you talk to Pam about?
23  A.   I just asked to speak to the warden.
24  Q.   So she answered the phone?
25  A.   Yes.

44

1   Q.   Did you talk to the warden?
2   A.   Yes.
3   Q.   What did you tell the warden?
4   A.   I told him I didn't have a chance to -- time to
5        request these things that he wanted.
6   Q.   Time before when?  What do you mean?
7   A.   Before my ERB.
8   Q.   And what was his response?
9   A.   He said he was sorry, there was nothing he could do
10       about it.
11  Q.   Did you receive written notice of charges when you
12       received notice that you were being recommended for
13       an employee review board hearing?
14  A.   Charges of when you -- when they send you to the
15       ERB?
16  Q.   Yes.
17  A.   Yes, because I have to sign for it, and that's done
18       at work.
19  Q.   With respect to the ERB that was held on
20       September 8th, had you received charges sometime
21       prior to September 8th indicating why you were
22       being recommended for an ERB hearing?
23  A.   Right.  Correct.
24  Q.   Did those charges include violation of a leave of
25       absence policy?

45

1   A.   No, unauthorized absences.
2   Q.   In violation of the affirmative attendance policy?
3   A.   Correct.
4   Q.   And the charges also indicated that you were on
5        proof status -- or that the department contended
6        that you were on proof status?
7   A.   When I asked my alternative time, I wrote right on
8        my slips not on proof, so I knew I was not on proof
9        status.
10  Q.   But the charges informed you that the department
11       held the position that you were on proof status;
12       correct?
13            MR. FIEWEGER:  Not whether it was correct
14       or not.
15  Q.   That the department had that correction, that the
16       department was telling you that it thought you were
17       on proof status; correct?
18  A.   Yes.  Yes.
19  Q.   And that would have been prior to -- About how long
20       before the ERB hearing would you have gotten notice
21       of the charges?
22  A.   Ten days.
23  Q.   Knowledge this -- Well, sometime from July 2003 to
24       November 2003 did you give Pam Verstraete -- or did
25       you consent to having Pam Verstraete contacting

# E M P L O Y E E   H A N D B O O K

Sergio Molina, Warden

REVISED:  January 6, 1997



EXHIBIT

16

# E M P L O Y E E   H A N D B O O K

## TABLE OF CONTENTS

1. PREFACE — 1

2. WARDEN STATEMENT — 2

3. ACA CODE OF ETHICS — 3

4. EMPLOYEE RULES AND RESPONSIBILITIES — 4 – 10

5. GENERAL EMERGENCY PROCEDURES — 11 – 14

6. RESPONSE TO MEDICAL EMERGENCIES — 15 – 17

7. GENERAL INFORMATION
   FROM DEPARTMENT OF PERSONNEL FOR NEW EMPLOYEE — 18 – 20

8. MISCELLANEOUS — 21 – 22

PREFACE

The East Moline Correctional Center has the dual responsibility of providing a safe and secure environment in addition to programs and services which are designed to assist inmates in reintegrating into the free community upon their release.  In order to attain maximum success of these goals, adequate security must be enforced and maintained by every employee.  Due to the specialized and detailed job functions of various staff, it is necessary for employees to respect, understand and cooperate with each other in their respective duties and responsibilities.  The ultimate goals of security and programming can only be achieved through constant alertness, cooperation and understanding of each staff person's role.

Every employee, regardless of his or her assignment, is responsible for the security and discipline of the institution.  Maintaining order and discipline is of prime importance and must be done without fear or favor, both among the inmates and employees.

The most unpredictable things happen in prisons when they are least expected.  In most cases, it is because some employee becomes careless in the performance of his/her duty.  No employee should be lulled into a feeling of false security by thinking: "IT CAN NEVER HAPPEN HERE."

Only responsible behavior will guarantee the welfare of employees, the safe keeping of inmates and an effectively operated correctional facility.

## EMPLOYEE GENERAL RULES

This handbook provides a set of general rules for employees of the East Moline Correctional Center. Violation of these rules may result in criminal prosecution or disciplinary action. Only through rigid, but fair enforcement of these rules can the desired degree of security and successful programming be attained. It is the duty of each employee to enforce the rules governing the inmate population and to obey each of the rules designed for the employees. Success in reaching our goals depends to a great extent on the employee's own conduct and behavior. A close observation of the manner in which successful employees perform their duties will greatly benefit the inexperienced employee. Supervisors should assist and encourage new employees whenever possible in order to help them to perform their duties properly. It is also good policy to give all employees a word of encouragement.

It is important that violations of institutional rules be reported. Information and/or rumors of an unusual nature should be reported to your supervisor. However, it must be remembered that the best employee is not always the one who writes the greatest number of reports. Few reports are necessary under proper supervision and guidance. Employees must be honest in all their activities. Truthfulness in making reports and answering questions is expected.

These rules are by no means all-inclusive. They are meant to be general guidelines for employees to follow. In addition to these rules, each employee must familiarize him/herself with the policies and procedures of the department in which they work.

Bulletins and policies are also issued from the Warden's Office. These bulletins are then considered rules and must be followed accordingly. Work rules are also determined by the supplemental agreements between the Department of Corrections and the unions for those employees covered by the union contracts.

In addition to the aforementioned, every employee is expected to be familiar with the Departmental Rules and Administrative Directives which are issued by the Director or Deputy Directors of the Department of Corrections. All department heads have copies of these AD's and DR's and will make them accessible to each employee. Because there are changes in rules and policies from time to time, it is necessary that the rule book be continually updated. Therefore, each employee is responsible for being aware of changes made in current policies and procedures as issued through Departmental Rules, Administrative Directives, bulletins and departmental procedures.

Sergio Molina, Warden
East Moline Correctional Center

*Employee Rules and Responsibilities mutually agreed to on January 2, 1992 have not changed and are still in effect.

## EMPLOYEE GENERAL RULES

This handbook provides a set of general rules for employees of the East Moline Correctional Center. Violation of these rules may result in criminal prosecution or disciplinary action. Only through rigid, but fair enforcement of these rules can the desired degree of security and successful programming be attained. It is the duty of each employee to enforce the rules governing the inmate population and to obey each of the rules designed for the employees. Success in reaching our goals depends to a great extent on the employee's own conduct and behavior. A close observation of the manner in which successful employees perform their duties will greatly benefit the inexperienced employee. Supervisors should assist and encourage new employees whenever possible in order to help them to perform their duties properly. It is also good policy to give all employees a word of encouragement.

It is important that violations of institutional rules be reported. Information and/or rumors of an unusual nature should be reported to your supervisor. However, it must be remembered that the best employee is not always the one who writes the greatest number of reports. Few reports are necessary under proper supervision and guidance. Employees must be honest in all their activities. Truthfulness in making reports and answering questions is expected.

