E-FILED
Friday, 02 March, 2007 04:38:38 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

RICK LIND, )
)
Plaintiff, )
)
vs. ) No. 4:05-CV-4959
)
STATE OF ILLINOIS, )
DEPARTMENT OF CORRECTIONS,)
)
Defendant. )
______________________________)

DEPOSITION OF WARDEN GENE JUNGWIRTH, taken before Heidi Krafka, Certified Shorthand Reporter of the States of Iowa and Illinois, at Katz, Huntoon & Fieweger, 1000 36th Avenue, Moline, Illinois, on Thursday, the 18th day of January, 2007, commencing at 10:02 a.m., pursuant to the within stipulation.



Kelly Reporting
(309) 788-3630

Q. And you would agree with me that you imposed discipline on Mr. Lind for missing work for the period that is covered under Exhibit 4?
A. Yes.
Q. And, in fact, Mr. Lind had paperwork to you requesting a medical leave of absence for the period of July 24th through August 6th, 2004, signed by a physician, completed in full, and in compliance with the requirements of the disability leave of absence policy under Exhibit 2; correct?
A. In October, yes, he did.
Q. As of October 1st, 2003?
A. Yes. Yes.
Q. And you made no decision on whether to approve or disapprove this fully completed disability leave request prior to suspending him and prior to terminating him?
A. If I remember correctly on the dates, this wasn't back prior to his suspension.
Q. Well, you made a decision to suspend him on

September 8th, 2003?

A. That's correct.

Q. But the suspension didn't go into effect until October 9th, 2003?

A. That was when it was confirmed by Springfield, yes.

MR. FIEWEGER: Objection. Misstatement of the record.

Q. Go ahead and answer.

MR. FIEWEGER: And if it was asked, it's asked and answered.

MS. KERLEY: The question was does he remember being asked the question, so he has to answer that.

BY MS. KERLEY:

Q. You recall that line of questioning?

A. Yes, uh-huh.

Q. Can -- Warden, in your experience with the Department of Corrections, who is a correctional officer's employer?

A. Department of Corrections.

Q. In your -- Do you have an understanding that anyone besides the Department of Corrections can an employee to be off work?

A. No, it has to be approved by the Department of Corrections.

Q. Directing your attention to Exhibit 5 and directing your attention to Request for Admission No. 13, do you have any knowledge about ways that correctional officers at the East Moline Correctional Center are informed that they have rights under the FMLA, the

the Department of Corrections; is that fair to say?
A. Yes. I do have to review them. There are so many of them, it's hard to keep everything straight, but yes, I do have a working knowledge.
Q. Do you also have a working knowledge of the institutional directives that apply to the East Moline Correctional Center?
A. Yes, same thing, I do review those occasionally when there's questions.
Q. Do you have a working knowledge of the employee handbook --
A. Yes.
Q. -- for employees of East Moline Correctional Center?
A. Yes.
Q. Does affirmative -- The department's affirmative attendance policy, is that housed in an administrative directive?
A. Yes.
Q. Does the affirmative attendance policy of the department include the provisions regarding proof

status?

A. Yes.

Q. With respect to proof status, the department's proof status adds additional responsibilities on an

employee; is that an accurate statement?

A. Yes, it is.

Q. And violation of the added obligations under proof status is a violation of an administrative directive; correct?

A. Yes.

Q. The violation of administrative directives can lead to discipline; is that correct?

A. That's correct, yes.

Q. What bearing does a leave of absence either pending or requested -- what bearing does an employee being on a leave of absence have with respect to discipline concerning violations of administrative directives?

MR. FIEWEGER: Objection. Vague.

A. None that I'm aware of.

Q. From July 2003 to November 2003 what was your

understanding as to what effect Rick Lind's request for a leave of absence would -- what effect that request had on his discipline for violating the administrative directives regarding proof status and affirmative attendance?

MR. FIEWEGER: Objection. Vague and assumes facts not in evidence.

Q. Go ahead and answer.

A. My understanding at that time is they were two separate incidents, situations, or items that didn't relate to each other.

Q. Just so I'm clear, you were not present at the ERB hearing with respect to Mr. Lind's discharge?

A. No, ma'am, I was not.

Q. You identified Rick Rogers as an individual that was present?

A. No, Dave Rayborn.

Q. Dave Rayborn, thank you. What did Mr. Rayborn -- did he complete any paperwork after the ERB?

A. Yes, he did.

Q. And what was that?

A. It would have been the final write-up of the decision on the recommendation.
Q. And who did that recommendation go to?
A. To me.
Q. And you approved that recommendation?
A. Yes.
Q. What happened to that recommendation after you approved it?
A. Then forwarded it to Springfield.
Q. What is your role in that discipline after it leave the facility?
A. None.

Q. And if Mr. Lind submitted to you a document signed by his chiropractic physician saying excuse him from work from July 24th, 2003, through 8-6-2003 along with his notification of absence form, that should have been sufficient to satisfy the

administrative directives for furnished proof status; correct?

