```
1        UNITED STATES DISTRICT COURT
      FOR THE CENTRAL DISTRICT OF ILLINOIS
2            ROCK ISLAND DIVISION

3

4

5  RICK LIND,          )
                       )
6       Plaintiff,     )
                       )
7   vs.                )  No. 4:05-CV-4959
                       )
8  STATE OF ILLINOIS,  )
   DEPARTMENT OF CORRECTIONS,)
9                      )
        Defendant.     )
10 _____)

11

12

13       DEPOSITION OF WARDEN GENE JUNGWIRTH,
   taken before Heidi Krafka, Certified Shorthand Reporter
14  of the States of Iowa and Illinois, at Katz, Huntoon &
   Fieweger, 1000 36th Avenue, Moline, Illinois, on
15  Thursday, the 18th day of January, 2007, commencing at
   10:02 a.m., pursuant to the within stipulation.
16

17

18

19

20

21

22
```



DEFENDANT'S EXHIBIT A

23

24        Kelly Reporting
         (309) 788-3630
25

28

1 Q. And you would agree with me that you imposed

2    discipline on Mr. Lind for missing work for the

3    period that is covered under Exhibit 4?

4 A. Yes.

5 Q. And, in fact, Mr. Lind had paperwork to you

6    requesting a medical leave of absence for the

7    period of July 24th through August 6th, 2004,

8    signed by a physician, completed in full, and in

9    compliance with the requirements of the disability

10    leave of absence policy under Exhibit 2; correct?

11 A. In October, yes, he did.

12 Q. As of October 1st, 2003?

13 A. Yes. Yes.

14 Q. And you made no decision on whether to approve or

15    disapprove this fully completed disability leave

16    request prior to suspending him and prior to

17    terminating him?

18 A. If I remember correctly on the dates, this wasn't

19    back prior to his suspension.

20 Q. Well, you made a decision to suspend him on

21    September 8th, 2003?

22  A.  That's correct.

23  Q.  But the suspension didn't go into effect until

24    October 9th, 2003?

25  A.  That was when it was confirmed by Springfield, yes.

    Kelly Reporting    (309) 788-3630

63

1       MR. FIEWEGER: Objection. Misstatement
2   of the record.
3 Q. Go ahead and answer.
4       MR. FIEWEGER: And if it was asked, it's
5   asked and answered.
6       MS. KERLEY: The question was does he
7   remember being asked the question, so he has to
8   answer that.
9 BY MS. KERLEY:
10 Q. You recall that line of questioning?
11 A. Yes, uh-huh.
12 Q. Can -- Warden, in your experience with the
13   Department of Corrections, who is a correctional
14   officer's employer?
15 A. Department of Corrections.
16 Q. In your -- Do you have an understanding that anyone
17   besides the Department of Corrections can
18   an employee to be off work?
19 A. No, it has to be approved by the Department of
20   Corrections.

21  Q.  Directing your attention to Exhibit 5 and directing

22     your attention to Request for Admission No. 13, do

23     you have any knowledge about ways that correctional

24     officers at the East Moline Correctional Center are

25     informed that they have rights under the FMLA, the

           Kelly Reporting     (309) 788-3630

70

1    the Department of Corrections; is that fair to say?

2 A. Yes. I do have to review them. There are so many

3    of them, it's hard to keep everything straight, but

4    yes, I do have a working knowledge.

5 Q. Do you also have a working knowledge of the

6    institutional directives that apply to the East

7    Moline Correctional Center?

8 A. Yes, same thing, I do review those occasionally

9    when there's questions.

10 Q. Do you have a working knowledge of the employee

11    handbook --

12 A. Yes.

13 Q. -- for employees of East Moline Correctional

14    Center?

15 A. Yes.

16 Q. Does affirmative -- The department's affirmative

17    attendance policy, is that housed in an

18    administrative directive?

19 A. Yes.

20 Q. Does the affirmative attendance policy of the

21    department include the provisions regarding proof

22   status?

23 A. Yes.

24 Q. With respect to proof status, the department's

25   proof status adds additional responsibilities on an

Kelly Reporting    (309) 788-3630

71

1   employee; is that an accurate statement?

