```
1              UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
2                   ROCK ISLAND DIVISION

3
                                    COPY
4

5  RICK LIND,                )
                             )
6        Plaintiff,          )
                             )
7     vs.                    )    No. 4:05-CV-4959
                             )
8  STATE OF ILLINOIS,        )
   DEPARTMENT OF CORRECTIONS,)
9                            )
         Defendant.          )
10 _____)

11

12

13          DEPOSITION OF RICK S. LIND,
   taken before Heidi Krafka, Certified Shorthand Reporter
14 of the States of Iowa and Illinois, at Katz, Huntoon &
   Fieweger, 1000 36th Avenue, Moline, Illinois, on
15 Thursday, the 18th day of January, 2007, commencing at
   12:48 p.m., pursuant to the within stipulation.
16

17

18

19

20

21

22

23

24              Kelly Reporting
                 (309) 788-3630
25
```

EXHIBIT 17

18

1 leave of absence?
2 A. Yes, it's the employee's responsibility to know how
3    much sick time he has, and I knew I was out of sick
4    time, and I knew the procedure.
5 Q. To the best of your recollection what did you say
6    to her, and what did she say to you in that
7    conversation?
8 A. I told her just what I've already told you, and she
9    said, okay, and I went to the warden's office and
10   requested the CMS-95.
11 Q. And when did you have this conversation with
12    Ms. Richardson and followed by going to the
13    warden's office?
14 A. At some time during this period, during this time
15    off.
16 Q. When you say this time, are you referring --
17 A. It was by phone.
18        MS. KERLEY: I'm sorry. Could you
19    please -- could you read back his response.
20        (The question was read back by the court
21         reporter.)
22 BY MS. KERLEY:
23 Q. Mr. Lind, you indicated that you spoke to
24    Ms. Richardson, the timekeeper, by telephone?
25 A. Yes.

Kelly Reporting    (309) 788-3630

19

1 Q. And where were you when you made that phone call?
2 A. Home.
3 Q. And following -- And have you related to me
4    everything that you recall telling Ms. Richardson
5    in that telephone call?
6 A. Yes.
7 Q. Following the telephone call did you speak with
8    Ms. Richardson again about orally requesting a
9    leave of absence?
10 A. No.
11 Q. Did you orally request a leave of absence from
12    anyone besides Ms. Richardson?
13 A. Pam Verstraete.
14 Q. And where did you -- And did you have that
15    conversation in person or on the phone?
16 A. In person.
17 Q. And where was that conversation?
18 A. In the warden's office.
19 Q. And when you say the warden's office -- it's really
20    two offices; is that correct?
21 A. Yes.
22 Q. It's the warden's inner office and then
23    Ms. Verstraete and the administrative assistant is
24    outside of his office; would that be correct?
25 A. That would be correct.

Kelly Reporting    (309) 788-3630

20

1 Q. Were you in Warden Jungwirth's office or out in
2    Ms. Verstraete's work area?
3 A. Let me clarify. There's a double door, that states
4    warden's office on it. I walked in the first --
5    walked in the double door. That's where I
6    requested the form.
7 Q. All right. As you recall, what did you say to
8    Ms. Verstraete during that conversation?
9 A. I told her that I was -- I needed a CMS-95 and I
10    would be applying for an LOA.
11 Q. What did she say to you?
12 A. Okay.
13 Q. Is that the extent of the conversation, as best you
14    can recall?
15 A. Yes.
16 Q. Did she give you a CMS-95?
17 A. Yes.
18 Q. I'm going to direct your attention to Exhibit 3.
19    You do recognize that document?
20 A. Yes.
21 Q. Do you know when you signed that document?
22 A. Yes, when I submitted my CMS-95.
23 Q. And do you know when that was, what day that was?
24 A. On 7-30-03.
25 Q. When did your back first start bothering you?