These rules are by no means all-inclusive. They are meant to be general guidelines for employees to follow. In addition to these rules, each employee must familiarize him/herself with the policies and procedures of the department in which they work.

Bulletins and policies are also issued from the Warden's Office. These bulletins are then considered rules and must be followed accordingly. Work rules are also determined by the supplemental agreements between the Department of Corrections and the unions for those employees covered by the union contracts.

In addition to the aforementioned, every employee is expected to be familiar with the Departmental Rules and Administrative Directives which are issued by the Director or Deputy Directors of the Department of Corrections. All department heads have copies of these AD's and DR's and will make them accessible to each employee. Because there are changes in rules and policies from time to time, it is necessary that the rule book be continually updated. Therefore, each employee is responsible for being aware of changes made in current policies and procedures as issued through Departmental Rules, Administrative Directives, bulletins and departmental procedures.

Gerardo Acevedo, Warden
East Moline Correctional Center

Mutually agreed to this 2nd day of January, 1992.

AFSCHE, Local 46

CU-500

INA-RC23 (Nurses)

Teamsters (Also on behalf of all Trade Unions).

2

EAST MOLINE CORRECTIONAL CENTER shall subscribe to the AMERICAN
CORRECTIONAL ASSOCIATION CODE OF ETHICS, which is as follows:

The American Correctional Association expects of its members
unfailing honesty, respect for the dignity and individuality of
human beings, and a commitment to professional and compassionate
service.  To this end we subscribe to the following principles.

Relationships with clients/colleagues/other professions/the public-
    -Members will respect and protect the civil and legal rights of
    all clients.
    -Members will serve each case with appropriate concern for all
    client's welfare and with no purpose of personal gain.
    -Relationships with colleagues will be of such character as to
    promote mutual respect within the professional and improvement
    of its quality of service.
    -Statements critical of colleagues or their agencies will be
    made only as these are verifiable and constructive in purpose.
    -Members will respect the importance of all elements of the
    criminal justice system and cultivate a professional
    cooperation with each segment.
    -Subject to the client's rights of privacy, members will respect
    the public's right to know, and will share information with the
    public with openness and candor.
    -Members will respect and protest the right of the public to be
    safeguarded from criminal activity.

Professional conduct/practices-
    -No member will use his official position to secure privileges or
    advantages for himself.
    -No member will act in his official capacity in any matter in
    which he has personal interest that could in the least degree
    impair his objectivity.
    -No member will accept any gift or favor of a nature to imply an
    obligation that is inconsistent with the free and objective
    exercise of his professional responsibilities.
    -In any public statement members will clearly distinguish between
    those that are personal views and those that are statements and
    positions on behalf of an agency.
    -Each member will be diligent in his responsibility to record and
    make available for review any and all case information which
    could contribute to sound decisions affecting a client or the
    public safety.
    -Each member will report without reservation any corrupt or
    unethical behavior which could affect either a client or the
    integrity of the organization.
    -Members will not discriminate against any client, employee or
    prospective employee on the basis of race, sex, creed or national
    origin.
    -Each member will maintain the integrity of private information;
    he will neither seek personal date beyond that needed to perform
    his responsibilities, nor reveal case information to anyone not
    having proper professional use for such.
    -Any member who is responsible for agency personnel actions will
    make all appointments, promotions or dismissals only on the basis
    of merit and not in furtherance of partisan political interests.
    (Adopted August, 1975 at the 105th Congress of Corrections).

## EMPLOYEE RULES AND RESPONSIBILITIES

1) It is the responsibility of each employee to read and to familiar-
ize him/herself and to comply with all Administrative Directives,
Department Rules, Institutional Directives, Employee Conduct Rules,
Warden's Bulletins, and written or verbal orders issued by proper
authorities.  These are available in Department Manuals and are
posted on Institutional bulletin boards in the form of bulletins
and memos.  Employees will be advised of new and revised Direc-
tives and Regulations.  Any employee who violates any directive,
regulation, written policy or procedure, or written or verbal order
is subject to disciplinary action.

2) Every employee is responsible for enforcing all rules and regula-
-tions.  When an employee observes an inmate in violation of any
rules or regulations, he/she is responsible for correcting the
behavior, counseling the inmate, and/or writing a Disciplinary
Report on the inmate, consistent with fairness and good judge
ment.  Disciplinary reports should be written for a serious rule
violation or a violation of State or Federal laws by an inmate.
The report may be brief, but it must contain specifics surrounding
the violation.  It must contain the correct name and register
number of the inmate.  The name, sex, race and badge number, as
applicable, of the reporting employee.  Such reports must be
completed by the employee before leaving duty on the date of the
violation.

3) If an employee has personal knowledge of or observes another
employee in violation of major rules or regulations, the employee
must report this to his/her supervisor.  All significant and/or
unusual events are to be reported to the immediate supervisor with
appropriate written reports submitted.

4) All staff are responsible for immediately reporting verbally to the
Shift Commander and to their supervisor any of the following
incidents or significant events, whether they are a participant or
a witness:  any disturbance;  an inmate's physical assault on
another inmate;  an inmate's physical assault on an employee;  an
employee's physical assault on another employee;  use of force by an
employee on an inmate;  an inmate suicide attempt;  escapes or
unauthorized absences;  inmate or employee deaths;  major property
loss or damage;  fires;  and any inmate or employee action which
could lead to criminal charges.  All such incidents must be properly
reported in writing by the employee to his/her supervisor on the
day of the incident.  A report is required regardless if the
incident occurs on grounds or away from the institution.  These
reports will then be properly forwarded through the chain of
command to the Warden.

5) All employees are to follow approved standards for personal groom-
ing.  Uniformed employees must wear their uniforms as prescribed,
including badge and name plate.  Non-uniformed employees shall be
expected to dress in good taste and in attire that is considered to
be appropriate for their respective assignments.  Uniformed
employees, unless authorized, shall be prohibited from wearing
their uniforms away from work other than to and from the facility.
Staff are expected to be neat and clean.  Grooming standards and
dress code are addressed in A.D. 03.02.110.

6) Each employee is issued an identification card which must be
carried at all times.  Uniformed personnel must carry their I.D.
cards on their person while on duty, but do not have to wear it if

4

they are wearing their name tag. Non-uniformed employees must wear their I.D. card prominently displayed on their outer most garment at all times while on institutional property. No employee shall allow any other employee to use his/her I.D. card. An employee must present his/her I.D. card to the gate officer if so requested. Any lost or stolen card must be promptly reported to the Major. Whenever the appearance of the employee changes so as to render the identification purpose of the picture invalid (such as growing a mustache), the employee shall secure a new I.D. card.

7) All uniformed security personnel must read the appropriate post descriptions. These are available in the Shift Commanders Office and are to be read and signed off on. Any questions about policy or procedures relating to a specific work assignment should be directed to the immediate supervisor.

8) All employees will at all times show respect for fellow employees.