MS. KERLEY: Objection. Calls for speculation.

MR. FIEWEGER: He's the one in charge of imposing the policy and implementing the policy.

A. If we would have received it in a timely manner at that time period, it should have been.

Q. And you have no personal knowledge of facts that would indicate that Dr. Freebern's statement, Exhibit 7, was not to you by September 8th, 2003, the date of the employee review hearing?

A. I don't know, no, sir.

Q. Okay. You can't tell us under oath whether similar language to Exhibit 1 was posted at the East Moline Correctional Center as of July 24th, 2003, can you?

A. I can't specifically say that date, no, sir.

Q. All right. Or between July 24th and November 10th, 2003, you have no personal knowledge of facts which would indicate that information contained in

been Major Ricky, but I'm not sure.

Q. Is the major also the shift commander?

A. Yes, uh-huh.

Q. So based on your understanding of how the facility works, the shift commander -- the person who would have received a document similar to Exhibit 7 was the person who in Mr. Lind's case drafted the charges for a violation; is that correct?

A. Should have been, yes.

Q. Did you -- If not prior to July 2003, were you ever made aware of any conflicts between Mr. Lind and Major Ricky?

A. No, not to my knowledge.

Q. Were you ever made aware of anything -- any situation between those two gentlemen that would cause you to call into question Major Ricky's drafting of charges for violation of administrative directives?

A. No, ma'am.

Q. If Exhibit 7 was received by the East Moline Correctional Center for the first time at

Mr. Lind's employee review board hearing, would he have still been in violation of the proof status policy?

MR. FIEWEGER: Objection. Assumes facts

not in evidence.

A. My understanding, yes, he would have been.

Q. And why is that?

A. Because of the time period involved.

MS. KERLEY: No further questions.

EXAMINATION

BY MR. FIEWEGER:

Q. Your answer to that question assumes that Mr. Lind was properly on furnished proof status; correct?

A. That is correct, yes.

Q. And Mr. Lind would not be required to provide medical documentation to cover his absences if he wasn't on furnished proof status, would he?

A. No, he wouldn't.

Q. But Mr. Lind did provide CMS-95 forms to your department or to your organization prior to the September 8th, 2003, disciplinary hearing signed by

a licensed chiropractic physician, Dr. Freebern, which covered the period that was -- the issues subjecting him to discipline; correct?

MS. KERLEY: Objection. Asked and answered.

A. He did submit the forms for that time period, but I understand it's two separate situations, and it didn't cover the proof.

from work.

MR. FIEWEGER: Right.

BY MR. FIEWEGER:

Q. They say that Mr. Lind called in each day that he was missing, correct, but he didn't have sufficient sick time to cover the time off; correct?

A. Did not have sufficient sick time, that is correct.

Q. And Mr. Lind -- Nowhere in the minutes or in the hearing board document does it say that Mr. Lind failed to provide medical authorization or proof status documentation from his physician, does it?

A. In those words, no, sir, it does not.

Q. And you didn't see any indication independently that Mr. Lind failed to provide documentation in compliance with the furnished proof status, did you?

A. The unauthorized absence would imply that he did not follow the rules and present the proper paperwork, which there are a number listed here with progressive discipline listed on it.

Q. But if Exhibit 7 was provided prior to referring him for discipline, that would have been sufficient to comply with the furnished proof status, wouldn't it?

MS. KERLEY: Objection. Asked and

answered. Misstates the witness's prior testimony.

A. If it were, it should have covered it, yes.

Q. And you don't know whether it was or not?

A. I do not, no.

MR. FIEWEGER: I have no further questions.

EXAMINATION

BY MS. KERLEY:

Q. Warden, you testified that under the furnished proof status an employee has a certain amount of time in which to provide a doctor's note; right?

A. That's correct. I didn't look at the date on that. What was the date on it?

Q. And when you say on that, are you referring to Exhibit 7?

A. 7, yes.

Q. Which plaintiff's counsel just showed you in his last question; correct?
A. 7-24 to 8-7, yes, there's no date when it was turned in.
Q. If a document was turned in -- If that doctor slip, Exhibit 7, was provided to EMCC after the time period, the three days or five days or whatever the proof status time period had run, would Mr. Lind have still been in violation of the proof status

CERTIFICATE

I, Heidi Krafka, Certified Shorthand Reporter of the States of Iowa and Illinois, do hereby certify that, on the 18th day of January, 2007, at Moline, Illinois, there appeared before me the following-named person, to wit, WARDEN GENE JUNGWIRTH, who was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the above-entitled cause; that I reported in shorthand the testimony of said witness, reduced the same to printing under my direction and supervision, and that the foregoing deposition is a true record of the testimony given by said witness and of all proceedings had on the taking of said deposition at the above time and place.

I further certify that I am not related to or employed by any of the parties to this deposition, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand and seal this __________ day of January, 2007.