2 A. Yes, it is.

3 Q. And violation of the added obligations under proof

4   status is a violation of an administrative

5   directive; correct?

6 A. Yes.

7 Q. The violation of administrative directives can lead

8   to discipline; is that correct?

9 A. That's correct, yes.

10 Q. What bearing does a leave of absence either pending

11   or requested -- what bearing does an employee being

12   on a leave of absence have with respect to

13   discipline concerning violations of administrative

14   directives?

15       MR. FIEWEGER: Objection. Vague.

16 A. None that I'm aware of.

17 Q. From July 2003 to November 2003 what was your

18   understanding as to what effect Rick Lind's request

19   for a leave of absence would -- what effect that

20   request had on his discipline for violating the

21   administrative directives regarding proof status

22   and affirmative attendance?

23        MR. FIEWEGER: Objection. Vague and

24   assumes facts not in evidence.

25 Q. Go ahead and answer.

Kelly Reporting    (309) 788-3630

72

1 A. My understanding at that time is they were two

2   separate incidents, situations, or items that

3   didn't relate to each other.

4 Q. Just so I'm clear, you were not present at the ERB

5   hearing with respect to Mr. Lind's discharge?

6 A. No, ma'am, I was not.

7 Q. You identified Rick Rogers as an individual that

8   was present?

9 A. No, Dave Rayborn.

10 Q. Dave Rayborn, thank you. What did Mr. Rayborn --

11   did he complete any paperwork after the ERB?

12 A. Yes, he did.

13 Q. And what was that?

14 A. It would have been the final write-up of the

15     decision on the recommendation.

16 Q. And who did that recommendation go to?

17 A. To me.

18 Q. And you approved that recommendation?

19 A. Yes.

20 Q. What happened to that recommendation after you

21     approved it?

22 A. Then forwarded it to Springfield.

23 Q. What is your role in that discipline after it leave

24     the facility?

25 A. None.

      Kelly Reporting    (309) 788-3630

74

1  Q. And if Mr. Lind submitted to you a document signed

2     by his chiropractic physician saying excuse him

3     from work from July 24th, 2003, through 8-6-2003

4     along with his notification of absence form, that

5     should have been sufficient to satisfy the

6    administrative directives for furnished proof

7    status; correct?

8        MS. KERLEY: Objection. Calls for

9    speculation.

10        MR. FIEWEGER: He's the one in charge of

11    imposing the policy and implementing the policy.

12 A. If we would have received it in a timely manner at

13    that time period, it should have been.

14 Q. And you have no personal knowledge of facts that

15    would indicate that Dr. Freebern's statement,

16    Exhibit 7, was not to you by September 8th, 2003,

17    the date of the employee review hearing?

18 A. I don't know, no, sir.

19 Q. Okay. You can't tell us under oath whether similar

20    language to Exhibit 1 was posted at the East Moline

21    Correctional Center as of July 24th, 2003, can you?

22 A. I can't specifically say that date, no, sir.

23 Q. All right. Or between July 24th and November 10th,

24    2003, you have no personal knowledge of facts which

25    would indicate that information contained in

Kelly Reporting    (309) 788-3630

77

1   been Major Ricky, but I'm not sure.

2  Q. Is the major also the shift commander?

3  A. Yes, uh-huh.

4  Q. So based on your understanding of how the facility

5      works, the shift commander -- the person who would

6      have received a document similar to Exhibit 7 was

7      the person who in Mr. Lind's case drafted the

8      charges for a violation; is that correct?

9  A. Should have been, yes.

10 Q. Did you -- If not prior to July 2003, were you ever

11     made aware of any conflicts between Mr. Lind and

12     Major Ricky?

13 A. No, not to my knowledge.

14 Q. Were you ever made aware of anything -- any

15     situation between those two gentlemen that would

16     cause you to call into question Major Ricky's

17     drafting of charges for violation of administrative

18     directives?

19 A. No, ma'am.

20 Q. If Exhibit 7 was received by the East Moline

21     Correctional Center for the first time at

22   Mr. Lind's employee review board hearing, would he

23   have still been in violation of the proof status

24   policy?

25          MR. FIEWEGER: Objection. Assumes facts

Kelly Reporting    (309) 788-3630

78

1   not in evidence.