Kelly Reporting    (309) 788-3630

21

1        MR. FIEWEGER: Relative to this time
2    period or historically?
3        MS. KERLEY: Historically.
4 A. June 26th, 1979.
5 Q. And was it -- Did you have an injury to your back?
6 A. Car accident. I almost killed myself.
7 Q. Were you diagnosed -- Or did you have a medical
8    diagnosis which referred to the injury to your
9    back?
10 A. Yes.
11 Q. And what was that diagnosis?
12 A. Fractured -- a compound fractured -- a compression
13    fracture, excuse me, of L4, 5 and 6.
14 Q. Were you employed by the Department of Corrections
15    in 1979?
16 A. No.
17 Q. Did that injury cause ongoing problems with your
18    back?
19 A. Can we go off the record?
20 Q. I bet your lawyer doesn't let you.
21 A. Okay. Well, then will you explain to me what
22    ongoing means?
23 Q. Sure. The compression fracture to the L4, 5, and
24    6, was that an injury that healed within two years
25    of your motor vehicle accident?

Kelly Reporting    (309) 788-3630

30

1  Q. Was that -- Had you had an appointment on that day?
2  A. I believe I did.
3  Q. Was it your first appointment, your second
4     appointment?
5  A. I don't recall. I don't -- That's impossible.
6  Q. And I'm sorry, I guess I don't understand why you
7     think it's impossible. You just don't recall?
8  A. Well, there's ten different days there. I don't
9     recall how many appointments I had during that
10    time.
11 Q. Do you recall whether you had more than one
12    appointment during the ten days that you were off
13    work?
14 A. Yes.
15 Q. You do recall having more than one appointment?
16 A. Yes.
17 Q. Do you recall how many appointments you had?
18 A. No.
19 Q. And you indicated that your doctor signed a CMS-95
20    on July 30th?
21 A. Yes.
22 Q. Mr. Lind, showing you what's been marked as
23    Exhibit 4, Deposition Exhibit 4, do you recognize
24    that document?
25 A. Yes, I do.

Kelly Reporting   (309) 788-3630

31

1  Q. What is it?
2  A. CMS-95.
3  Q. And what is the -- not the date stamp, but on the
4     second page of that document what date is by the
5     signature?
6  A. 7-30-03.
7  Q. And it's your testimony that that document was
8     signed by your physician on July 30th, 2003, and
9     that you drove it to East Moline Correctional
10    Center and handed it to Pam Verstraete?
11 A. That's correct.
12 Q. Do you recall what time of the day you were at the
13    doctor's office?
14 A. I can't be specific, no.
15 Q. Do you recall what time of the day you left the
16    doctor's office and went to East Moline?
17 A. Sometime in the afternoon.
18 Q. Okay. So you were in East Moline in the afternoon?
19 A. Yes.
20 Q. In July of 2003 you worked second shift; correct?
21 A. Correct.
22 Q. And second shift starts at 3 with roll call at
23    2:45?
24 A. Yes.
25 Q. And it did in July of '03 as well?

Kelly Reporting   (309) 788-3630

32

1  A. Yes.
2  Q. Did you deliver the -- did you deliver Exhibit 4
3     before or after second shift roll call?
4  A. It would have to be before.
5  Q. And why would it have to be before?
6  A. Oh, that's just the way I recall it. That's what I
7     recall is before the shift.
8  Q. Do you recall who was working the gate when you
9     came to hand-deliver that document to
10    Ms. Verstraete?
11 A. No.
12 Q. But do you recall that it was first shift staff?
13 A. Yes.
14 Q. Did you talk to anyone while you were at the
15    correctional center on July 30th?
16 A. No.
17 Q. Did you talk to Pam Verstraete?
18 A. I just gave her these documents.
19 Q. Where was she when you handed them to her?
20 A. At her desk.
21 Q. And when you say these documents, you are referring
22    to Exhibit 4?
23 A. Correct.
24 Q. Did she respond to you in any way?
25 A. I believe she asked me how I was feeling, and that

Kelly Reporting   (309) 788-3630

33

1     was it.
2  Q. Did you respond to her?
3  A. I don't remember what I said to her.
4  Q. Was there any conversation with Pam Verstraete that
5     you had on July 30th, 2003, that you haven't
6     related to me?
7  A. Not that I'm aware of. I don't recall.
8  Q. You indicated that you provided a -- well, a total
9     of three CMS-95's. When did you provide a second
10    CMS-95?
11 A. August 14th.
12 Q. And how do you recall that it was August 14th.
13 A. During the time that I was waiting to hear from
14    this -- the first CMS-95, I had the union check for
15    me when I was not at work, and I also checked by
16    phone for the progress on my CMS-95, my LOA.
17 Q. Okay. Let's talk about that. After
18    hand-delivering, handing a document, handing
19    Exhibit 4 to Pam Verstraete on July 30th, did you
20    have conversations with anyone at the Department of
21    Corrections relating to a request for a leave of
22    absence?
23 A. Yes, I talked with Pam Verstraete, and I also
24    talked with the warden.
25 Q. Okay. When did you talk to Pam?