9) Disorderly conduct during working hours or on institutional property, such as fighting, horseplay, arguments and all other acts which might tend to disrupt the harmony and order of the institution, and threatening or abusing any person by word or act is prohibited.

10) Except as approved by the Warden, employees will not bring on to institutional grounds, either on their person or in their vehicles, any of the following items: Knives, weapons, files, guns, rope, alcoholic beverages, drugs, tear gas devices, billy clubs, explosives, poisons, photographic equipment, recording devices, TVs, radios, other audio-visual items, unauthorized medication, or any other items considered to be contraband or which would pose a threat to the security of the institution.

11) All employees are advised against carrying large amounts of cash or valuable items (i.e. jewelry, checks, etc.) on their person or in their vehicles. A limit of $50.00 currency is normally to be followed. Any personal loss should be reported in writing immediately to your supervisor and the loss is the employee's responsibility.

12) Consuming or being under the influence of alcoholic beverages or any narcotic, hallucinogenic drug or other non-prescribed drugs during working hours, or being in possession of any of the above on institutional grounds is prohibited.

13) Employees entering or leaving the Main Gate will remove sunglasses, ski masks, or any other facial obstructions for identification purposes.

14) All institutional employees entering or leaving the grounds except the Warden are subject to a frisk search by Security personnel. Also, all employees on institutional grounds are subject to a body search and/or strip search when there is reason to believe that they have contraband on their person. Strip searches may only be authorized by the Warden or his designee. Employee's possessions and personally owned vehicles are also subject to search with the employee and/or union representation present. The refusal of an employee to submit to a frisk search or to a properly authorized body search or strip search may subject the employee to disciplinary action.

15) All employees are expected to behave in a responsible manner and to perform their assigned duties efficiently and effectively. Employees shall conduct themselves in a professional manner at all times while on duty so as not reflect unfavorably on the Department and shall not engage in conduct unbecoming an employee or which impairs the operation of the Department. Employees shall not engage in conduct which impairs their abilities to perform their duties and responsibilities in an impartial manner. Employees shall notify their supervisors when their job duties may give rise to a conflict of interest.

16) Employees are required to obey all Federal, State, and local laws; applicable court decisions and orders related to the performance of their job duties. Convictions or violations of any State or Federal statutes, as well as, violation of Personnel or Employee Conduct Rules may be cause for disciplinary action and/or dismissal. Employees must submit a written report within five (5) working days of any arrest, indictment, or conviction for a felony or a misdemeanor, other than a minor traffic offense, to their immediate supervisor. Driving under the influence of alcohol and other alcohol arrests and/or convictions related to motor vehicles are not considered minor traffic offenses. The report shall specify the facts forming the basis for the arrest, indictment, or conviction and the caption of the case. This information is to be forwarded through the chain of command to the Warden.

17) No employee is permitted to knowingly socialize with inmates who are currently in the custody of any State correctional institutions or facilities, parolees, mandatory or correctional releasees, or any of their relatives or close associates except under special circumstances which are approved by the Warden. Any relationship which existed prior to or during your employment or inmate incarceration must be reported to the Warden.

18) An employee may not visit an inmate at any correctional facility unless the inmate is a member of the employee's immediate family. If such a relationship does exist, the employee must notify the Warden of this institution prior to attempting to visit the inmate.

19) Employees may not purchase or bring in items for an inmate without permission of the Warden. An employee may not knowingly hire an inmate to perform any service and may not accept gifts, bribes, or gratuities from inmates, their relatives or friends, or from anyone who has, or expects to have, business dealings with the Department of Corrections. Employees shall not accept or request anything of value as an inducement to perform or not to perform any act related to their employment.

20) Granting special privileges or showing partiality to an inmate is prohibited. Special needs or problems of inmates are to be referred to the assigned counselor or other appropriate staff member.

21) Employees may not lend money to an inmate or place money in the Trust Fund of any inmate without the approval of the Warden.

22) No inmate may make purchases from his Trust Fund for any employee.

23) Employees shall not trade, traffic with, or improperly aid or abet any unauthorized actions by inmates.

24) Keys are not to be given to inmates except as authorized by the Warden.

25) Employees are not to give inmates their home address or telephone number or any other employee's home address or telephone number.

26) Employees shall not convey any message, written or verbal, from one inmate to another or to any person outside the institution.

27) When searching an area, the employee must ensure that no damage is intentionally and/or negligently done to any property and will restore the area as close as possible to its original state after the shakedown is completed.

28) Employees are prohibited from damaging or destroying inmate mail. Authorized personnel may read and spot-check incoming and out-going non-privileged mail for contraband and possible threats to the security and safety of the institution. Employees will not bring in or take out of the institution any inmate's mail, with the exception of those individuals who are authorized to pick up and

deliver institutional mail to the U.S. Post Office.

29) There will be no discrimination among staff or inmates with regard to disciplinary action, transfers, assignments, and other such matters on the basis of sex, race, religion, creed, color, and/or national origin, and/or union activity.

30) Corporal punishment or mistreatment of inmates is strictly prohibited. Corporal punishment is defined as striking, pushing or shoving a person for the purpose of causing pain or discomfort; the improper use of profane or abusive language; or any pressure which may be injurious to an individual. Use of force against any inmate, other than the necessary minimum force to protect him/herself from injury or injury to other employees or inmates or to prevent damage to property or to prevent escape, is prohibited. Also, employees are not authorized to withhold food, medical services or other essential services from inmates. The Warden or Duty Warden must be notified if the use of force is anticipated or if force is used.

31) All personnel while on duty will refrain from fraternizing with inmates (i.e. watching television, playing games, etc.)

32) All personnel are prohibited from reading unauthorized materials (i.e newspapers, books, etc.) while on duty.

33) All employees are prohibited from sleeping or not being alert while on duty.

34) Gambling at any time on institutional property is prohibited.

35) All employees are prohibited from smoking where food is being prepared and served, designated hospital areas, any areas where there are combustible materials, and any other areas so designated.

36) Employees will receive no personal services (hair cuts, etc.) while on duty except during lunch periods with approval of your supervisor.

37) Any employee who for health reasons brings prescription medication into the facility must notify his/her supervisor of this situation immediately. They should bring in only that amount of medication which is needed during their work day. Said medication should be accompanied by the prescription label or a copy of the prescription. Any employee who is taking medication which might adversely affect the employee's behavior, job performance, etc. must advise his/her supervisor of this.

38) All employees are prohibited from engaging in political activities during work hours or on institutional property. Employees are also prohibited from engaging in political activities while in uniform. This includes conducting meetings, soliciting money, selling or distributing tickets, literature, or petitions.   -

39) Any employee wishing to bring visitors onto institutional grounds must have permission from the Warden or Duty Warden. Requests for approval of visitors, including those employed by the Department of Corrections, must be submitted in advance through the appropriate department supervisor to the respective Assistant Warden or the Warden.