2 A. My understanding, yes, he would have been.

3 Q. And why is that?

4 A. Because of the time period involved.

5          MS. KERLEY: No further questions.

6               EXAMINATION

7 BY MR. FIEWEGER:

8 Q. Your answer to that question assumes that Mr. Lind

9   was properly on furnished proof status; correct?

10 A. That is correct, yes.

11 Q. And Mr. Lind would not be required to provide

12   medical documentation to cover his absences if he

13   wasn't on furnished proof status, would he?

14 A. No, he wouldn't.

15 Q. But Mr. Lind did provide CMS-95 forms to your

16   department or to your organization prior to the

17   September 8th, 2003, disciplinary hearing signed by

18   a licensed chiropractic physician, Dr. Freebern,

19   which covered the period that was -- the issues

20   subjecting him to discipline; correct?

21         MS. KERLEY: Objection. Asked and

22   answered.

23 A.  He did submit the forms for that time period, but I

24   understand it's two separate situations, and it

25   didn't cover the proof.

   Kelly Reporting    (309) 788-3630

83

1    from work.

2         MR. FIEWEGER: Right.

3  BY MR. FIEWEGER:

4  Q. They say that Mr. Lind called in each day that he

5     was missing, correct, but he didn't have sufficient

6     sick time to cover the time off; correct?

7  A. Did not have sufficient sick time, that is correct.

8  Q. And Mr. Lind -- Nowhere in the minutes or in the

9     hearing board document does it say that Mr. Lind

10    failed to provide medical authorization or proof

11    status documentation from his physician, does it?

12 A. In those words, no, sir, it does not.

13 Q. And you didn't see any indication independently

14    that Mr. Lind failed to provide documentation in

15    compliance with the furnished proof status, did

16    you?

17 A. The unauthorized absence would imply that he did

18    not follow the rules and present the proper

19    paperwork, which there are a number listed here

20    with progressive discipline listed on it.

21 Q. But if Exhibit 7 was provided prior to referring

22    him for discipline, that would have been sufficient

23    to comply with the furnished proof status, wouldn't

24    it?

25        MS. KERLEY: Objection. Asked and

1   answered. Misstates the witness's prior testimony.

2 A. If it were, it should have covered it, yes.

3 Q. And you don't know whether it was or not?

4 A. I do not, no.

5        MR. FIEWEGER: I have no further

6    questions.

7            EXAMINATION

8 BY MS. KERLEY:

9 Q. Warden, you testified that under the furnished

10   proof status an employee has a certain amount of

11   time in which to provide a doctor's note; right?

12 A. That's correct. I didn't look at the date on that.

13   What was the date on it?

14 Q. And when you say on that, are you referring to

15   Exhibit 7?

16 A. 7, yes.

17  Q.  Which plaintiff's counsel just showed you in his

18      last question; correct?

19  A.  7-24 to 8-7, yes, there's no date when it was

20      turned in.

21  Q.  If a document was turned in -- If that doctor slip,

22      Exhibit 7, was provided to EMCC after the time

23      period, the three days or five days or whatever the

24      proof status time period had run, would Mr. Lind

25      have still been in violation of the proof status

Kelly Reporting    (309) 788-3630

86

1

2

3

4        CERTIFICATE

5
    I, Heidi Krafka, Certified Shorthand Reporter of
6  the States of Iowa and Illinois, do hereby certify
   that, on the 18th day of January, 2007, at Moline,
7  Illinois, there appeared before me the following-named
   person, to wit, WARDEN GENE JUNGWIRTH, who was by me
8  first duly sworn to testify the truth, the whole truth,
   and nothing but the truth in the above-entitled cause;
9  that I reported in shorthand the testimony of said
   witness, reduced the same to printing under my
10  direction and supervision, and that the foregoing
    deposition is a true record of the testimony given by
11  said witness and of all proceedings had on the taking
    of said deposition at the above time and place.
12

13     I further certify that I am not related to or
   employed by any of the parties to this deposition, and
14  further that I am not a relative or employee of any
    attorney or counsel employed by the parties hereto or
15  financially interested in the action.

16

17

18     IN WITNESS WHEREOF, I have set my hand and

19  seal this _____ day of January, 2007.

20