Kelly Reporting   (309) 788-3630

34

1  A.  It was via telephone.
2  Q.  And when was that?
3  A.  Sometime during the time that I was off. I mean,
4      it happened -- I can't be specific on what date and
5      what time.
6  Q.  So it was sometime between July 30th and
7      August 7th?
8  A.  Yep.
9  Q.  And what did you say to her, and what did she say
10     to you?
11 A.  I wanted to know the status of my LOA, and she told
12     me that it was on the warden's desk. That was it.
13 Q.  Did you -- you indicated that -- Is that the only
14     conversation you recall having with Pam Verstraete
15     between July 30th, 2003, and August 14th, 2003?
16 A.  No, I had subsequent conversations with her.
17 Q.  Between July 30th and --
18 A.  Yes.
19 Q.  What was the second conversation that you had with
20     Pam?
21 A.  I wanted to know what the status was with my LOA
22     request.
23 Q.  And when was that conversation?
24 A.  Like I said, I don't recall the date and time.
25 Q.  Was it in person or by telephone?

Kelly Reporting    (309) 788-3630

35

1  A.  Telephone.
2  Q.  Was this conversation also during the time that you
3      were off work?
4  A.  Yes.
5  Q.  Meaning July 30th -- between July 30th and
6      August 7th, 2003?
7  A.  Yes.
8  Q.  And what did she tell you?
9  A.  She told me -- the subsequent conversations she
10     told me was everything had been sent to
11     Springfield. I asked where in Springfield. She
12     couldn't tell me.
13 Q.  Did she indicate that she did not know or that she
14     was specifically not telling you?
15 A.  She did not know, and she did not know -- she told
16     me she did not know to whom it was sent, and then I
17     asked to talk to the warden, and he told me the
18     same.
19 Q.  Did Pam give you any indication whether or not
20     prior to being sent to Springfield a decision had
21     been made with that document?
22 A.  I asked, and she said she couldn't give me an
23     answer.
24 Q.  When she said that she couldn't give you an answer,
25     I mean, did she tell you she didn't know whether a

Kelly Reporting    (309) 788-3630

36

1      decision had been made?
2  A.  Yes.
3  Q.  And you asked to talk to the warden?
4  A.  Yes.
5  Q.  Did you talk to the warden?
6  A.  Yes.
7  Q.  In that same telephone call?
8  A.  Yes.
9  Q.  And what did you ask the warden?
10 A.  The same question.
11 Q.  Which was?
12 A.  Which was what was the status of my LOA request.
13 Q.  And what did he tell you?
14 A.  It's out of my hands, everything has been sent to
15     Springfield.
16 Q.  Did you ask him whether a decision had been made?
17 A.  Yes. He told me he didn't know.
18 Q.  Was that the end of your conversation with the
19     warden?
20 A.  Yes.
21 Q.  Did you have any other conversations with Pam
22     Verstraete or Warden Jungwirth between July 24th
23     and August 14th, 2003?
24 A.  No, I don't recall.
25 Q.  And then you indicated in August -- which we jumped

Kelly Reporting    (309) 788-3630

37

1      past this. You indicated on August 14th, 2003, you
2      provided a second CMS-95 to East Moline?
3  A.  Yes.
4  Q.  I am going to show you Exhibit 6 and ask you to
5      look at it.
6  A.  Okay.
7  Q.  Is Exhibit 6 the document you referred to as
8      presenting the second CMS-95?
9  A.  Yes.
10 Q.  Why did you provide this second document?
11 A.  Because I hadn't heard anything on my request. No
12     response. I couldn't get any answers, and I had
13     the union also check, which is why I recall the
14     date, because I had the union check on my status of
15     my LOA.
16 Q.  So on the 14th you had the union check on your
17     status?
18 A.  Yes.
19 Q.  Who did you talk to?
20 A.  Jeff Papish, Randy Sanders.
21 Q.  Were you at work on the 14th of August?
22 A.  No.
23     MR. FIEWEGER: Meaning was he working?
24     MS. KERLEY: Yes, working.
25 A.  I don't recall. Yes, I was, I believe.