40) The Warden and his designated representatives are the only employees designated as public information spoke persons and who therefore are authorized to contact, communicate, and correspond with representatives of the news media concerning all activities of the institution. All inquiries from news media staff pertaining to the operation and activities of the institution and the Department of Corrections are to be referred to the Warden.

41) Employees who have access to confidential information and records for employees and inmates are expected to preserve and maintain

7

confidentiality of these records. This includes refraining from discussing or divulging confidential information about employees and/or inmates in public or in the presence of other staff and/or inmates.

42) All employees are responsible for the safety, security and maintenance of order within the institution. Therefore, regardless of title or function, each employee must report any incident or information based on personal knowledge which comes to his/her attention that might affect the health, safety, welfare, good order, or security of inmates or other staff. These reports must be dated and clearly state facts as differentiated from conclusions, hearsay, and personal interpretations.

43) Employees are to follow all safety regulations and instructions and are to refrain from any action which could create a dangerous or potentially dangerous situation for themselves or for other persons.

44) An employee may not cause or permit the burning of paper, wood, trash, or other materials on State property.

45) All employees, including those off duty, are subject to call on a 24-hour a day basis. Those who are non-security may be assigned to security duties in an emergency situation.

46) All employees not reporting to work on their scheduled day shall notify the Shift Commander or their supervisor at least one hour prior to starting time/Roll Call, unless a last minute emergency situation develops. The Shift Commander shall then notify the employee's supervisor of the proposed absence. Absence of an employee for five (5) consecutive days without any notification to the institution may be cause for discharge.

47) All employees who are late due to emergencies will report, upon arrival, to their supervisor. Employees who do not arrive within one (1) hour of their scheduled start time will be considered as an unauthorized absence as compared to tardy.

48) Those employees who sign daily Sign In/Sign Out Sheets are required to document the exact time of arrival and departure from work as opposed to routinely filling in their shift hours.

49) Intentionally falsifying or causing the falsification of any personnel or working records (including Sign In/Sign Out Sheets) of the institution is prohibited.

50) Call-ins for use of sick time of more than four consecutive days will require a physician statement.

51) No employee shall leave his/her work assignment before quitting time or before being properly relieved, if a relief is scheduled, or before being granted permission to do so by a supervisor.

52) Employees are permitted no more than one-half hour for meal break which must be taken in one consecutive period and are to immediately return to their assignment after this time. Employees shall not loiter or congregate on other assignments of fellow employees during working hours. Employees are not to leave the institutional grounds during their assigned work hours unless authorized to do so by the Warden, an Assistant Warden or authorized supervisor.

53) Full time employees shall not engage in non-state employment or accept non-state compensation or honorariums except as approved by the Warden.

54) Employees are required to provide the employer with his/her current telephone number and address. Any changes shall immediately be reported to the Personnel Office and Department Head. This inform-

ation will then be conveyed to the Major to be kept on file for use in case of an institutional emergency.  This information is to be considered confidential.

55)  Employees will report Vehicles and license numbers they drive or park on institutional grounds to the B. of I. and will be issued stickers.  Any changes should be immediately reported to the B. of I.

56)  Employees are responsible for the security of their personal vehicles and assigned state vehicles while on State property. Vehicles must be locked with keys removed except when being driven. All vehicles on institutional grounds are subject to search.  All vehicles are to be parked in designated areas only.

57)  The State telephone system shall only be used for conducting official State business.  Employees may utilize the institutional telephone to make personal local telephone calls which are of an and emergency nature when a public pay phone is not accessible. Employees may not make long distance telephone calls of a personal nature utilizing institutional phones unless the call is a collect call to the outside party or the call is billed to the employee's home phone.  All personal telephone calls are to be brief and should not interfere with the employee's performance of his/her job duties.  Prior to making a call, the employee is required to obtain clearance from the Shift Commander or appropriate supervisor who will transmit approval to the Armory or Switchboard.  Violation of the use of telephones may result in disciplinary action, including reimbursement as outlined in A.D. 01.02.109.  This rule also applies to the unauthorized use of telephone credit cards and facsimile machines.

58)  Employees may not duplicate institutional documents or remove any documents from the institution unless they first receive approval to do so from their department supervisor or Shift Commander.  The use of any copying machine for personal business is not allowed.

59)  Procedures for the inventory of tools must be followed.  All employees on an assignment with tools are responsible for the supervision and inventory of the tools.  Loss or miscount of tools must be reported immediately to the Shift Commander and be documented by completing a DC 434 report.

60)  Procedures for the control of keys must be followed as described by Institutional Directive.  Employees are responsible for maintaining possession of all authorized keys and advising appropriate personnel when keys are transferred to another employee or if they are lost or misplaced.  Keys and locks may be changes only upon authorization of the Warden.

61)  Unauthorized, personal or private use, abuse, or consumption of state property or equipment including vehicles, credit cards, State vouchers, etc. is prohibited.  This includes the use of State employees or inmates.  Employees are also prohibited from damaging or destroying state property, inmate property or other employees' property.  Restitution may be required by the employee when property is lost or damaged.

62)  Any employee who experiences or learns about damage, loss or abuse of state equipment must promptly report this matter to his/her supervisor prior to leaving the institution.  The loss of theft of keys, weapons, tools, or vehicles must be immediately reported to the employee's supervisor and the Shift Commander.  Depending on the circumstances involved, employees may be subject to disciplinary action due to deliberate destruction, negligence or loss of state property or equipment.

63)  State property may not be moved from one location to another without proper administrative approval.  The movement of any equipment items must be reported to the property control clerk.

state property will not be removed from the institutional grounds without the approval of the Warden or his designee.

64) Causing or engaging in any interruption of or impediment to work is prohibited.

65) Insubordination by refusing to carry out a supervisor's instructions or refusing to follow the lawful directive, policy or procedure issued by the employee's supervisor or higher level staff person is prohibited. The last order from a superior officer is to be followed.

66) In the event of an escape, an employee will have only those weapons authorized by the Warden and issued by the institution through supervisory staff.

67) Employees are not to take to their assignments any items which, if stolen, would constitute a threat to the security or safety of staff or inmates. Personnel possessing purses, wallets, and keys are not to leave these items in areas accessible to inmates. Desks and files should be locked at all times when they are not under the direct supervision or control of an employee.

68) An employee who has an accident or experiences illness while working at the institution must report the occurrence promptly to his/her supervisor. Accident reports must be completed in the case of an accident. The report is to be filed before the end of the employee's shift.

69) All employees who drive state vehicles must possess a valid vehicle driver's license for the type of vehicle being operated. Also an employee who has been issued a State vehicle may not allow another State employee to drive the vehicle unless that employee presents a valid driver's license. Department vehicles and equipment will be used only as defined in relevant Institutional Directives. Any traffic violations or parking tickets received while using the vehicle must be reported in writing to the employee's supervisor.