Kelly Reporting    (309) 788-3630

## 42

1  A. No.
2  Q. Would you have used -- Would you have gone to the
3     warden's office to provide paperwork after roll
4     call?
5  A. No.
6  Q. Do you ever recall doing that?
7  A. Do I ever recall doing that? Yes. Yes, I have.
8  Q. Do you recall that with -- Strike that.
9     What did you do in response to receiving the
10    memorandum dated September 5th, 2003?
11 A. I called the warden's office, and I've already been
12    to -- and I said I didn't have enough time to get
13    any -- get my paperwork correct. I requested more
14    time, and the hearing was already held.
15 Q. All right. There was lots in there. When did you
16    receive this memo?
17 A. 9-5 -- no, I believe it was -- it was dated
18    September 5th, so I had to receive it on 9-8.
19 Q. Do you recall whether or not you received it prior
20    to the day that your ERB was scheduled?
21 A. No, I couldn't have.
22 Q. And why do you say that you could not have?
23 A. It came in the U.S. mail, regular mail. It wasn't
24    sent certified, and if it is dated September 5th,
25    it would be impossible to get it before my ERB.

Kelly Reporting   (309) 788-3630

## 43

1  Q. And why is it impossible? I'm sorry. I don't
2     understand.
3  A. The length of time that it would take the mailman
4     to deliver it.
5  Q. And you live in Erie, Illinois?
6  A. That's correct.
7  Q. And approximately how long of a distance or how
8     many -- how long does it take you to travel from
9     Erie to East Moline?
10 A. 30 minutes.
11 Q. And it's your testimony that for this Exhibit 9 to
12    get from East Moline to your house 30 minutes away
13    would have to have taken a minimum of three days?
14 A. By U.S. mail, yes.
15 Q. Okay. You don't recall when you got it?
16 A. Not exactly, no.
17 Q. After you received it, you indicated that you
18    called the warden's office?
19 A. Yes.
20 Q. Who did you talk to?
21 A. Pam Verstraete, and I asked for the warden.
22 Q. And what you talk to Pam about?
23 A. I just asked to speak to the warden.
24 Q. So she answered the phone?
25 A. Yes.

Kelly Reporting   (309) 788-3630

## 44

1  Q. Did you talk to the warden?
2  A. Yes.
3  Q. What did you tell the warden?
4  A. I told him I didn't have a chance to -- time to
5     request these things that he wanted.
6  Q. Time before when? What do you mean?
7  A. Before my ERB.
8  Q. And what was his response?
9  A. He said he was sorry, there was nothing he could do
10    about it.
11 Q. Did you receive written notice of charges when you
12    received notice that you were being recommended for
13    an employee review board hearing?
14 A. Charges of when you -- when they send you to the
15    ERB?
16 Q. Yes.
17 A. Yes, because I have to sign for it, and that's done
18    at work.
19 Q. With respect to the ERB that was held on
20    September 8th, had you received charges sometime
21    prior to September 8th indicating why you were
22    being recommended for an ERB hearing?
23 A. Right. Correct.
24 Q. Did those charges include violation of a leave of
25    absence policy?

Kelly Reporting   (309) 788-3630

## 45

1  A. No, unauthorized absences.
2  Q. In violation of the affirmative attendance policy?
3  A. Correct.
4  Q. And the charges also indicated that you were on
5     proof status -- or that the department contended
6     that you were on proof status?
7  A. When I asked my alternative time, I wrote right on
8     my slips not on proof, so I knew I was not on proof
9     status.
10 Q. But the charges informed you that the department
11    held the position that you were on proof status;
12    correct?
13           MR. FIEWEGER: Not whether it was correct
14    or not.
15 Q. That the department had that correction, that the
16    department was telling you that it thought you were
17    on proof status; correct?
18 A. Yes. Yes.
19 Q. And that would have been prior to -- About how long
20    before the ERB hearing would you have gotten notice
21    of the charges?
22 A. Ten days.
23 Q. Knowledge this -- Well, sometime from July 2003 to
24    November 2003 did you give Pam Verstraete -- or did
25    you consent to having Pam Verstraete contacting

Kelly Reporting   (309) 788-3630

PAM VERSTRAETE
January 5, 2007

## PAGE 1

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

RICK LIND,
    Plaintiff,
vs.    No. 4:05-CV-4959
STATE OF ILLINOIS DEPARTMENT OF CORRECTIONS,
    Defendant.