70) Employees driving institutional vehicles off grounds are to utilize vehicle seat belts. Likewise, all front seat passengers are to properly utilize seat belts.

71) Each department head shall schedule at least monthly meetings with his/her staff. Minutes will be kept and submitted to the appropriate Executive Staff member and to the Warden.

72) Supervisors must complete performance evaluations on all assigned employees under their supervision as required by Departmental Regulations and institutional policy. Performance evaluations must be completed in a timely manner and must present realistic and measurable goals. Also, quarterly reviews are to be performed, as needed and required on a timely basis.

## GENERAL EMERGENCY PROCEDURES

It is important to remember that even in the best managed correctional facilities, situations arise that threaten life safety. These threats can be either natural or man-made and can affect any one or more of us. The best course of action to maintain life safety is prevention and/or appropriate action if a threat should occur. Prevention can be accomplished by simply performing your duties in accordance with post descriptions, policy and procedure. Fires may result due to negligent or sloppy housekeeping. Improper key control might result in inmates taking control of an area they should not have had access to. Failure to report or deal with a small incident may lead to a generalized crisis, etc.

Knowing how to deal with a situation, should one develop, can minimize its affect and lead to early intervention and/or dissolution. The following generalized procedures are offered for that purpose.

It is important for non-uniformed staff to remember that during an institutional crisis, the Shift Commander and/or Tactical Unit Commander may have to issue them specific orders to follow. The only higher institutional authority would be the Chief of Security, Assistant Wardens and Warden.

All telephone use and radio traffic will be restricted to emergency use only.

### Employee Evacuation of Buildings

Diagrams indicating evaluation routes are posted in all buildings. Staff should familiarize themselves with these on all building assignments.

In the event an evacuation is ordered for your building, ensure that you inform those people who are in your area who may not be aware of the order. Systematically close windows and doors of already evacuated areas. In a calm manner, exit the building via the closest and most direct established route. If your primary route of exit is inaccessible, use the secondary route.

For purposes of accountability, evacuated staff members should report to the Dietary Building. Each office or departmental supervisor is responsible to account for staff under his/her charge.

The following information should be reported immediately to the ranking security officer on the scene:

    1)  Any injuries sustained;
    2)  Any staff members still in the building or unaccounted for;
    3)  Location of any non-secure valuables or restricted materials.

Immediate medical attention will be given for injuries sustained. Do not attempt to re-enter the building unless the ranking security officer has so instructed.

Appropriate reports, including incident report form DC 434, should be prepared and submitted in accordance with A.D. 01.12.105.

### Fire and/or Smoke

In the event a fire or heavy smoke occurs on your assignment, or you observe such an incident, immediately notify the Armory at extension 400.

If you are not aware of the location of fire fighting equipment, the posted building diagram will indicate same.

You do not have the authority to evacuate inmates until so instructed by the Shift Commander or higher authority. Inmates sometimes cause fires as a diversion in order to escape or for some other devious reason. Before an evacuation can be effected, security precautions must be taken. The Armory Officer will have dispatched additional staff and equipment to the fire.

Immediate medical attention will be afforded any injuries sustained. Violation reports (if applicable) and incident reports must be submitted.

## Escape

In the event you cannot locate an inmate under your supervision, immediately notify your supervisor. Recount (positive I.D.) your inmates and search your assignment. Contact unauthorized locations the inmate may be, i.e., recreation programs, commissary, library, etc. If you are unable to locate the inmate, contact the Shift Commander immediately and stand by for further instruction.

If you witness an actual escape attempt, immediately notify the Armory at extension. 400 and/or the Shift Commander. If possible, attempt to foil the attempt by offering verbal commands to halt and/or physical restraint. Do not take any unnecessary chances! Attempt to note direction of flight, clothing attire, vehicle description, license number, etc.

Be prepared to submit appropriate violation report(s) and submit an incident report.

## Inmate Sit-Downs

Inmate sit-downs are generally non-violent inmate protests against real or imaginary inmate grievances.

In the event of a sit-down, notify your immediate supervisor and the Shift Commander immediately. Secure your assignment to maximum security and confine all inmates to their room or assignment. Lock all doors and gates. Prevent the sit-down from spreading into additional areas of the institution.

Once your living unit or assignment is secure, dispatch available staff under your charge to the Shift Commander. Take a formal count of your assignment. If you are in the vicinity of the sit-down, do not attempt to communicate with the inmates involved other than initial commands telling them not to participate.

At the termination of the sit-down, prepare and submit an incident report and appropriate inmate disciplinary reports. Always attempt to identify inmate leaders.

## Tactical Unit

The East Moline Correctional Center Tactical Unit is highly organized, and its members receive intense training at regularly scheduled training sessions. The Tactical Unit is trained in approved methods of crowd control, use of chemical agents and protective gear, special weaponry restricted to their use, self defense, including use of riot baton, use of force, physical conditioning, and use of emergency equipment.

Regular attendance at scheduled training sessions and proficiency in all areas of required training are prerequisites to unit membership. Members are required to respond to all emergency mobilizations.

Tactical Unit participation is voluntary in regard to attempting to gain membership.

The Tactical Unit may be activated in times of emergency at this or other facilities or to accomplish some special detail which requires their special training.

## Hostage Situation

It is imperative that you take immediate action if you observe or become aware of a hostage situation developing. If you are able to intervene and halt the attempt, you should do so. Intervention might include giving verbal commands, securing a door or gate, or using physical restraint. Call for assistance; if not the Armory, then somebody who has access to a telephone or radio and can relay the call for assistance.

If a hostage(s) has actually been taken, all assignments and details will implement maximum security. All inmates will be secured in their rooms or building assignments and you should take a formal count of inmates under your supervision. Inmates not involved in the incident will be cleared from the area and escorted to an area(s) designated by the Shift Commander. It is imperative that other areas of the institution do not become accessible to inmates involved in the incident. It is equally important that inmates not involved don't become involved. If the Shift Commander or higher authority orders you to move inmates from one area to another location, select a route that does not lead near the incident and that is in view of outside patrols.

Supervisors of outer-perimeter details should not attempt to reenter the perimeter unless so ordered by the Shift Commander or higher authority. Rather, they should take their details directly to the Main Gate; account for all inmates on his/her detail; verbally report his/her status and inmate count to the Shift Commander, and stand by for further instructions while maintaining control of his/her detail.

Supervisors of inner-perimeter details and other outdoor activities should not attempt to let the inmates return to their building assignment. Rather, they should return to the outside garage and follow the same generalized procedures as stipulated for outer-perimeter details.

All available staff report to the Shift Commander for appropriate deployment.

If you are in the vicinity of the incident, do not attempt to communicate with inmates involved. Hostages lose identity and have no authority.