ORIGINAL

DEPOSITION UPON ORAL EXAMINATION OF
PAM VERSTRAETE

Taken January 5, 2007
Commencing at 10:40 a.m.

REPORTED BY: KATHY REUMANN, CSR, RPR, RMR
Registered Professional and Merit Reporter
Certified in Iowa and Illinois

CONNELL REPORTING
P.O. Box 3171
Rock Island, Illinois 61204-3171
(309) 788-3741

## PAGE 2

DEPOSITION

The following is the deposition of PAM VERSTRAETE taken pursuant to Notice of Deposition, at the offices of the East Moline Correctional Center, 100 Hillcrest Road, East Moline, Illinois, commencing at approximately 10:40 a.m., on January 5, 2007.

APPEARANCES

On Behalf of the Plaintiff:

    ATTORNEY STEPHEN T. FIEWEGER
    Katz, Huntoon & Fieweger, P.C.
    1000 - 36th Avenue
    P.O. Box 950
    Moline, Illinois 61266-0950

Behalf of the Defendant:

    ASSISTANT ILLINOIS ATTORNEY GENERAL
    SARAH R. KERLEY
    General Law Bureau
    Office of the Attorney General
    500 South Second Street
    Springfield, Illinois 62706

ALSO PRESENT: Rick Lind.

SPECIAL INSTRUCTIONS: Signature reserved. Deponent may review Attorney Kerley's transcript copy.

## PAGE 3

INDEX

WITNESSES

All Witnesses:     page
PAM VERSTRAETE

Examination by MR. FIEWEGER:     5:4
Examination by MS. KERLEY:     78:16
Examination by MR. FIEWEGER:     111:1
Examination by MS. KERLEY:     116:16
Examination by MR. FIEWEGER:     117:6

EXHIBITS

Verstraete Deposition Exhibit No. 1     11:11
Verstraete Deposition Exhibit No. 2     17:5
Verstraete Deposition Exhibit No. 3     24:7
Verstraete Deposition Exhibit No. 4     35:1
Verstraete Deposition Exhibit No. 5     54:1
Verstraete Deposition Exhibit No. 6     67:4
Verstraete Deposition Exhibit No. 7     69:2
Verstraete Deposition Exhibit No. 8     78:14
Verstraete Deposition Exhibit No. 9     82:23
Verstraete Deposition Exhibit No. 10     89:6
Verstraete Deposition Exhibit No. 11     91:6
Verstraete Deposition Exhibit No. 12     111:24

CERTIFICATE OF SHORTHAND REPORTER     120

## PAGE 4

STIPULATION

It is stipulated by and between parties herein by their respective counsel that the discovery deposition of PAM VERSTRAETE may be taken pursuant to the applicable rules of the Federal Code of Civil Procedure and that notice of taking said deposition is hereby waived.

That the deposition shall be taken before Kathy Reumann, Certified Shorthand Reporter, in and for the States of Iowa and Illinois, at the hour of 10:40 a.m. on January 5, 2007, at East Moline Correctional Center, 100 Hillcrest Road, East Moline, Illinois, and that the testimony of the witness may be transcribed by Kathy Reumann, Certified Shorthand Reporter, or at her direction.

That in the event said transcript or any portion thereof shall be sought to be used at time of trial for any proper purpose under the Federal Code of Civil Procedure, it shall not be necessary to call the reporter to verify the accuracy of said transcript; provided, however, respective counsel shall have reasonable time from the date of delivery of the transcript to call to the attention of the reporter any errors or omissions.