## If You Are Taken Hostage

If is appears that you may be taken hostage, attempt to secure yourself in an area where communications (Telephone, Radio) or a route of escape is accessible. If necessary, destroy radio, telephone, and keys before they fall into the hands of the inmates. If you are taken hostage, make observation of the incident that caused the hostage situation. Observe and identify any other hostages. Observe and identify all inmates involved in the situation. Observe any weapons the inmates have. Observe any injuries to staff and/or inmates. Observe any security control devices in the hands of inmates. Remember time and sequence of events. REMAIN CALM, DO NOT ACT OR APPEAR UPSET. BE PREPARED FOR A LONG WAIT. FOLLOW INSTRUCTIONS FROM YOUR CAPTORS AND BE COOPERATIVE. ONCE TAKEN HOSTAGE, DO NOT ARGUE OR BECOME HOSTILE. DO NO SPEAK UNLESS SPOKEN TO. KEEP QUIET DURING NEGOTIATIONS. REST WHEN POSSIBLE. NEVER MAKE SUGGESTIONS TO YOUR CAPTORS. Point out to captors anyone who may be in need of medical attention. NEVER TURN YOUR BACK ON YOUR CAPTORS UNLESS INSTRUCTED TO DO SO. DO NOT TAKE WRITTEN NOTES. USE ONLY MEMORY TO RECORD INFORMATION.

ONCE A RESCUE ATTEMPT BEGINS:

1. HIT THE FLOOR AND LIE FLAT 2. COVER YOUR HEAD 3. REFRAIN FROM ANY QUICK MOVEMENTS!

During a rescue attempt, chemical agents will probably be used. Do not panic. Close your eyes and do not rub them. Let your eyes tear freely. Take short, light breaths.

When the hostage situation is over, all involved staff will submit incident reports in accordance with A.D. 01.12.105 and applicable inmate violation reports. Immediate medical attention will be given to any injured staff and/or inmates.

## Riots

In the event of a riot (as may be the case with hostage situations), the disturbance must be contained and isolated at its point of origin. All assignments and living units must implement maximum security measures. Do not attempt to stop a riot by yourself. Once a riot has begun, it will require an organized effort to terminate it. Notify the Armory at extension. 400 immediately with information as to the location, number of inmates involved, types of weapons, staff injured and/or in distress, etc.

Implement the same generalized procedures as outlined in "Hostage Situations", as a riot may very well lead to a hostage taking attempt. As in all crisis situations, radio traffic and telephone use is restricted to emergency use only. Radio air time and telephone lines will be needed by command staff. It is important that non-command staff do not make command decisions. DO NOT TAKE THE SITUATION INTO YOUR OWN HANDS. Attempt to get non-involved inmates out of the area and into a secure location.

At the termination of the riot, immediate medical attention will be given to staff and inmates. Incident reports and appropriate inmate violation reports will be submitted by appropriate staff.

## Tornadoes and Severe Storms

In the event of a tornado or severe storm and upon orders of the Shift Commander, all outside details will return to their building assignments. All inmate movement will cease. Available staff will report to the Shift Commander to be deployed where needed. Secure your assignment to maximum security and take a formal inmate count. Instruct inmates to take cover in their rooms beneath their bed or mattress.

Inmates in buildings other than their living units should be instructed to take cover near the Southwest wall and stay clear of windows. If a tornado is imminent, staff should take cover.

## Suicides

An inmate may threaten or attempt suicide in an actual attempt to take his own life, or a fake attempt may be made as a diversion for some devious reason. Even though risk is involved, a suicide attempt or threat must be responded to immediately.

Before entering the room or cell, look at the inmate's hands to see if he is holding a weapon. If he is, give him a verbal command to drop it. In any event, you will have to enter the room or cell. If he still has the weapon, you will have to disarm him. If the inmate is hanging, you will have to release him from that position. If CPR is required and/or mouth-to-mouth resuscitation, administer same (in some instances a serious suicide victim will have gagged himself by putting a rag in his mouth). If the inmate has caused lacerations to his body, apply direct pressure to the wounds and/or first aid as needed. Immediately notify the Armory at extension. 400 and advise same of the medical emergency.

In the event of a successful suicide attempt, immediately alert the Armory at extension. 400. The inmate is not to be removed, the content of the cell is not to be disturbed, and the room door is to be locked and sealed. This is mandatory in the event of a subsequent investigation made by any law enforcement agency.

All staff involved in a threat, attempt, or an actual suicide must submit an incident report.

## RESPONSE TO MEDICAL EMERGENCIES

In the event you discover a critically ill or injured employee/inmate and assistance is needed, you can obtain assistance by calling the Armory at Extension 400 or by having another employee radio a 10.33 (Emergency) giving the location of the emergency.

As an employee of East Moline Correctional Center, you need to familiarize yourself with the following responses to medical emergencies:

1. Respiratory Arrest/Choking

    a. Signs and Symptoms:  Individual gesturing he/she is choking, high pitched noises while inhaling, increasing respiratory difficulty, cyanosis (bluish complexion).

    b. Response/Action

        1)  Respiratory arrest – mouth-to-mouth resuscitation.

        2)  Choking

            If an individual can talk or is coughing, no action is required.
            If an individual is conscious, but cannot talk, perform the back-blow, abdominal thrust maneuver until the foreign body is dislodged or until the individual becomes conscious. If the individual becomes unconscious, continue back-blow –abdominal thrust maneuver and mouth-to-mouth resuscitation until foreign body is dislodged.  Transport to Health Care Unit.

2. Chest Pain/Heart Attack

    a. Signs and Symptoms:  Tightness in chest, shortness of breath, profuse sweating, pain in jaw, left shoulder and left arm, nausea and vomiting, feeling of impending doom.

    b. Response/Action

        If an individual is conscious and displays signs and symptoms, contact the Armory and transport to the Health Care Unit immediately.

        If an individual is unconscious, and pulseless, institute cardiopulmonary resuscitation (CPR).  Transport to Health Care Unit immediately.

3. Seizure

    a. Signs and Symptoms:  Possible complaint of strange smell or seeing colors, jerking of extremities, unconsciousness, possible incontinence of urine and feces, possible brief period of no breathing, confusion/disorientation.

    b. Response/Action

        During the seizure – Attempt to protect the individual from hurting himself/herself by loosely holding the head and extremities to prevent flailing about.  If possible, turn the head to the side so oral secretions can drain from the mouth. After the seizure – Keep patient warm, observe for respirations, there may be a brief period of apnea (no breathing) but then followed by spontaneous respirations.  If no spontaneous

respirations, begin mouth-to-mouth resuscitation, clear mouth
of oral secretions, provide emotional support.

4. Burn

    a. Signs and Symptoms: Large or severe burned area of body,
impaired respirations, shock - cool, clammy skin, pale color,
rapid, irregular pulse, confusion; unconsciousness.

    b. Response/Action

       Observe for respiratory distress, if necessary, institute
mouth-to-mouth resuscitation, transport immediately to Health
Care Unit, provide emotional support.