EXHIBIT 18

PAM VERSTRAETE
January 5, 2007

PAGE 73

1  Q.  You do copy those.
2  A.  No.
3  Q.  You don't.
4  A.  No.
5  Q.  Do you know -- then how can you know when that
6  type of information is given to an employee?
7  A.  I don't have documentation that it was.
8  Q.  Mr. Lind was a member of AFSCME Local 31 of
9  the AFL-CIO, wasn't he?
10 A.  I don't know that for a fact.  I would think
11 so.
12 Q.  Okay.  He was covered under the collective
13 bargaining agreement between the state of Illinois and AFSCME
14 for the period of July 1st, 2000, through June 30th, 2004,
15 wasn't he?
16 A.  Again, I don't know that for a fact, but I
17 would think so.
18 Q.  If Mr. Lind was a member of the union, he
19 would be covered under the terms and conditions of the union
20 collective bargaining agreement between the state of Illinois
21 and the AFSCME council and its locals, correct?
22 A.  Correct.
23 Q.  Now, would you agree with me that the signed
24 physician -- chiropractic physician's statement of 8-4-03
25 released Mr. Lind from work as of the period of 7-24 through

PAGE 74

1  8-7-03?
2  A.  Yes.
3  Q.  Okay.  Those are pretty typical forms that a
4  chiropractor or a physician will provide to an employee and
5  you'll receive in the ordinary course of business, correct?
6  A.  Correct.
7  Q.  And if an employee is on furnished proof
8  status under the union contract, they're required under the
9  administrative directive to actually provide this type of
10 document, correct?
11 A.  Correct.
12 Q.  And Mr. Lind did provide Exhibit 7 on or about
13 August 6 to the East Moline Correctional Center.
14      MS. KERLEY:  Is that a question?
15 Q.  (Continuing)  Didn't he?
16      MR. FIEWEGER:  Now it is.
17      MS. KERLEY:  Thank you.
18 A.  I don't know what date he brought it in.
19 Q.  Well, let's -- on Request No. 41, it says --
20      MS. KERLEY:  I had forgotten how many
21 there were.
22      MR. FIEWEGER:  Page 11.
23 Q.  -- Admit plaintiff gave Exhibit 8 to defendant
24 on August 6, 2003.  And this is -- I'll show you, Exhibit
25 8 --

PAGE 75

1  A.  Correct.
2  Q.  -- is that document, correct?
3  A.  Correct.
4  Q.  Which is now Verstraete Exhibit 7, correct?
5  A.  Correct.
6  Q.  And it says denied.
7      And on Request No. 41, you were the person to
8  have personal knowledge of facts which would support the
9  denial of Request No. 41, aren't you?
10 A.  Correct.
11 Q.  So what personal knowledge of facts do you
12 have that would indicate that Rick Lind didn't give that
13 document to this office on August 6th, 2003?
14 A.  I don't have knowledge of it being given to us
15 on August 6th or any other day.
16 Q.  You're saying it was never given to your
17 office?
18 A.  No, no.  I'm saying I don't have knowledge of
19 what day it was given to us.
20 Q.  So if Rick Lind says, I gave it to your office
21 and to you specifically on August 6, 2003 --
22 A.  Uh-huh.
23 Q.  -- you can't deny that, can you?
24      MS. KERLEY:  Objection.  Calls for
25 speculation.

PAGE 76

1       THE WITNESS:  Does that mean I get to
2  answer?
3       MS. KERLEY:  Yeah.
4  A.  It doesn't mean that I can affirm it.  I can't
5  deny it or affirm because I don't know when I got it.
6  Q.  So how can you deny this request for admission
7  of facts or how are you a person with personal knowledge of
8  facts which support this denial if you can't confirm it one
9  way or another?
10      MS. KERLEY:  Objection.  Calls for legal
11 conclusion.  There's no foundation that this witness created
12 this document.
13      MR. FIEWEGER:  Didn't say she did.  I
14 asked the question in Request No. 41, Admit that Mr. Lind
15 gave that document.  I didn't say created the document.  Gave
16 the document to the defendant.
17      MS. KERLEY:  No, I'm sorry if I didn't
18 make myself clear.  Ms. Verstraete did not create the
19 response to admission of fact which is, I believe, where your
20 question was going.
21      MR. FIEWEGER:  But in response to
22 Interrogatory No. 2, the Department of Corrections of the
23 state of Illinois, defendant, has represented that
24 Ms. Verstraete has personal knowledge of facts which support
25 this denial of Request No. 41.

CONNELL REPORTING
P.O. Box 3171, Rock Island, Illinois  61204-3171