5. Hemorrhage

    a. Signs and Symptoms: Loss of large amounts of blood from:

       Mouth/Nose, rectum, laceration. Cool, clammy skin; rapid
shallow respiration; pale color; confusion/disorientation.

    b. Response/Action

       Laceration - Apply pressure to area to aid in decreasing blood
flow, transport to Health Care Unit.

       Mouth - Observe for choking and transport to Health Care Unit.
Nose - Observe for choking; tilt head back slightly, apply
       pressure to nostrils to aid in clot formation,
       transport to Health Care Unit.
Rectum - Transport to Health Care Unit.

6. Stroke

    a. Sign and Symptoms: Unconsciousness, confusion/disorientation,
possible incontinence of urine/feces, possible loss of speech
and control of extremities on either right or left side of body.

    b. Response/Action

       Observe for respiratory distress, keep patient warm, provide
emotional support, transport to Health Care Unit.

7. Chemical Dependency

    a. Signs and Symptoms: Confusion/disorientation, decreased
coordination, uncontrollable tremors (shaking), loss of
appetite/weight loss, possible seizure activity, allergy type
symptoms with persistent eye and nasal discharge.

    b. Response/Action

       Contact the Armory at Extension 400.

8. Mental Illness/Retardation

    a. Signs of mental illness include but are not limited to extreme
changes in behavior or activities such as:

       1. Unusual aggressiveness or passiveness;

       2. Inability to engage in normal activities or a more frenzied
          type of activity.

       3. Marked restlessness or withdrawal;

       4. Inability to concentrate on job, educational, or vocational
          assignments;

    5.  Unusual states of nervousness;

    6.  Insomnia, or choosing to spend an excessive amount of time sleeping;

    7.  Preoccupation with sexual behavior;

    8.  Lack of attention to personal hygiene or appearance; and/or

    9.  Loss of appetite and significant unexplained weight loss.

b.  Symptoms of mental illness may also include an apparent deterioration in emotional responses such as:

    1.  Inappropriate laughter

    2.  Depression, uneasiness, fearfulness

    3.  <u>Unprovoked</u> outbursts of excitement, temper tantrums, <u>assaultive</u> tendencies.

c.  Mental Retardation

    1.  Signs and Symptoms:  Slow to understand simple instructions,

        "slow speech", poor coordination, involuntary movements of extremities.

    2.  Response/Action

        Contact the Clinical Services Supervisor at Extension 310 and/or Crisis Team member through the Armory at extension 400 who will then contact the Psychiatrist/Psychologist.

9.  Falls

    If an employee/inmate sustains a fall which results in injury to the head or neck, DO NOT MOVE PERSON.  Contact the Armory who will respond medical assistance to the site of the fall.

## GENERAL INFORMATION

### FROM THE DEPARTMENT OF PERSONNEL FOR THE NEW EMPLOYEE

This information is for your use and can be read at your leisure. It is meant to be a brief description of the benefits and policies offered by the Department of Corrections.

CERTIFICATION  Upon beginning work, if you are hired on a probationary permit, and when you enter a probationary period following promotion, you are attempting to achieve certification. After two and one half months, your supervisor is obligated to complete a performance evaluation, which is a report on how you are doing and the same occurs three months later for new probationary appointments. The probationary period for promotions is a four month period before you achieve certification and new hires six months (with the exception of Correctional Officers which takes 7 1/2 months to achieve certification.

PERSONNEL RECORDS  There will be personnel file kept in the Personnel Office at the Correctional Facility, in the Department of Corrections Central Personnel Office and in the Department of Central Management Services. The Personnel File will contain only work related information. This file may be reviewed by you in the Personnel Office between the hours of 8-4, Monday through Friday. You should receive a copy of any disciplinary action placed in your file.

SICK LEAVE  Sick leave is earned at the rate of one day per month. Sick leave may be used for personal illness; serious illness, disability, injury or death of a member of the immediate family. For purpose of definition the "immediate family" shall be husband, wife, mother, father, brother, sister, children or any relative living in the employees immediate household for whom the employee has custodial responsibility. Sick time may also be used in the event of the death of grandrelations and parent and child-in-laws. Abuse of sick time will be result in the employee being placed on "Proof Status" – this means that any absence using sick time must be verified by a Physician's Statement.

VACATION DAYS  Below is how vacation time can be earned. Vacations may be taken in not less than 1/2 days increments. It may accumulate for only a 24 month period.

|                | |
|----------------|---------|
| Up to 5 years  | 10 days |
| 5-9 years      | 15 days |
| 9-14 years     | 20 days |
| 14-19 years    | 22 days |
| Over 24 years  | 25 days |

HOLIDAYS  All employees shall have time off with full salary on the following holidays.

| | | |
|---|---|---|
| New Year's Day | Memorial Day | Thanksgiving Day |
| Martin Luther King Day | Independence Day | Friday after Thanksgiving Day |
| Lincoln's Birthday | Labor Day | Christmas Day |
| Washington's Birthday | Columbus Day | General Election Day (on which members of the House of Representatives elected) |

Where employees are scheduled to work on a holiday, equivalent time off will be granted within the following 12 month period at a time convenient to the employee and consistent with the agency's operating needs.

PERSONAL DAYS  Employees on the payroll as of January 1 of each year are entitled to 3 days of personal business.  Personal days should be arranged in advance except for emergency situations.  Personal days cannot be taken in less than 2 hour increments.

If you are not employed on January 1, below is how you accumulate personal days:

|  |  |
|---|---|
| January 1 – February 14 | 3 days |
| February 15 – April 15 | 2 1/2 days |
| April 16 – June 15 | 2 days |
| June 16 – August 15 | 1 1/2 days |
| August 16 – October 15 | 1 day |
| October 16 – December 15 | 1/2 day |

Employees using no sick time during the calendar year will receive an additional Personal Day for the following year.

INSURANCE  The State of Illinois offers Cigna Health Insurance and John Hancock Life Insurance for you and your dependents.  There are also HMO's available.  They are Health Alliance, Maxicare and Heritage National.  For more information, contact the Personnel Office at extension 502.  Along with your health insurance anyone covered by one of the above plans also received dental and vision insurance at a small charge.  Employees are given life insurance based on a year's annual salary at no charge by the State of Illinois.  Optional coverage up to 5 years of salary may be purchased.

PAY  You are paid twice a month, on the 15th and the last day of the month.  You may also make arrangements for direct deposit through the payroll office.  Deductions will be made from your check for Federal and State Income Tax, Social Security and after 6 months of employment, Retirement deductions will be made.  Upon your request, deductions will be mae for U.S. Savings Bonds, Insurance, Union Dues, Credit Union and Deferred Compensation.

OVERTIME  Those who are eligible for overtime are paid either by cash or compensatory time off.

JURY DUTY  You are allowed time off, with pay, for Jury Duty, but you must turn over any fee you receive for such duty.  Prior to Jury Duty contact the Payroll Office for instructions as to what you need to do prior to the time you are to report for Jury Duty.

LEAVE OF ABSENCE  To apply for a Medical Leave of Absence (including maternity) follow these steps:

STEP 1:  Have your doctor complete a Physician's Statement which can be obtained in the Personnel Office.

STEP 2:  When approved by your Supervisor, report to the Personnel Office with completed statement.

STEP 3:  Personnel initiates the paperwork for Warden's signature and Director's approval or denial.

STEP 4:  When on leave of absence, you must submit a Doctor's statement to the Personnel Office.

STEP 5:  When returning to work, you must submit a Doctor's statement releasing you to full duty without limitations.  If you have restricted duty, report to the Personnel Office a few days before your return to limited duty.  Limited duty can only for a period of 90 days.  Make sure you report to the Personnel Office to sign your return from leave of absence form.

OTHER TYPES OF LEAVE  General, Education, Military, Personal, etc., contact the Personnel Office for more information.  Employees who have their spouse covered under the health insurance program may be eligible for a Maternity/Paternity Leave of Absence.  This is a 10 day leave of

absence (with pay) for those employees who are expecting a new-born. Contact the Personnel Office as soon as possible after becoming aware that you are expecting a baby in order to have the proper forms completed within the time frame necessary to qualify for this type of leave.

PROMOTIONS   You must be or have been a certified employee to be eligible for promotion.   To receive a grade for promotion, submit a CMS100B (Promotional Application Form) which can be obtained in the Personnel Office.   Your application must be submitted to the Central Management Services, Bureau of Personnel for grading.   Vacancies are posted on all Bulletin Boards.   At that time if you are interested in the position submit your application to the person indicated on the posting.

WORKER'S COMPENSATION   All employees are covered by the Worker's Compensation Act which provides benefits should you be injured or become ill as a result of your employment.   You should report to your supervisor any illness or injury.   Your supervisor should send you to the Health Care Unit and also to the Worker's Compensation Coordinator.

DISCIPLINARY ACTION   There is a formal grievance procedure to follow if you feel you have been unfairly disciplined that is in accordance with the Union Contract or Personnel Rules, which you can review in the Personnel Office.

RETIREMENT   Another benefit comes to you by way of the Retirement System which offers a means of financial security during your old age.   The system also provides disability protection for those who have been contributing members to the Retirement System for 18 months.   If you eligible for disability you will receive 50% of your monthly income for 1 year for every two years you have paid into the system.

UNION   A number of employees are covered by AFSCME or Illinois Nurses' Association.   For more information contact your union representative.

## MISCELLANEOUS

### SERVICE CONNECTED INJURY

In the event of a service connected injury, the following procedures shall be followed:

a. Employee reports to Health Care Unit.
b. Employee or Health Care staff shall notify employee's supervisor.
c. Once the initial evaluation, treatment and/or stabilization has been effected, the employee is to be referred to either an acute care facility or his own physician, whichever is medically appropriate.
d. Health Care staff will furnish employee with Worker's Compensation Booklet and Injury Report Form.
e. Health Care staff may assist the employee in completing the Injury Report forms which are submitted to employee's supervisor by the employee.
f. Supervisor will complete Injury Report form provided by Health Care staff. A DC 314F time slip will be completed by the employee and submitted to the supervisor on the day of the injury except in an emergency situation. The employee must have the supervisor's approval prior to leaving the institution. The supervisor will forward all injury reports and time slips to Timekeeping.
g. Injury reports are forwarded to the Division of Rick Management.
h. If the employee expects to be off work for an entire pay period or longer, it is suggested that he/she request a leave of absence. A written request for a leave of absence should be forwarded to the Personnel Office.

### DISABILITY LEAVE OF ABSENCE

If the employee requests a disability leave of absence for an illness or injury, the following procedures shall be followed:

a. Employee informs Personnel of a request for a service or non-service connected leave of absence.
b. Personnel will furnish a Physician's Statement Form, CMS-95, to the employee.
c. Employee will have his/her physician fill the form completely. The statement must be signed by the physician personally. Nurses' signatures or signature stamps will not be accepted.
d. The complete Physician's Statement Form shall be returned to Personnel as soon as possible.
e. The Warden will approve or disapprove the leave.
f. If approved, a copy of the personnel form is sent to the employee's supervisor.
g. The employee is required to submit to Personnel an updated Physician's Statement every thirty (30) days during the period of disability.
h. Before returning to work, employees are required to submit to Personnel a release from the physician to return to work. This release must be signed by the physician personally and processed through Personnel prior to the employee returning to his/her work assignment.

### RIFLE/PISTOL TEAM (A.D. 01.02.118)

This facility currently has a rifle and pistol team. Any full-time employee of the Department on active duty status who has met range qualifications is eligible to qualify for team membership. Anyone interested should contact the Training Coordinator.

### EMPLOYEE USE OF THE WELLNESS CENTER

The administration encourages and support staff use of the Wellness Center for physical fitness. The Wellness Center located on the first

floor of the Administration Building is available for staff use 24 hours a day.

The Wellness Center is only to be utilized by employees during their off duty hours, however, you may use the Wellness Center on your lunch break, in lieu of eating, if you so desire.

## IDENTIFICATION CARDS (EMPLOYEE BULLETIN 41-83

All non-uniformed staff must wear their Identification Cards on their person at all times while on institutional grounds.  The I.D. must be worn on the front part of the body at waist level or above.

All uniformed staff must wear their name plate on the front part of the body at breast level or above.  Uniformed staff must still carry their Identification Care on their person while on institutional grounds or while assigned off grounds.

## INSTITUTIONAL COUNTS (A.D. 05.01.102)

Institutional Counts are conducted at regular intervals to ensure all inmates are accounted for.  There are two types of counts:  1) Body Count – A physical count in which the employee must actually see the inmate to count him.  2)  Check-In Count – Employees check inmate names with area count sheets to verify his presence on the institutional grounds.  Count times are:

|           |                     |
|-----------|---------------------|
| 2:00 A.M. | Body Count          |
| 4:45 A.M. | Body Count          |
| 7:00 A.M. | Body Count          |
| 10:00 A.M.| Check-In Count      |
| 12:30 P.M.| Body Count          |
| 3:15 P.M. | Voice Response Count |
| 8:45 P.M. | Body Count          |
| 11:00 P.M.| Body Count          |

All staff must be familiar with the Count procedure.

## PART TIME EMPLOYMENT (A.D. 03.02.108)

Full time State employees may submit form #DC 515 to request approval to accept part time employment.  All written requests must be submitted to your supervisor outlining the following information:

1. Type of employment
2. Hours
3. Note any conflicts with full time State job

Requests will be forwarded to the Warden for approval.

It is not appropriate for an employee to begin part time non-State employment without form #DC 515 completed and approved by this office.